

1  COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
   JOHN K. GRANT (169813)
3  100 Pine Street, Suite 2600
   San Francisco, CA  94111
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  shawnw@csgrr.com
   johng@csgrr.com
6       – and –
   DARREN J. ROBBINS (168593)
7  DAVID C. WALTON (167268)
   CATHERINE J. KOWALEWSKI (216665)
8  655 West Broadway, Suite 1900
   San Diego, CA  92101-3301
9  Telephone:  619/231-1058
   619/231-7423 (fax)
10 darrenr@csgrr.com
   davew@csgrr.com
11 katek@csgrr.com

12 Attorneys for Plaintiff

13            UNITED STATES DISTRICT COURT

14           NORTHERN DISTRICT OF CALIFORNIA

15 CITY OF WESTLAND POLICE AND FIRE      )  Case No. C 07 5111
16 RETIREMENT SYSTEM, On Behalf of Itself )
   and All Others Similarly Situated,           )  CLASS ACTION
17                                              )
                            Plaintiff,          )  COMPLAINT FOR VIOLATION OF THE
18                                              )  FEDERAL SECURITIES LAWS
          vs.                                   )
19                                              )
   SONIC SOLUTIONS, DAVID C. HABIGER,  )
20 ROBERT J. DORIS, A. CLAY LEIGHTON,    )
   MARY C. SAUER and MARK ELY,           )
21                                              )
                            Defendants.         )
22 _____ )  DEMAND FOR JURY TRIAL

23

24

25

26

27

28

## SUMMARY AND OVERVIEW OF THE ACTION

1.    This is a securities class action on behalf of all persons who purchased the common stock of Sonic Solutions ("Sonic" or the "Company") between October 4, 2002 and May 17, 2007 (the "Class Period"), against certain of Sonic's top officers and directors for violations of the federal securities laws. This action arises out of defendants' false statements about Sonic's earnings and their concealment of the backdating of stock option grants to and for the benefit of Sonic's directors and top executive officers, including its President and Chief Executive Officer, David C. Habiger, Chairman, Robert J. Doris, Chief Financial Officer and Executive Vice President, A. Clay Leighton, director and Secretary, Mary C. Sauer, and Executive Vice President, Mark Ely.

2.    Sonic develops and markets computer software related to digital media, such as data, photographs, audio and video in digital formats. Prior to the Class Period, Sonic had manipulated its stock option accounting which caused its SEC filings made during the Class Period to be false. Also during the Class Period, defendants made false statements about Sonic's business and prospects.

3.    Stock option grants give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually does not vest for a year or more, but then it continues for several years. The exercise price is usually the stock's closing price on the date of grant. Obviously, the lower the exercise price, the more money the recipient can potentially make some day by exercising the options.

4.    Defendants' conduct has unjustly enriched Sonic's top executives and misled its public shareholders. This conduct also caused Sonic to falsely report its financial results prior to and during the Class Period. A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price. Backdating them so they carry a lower price runs counter to this goal, giving the recipient a paper gain right from the start. Additionally, due to defendants' conduct, Sonic has been exposed to a costly investigation by the U.S. Securities and Exchange Commission ("SEC"), as well as costly internal investigations into Sonic's compliance with the federal securities laws and accounting rules applicable to public companies. As *The Wall Street Journal* explained:

Companies have a right to give executives lavish compensation if they choose to, but they can't mislead shareholders about it. Granting an option at a price below the current market value, while not illegal in itself, could result in false disclosure. That's because companies grant their options under a shareholder-approved "option plan" on file with the SEC. The plans typically say options will carry the stock price of the day the company awards them or the day before. *If it turns out they carry some other price, the company could be in violation of its options plan, and potentially vulnerable to an allegation of securities fraud.*

It could even face accounting issues. Options priced below the stock's fair value when they're awarded bring the recipient an instant paper gain.   Under accounting rules, that's equivalent to extra pay and thus is a cost to the company. *A company that failed to include such a cost in its books may have overstated its profits, and might need to restate past financial results.*

5.     During the Class Period, Sonic and its top officers made false and misleading statements about its business and prospects, all while concealing its false option practices, causing its stock to trade at artificially inflated levels.

6.     On February 1, 2007, Sonic issued a press release entitled "Sonic Announces Voluntary Review of Stock Option Accounting."  The press release stated in part:

Sonic Solutions, the world leader in digital media software, announced today that it has commenced a voluntary review of its historical and current stock option grant practices and related accounting. The review was initiated by management and is being conducted by the audit committee of the board of directors, comprised solely of independent directors, with the assistance of independent legal counsel. The audit committee and Company management have been discussing this ongoing review with the Company's independent auditors and have voluntarily informed the Securities and Exchange Commission of the review.

Based on the review to date, the audit committee and Company management have preliminarily concluded that, under applicable accounting guidance, the Company lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants may need to be adjusted. Based also on this review, the Company believes that its current options granting practices are generally acceptable and meet relevant standards for properly documenting grant dates.

The audit committee continues to analyze the impact of this issue, but believes it will result in significant non-cash charges. These charges will principally affect prior fiscal years, and the Company believes that the accounting adjustments will not have any impact on previously reported cash positions or revenues. The Company has not yet determined the amount or materiality of any such non-cash charges, any resulting cash charges associated with tax issues, or accounting or other consequences. Although the timeframe for completing the review is uncertain, the Company continues to be focused on completing this review in a timely manner. Based on the preliminary conclusions of the review, the audit committee and management believe that the Company will need to restate its previously issued financial statements in order to record additional non-cash charges for stock-based compensation expense. However, given that the audit committee review is still

1    ongoing, the audit committee has not yet determined which years or periods will
2    need to be restated.

3         Accordingly, the audit committee, after consultation with management and
     the Company's board of directors, determined that the Company's annual and interim
4    financial statements should no longer be relied upon. Given these circumstances, the
     Company expects that it will not be in a position to file its Quarterly Report on Form
5    10-Q for the quarter ended December 31, 2006 in a timely manner. The Company
     plans to become current in its periodic reports required under the Securities
6    Exchange Act of 1934, as amended, as soon as practicable following the completion
     of the audit committee's review and any required restatement of the Company's
7    financial statements.

8         7.    On February 15, 2007, Sonic issued selected financial results for its third quarter

9    2006, in a release which stated in part:

10        Sonic Solutions today announced the following selected preliminary
     unaudited financial results for the quarter ended December 31, 2006.

11        Selected Preliminary Financial Results

12        Net revenue for the quarter was $39,120,000. Cost of revenue, excluding any
     stock based compensation costs, was $8,838,000. Included in cost of revenue is
13   $1,236,000 of expense related to the amortization of acquired intangibles. Marketing
     and sales expenses, excluding any stock based compensation costs, were $8,003,000.
14   Research and development expenses, excluding any stock based compensation costs,
     were $10,875,000. General and administrative expenses, excluding any stock based
15   compensation costs, were $4,788,000. Sonic recorded a $3,400,000 charge for
     acquired in-process research and development, on a preliminary basis, related to the
16   November 2006 acquisition of System OK AB, a private Swedish software concern.
     Other income (net of other expenses) was $311,000. For the quarter ended December
17   31, 2006, the number of shares outstanding on a fully diluted basis was
     approximately 27,500,000.
18
          As of December 31, 2006, Sonic had cash and cash equivalents of
19   $22,543,000 and short term investments of $33,450,000. Bank debt at December 31,
     2006 was $20,000,000. During the quarter and as part of the acquisition of System
20   OK, Sonic paid $7,920,000 to System OK's shareholders.

21        Guidance

22        In addition, Sonic announced the following guidance:

23        For the fourth fiscal quarter ending March 31, 2007, management anticipates
     net revenue, on a GAAP basis, will be between $37 million and $41 million. Cost of
24   revenue, as a percentage of net revenue and excluding expenses related to the
     amortization of intangibles and stock based compensation, is estimated to be 18%.
25   Operating expenses, excluding stock based compensation and any costs associated
     with Sonic's options review, are estimated to be $24 million. Other income (net of
26   other expenses) is estimated to be $350,000. The number of shares outstanding on a
     fully diluted basis is estimated to be 27.5 million.
27
          For Sonic's Roxio Division, during fiscal year 2008, management expects net
28   revenue in the bricks and mortar retail business channel to be roughly flat compared

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                        - 3 -

to fiscal 2007, OEM business channel net revenue to grow by 10-15%, and direct online sales growth of more than 25%. Sonic's management further expects Advanced Technology Group revenues to grow by more than 25% over fiscal 2007. Sonic will forecast relatively flat revenue for its Professional Products Group until the Company sees clear evidence of Hollywood's commitment to volume title production in high-definition formats.

Options Review

The Company's selected preliminary results and guidance may be adjusted as a result of possible restatement of historical results. As previously announced on February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting. Based on the review, the audit committee and Sonic management have preliminarily concluded that, under applicable accounting guidance, Sonic lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants will need to be adjusted. Further, as previously announced, the audit committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements may no longer be relied upon.

***Sonic believes it will have to record additional non-cash charges for stock-based compensation expense and restate previous financial statements, and that such charges will be material.*** Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions. Sonic intends to file its restated financial results and related periodic reports as quickly as possible.

8.    Then, on May 17, 2007, after the market closed, Sonic issued selected financial results for its fourth quarter 2007, in a press release stating in part:

Sonic Solutions today announced the following selected preliminary unaudited financial results for the fourth quarter ended March 31, 2007.

Selected Preliminary Financial Results

Net revenue for the quarter was $38.1 million. Cost of revenue, excluding any stock-based compensation costs, was $9.0 million. Included in cost of revenue is $1.4 million of expense related to the amortization of acquired intangibles. Marketing and sales expenses, excluding any stock-based compensation costs, were $8.6 million. Research and development expenses, excluding any stock-based compensation costs, were $11.7 million. General and administrative expenses, excluding any stock-based compensation costs, were $4.9 million, of which $0.6 million represented legal and professional expenses associated with the stock option review. Other income (net of other expenses) was $0.2 million. For the quarter ended March 31, 2007, the number of shares outstanding on a fully diluted basis was approximately 27.5 million.

As of March 31, 2007, Sonic had cash and cash equivalents of $17.1 million and short term investments of $47.3 million. Bank debt at March 31, 2007 was $20.0 million.

Guidance

For the first fiscal quarter ending June 30, 2007, the Company's management anticipates net revenue, on a GAAP basis, will be between $33 million and $35

million. Cost of revenue, as a percentage of net revenue and excluding expenses related to the amortization of intangibles and stock-based compensation, is estimated to be 19%. Operating expenses, excluding stock-based compensation costs and any one-time charges associated with the Company's option review, are estimated to be $25 million.

Options Review

The Company's selected preliminary results and guidance may be adjusted as a result of the expected restatement of historical results. As previously announced on February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting. Based on the review, the audit committee and Sonic management have concluded that, under applicable accounting guidance, Sonic lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants will need to be adjusted. Further, as previously announced, the audit committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements may no longer be relied upon.

Sonic believes it will have to record additional cash and non-cash charges for stock-based compensation expense and restate previous financial statements, and that such charges will be material. Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions. Sonic intends to file its restated financial results and related periodic reports as quickly as possible.

9.       On this news, Sonic's stock collapsed from $13.37 per share to as low as $11.76 per share on volume of 1.8 million shares.  This drop continued a decline from $18 per share which began in February 2007, when Sonic first disclosed its options problems.

10.      In fact, during the Class Period, Sonic's public representations were materially false and misleading due to defendants' concealment of the following adverse facts:

(a)      The Company for years had been manipulating stock option grant dates to benefit insiders, which caused the Company's proxy statements and Form 10-Qs and Form 10-Ks to be materially false and misleading; and

(b)      Defendants' stock option practices would lead to government investigations, potential IRS penalties and earnings restatements.

## JURISDICTION AND VENUE

11.      The claims asserted in this Complaint arise under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          - 5 -

1  instrumentalities of interstate commerce, the United States mail and the facilities of a national

2  securities market.

3      12.   This Court has subject matter jurisdiction under §27 of the Exchange Act, 15 U.S.C.

4  §78aa, as well as 28 U.S.C. §1331.

5      13.   Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa, as

6  well as 28 U.S.C. §1391(b).  Many of the acts challenged in this Complaint, including the

7  preparation and dissemination of materially false and misleading information, occurred in substantial

8  part in this District.  Sonic is located in and conducts its business in this District.  Further, certain

9  defendants conduct business in this District, and are citizens of California and/or reside in this

10 District.

11                                      **THE PARTIES**

12     14.   Plaintiff City of Westland Police and Fire Retirement System purchased shares of

13 Sonic as described in the attached certification and has been damaged thereby.

14     15.   Defendant Sonic is a California corporation with its executive offices and principal

15 place of business located at, 101 Rowland Way, Novato, California 94945.

16     16.   Defendant David C. Habiger ("Habiger") has served as President and Chief Operating

17 Officer ("COO") of Sonic since April 2005 and additionally as Chief Executive Officer ("CEO") of

18 the Company since September 2005.  Habiger joined the Company in 1993 and served in a variety of

19 sales and management positions until his promotion in April 2005.  Because of Habiger's positions,

20 he knew the adverse non-public information about the business of Sonic, as well as its finances,

21 markets and present and future business prospects, via access to internal corporate documents,

22 conversations and connections with other corporate officers and employees, attendance at

23 management meetings and via reports and other information provided to him in connection

24 therewith.  During the relevant period, Habiger participated in the issuance of false and misleading

25 statements, including the preparation of the false and/or misleading press releases and SEC filings.

26     17.   Defendant Robert J. Doris ("Doris") co-founded Sonic in 1986 and has served as the

27 Company's Chairman of the Board and a director since its inception.  Doris additionally served as

28 the Company's President from its inception until April 2005, and its CEO from the Company's

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                        - 6 -

1  inception until September 2005. Because of Doris's positions, he knew the adverse non-public

2  information about the business of Sonic, as well as its finances, markets and present and future

3  business prospects, via access to internal corporate documents, conversations and connections with

4  other corporate officers and employees, attendance at management and Board meetings and

5  committees thereof and via reports and other information provided to him in connection therewith.

6  During the relevant period, Doris participated in the issuance of false and misleading statements,

7  including the preparation of the false and/or misleading press releases and SEC filings. As a

8  member of the Board of Directors, Doris caused or permitted the backdated stock options described

9  herein to be granted and personally benefited therefrom. Doris is or was married to defendant Mary

10  C. Sauer. Notwithstanding his knowledge of material non-public information regarding the

11  Company, defendant Doris sold (with Sauer) 1.03 million shares of Sonic stock for proceeds of over

12  $17.6 million during the Class Period.

13      18.     Defendant A. Clay Leighton ("Leighton") has served as Chief Financial Officer

14  ("CFO") of Sonic since January 1999, and additionally as Executive Vice President since September

15  2006. Leighton joined the Company in 1993 as Vice President, Finance and was named Senior Vice

16  President, Worldwide Sales and Finance from January 1999 until September 2006. Because of

17  Leighton's positions, he knew the adverse non-public information about the business of Sonic, as

18  well as its finances, markets and present and future business prospects, via access to internal

19  corporate documents, conversations and connections with other corporate officers and employees,

20  attendance at management meetings and via reports and other information provided to him in

21  connection therewith. Defendant Leighton, by his specialized financial expertise, was in a unique

22  position to understand the business of Sonic, as well as its finances, markets and present and future

23  business prospects. During the relevant period, Leighton participated in the issuance of false and/or

24  misleading statements, including the preparation of the false and/or misleading press releases and

25  SEC filings. Notwithstanding his knowledge of material non-public information regarding the

26  Company, defendant Leighton sold 301,000 shares of Sonic stock for proceeds of over $4.7 million

27  during the Class Period.

28

1    19.    Defendant Mary C. Sauer ("Sauer") co-founded Sonic in 1986 and has served as a

2  director and Secretary since its inception.  Sauer additionally served as Vice President of the

3  Company from 1986 to September 2005 and as Senior Vice President, Marketing and Sales from

4  February 1993 to September 2005.  Because of Sauer's positions, she knew the adverse non-public

5  information about the business of Sonic, as well as its finances, markets and present and future

6  business prospects, via access to internal corporate documents, conversations and connections with

7  other corporate officers and employees, attendance at management and Board meetings and

8  committees thereof and via reports and other information provided to her in connection therewith.

9  During the relevant period, Sauer participated in the issuance of false and/or misleading statements,

10 including the preparation of the false and/or misleading press releases and SEC filings.  As a

11 member of the Board of Directors, Sauer caused or permitted the backdated stock options described

12 herein to be granted and personally benefited therefrom.  Sauer is or was married to defendant Doris.

13 Based on her knowledge of material non-public information regarding the Company, defendant

14 Sauer sold (with defendant Doris) 1.03 million shares of Sonic stock for proceeds of $17.6 million

15 during the Class Period.

16    20.    Defendant Mark Ely ("Ely") has served as Executive Vice President, Strategy of

17 Sonic since September 2006. Ely joined the Company in 1992, serving in various management roles

18 until his promotion to his current position in 2006. Because of Ely's positions, he knew the adverse

19 non-public information about the business of Sonic, as well as its finances, markets and present and

20 future business prospects, via access to internal corporate documents, conversations and connections

21 with other corporate officers and employees, attendance at management meetings and via reports and

22 other information provided to him in connection therewith.  During the relevant period, Ely

23 participated in the issuance of false and/or misleading statements, including the preparation of the

24 false and/or misleading press releases and SEC filings.  Notwithstanding his knowledge of material

25 non-public information regarding the Company, defendant Ely sold 28,071 shares of Sonic stock for

26 proceeds of $428,083 during the Class Period.

27    21.    Defendants Habiger, Doris, Leighton, Sauer and Ely (the "Individual Defendants"),

28 because of their positions with the Company, possessed the power and authority to control the

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 8 -

1  contents of Sonic's quarterly reports, press releases and presentations to securities analysts, money

2  and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies

3  of the Company's reports and press releases alleged herein to be misleading prior to or shortly after

4  their issuance and had the ability and opportunity to prevent their issuance or cause them to be

5  corrected. Because of their positions as President, COO and CEO, Chairman, CFO and Executive

6  Vice President, director and Secretary, and Executive Vice President, these defendants knew that the

7  adverse facts specified herein had not been disclosed to and were being concealed from the public

8  and that the positive representations being made were then materially false and misleading. The

9  Individual Defendants are liable for the false statements pleaded herein at ¶¶38-42, 44, 46-50 and

10  52-62.

11  <center>**FRAUDULENT SCHEME AND COURSE OF BUSINESS**</center>

12  22.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose

13  adverse facts known to them about Sonic. Defendants' fraudulent scheme and course of business

14  that operated as a fraud or deceit on purchasers of Sonic common stock was a success, as it: (i)

15  deceived the investing public regarding Sonic's prospects and business; (ii) artificially inflated the

16  price of Sonic's common stock; and (iii) caused plaintiff and other members of the Class to purchase

17  Sonic common stock at inflated prices.

18  <center>**BACKGROUND**</center>

19  23.    Sonic engages in the development and marketing of computer software related to

20  digital media. The Company has three divisions: Professional Products, Roxio, and Advanced

21  Technology. The Professional Products division offers professional-level hardware and software

22  authoring solutions for creating packaged media releases in DVD-Video, DVD-ROM, HD DVD, and

23  BD formats. This division's products include Scenarist Workgroup; SD-series and CineVision video

24  and audio encoders; DVDit, DVDit Pro, and eDVD. This division also provides content

25  development technology, products, and services that enable professional DVD-ROM publishers to

26  create interactivity and seamless Internet connectivity for DVD-Video titles. The Roxio division

27  offers various digital media software application products under the Roxio brand name. This

28  division sells and markets its products through product bundling arrangements with original

1  equipment manufacturer suppliers of related products, as well as through its Web store and in retail

2  channels. The Advanced Technology division develops, licenses, and supplies software and

3  software components under the AuthorScript, CinePlayer and Roxio brand names to PC application

4  and consumer electronics developers. The Company's products are used in creating digital audio

5  and video titles; recording data files; editing video programs; playing DVD, HD DVD, and BD

6  discs; managing digital media on a computer or consumer electronic device file system; editing and

7  adjusting digital photographs and other images; and backing up the information contained on hard

8  disks attached to computers and consumer electronic devices.

9       24.     Since the early 2000s, Sonic, through the actions of its Board of Directors and its

10  Compensation Committee, has granted stock options for the purchase of millions of shares of the

11  Company's common stock to its top executives, including its CEO, defendant Habiger, Chairman,

12  defendant Doris, CFO, defendant Leighton, director and Secretary, defendant Sauer, and Executive

13  Vice President, defendant Ely.

14       25.     In its public filings with the SEC, including in shareholder-approved stock option

15  plans, Sonic represented that the exercise price of the Company's stock options would be not less

16  than the fair market value of Sonic's common stock, measured by the publicly traded closing price

17  for Sonic common stock on the day before the date of grant.

18       26.     As described by Sonic's 2004 Proxy Statement, Sonic's 2004 Equity Compensation

19  Plan also provides that the exercise price of stock options shall be 100% of the Fair Market Value,

20  stating:

21              The term of any award granted under the 2004 Plan may not be for more than
        ten years (or five years in the case of an incentive stock option granted to any
22      participant who owns stock representing more than 10% of the combined voting
        power of the Company or any parent or subsidiary of the Company), excluding any
23      period for which the participant has elected to defer the receipt of the shares or cash
        issuable pursuant to the award.
24
                The 2004 Plan authorizes the Administrator to grant incentive stock options
25      and non-qualified stock options at an exercise price not less than 100% of the fair
        market value of the common stock on the date the option is granted (or 110%, in the
26      case of an incentive stock option granted to any employee who owns stock
        representing more than 10% of the combined voting power of the Company or any
27      parent or subsidiary of the Company). In the case of stock appreciation rights, the
        base appreciation amount shall not be less than 100% of the fair market value of the
28      common stock on the date of grant. In the case of all other awards granted under the

2004 Plan, the exercise or purchase price shall be determined by the Administrator. The exercise or purchase price is generally payable in cash, check, shares of common stock or with respect to options, payment through a broker-dealer sale and remittance procedure

27.    Contrary to the foregoing public disclosures, the multi-year pattern of grant dates that were highly favorable to the option recipients demonstrates that the stock options were not, in fact, priced "on the date of grant" but were in fact backdated.  In many instances, the annual grant dates were allegedly dated just before a sharp increase in the trading price of Sonic stock or at the bottom of a steep drop in the stock's price.

28.    Many companies make their stock option grants at the same time each year, a policy that eliminates the potential for backdating.  By providing for predetermined dates for the granting of those options (and hence the date on which the exercise price would be set), the potential for backdating stock options issued to officers, directors and employees was eliminated.

29.    In contrast, Sonic's stock option plans did not contain such safeguards.  Hence, defendants retained unusual control over the grant dates and a procedure that increased the risk for backdating stock options granted to Sonic's executives.  For example:

(a)    On July 12, 2001, defendants dated many of Sonic's fiscal 2002 option grants to top executives at $1.12 per share – the low of the month.  Within five days, the stock closed at $1.40 per share.  Defendants Doris, Sauer and Leighton received 90,000, 90,000 and 40,000 options, respectively, at the $1.12 exercise price.

(b)    On March 11, 2003, defendants dated many of Sonic's fiscal 2003 option grants to top executives at $3.97 per share – the low of the month.  Within two weeks, the stock closed above $5.00 per share.  Defendant Leighton received 100,000 options at the $3.97 exercise price.  Notwithstanding the fact that this purported grant occurred after the enactment of the Sarbanes-Oxley Act of 2002, which requires that all such equity transactions be reported within two days, no Form 4 was timely filed for this purported grant date.

(c)    Another post-Sarbanes-Oxley grant to Leighton was made as of May 10, 2004 at $17.49 per share.  This grant was made just as Sonic announced an agreement with Microsoft which pushed the price of Sonic stock to above $19 per share within three days and to above $21 per

share by the end of May 2004. Defendant Leighton received 100,000 options with the $17.49 exercise price.

30.    As a result of the backdating of stock options issued to Leighton and Sonic's other top insiders, defendants have been unjustly enriched at the expense of Sonic, which has received and will receive less money from defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated. These windfall profits have made defendant Leighton and his colleagues some of the best-paid executives in the digital media industry.

31.    The practice of backdating stock options not only lines the pockets of Sonic's directors and executives at the direct expense of the Company, which dollar for dollar receives less money when the options are exercised, but also resulted in the overstatement of Sonic's publicly reported financial results since at least 2001. This is because options priced below the stock's fair market value when they are awarded bring the recipient an instant paper gain. Under accounting rules, that is the equivalent of additional compensation and thus must be treated as a cost to the Company. On information and belief, Sonic did not account for the amount by which the market price of the Company's stock on the actual date the options were issued exceeded the exercise price of the options, as expenses, and thus the defendants' conduct described herein may have caused Sonic to materially overstate its publicly reported financial results.

32.    Moreover, the description of Sonic's stock option plans were false and misleading, as defendants' claims that the option grants were set at the fair market price on the day before the grant date were repeated in SEC filings, including Sonic's proxy statements. In fact, Sonic's SEC filings omitted that defendants had backdated options.

## PRE-CLASS PERIOD STATEMENTS

33.    On July 25, 2002, Sonic reported its first quarter results for fiscal 2002[1] in a release which stated in part:

> Sonic Solutions announced today results for the Company's first fiscal quarter ended June 30, 2002. Revenues for the quarter were $7,384,000 compared to

---

[1]    Sonic's fiscal year ends on March 31.

$4,204,000 from the same period in the prior fiscal year. Operating income for the quarter was $582,000, or $0.03 per share, compared to an operating loss of $1,642,000, or $0.12 per share, in the same period of the prior fiscal year. (All operating income calculations are GAAP basis, and all per share calculations are fully diluted.)

"The first quarter marked significant progress for Sonic," said Bob Doris, Sonic's President. "We exceeded our financial targets with record revenues and a better than expected profit. We also addressed a key strategic objective to enter into the retail distribution channel by means of our new partnership with Adaptec. We believe that Sonic is on an excellent trajectory and look forward to the future with great enthusiasm."

34.    On July 25, 2002, Sonic issued its proxy statement to its shareholders, stating with respect to options granted to executives that:

The exercise price is equal to the fair market value of the Company's Common Stock on the date of grant, as determined by reference to the closing price of the Company's Common Stock on the Nasdaq National Market.

35.    The proxy statement also included a summary compensation table which purported to describe the compensation to the top executives. The proxy stated:

### SUMMARY COMPENSATION TABLE

| Name and Principal Position | Fiscal Year Ended March 31, | Annual Compensation | | Long-Term Compensation |
| | | Salary ($) | Bonus ($) | Number of Securities Underlying Options (#)(1) |
| --- | --- | --- | --- | --- |
| Robert J. Doris | 2002 | $161,250 | $0 | 260,000 |
| President (Chief Executive Officer) | 2001 | $225,000 | $0 | 85,000 |
| and Director | 2000 | $221,250 | $0 | 85,000 |
| Mary C. Sauer | 2002 | $ 89,250 | $0 | 170,000 |
| Senior Vice President, Business | 2001 | $127,875 | $0 | 40,000 |
| Development, Secretary and Director | 2000 | $112,675 | $0 | 40,000 |
| Christopher A. Kryzan | 2002 | $187,000 | $40,132 | 70,000 |
| Senior Vice President, | 2001 | $187,000 | $38,917 | 48,000 |
| Engineering and Marketing | 2000 | $185,500 | $45,031 | 25,000 |
| A. Clay Leighton | 2002 | $151,600 | $15,000 | 250,000 |
| Senior Vice President Worldwide Operations, | 2001 | $180,000 | $15,000 | 50,000 |
| Finance and Chief Financial Officer | 2000 | $176,250 | $15,000 | 65,000 |

(1)    All figures in this column represent options to purchase the Company's Common Stock.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

36.    As described herein, the compensation in the table understated the compensation to executives which was caused by the backdating practices.

37.    These statements were alive and uncorrected at the beginning of the Class Period.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

38.    On November 7, 2002, Sonic reported its second quarter results for fiscal 2002 in a release which stated in part:

> Sonic Solutions announced today results for the Company's second fiscal quarter ended September 30, 2002. Revenues for the quarter were $7,488,000 compared to $3,974,000 from the same period in the prior fiscal year, an increase of 88%. Operating income for the quarter was $726,000, or $0.04 per share, compared to an operating loss of $1,790,000, or $0.13 per share, in the same period of the prior fiscal year. (All operating income calculations are GAAP basis, and all per share calculations are fully diluted.)

> Revenues for the six months ended September 30, 2002 increased to $14,872,000 compared to $8,178,000, an increase of 82%, from the same period in the prior fiscal year. Operating income for the six months was $1,308,000, or $0.07 per share, compared [sic] an operating loss of $3,432,000, or $0.25 per share, in the same period of the prior fiscal year.

> "We are pleased to have exceeded our financial targets again this quarter," said Bob Doris, Sonic's President and Chief Executive Officer. "During the quarter, we secured additional OEM wins with Sony, Memorex and TDK, adding to our extensive OEM partner penetration. We also increased our technology lead with the introduction of DVD PrePlay(TM), DVD-Audio Creator LE, DVD Producer(TM) Version 3.5, and ReelDVD(R) 3.0.1. These products allow consumers and professionals alike to access unparalleled features and functionality. Lastly, our introduction of AuthorScript(R) CE, a DVD formatting, recording and disc re-editing solution for consumer electronics (CE) manufacturers of set-top DVD recorders, will enhance our longer term prospects as DVD creation becomes the centerpiece of the consumer's digital lifestyle."

39.    On January 30, 2003, Sonic reported its third quarter results for fiscal 2002 in a release which stated in part:

> Record Revenues Drive Record Quarterly Profit; Sonic Reports EPS of $0.06 per Share (GAAP basis) and $0.12 per Share (Pro Forma)

> Sonic Solutions announced today results for the Company's third fiscal quarter ended December 31, 2002.

> *       *       *

> GAAP Presentation

> On a GAAP basis, net revenue for the quarter was $8,379,000 compared to $4,120,000 for the same period in the prior fiscal year. Operating income for the

quarter was $1,147,000 and net income per diluted share was $0.06 compared to an operating loss of $1,343,000 and net loss per diluted share of $0.10 for the same period of the prior fiscal year.

Pro Forma Presentation

During the quarter ended December 31, 2002, and as previously announced, Sonic Solutions closed the acquisition of VERITAS Software's Desktop Mobile Division ("DMD"). Sonic Solutions has introduced a pro forma presentation of its results which it plans to continue in future quarters for as long as such a presentation continues to be meaningful.

The pro forma presentation adjusts the following items:

Revenue – Under purchase accounting rules, OEM royalties received by Sonic on account of DMD's business may only be included in revenue if they reflect OEM shipments occurring after the date of the acquisition (December 18, 2002). The pro forma presentation includes in revenue royalties for which Sonic received reports of shipments from OEMs after December 18, 2002 for shipments prior to December 18, 2002 and for which Sonic has invoiced the OEMs and expects to collect the amounts due in cash.

Acquisition Related Intangible Amortization – Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such as core and developed technology and customer relationships, which are then amortized over various periods of time. These non-cash charges are eliminated in the pro forma presentation in calculating operating income.

Business Integration Expenses – Certain charges that occur at or around the time of an acquisition, and that are not expected to recur, are considered to be one-time charges. The pro forma presentation eliminates any of these charges included in operating expense.

Under the pro forma presentation, net revenue for the quarter was $9,479,000. Operating income for the quarter was $2,477,000 and net income per diluted share was $0.12.

"The third quarter was an eventful and exciting one for Sonic," said Bob Doris, Sonic's President. "We enjoyed a significant increase in revenues, which grew approximately 12% sequentially, and more than 100% year over year. The company's December operating profit (on a GAAP basis) increased by 58% over the September quarter. Growth in revenues and profits were due largely to higher shipments of our DVD creation software."

"During the quarter we announced and closed the acquisition of VERITAS Software's Desktop and Mobile Division. This new addition to the Sonic family permits us to expand our product offerings to consumers and most importantly to OEM customers. We are now busily engaged in integrating the DMD organization and product line with our own, and I'm happy to report that customer reaction to the acquisition has been very positive," concluded Doris.

40.    On May 5, 2003, Sonic reported its results for the fourth fiscal quarter ended March 31, 2003, in a release which stated in part:

Record Revenues; Sonic Reports EPS of $0.01 per Share (GAAP basis) and $0.10 per Share (Non-GAAP basis) Exceeding Analyst Consensus

Sonic Solutions announced today results for the Company's fourth fiscal quarter ended March 31, 2003.

*          *          *

"Fiscal 2003 was a pivotal year for Sonic Solutions," commented Bob Doris, Sonic's Chief Executive Officer and President. "Revenues increased 71% over fiscal 2002, and the fourth quarter of fiscal 2003 marked the fifth consecutive profitable quarter for the Company. Over the last year, Sonic completed two strategic acquisitions and entered the retail distribution channel, solidifying our position as the world's leading supplier of DVD creation software, and increasing our OEM and end-user consumer customer base. We also laid the foundation for entry of our technology into the consumer electronics venue. We believe that Sonic is on an excellent trajectory, and that FY 2004 will be a year of continued growth and profitability."

GAAP Presentation

As reported under generally accepted accounting principles (GAAP), net revenue for the quarter was $9,467,000 compared to $6,806,000 for the same period in the prior fiscal year. Operating income for the quarter was $328,000 and net income per diluted share was $0.01 compared to operating income of $838,000 and net income per diluted share of $0.04 for the same period of the prior fiscal year.

Net revenue for the fiscal year was $32,718,000 compared to $19,104,000 for the prior fiscal year. Operating income for the fiscal year was $2,783,000 and net income per diluted share was $0.13 compared to an operating loss of $3,937,000 and net loss per diluted share of $0.30 for the prior fiscal year.

*          *          *

As previously announced, Sonic Solutions closed the acquisition of VERITAS Software's Desktop Mobile Division ("DMD") on December 18, 2002. During the December quarter Sonic Solutions introduced a non GAAP presentation of its results which it plans to continue in future quarters for as long as such a presentation continues to be meaningful.

The non GAAP presentation adjusts the following items:

Revenue – Under purchase accounting rules, OEM royalties received by Sonic on account of DMD's business may only be included in revenue if they reflect OEM shipments occurring after the date of the acquisition (December 18, 2002). The non GAAP presentation includes in revenue royalties for which Sonic received reports of shipments from OEMs after December 18, 2002 for shipments prior to December 18, 2002 and for which Sonic has invoiced the OEMs and expects to collect the amounts due in cash.

Acquisition Related Intangible Amortization – Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such as core and developed technology and customer relationships, which are then amortized over various periods of time. These non-cash charges are eliminated in the non GAAP presentation in calculating operating income.

1    Business Integration Expenses – Include certain charges that occur at or around the time of an acquisition. The non GAAP presentation eliminates any of

2 these charges included in operating expense.

3    Under the non GAAP presentation, net revenue for the quarter was $11,258,000. Operating income for the quarter was $2,325,000 and net income per

4 diluted share was $0.10.

5    June Quarter and Full Fiscal 2004 Guidance

6    The following statements are based on current expectations. These statements are forward-looking, and actual results may differ materially.

7

8    For the full fiscal year 2004 (ending March 31, 2004), we are reaffirming our prior guidance and expect GAAP revenues to range from $51 million to $59 million, GAAP earnings per diluted share to range from $0.47 to $0.53 cents [sic] per share

9 and non GAAP earnings per diluted share to range from $0.51 to $0.60 cents [sic] per share. For the first fiscal quarter of 2004 (ending June 30, 2003), we forecast that

10 revenues will range from $11.0 million to $11.5 million, GAAP earnings per diluted share will range from $0.06 to $0.08 cents [sic] per share and non GAAP earnings

11 per diluted share will range from $0.07 to $0.09 cents [sic] per share. The difference between the GAAP and non GAAP earnings relates to the amortization expense on

12 acquired intangibles from our acquisitions which are deducted to calculate the GAAP earnings per diluted share.

13

14   41.  On July 29, 2003, Sonic issued its proxy statement to shareholders, stating with

respect to options granted to executives that:

15

16    The exercise is equal to the fair market value of Sonic's common stock on the date of grant, as determined by reference to the closing price of Sonic's common stock on the Nasdaq National Market.

17

18   42.  The proxy also included a summary compensation table which purported to describe

the compensation to the top executives.  The proxy stated:

19

20

21

22

23

24

25

26

27

28

## SUMMARY COMPENSATION TABLE

| Name and Principal Position | Fiscal Year Ended March 31, | Annual Compensation | | Long-Term Compensation |
| --- | --- | --- | --- | --- |
| | | Salary ($) | Bonus ($) | Number of Securities Underlying Options (#)(1) |
| Robert J. Doris | 2003 | $198,750 | $ 0 | 170,000 |
| President (Chief Executive Officer) | 2002 | $161,250 | $ 0 | 260,000 |
| and Director | 2001 | $225,000 | $ 0 | 85,000 |
| Mary C. Sauer | 2003 | $135,750 | $ 0 | 80,000 |
| Senior Vice President, Business | 2002 | $ 89,250 | $ 0 | 170,000 |
| Development, Secretary and Director | 2001 | $127,875 | $ 0 | 40,000 |
| Christopher A. Kryzan(2) | 2003 | $187,000 | $ 63,934 | 0 |
| Senior Vice President, | 2002 | $187,000 | $ 40,132 | 70,000 |
| Engineering and Marketing | 2001 | $187,000 | $ 38,917 | 48,000 |
| A. Clay Leighton | 2003 | $168,333 | $ 15,000 | 100,000 |
| Senior Vice President Worldwide Operations, | 2002 | $151,600 | $ 15,000 | 250,000 |
| Finance and Chief Financial Officer | 2001 | $180,000 | $ 15,000 | 50,000 |

(1)    All figures in this column represent options to purchase Sonic's common stock.

(2)    Mr. Kryzan resigned as an executive officer of Sonic effective May 31, 2003. Mr. Kryzan acted as a consultant to Sonic through July 11, 2003 pursuant to an agreement dated May 31, 2003.

43.    As described herein, the compensation in the table understated the compensation to executives which was caused by the backdating practices.

44.    On July 30, 2003, Sonic issued a press release entitled "Sonic Solution Reports Results for First Fiscal Quarter Ended June 30, 2003; Record Quarter Revenue Drives Record Quarterly Profit." The press release stated in part:

Sonic Solutions announced today results for the Company's first fiscal quarter ended June 30, 2003.

Net revenue for the quarter was $12,022,000 compared to $7,384,000 for the same period in the prior fiscal year. Operating income for the quarter was $2,024,000 and net income per diluted share was $0.08 compared to operating income of $582,000 and net income per diluted share of $0.03 for the same period of the prior fiscal year.

"We are very pleased by the momentum Sonic continues to generate with our OEM customers and technology partners, and the fact that it's now showing up strongly in our reported financial results," commented Bob Doris, Sonic's president. "In the June quarter Sonic generated the highest quarterly revenue, gross margin and net income in the history of the company. This is a great start to what we believe will be a very rewarding year for our shareholders."

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 18 -

1       45.    After these results were issued, Sonic's stock increased from the $8-$9 per share

2 range to above $12 per share.

3       46.    On October 30, 2003, Sonic issued its results for second fiscal quarter ended

4 September 30, 2003, in a release which stated in part:

5
> Sonic Solutions announced today results for the Company's second fiscal quarter ended September 30, 2003.

6

7
> Net revenue for the quarter was $12,695,000 compared to $7,488,000 for the same period in the prior fiscal year. Operating income for the quarter was $2,261,000 and net income per diluted share was $0.08 compared to operating income of $726,000 and net income per diluted share of $0.04 for the same period of the prior fiscal year.

8

9

10
> Net revenue for the six months ended September 30, 2003 was $24,717,000 compared to $14,872,000 for the same period in the prior fiscal year. Operating income for the six months was $4,284,000 and net income per diluted share was $0.16 compared to operating income of $1,308,000 and net income per diluted share of $0.07 for the same period of the prior fiscal year.

11

12

13
> "Sonic's revenues grew during the September quarter, as DVD recorder shipments continued to ramp and as our business expanded on several fronts," noted Bob Doris, president & CEO of Sonic Solutions. "The company's financial performance was excellent, on virtually all income statement and balance sheet metrics. We're very much looking forward to the last two quarters of our 2004 fiscal year, when we expect that growth will accelerate, taking Sonic to new levels of performance."

14

15

16

17       47.    On February 3, 2004, Sonic issued a press release entitled "Sonic Solutions Reports

Results for Third Fiscal Quarter Ended December 31, 2003," which stated in part:

18
> &ndash;    Revenue increase drives record quarterly profitability

19

20
> &ndash;    Revenue of $14.8 million, up 77% over prior year

21
> &ndash;    Net income of $3.2 million or $0.13 per share, up 197% over prior year

22
> Sonic Solutions announced today results for the Company's third fiscal quarter ended December 31, 2003.

23

24
> Net revenue for the quarter was $14,834,000 compared to $8,379,000 for the same period in the prior fiscal year. Operating income for the quarter was $3,636,000 and net income per diluted share was $0.13 compared to operating income of $1,147,000 and net income per diluted share of $0.06 for the same period of the prior fiscal year.

25

26
> Net revenue for the nine months ended December 31, 2003 was $39,551,000 compared to $23,251,000 for the same period in the prior fiscal year. Operating income for the nine months was $7,920,000 and net income per diluted share was

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        - 19 -

$0.29 compared to operating income of $2,456,000 and net income per diluted share of $0.13 for the same period of the prior fiscal year.

48.      On May 4, 2004, Sonic issued a press release entitled "Sonic Solutions Reports Record Results for Fourth Quarter and Fiscal Year Ended March 31, 2004; 10th Consecutive Quarter of Increasing Revenues Drives All-Time Record Profits," which stated in part:

Sonic Solutions announced today the financial results for the Company's fourth quarter and fiscal year ended March 31, 2004.

Net revenue for the quarter was $17,302,000 compared to $9,467,000 for the same period in the prior fiscal year. Net income for the quarter was $4,336,000 or $0.17 per diluted share compared to net income of $145,000 or $0.01 per diluted share for the same period in the prior fiscal year.

Net revenue for the fiscal year ended March 31, 2004 was $56,853,000 compared to $32,718,000 for the prior fiscal year. Net income for the fiscal year was $11,084,000 or $0.46 per diluted share compared to net income of $2,537,000 or $0.13 per diluted share for the prior fiscal year.

49.      On July 27, 2004, Sonic issued its proxy statement to shareholders, which concealed that options had been granted at other than fair market value, with no corresponding compensation expense recorded.

50.      The proxy also included a summary compensation table which purported to describe the compensation to the top executives. The proxy stated:

**SUMMARY COMPENSATION TABLE**

| | | Annual Compensation | | Long-term Compensation |
|---|---|---|---|---|
| Name and Principal Position | Fiscal Year Ended March 31, | Salary ($) | Bonus ($) | Number of Securities Underlying Options (#)(1) |
| Robert J. Doris | 2004 | $225,000 | $ 0 | 170,000 |
| President, Chief Executive Officer, | 2003 | $198,750 | $ 0 | 170,000 |
| and Director | 2002 | $161,250 | $ 0 | 260,000 |
| Mary C. Sauer | 2004 | $155,925 | $ 0 | 80,000 |
| Senior Vice President, | 2003 | $135,750 | $ 0 | 80,000 |
| Business Development, | 2002 | $ 89,250 | $ 0 | 170,000 |
| Secretary and Director | | | | |
| A. Clay Leighton | 2004 | $223,750 | $ 15,000 | 0 |
| Senior Vice President Worldwide Operations, | 2003 | $168,333 | $ 15,000 | 100,000 |
| Finance and Chief Financial Officer | 2002 | $151,600 | $ 15,000 | 250,000 |

(1)    All figures in this column represent options to purchase Sonic's common stock.

51.    As described herein, the compensation table understated the compensation to executives which was caused by the backdating practices.

52.    On August 2, 2004, Sonic reported record results for first quarter ended June 30, 2004, in a release which stated in part:

Sonic Solutions announced today the financial results for the Company's first quarter ended June 30, 2004.

Net revenue for the quarter was $17,909,000 compared to $12,022,000 for the same period in the prior fiscal year. Net income for the quarter was $3,987,000 or $0.16 per diluted share compared to net income of $1,643,000 or $ 0.08 per diluted share for the same period in the prior fiscal year.

53.    On November 8, 2004, Sonic issued a press release entitled "Sonic Solutions Reports Results for Second Quarter Ended September 30, 2004; Quarterly Revenue Increases 37%; Quarterly Net Income Increases 88% Year Over Year," which stated in part:

Sonic Solutions announced today the financial results for the Company's second quarter ended September 30, 2004.

Net revenue for the quarter was $17,437,000 compared to $12,695,000 for the same period in the prior fiscal year. Net income for the quarter was $3,575,000 or $0.14 per diluted share compared to net income of $1,898,000 or $0.08 per diluted share for the same period in the prior fiscal year.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 21 -

Net revenue for the six months was $35,346,000 compared to $24,717,000 for the same period in the prior fiscal year. Net income for the six months was $7,562,000 or $0.29 per diluted share compared to net income of $3,540,000 or $0.16 per diluted share for the same period in the prior fiscal year.

54.     On February 8, 2005, Sonic reported third quarter results for 2004 in a release which stated in part:

Sonic Solutions Record Revenues and Strong Profitability (Non GAAP) Mark First Quarter Report Post Roxio Acquisition

Sonic Solutions announced today the financial results for the Company's third quarter ended December 31, 2004.

*        *        *

Summary

On a GAAP basis, net revenue for the quarter was $19,677,000 compared to $14,834,000 for the same period in the prior fiscal year. Net loss for the quarter was $419,000 or $0.02 per diluted share compared to net income of $3,208,000 or $0.13 per diluted share for the same period in the prior fiscal year.

On a GAAP basis, net revenue for the nine months was $55,023,000 compared to $39,551,000 for the same period in the prior fiscal year. Net income for the nine months was $7,143,000 or $0.25 per diluted share compared to net income of $6,748,000 or $0.27 per diluted share for the same period in the prior fiscal year.

On a Non GAAP basis, net revenue for the quarter was $20,615,000 and net income was $4,941,000 and net income per diluted share was $0.18.

Non GAAP Presentation

During the quarter ended December 31, 2004, and as previously announced, Sonic Solutions acquired substantially all of the assets and liabilities of the Consumer Software Division of Roxio, Inc. . . .

The Non GAAP presentation adjusts the following items:

Revenue – Under purchase accounting rules, OEM royalties received by Sonic on account of Roxio's business may only be included in revenue if they reflect OEM shipments occurring after the date of the acquisition (December 17, 2004). The Non GAAP presentation includes in revenue royalties for which Sonic received reports of shipments from OEM's after December 17, 2004 for shipments prior to December 17, 2004 and for which Sonic has invoiced the OEMs and expects to collect the amounts due in cash. Sonic has also excluded in the Non GAAP presentation an end of life reserve related to some of the Roxio products.

Acquisition Related Intangible Amortization – Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such as core and developed technology and customer contracts, which are then amortized over various periods of time. The GAAP presentation includes amortization on all acquired intangibles. These non-cash charges are eliminated in the Non GAAP presentation in calculating operating income.

1            Acquired in-process Technology – In the GAAP presentation, the write-off of acquired in-process technology is included in operating expenses. This expense has been eliminated in the Non GAAP presentation.

2

3            Business Integration Expenses – Certain charges that occur at or around the time of an acquisition, and that are not expected to recur, are considered to be non-recurring charges. The Non GAAP presentation eliminates any of these charges included in operating expense.

4

5       55.    On May 16, 2005, Sonic reported its fourth quarter results for the fiscal year ended

6       March 31, 2005, in a release which stated in part:

7

8            Sonic Solutions ("Sonic") announced today its financial results for the fourth quarter and fiscal year ended March 31, 2005.

9                    *     *     *

10           On the basis of generally accepted accounting principles ("GAAP"), net revenue for the quarter was $35,604,000 compared to $17,302,000 for the same period in the prior fiscal year. Net income for the quarter was $1,220,000, or $0.05 per diluted share, compared to net income of $4,336,000, or $0.17 per diluted share, for the same period in the prior fiscal year.

11

12

13           On a GAAP basis, net revenue for the fiscal year ended March 31, 2005 was $90,627,000 compared to $56,853,000 for the prior fiscal year. Net income for the fiscal year was $8,363,000, or $0.32 per diluted share, compared to net income of $11,084,000, or $0.46 per diluted share, for the prior fiscal year.

14

15

16           On a non-GAAP basis, net revenue for the quarter was $37,475,000, net income was $7,505,000 and net income per diluted share was $0.28.

17           Non-GAAP Presentation

18           During the quarter ended December 31, 2004, and as previously announced, Sonic acquired substantially all of the assets and liabilities of the Consumer Software Division of Roxio, Inc. . . .

19

20           The non-GAAP presentation adjusts the following items:

21           Revenue. Under purchase accounting rules, Original Equipment Manufacturer ("OEM") royalties received by Sonic on account of Roxio's business may be included in revenue only if they reflect OEM shipments occurring after the date of the acquisition (December 17, 2004). The non-GAAP presentation includes revenue royalties for which Sonic received reports of shipments from OEMs after December 17, 2004 for shipments prior to December 17, 2004 and for which Sonic has invoiced the OEMs and expects to collect the amounts due in cash. Sonic has also excluded in the non-GAAP presentation an end of life reserve related to shipments of Easy Media Creator 7.0, which Sonic shipped to and invoiced distributors during the fourth quarter and expects to collect the amounts due in cash but was not able to record the revenue due to the pending launch of Easy Media Creator 7.5 . . . .

22

23

24

25

26

27

28           Acquisition-Related Intangible Amortization. Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such

as core and developed technology and customer contracts, which are then amortized over various periods of time. The GAAP presentation includes amortization on all acquired intangibles. These non-cash charges are eliminated in the non-GAAP presentation in calculating operating income.

Easy Media Creator 7.5 Launch Expenses. After completion of the acquisition, Sonic immediately began preparations for a previously unplanned release of a new version of Easy Media Creator. The Roxio organization had been planning to release a new version of Easy Media Creator in the fall of 2005. Sonic management took this step because it believed that an early release of a new version of Easy Media Creator, incorporating some Sonic technology and identifiable branding, would accelerate integration of the Roxio business into Sonic both from a market as well as an internal organizational perspective. The incremental costs of this release, including the related end of life reserve discussed above, are included in the GAAP presentation and excluded in the non-GAAP presentation.

Third-Party Expenses Related to Compliance with the Sarbanes-Oxley Act of 2002 ("SOX"). The third-party expenses related to SOX compliance work for the 2005 fiscal year are included in the GAAP presentation and excluded in the non-GAAP presentation. The expenses excluded in the non-GAAP presentation are primarily the fees paid to compliance consultants and to Sonic's external auditors for work in connection with Sonic's SOX compliance. As discussed further below, Sonic management believes that SOX compliance efforts were significantly complicated by the impact of the Roxio acquisition, including management's decision to migrate Sonic's accounting into systems that were acquired as part of the Roxio combination. Hence, Sonic management believes the level of SOX expenses is extraordinary and is unlikely to recur in future periods.

Business Integration Expenses. Certain charges that occurred at or around the time of an acquisition, and that are not expected to recur, are considered to be non-recurring charges. The non-GAAP presentation eliminates these charges included in operating expense.

Guidance

For its fiscal quarter ending June 30, 2005, Sonic anticipates GAAP revenues to be in the range of $32 million to $34 million and GAAP fully diluted earnings to be between $0.13 and $0.15 per share.

Sonic is maintaining our prior fiscal year 2006 guidance, for its fiscal year ending March 31, 2006, Sonic anticipates GAAP revenues to be in the range of $155 million to $165 million and GAAP fully diluted earnings to be between $1.20 and $1.30 per share.

SOX Compliance

The SEC's rules implementing Section 404 of the Sarbanes-Oxley Act of 2002 require Sonic management to assess the effectiveness of its internal control over financial reporting annually, and to include in Sonic's Annual Report on Form 10-K for the fiscal year ended March 31, 2005 and subsequent years a management report on that assessment, together with an opinion thereon by Sonic's independent registered public accounting firm. Sonic expects to comply with these disclosure requirements on a timely basis. Management is in the process of reviewing internal control systems and, in connection with this evaluation, has identified certain deficiencies. Although none of these deficiencies have been identified as a significant

1  deficiency or material weakness at this time, the evaluation of internal control over
   financial reporting is not yet complete and there can be no assurance that, as a result
2  of the ongoing evaluation, additional deficiencies will not be identified or that any
   deficiencies identified, either alone or in combination with others, will not be
3  considered a significant deficiency or a material weakness. Although certain
   remediation efforts have been undertaken, any deficiency or weakness will not be
4  considered effectively remediated until new internal controls are operational for a
   period of time and are tested, and management and Sonic's independent registered
5  public accounting firm conclude that these controls are operating effectively. As a
   result of the recent Roxio acquisition, management has actively been working to
6  integrate the operations of the acquired business, particularly with respect to
   accounting, accounting systems and financial reporting. In part due to these
7  acqisition and integration efforts, many of Sonic's processes and procedures in these
   areas have been recently restructured, and the evaluations relate to the restructured
8  process and procedures. Due to the nature of and the time necessary to effectively
   remediate and test each of the deficiencies identified to date, Sonic expects to
9  conclude that some of the deficiencies identified to date had not been effectively
   remediated as of March 31, 2005.

10

11         At this time, management does not believe that the results of its evaluation of
   internal control over financial reporting will preclude an unqualified opinion from
12  Sonic's auditor with respect to the annual financial statements; however, there can be
   no assurance that the results of such evaluation will not cause an adjustment to the
13  financial statements to be included in the Annual Report on Form 10-K.

14         Further, while at this time Sonic has completed a review with its independent
   auditors of the financial statements presented in this press release, the dependency of
15  the evaluation of internal controls mentioned above, as well as lack of completion of
   all financial audit test procedures means that the presentation contained in this press
16  release is unaudited and subject to further change prior to the filing of Sonic's
   Annual Report on Form 10-K.

17         56.    On August 15, 2005, Sonic reported results for first quarter ended June 30, 2005, in a

18  release which stated in part:

19         Sonic Solutions ("Sonic") announced today the financial results for its first
   fiscal quarter ended June 30, 2005.

20

21                     *       *       *

22         On the basis of generally accepted accounting principles ("GAAP"), net
   revenue for the quarter was $35,519,000 compared to $17,909,000 for the same
   period in the prior fiscal year. Net income for the quarter was $4,013,000, or $0.15
23  per diluted share, compared to net income of $3,987,000, or $0.16 per diluted share,
   for the same period in the prior fiscal year.

24

25         On a non-GAAP basis, net revenue for the quarter was $35,519,000, net
   income was $5,073,000 and net income per diluted share was $0.18.

26         Non-GAAP Presentation

27         In this press release, Sonic provides certain adjustments to financial
   information calculated on the basis of GAAP as supplemental information relating to
28  its results of operations. These non-GAAP financial measures include non-GAAP net

income, diluted earnings per share, and gross profit and margin figures, which exclude certain expense items associated with, among other things, the acquisition of the assets and liabilities of the Consumer Software Division of Roxio, Inc., each as more fully described below. The non-GAAP financial measures also exclude the third party costs incurred by Sonic in the first quarter in connection with Sonic's implementation of the requirements of Section 404 of the Sarbanes-Oxley Act (see "SOX Compliance" below). Management believes that this non-GAAP presentation allows investors to better understand the operating results of Sonic for the quarter ended June 30, 2005 because this presentation excludes non-recurring acquisition-related charges and other non-recurring expenses, and provides insight into how management evaluates operating results. In addition, Sonic has reported similar non-GAAP results in the past and believes the inclusion of this non-GAAP presentation provides consistency in its financial reporting. However, these non-GAAP measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and other companies may use different non-GAAP measures and presentations of results.

The non-GAAP presentation adjusts the following items:

Acquisition-Related Intangible Amortization. Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such as core and developed technology and customer contracts, which are then amortized over various periods of time. The GAAP presentation includes amortization on all acquired intangibles. These non-cash charges are eliminated in the non-GAAP presentation in calculating operating income.

Acquired Patents. During the quarter ended on June 30, 2005, Sonic sold certain patents that had been acquired as part of the Roxio acquisition. In connection with that sale, the value ascribed to the cost of the patents, in the amount of $1,169,000, was included in cost of revenue in the GAAP presentation. This charge is eliminated in the non-GAAP presentation, as it is a non-cash charge that obscures the cash profit derived from the transactions.

Third-Party Expenses Related to Compliance with the Sarbanes-Oxley Act of 2002 ("SOX"). Certain third-party expenses related to SOX compliance work for the 2005 fiscal year, which were billed and accrued for during the first quarter of the 2006 fiscal year, are included in the GAAP presentation and excluded in the non-GAAP presentation. The expenses excluded in the non-GAAP presentation are primarily the fees paid to compliance consultants and to Sonic's external auditors for work in connection with Sonic's SOX compliance. Sonic management believes that SOX compliance efforts were significantly complicated by the impact of the Roxio acquisition, including management's decision to migrate Sonic's accounting into systems that were acquired as part of the Roxio combination. Sonic management believes the level of SOX expenses is extraordinary, is unlikely to recur in future periods, and in any event relates entirely to work performed relative to the fiscal 2005 audit. Hence, it is excluded from the non-GAAP presentation.

Business Integration Expenses. Certain charges that occurred in connection with the Roxio acquisition, and that are not expected to recur, are considered to be non-recurring charges. The non-GAAP presentation eliminates these charges included in operating expense.

57.     On October 24, 2005, Sonic issued its proxy statement to shareholders, which concealed the past improprieties with respect to options and also stated in part:

1      The exercise price is equal to the fair market value of Sonic's common stock
       on the date of grant, as determined by reference to the closing price of Sonic's
2      common stock on the Nasdaq National Market.

3      58.    On November 8, 2005, Sonic reported second quarter 2005 results in a release which

4  stated in part:

5      Sonic Solutions announced today the financial results for its second quarter
       ended September 30, 2005.
6
       Net revenue for the quarter was $31,948,000 compared to $17,437,000 for the
7      same period in the prior fiscal year. Net income for the quarter was $3,102,000 or
       $0.11 per diluted share compared to net income of $3,575,000 or $0.14 per diluted
8      share for the same period in the prior fiscal year.

9      Net revenue for the six month period ended September 30, 2005 was
       $67,467,000 compared to $35,346,000 for the same period in the prior fiscal year.
10     Net income for this six month period was $7,115,000 or $0.26 per diluted share
       compared to net income of $7,562,000 or $0.29 per diluted share for the same period
11     in the prior fiscal year.

12     59.    On February 8, 2006, Sonic issued a press release entitled "Sonic Solutions Reports

13  Results for Third Quarter Ended December 31, 2005; Sonic Solutions Reports Record Revenues and

14  Profits for its Fiscal Third Quarter," which stated in part:

15     Sonic Solutions today announced its financial results for the third quarter of
       fiscal 2006.  Quarterly revenues were a record $40.8 million, up 28% from $31.9
16     million in the second fiscal quarter of the year, and up more than 100% from $19.7
       million for the third quarter of fiscal 2005.
17
       Operating income for the third quarter of fiscal 2006 was $9.3 million or
18     22.8% of revenue compared to $3.2 million or 10.1% of revenue for the second
       quarter of fiscal 2006 and an operating loss of $0.7 million or 3.7% for the third
19     quarter of fiscal 2005. Net income grew to $8.2 million or $0.30 per share in the third
       quarter of fiscal 2006 versus $3.1 million or $0.11 per share in the second quarter of
20     fiscal 2006 and net loss of $419,000 or $0.02 per share in the third quarter of fiscal
       2005.
21
       Dave Habiger, President and Chief Executive Officer of Sonic, stated, "We
22     are pleased with the Company's results this quarter as we celebrated the one year
       anniversary of the Roxio acquisition. We have begun to reap the rewards of our
23     investment and continue to see tremendous opportunity from the integration of Sonic
       and Roxio. We are well positioned as the leading digital media software provider for
24     next-generation high definition formats and channels."

25     60.    On May 23, 2006, Sonic issued a press release entitled "Sonic Solutions Reports

26  Results for Fourth Quarter and Fiscal Year Ended March 31, 2006; Sonic Reports Record Revenues

27  and Profits for Its Full Fiscal Year." The press release stated in part:

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 27 -

1    Sonic Solutions today announced its financial results for the fourth quarter
and fiscal year ended March 31, 2006.

2

3                            *      *      *

4    For the fiscal year, net revenue, gross profit and operating profit all reached
record levels. Net revenue grew 64% in fiscal 2006 to $148.7 million from $90.6
5    million in fiscal 2005. Gross profit climbed 51% to $114.6 million compared to
$75.9 million in fiscal 2005. Operating income rose 155% to $24.0 million, from
6    $9.4 million in fiscal 2005. Net income for fiscal 2006 was a record $19.3 million or
$0.70 per diluted share versus $8.5 million or $0.32 per diluted share in fiscal 2005.

7    For the quarter, net revenue was $40.4 million, reflecting an increase of more
than 13% from $35.6 million for the fourth quarter of fiscal 2005. Gross profit was
8    $32.7 million compared to $27.8 million for the fourth quarter of fiscal 2005,
representing an increase of 18%. Operating income was $9.3 million or 23% of
9    revenue compared to $2.1 million or 6% of revenue for the fourth quarter of fiscal
2005. Net income was $2.1 million or $0.08 per share in the fourth quarter of fiscal
10   2006 including an unusually high provision for income taxes. The non-GAAP
presentation below is calculated based upon the same effective income tax rate
11   (7.4%) as we used in our fiscal fourth quarter guidance. As a result, non-GAAP net
income for the quarter was $8.5 million and net income per diluted share on a non-
12   GAAP basis was $0.31.

13   Dave Habiger, President and Chief Executive Officer of Sonic, stated, "We
are very pleased with the Company's performance this quarter and for the fiscal year,
14   as we met or exceeded all of our operating goals. We expanded our technology and
OEM partnerships, which continued to drive all areas of our business. As new
15   formats and channels such as HD and download and burn, emerge and develop, we
believe Sonic is well positioned to continue to lead the market for digital media
16   software."

17   61.    On February 1, 2007, Sonic issued a press release entitled "Sonic Announces

18   Voluntary Review of Stock Option Accounting." The press release stated in part:

19   Sonic Solutions, the world leader in digital media software, announced today
that it has commenced a voluntary review of its historical and current stock option
20   grant practices and related accounting. The review was initiated by management and
is being conducted by the audit committee of the board of directors, comprised solely
21   of independent directors, with the assistance of independent legal counsel. The audit
committee and Company management have been discussing this ongoing review
22   with the Company's independent auditors and have voluntarily informed the
Securities and Exchange Commission of the review.

23

24   Based on the review to date, the audit committee and Company management
have preliminarily concluded that, under applicable accounting guidance, the
25   Company lacks sufficient documentation for certain historical option grants and that
the measurement dates associated with these option grants may need to be adjusted.
Based also on this review, the Company believes that its current options granting
26   practices are generally acceptable and meet relevant standards for properly
documenting grant dates.

27

28   The audit committee continues to analyze the impact of this issue, but
believes it will result in significant non-cash charges. These charges will principally

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 28 -

affect prior fiscal years, and the Company believes that the accounting adjustments will not have any impact on previously reported cash positions or revenues. The Company has not yet determined the amount or materiality of any such non-cash charges, any resulting cash charges associated with tax issues, or accounting or other consequences. Although the timeframe for completing the review is uncertain, the Company continues to be focused on completing this review in a timely manner. Based on the preliminary conclusions of the review, the audit committee and management believe that the Company will need to restate its previously issued financial statements in order to record additional non-cash charges for stock-based compensation expense. However, given that the audit committee review is still ongoing, the audit committee has not yet determined which years or periods will need to be restated.

Accordingly, the audit committee, after consultation with management and the Company's board of directors, determined that the Company's annual and interim financial statements should no longer be relied upon. Given these circumstances, the Company expects that it will not be in a position to file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2006 in a timely manner. The Company plans to become current in its periodic reports required under the Securities Exchange Act of 1934, as amended, as soon as practicable following the completion of the audit committee's review and any required restatement of the Company's financial statements.

62.    On February 15, 2007, Sonic issued selected financial results for its third quarter 2006, in a release which stated in part:

Sonic Solutions today announced the following selected preliminary unaudited financial results for the quarter ended December 31, 2006.

Selected Preliminary Financial Results

Net revenue for the quarter was $39,120,000. Cost of revenue, excluding any stock based compensation costs, was $8,838,000. Included in cost of revenue is $1,236,000 of expense related to the amortization of acquired intangibles. Marketing and sales expenses, excluding any stock based compensation costs, were $8,003,000. Research and development expenses, excluding any stock based compensation costs, were $10,875,000. General and administrative expenses, excluding any stock based compensation costs, were $4,788,000. Sonic recorded a $3,400,000 charge for acquired in-process research and development, on a preliminary basis, related to the November 2006 acquisition of System OK AB, a private Swedish software concern. Other income (net of other expenses) was $311,000. For the quarter ended December 31, 2006, the number of shares outstanding on a fully diluted basis was approximately 27,500,000.

As of December 31, 2006, Sonic had cash and cash equivalents of $22,543,000 and short term investments of $33,450,000. Bank debt at December 31, 2006 was $20,000,000. During the quarter and as part of the acquisition of System OK, Sonic paid $7,920,000 to System OK's shareholders.

Guidance

In addition, Sonic announced the following guidance:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 29 -

1    For the fourth fiscal quarter ending March 31, 2007, management anticipates net revenue, on a GAAP basis, will be between $37 million and $41 million. Cost of
2    revenue, as a percentage of net revenue and excluding expenses related to the amortization of intangibles and stock based compensation, is estimated to be 18%.
3    Operating expenses, excluding stock based compensation and any costs associated with Sonic's options review, are estimated to be $24 million. Other income (net of
4    other expenses) is estimated to be $350,000. The number of shares outstanding on a fully diluted basis is estimated to be 27.5 million.

5

6    For Sonic's Roxio Division, during fiscal year 2008, management expects net revenue in the bricks and mortar retail business channel to be roughly flat compared
     to fiscal 2007, OEM business channel net revenue to grow by 10-15%, and direct
7    online sales growth of more than 25%. Sonic's management further expects Advanced Technology Group revenues to grow by more than 25% over fiscal 2007.
8    Sonic will forecast relatively flat revenue for its Professional Products Group until the Company sees clear evidence of Hollywood's commitment to volume title
9    production in high-definition formats.

10    Options Review

11    The Company's selected preliminary results and guidance may be adjusted as a result of possible restatement of historical results. As previously announced on
12    February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting. Based on the review, the
13    audit committee and Sonic management have preliminarily concluded that, under applicable accounting guidance, Sonic lacks sufficient documentation for certain
14    historical option grants and that the measurement dates associated with these option grants will need to be adjusted. Further, as previously announced, the audit
15    committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements
16    may no longer be relied upon.

17    ***Sonic believes it will have to record additional non-cash charges for stock-based compensation expense and restate previous financial statements, and that***
18    ***such charges will be material.*** Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions. Sonic intends to
19    file its restated financial results and related periodic reports as quickly as possible.

20    63.    In the days following this announcement, Sonic's stock began a steady decline from

21    $18.03 per share on February 1, 2007, to $14.70 per share on February 16, 2007, as the stock option

22    backdating scandal flourished in the media and Sonic's situation came into focus. However, Sonic's

23    stock continued to trade at artificially inflated levels as the Company concealed its problems with

24    backdating and with its earnings forecasts.

25    64.    Then, on May 17, 2007, after the market closed, Sonic issued selected financial

26    results for its fourth quarter 2007, in a release which stated in part:

27    Sonic Solutions today announced the following selected preliminary unaudited financial results for the fourth quarter ended March 31, 2007.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                              - 30 -

### Selected Preliminary Financial Results

Net revenue for the quarter was $38.1 million. Cost of revenue, excluding any stock-based compensation costs, was $9.0 million. Included in cost of revenue is $1.4 million of expense related to the amortization of acquired intangibles. Marketing and sales expenses, excluding any stock-based compensation costs, were $8.6 million. Research and development expenses, excluding any stock-based compensation costs, were $11.7 million. General and administrative expenses, excluding any stock-based compensation costs, were $4.9 million, of which $0.6 million represented legal and professional expenses associated with the stock option review. Other income (net of other expenses) was $0.2 million. For the quarter ended March 31, 2007, the number of shares outstanding on a fully diluted basis was approximately 27.5 million.

As of March 31, 2007, Sonic had cash and cash equivalents of $17.1 million and short term investments of $47.3 million. Bank debt at March 31, 2007 was $20.0 million.

### Guidance

For the first fiscal quarter ending June 30, 2007, the Company's management anticipates net revenue, on a GAAP basis, will be between $33 million and $35 million. Cost of revenue, as a percentage of net revenue and excluding expenses related to the amortization of intangibles and stock-based compensation, is estimated to be 19%. Operating expenses, excluding stock-based compensation costs and any one-time charges associated with the Company's option review, are estimated to be $25 million.

### Options Review

The Company's selected preliminary results and guidance may be adjusted as a result of the expected restatement of historical results. As previously announced on February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting. Based on the review, the audit committee and Sonic management have concluded that, under applicable accounting guidance, Sonic lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants will need to be adjusted. Further, as previously announced, the audit committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements may no longer be relied upon.

Sonic believes it will have to record additional cash and non-cash charges for stock-based compensation expense and restate previous financial statements, and that such charges will be material. Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions. Sonic intends to file its restated financial results and related periodic reports as quickly as possible.

65.    On this news, Sonic's stock collapsed from $13.37 per share to $12.08 per share on volume of 1.8 million shares.

66.    In fact, during the Class Period, Sonic's public representations were materially false and misleading due to defendants' concealment of the following adverse facts:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 31 -

1        (a)    The Company for years had been manipulating stock option grant dates to

2 benefit insiders, which caused the Company's proxy statements and Form 10-Qs and Form 10-Ks to

3 be materially false and misleading; and

4        (b)    Defendants' stock option practices would lead to government investigations,

5 potential IRS penalties and earnings restatements.

6     67.    The table below summarizes defendants' insider trading during the Class Period:

| DEFENDANT | DATE OF SALES | SHARES SOLD | PROCEEDS |
|---|---|---|---|
| DORIS/SAUER | 8/22/02-1/8/07 | 1,031,000 | $17,672,635 |
| LEIGHTON | 8/20/02 – 8/25/05 | 301,000 | $4,784,100 |
| ELY | 9/5/06 | 28,071 | $428,083 |
| TOTAL | | 1,360,071 | $22,884,818 |

## LOSS CAUSATION/ECONOMIC LOSS

68.    By misrepresenting its business, the defendants presented a misleading picture of Sonic's prospects. Thus, instead of truthfully disclosing during the Class Period that Sonic's business was not as healthy as represented, defendants falsely misrepresented Sonic's business as "well positioned" for increased growth and concealed their stock option manipulations.

69.    These claims caused and maintained the artificial inflation in Sonic's stock price throughout the Class Period and until the truth was revealed to the market.

70.    Defendants' false and misleading statements had the intended effect and caused Sonic stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $23.67 per share.

71.    On February 1, 2007, Sonic reported an internal investigation into its stock option practices.

72.    Later, on May 17, 2007, Sonic announced insufficient documentation for certain historical option grants, which resulted in a huge shortfall on earnings.

73.    As a direct result of the public revelations regarding the truth about Sonic's overstatement of income and its actual business prospects going forward, Sonic's stock price plummeted 33%, closing at $12.08 per share on May 18, 2007, down from above $18 per share when

1   the options issue was first disclosed.  This drop removed the inflation from Sonic's stock price,

2   causing real economic loss to investors who had purchased the stock during the Class Period.

### COUNT I

#### For Violations of §10(b)
#### and Rule 10b-5 of the Exchange Act

74.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above as though fully set forth herein.

75.    At all relevant times, defendants individually and in concert, directly and indirectly,

by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct designed to divert hundreds of millions of dollars to

defendants via improper option grants.

76.    Defendants employed devices, schemes and artifices to defraud while in possession of

material, adverse non-public information and engaged in acts, practices and a course of conduct that

included the making of, or participation in the making of, untrue and/or misleading statements of

material facts and/or omitting to state material facts necessary in order to make the statements made

about Sonic not misleading.

77.    Defendants, as top executive officers and directors of the Company, are liable as

direct participants in the wrongs complained of herein.  Through their positions of control and

authority as officers of the Company, each of the defendants was able to and did control the conduct

complained of herein and the content of the public statements disseminated by Sonic.

78.    At all relevant times, defendants acted with scienter, in that they either had actual

knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with

reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though

such facts were available to them.  Defendants were the senior management of the Company, and

were therefore directly responsible for the false and misleading statements and/or omissions

disseminated to the public through press releases, news reports and filings with the SEC.

79.    Each of the defendants participated in a scheme to defraud with the purpose and

effect of defrauding plaintiff and others similarly situated.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 33 -

1      80.    As a result, defendants are liable for damages that have been sustained by plaintiff

2  and the Class in connection with their purchase of Sonic common stock during the Class Period.

3                                    **COUNT II**

4                      **For Violations of §14(a) of the Exchange Act**

5      81.    Plaintiff incorporates by reference and realleges each and every allegation set forth

6  above as though fully set forth herein.

7      82.    Rule 14a-9, promulgated under §14(a) of the Exchange Act, provides that no proxy

8  statement shall contain "any statement which, at the time and in the light of the circumstances under

9  which it is made, is false or misleading with respect to any material fact, or which omits to state any

10  material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R.

11  §240.14a-9.

12      83.    Sonic's proxy statements violated §14(a) and Rule 14a-9 because they omitted

13  material facts, including the fact that defendants were causing Sonic to engage in an option

14  backdating scheme, a fact which defendants were aware of and participated in.

15      84.    In the exercise of good faith and reasonable care, defendants should have known that

16  Sonic's proxy statements were materially false and misleading.

17      85.    The misrepresentations and omissions in the proxy statements were material to

18  plaintiff and Sonic shareholders in voting on each proxy statement.  The proxy statements were an

19  essential link in the accomplishment of the continuation of defendants' unlawful stock option

20  backdating scheme, as revelations of the truth would have immediately thwarted a continuation of

21  shareholders' endorsement of the directors' positions, the executive officers' compensation and the

22  Company's compensation policies.

23      86.    As a result, defendants are liable for damages that have been sustained by plaintiff

24  and the Class.

25                                    **COUNT III**

26                      **For Violations of §20(a) of the Exchange Act**

27      87.    Plaintiff incorporates by reference and realleges each and every allegation set forth

28  above as though fully set forth herein.

88.    The Individual Defendants, by virtue of their positions with Sonic and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sonic within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause Sonic to engage in the illegal conduct and practices complained of herein.  Sonic controlled its officers and employees.

## CLASS ACTION ALLEGATIONS

89.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Sonic common stock on the open market during the Class Period (the "Class").  Excluded from the Class are defendants.

90.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Sonic has more than 26 million shares of stock outstanding, owned by hundreds if not thousands of persons.

91.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the Exchange Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Sonic's common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

92.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

1    93.    Plaintiff will adequately protect the interests of the Class and has retained counsel

2    who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

3    with those of the Class.

4    94.    A class action is superior to other available methods for the fair and efficient

5    adjudication of this controversy.

<div align="center">

**PRAYER FOR RELIEF**

</div>

7    WHEREFORE, plaintiff prays for judgment as follows:

8    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

9    B.    Awarding plaintiff and the members of the Class damages, interest and costs;

10    C.    Awarding plaintiff reasonable costs and attorneys' fees; and

11    D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

12    proper.

<div align="center">

**JURY DEMAND**

</div>

14    Plaintiff demands a trial by jury.

15    DATED:  October 4, 2007    COUGHLIN STOIA GELLER
                                   RUDMAN & ROBBINS LLP
16                                 SHAWN A. WILLIAMS
                                   JOHN K. GRANT

17

18

19                                 SHAWN A. WILLIAMS

20                                 100 Pine Street, 26th Floor
                                   San Francisco, CA  94111
21                                 Telephone:  415/288-4545
                                   415/288-4534 (fax)
22
                                   COUGHLIN STOIA GELLER
23                                   RUDMAN & ROBBINS LLP
                                   DARREN J. ROBBINS
24                                 DAVID C. WALTON
                                   CATHERINE J. KOWALEWSKI
25                                 655 West Broadway, Suite 1900
                                   San Diego, CA  92101-3301
26                                 Telephone:  619/231-1058
                                   619/231-7423 (fax)
27
                                   Attorneys for Plaintiff
28    T:\usersSF\deborahD\Cpt Sonic Solutions.doc

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2    Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3 named parties, there is no such interest to report.

4

5    _____
ATTORNEY OF RECORD FOR PLAINTIFF

6    CITY OF WESTLAND POLICE AND FIRE
RETIREMENT SYSTEM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|
| | | | |

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*In re Open Joint Stock Company "Vimpel-Comm" Sec. Litig.*, No. 04-CV-9742 (S.D.N.Y.)
*In re Williams Sec. Litig.*, No. 02-CV-72-11(M) (N.D. Okla.)
*Garber v. Legg Mason, Inc., et al.*, No. 1:06-cv-09436-PKC (S.D.N.Y.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery.

SONIC

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2ND day of August, 2007.

CITY OF WESTLAND POLICE AND
FIRE RETIREMENT SYSTEM

By: _Robert G. Bimonn_

Its: _TrustEE_

- 2 -

SONIC

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/29/2003 | 2,300 | $19.22 |
| 01/26/2004 | 7,300 | $21.76 |
| 02/19/2004 | 1,900 | $20.77 |
| 02/10/2005 | 4,200 | $20.11 |
| 04/05/2006 | 1,000 | $18.19 |
| 05/15/2006 | 1,100 | $16.74 |
| 05/19/2006 | 650 | $16.31 |
| 06/20/2006 | 610 | $14.45 |
| 11/14/2006 | 915 | $15.03 |
| 11/21/2006 | 1,085 | $15.24 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 11/04/2003 | 400 | $17.69 |
| 11/04/2003 | 400 | $17.68 |
| 11/04/2003 | 500 | $17.71 |
| 11/04/2003 | 1,000 | $17.72 |
| 03/11/2004 | 7,300 | $18.03 |
| 07/01/2004 | 1,900 | $20.51 |
| 10/04/2006 | 760 | $14.49 |
| 12/07/2006 | 1,730 | $15.82 |
| 02/02/2007 | 595 | $17.25 |
| 04/19/2007 | 1,000 | $14.47 |