COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS (213113)
CHRISTOPHER M. WOOD (254908)
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@csgrr.com
cwood@csgrr.com

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
ckeller@labaton.com
jgardner@labaton.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM AND PLYMOUTH COUNTY RETIREMENT SYSTEM, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SONIC SOLUTIONS, DAVID C. HABIGER, ROBERT J. DORIS, A. CLAY LEIGHTON, MARY C. SAUER, MARK ELY, ROBERT M. GREBER, PETER J. MARGUGLIO and R. WARREN LANGLEY,<br><br>Defendants. | No. C 07-05111-JSW<br><br><u>CLASS ACTION</u><br><br>APPENDIX TO CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW |

Exhibit 1:     February 1, 2007 press release, "Sonic Announces Voluntary Review of Stock Option Granting Accounting."

Exhibit 2:     Sonic Solutions September 1989 Stock Option Plan.

Exhibit 3:     Sonic Solutions 1994 Non-Employee Directors Stock Option Plan.

Exhibit 4:     Sonic Solutions 1998 Stock Option Plan.

Exhibit 5:     Sonic Solutions 2000 Stock Option Plan.

Exhibit 6:     Sonic Solutions' restated Form 10-K for fiscal year ending March 31, 2007, filed February 26, 2008.

Exhibit 7:     September 19, 2006 letter issued by SEC Chief Accountant Conrad Hewitt.

Exhibit 8:     February 15, 2007 press release, "Sonic Solutions Reports Selected Preliminary Financial Results for Third Quarter Ended December 31, 2006: Updates Guidance."

Exhibit 9:     May 17, 2007 press release, "Sonic Solutions Reports Selected Preliminary Financial Results for Third Quarter Ended March 31, 2007: Updates Guidance."

Exhibit 10:    May 21, 2003 press release, "Roxio Reports Fourth Quarter and Fiscal 2003 Results."

Exhibit 11:    July 30, 2003 press release, "Sonic Solutions Reports Results For First Fiscal Quarter Ended June 30, 2003; Record Quarterly Revenue Drives Record Quarterly Profit."

Exhibit 12:    October 30, 2003 press release, "Sonic Solutions Reports Results For Second Fiscal Quarter Ended September 30, 2003; Revenue Increase Drives Record Quarterly Profitability."

Exhibit 13:    February 4, 2004 press release, "Roxio Reports Third Quarter Results and New University License Deal for Napster."

Exhibit 14:    August 2, 2004 press release titled, "Sonic Solutions Reports Record Results for First Quarter Ended June 30, 2004; 11th Consecutive Quarter of Increasing Revenues."

Exhibit 15:    November 8, 2004 press release, "Sonic Solutions Reports Results for Second Quarter Ended September 30, 2004; Quarterly Revenue Increases 37%; Quarterly Net Income Increases 88% Year Over Year."

Exhibit 16:    February 8, 2005 press release, "Sonic Solutions Reports Results for Third Quarter Ended December 31, 2004; Record Revenues and Strong Profitability (Non GAAP) Mark First Quarter Report Post Roxio Acquisition."

Exhibit 17:    May 16, 2005 press release, "Sonic Solutions Reports Results for Fourth Quarter and Fiscal Year Ended March 31, 2005; Record Revenues Drive Profitable First Full Quarter of Roxio/Sonic Integration."

Exhibit 18: November 8, 2005 press release, "Sonic Solutions Updates Financial Guidance."

Exhibit 19: __ February 8, 2006 press release, "Sonic Solutions Reports Results for Third Quarter Ended December 21, 2005; Sonic Solutions Reports Record Revenue and Profits for its Fiscal Third Quarter."

Exhibit 20: May 23, 2006 press release, "Sonic Solutions Reports Results for Fourth Quarter and Fiscal Year Ended March 31, 2006; Sonic Reports Record Revenues and Profits for Its Full Fiscal Year."

Exhibit 19: August 8, 2006 press release, "Sonic Solutions Reports Results for First Quarter Ended June 30, 2006."

Exhibit 22: November 8, 2006 press release, "Sonic Solutions Reports Results for Second Quarter Ended September 30, 2006."

Exhibit 23: August 15, 2005 press release, "Sonic Solutions Reports Results for First Quarter Ended June 30, 2005."

Exhibit 24: May 4, 2004 press release, "Sonic Solutions Reports Results for Fourth Quarter and Fiscal Year Ended March 31, 2004."

DATED: March 21, 2008

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
CHRISTOPHER M. WOOD

s/ Shawn A. Williams
SHAWN A. WILLIAMS

100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

Co-Lead Counsel for Plaintiffs

VANOVERBEKE MICHAUD
& TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200

313/578-1201 (fax)

Additional Counsel for Plaintiff

T:\CasesSF\Sonic Solutions\APN00050094.doc

CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 21, 2008.

s/ Shawn A. Williams

SHAWN A. WILLIAMS
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

E-mail:ShawnW@csgrr.com

# Mailing Information for a Case 3:07-cv-05111-JSW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com
- **Sara B. Brody**
  sara.brody@hellerehrman.com,terri.newman@hellerehrman.com
- **John K. Grant**
  johnkg@csgrr.com,JDecena@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com
- **Monica Patel**
  monica.patel@hellerehrman.com
- **Darren Jay Robbins**
  e_file_sd@csgrr.com
- **Shawn A. Williams**
  shawnw@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Catherine J Kowalewski**
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

**David C. Walton**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301

# Exhibit 1



Sonic / About / Press / **News**

Browse All Products

**Sonic Announces Voluntary Review of Stock Option Accounting**

**Novato, California (February 1, 2007)** - Sonic Solutions® (NASDAQ: SNIC), the world leader in digital media software, announced today that it has commenced a voluntary review of its historical and current stock option grant practices and related accounting. The review was initiated by management and is being conducted by the audit committee of the board of directors, comprised solely of independent directors, with the assistance of independent legal counsel. The audit committee and Company management have been discussing this ongoing review with the Company's independent auditors and have voluntarily informed the Securities and Exchange Commission of the review.

Based on the review to date, the audit committee and Company management have preliminarily concluded that, under applicable accounting guidance, the Company lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants may need to be adjusted. Based also on this review, the Company believes that its current options granting practices are generally acceptable and meet relevant standards for properly documenting grant dates.

The audit committee continues to analyze the impact of this issue, but believes it will result in significant non-cash charges. These charges will principally affect prior fiscal years, and the Company believes that the accounting adjustments will not have any impact on previously reported cash positions or revenues. The Company has not yet determined the amount or materiality of any such non-cash charges, any resulting cash charges associated with tax issues, or accounting or other consequences. Although the timeframe for completing the review is uncertain, the Company continues to be focused on completing this review in a timely manner. Based on the preliminary conclusions of the review, the audit committee and management believe that the Company will need to restate its previously issued financial statements in order to record additional non-cash charges for stock-based compensation expense. However, given that the audit committee review is still ongoing, the audit committee has not yet determined which years or periods will need to be restated.

Accordingly, the audit committee, after consultation with management and the Company's board of directors, determined that the Company's annual and interim financial statements should no longer be relied upon. Given these circumstances, the Company expects that it will not be in a position to file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2006 in a timely manner. The Company plans to become current in its periodic reports required under the Securities Exchange Act of 1934, as amended, as soon as practicable following the completion of the audit committee's review and any required restatement of the Company's financial statements.

**About Sonic Solutions**

Sonic Solutions (NASDAQ: SNIC; http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform-independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio®-branded CD and DVD creation, playback and backup solutions that have become the premier choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers as well as online at Sonic.com and Roxio.com, and are bundled with PCs, after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the U.S. and/or other countries. All other company or product names are trademarks or registered trademarks of their respective owners and, in some cases, are used by Sonic under license.

**Forward-Looking Statements**

This press release contains forward-looking statements that are based upon current expectations. Such forward-looking statements include views regarding the status and preliminary conclusions of the Company's review of its historical and current stock option grant practices and related accounting, the expected impact and consequences of this review, including the expected restatement of the Company's historical financial statements, and the time for completing the process. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, the timing, final results and final conclusions of the audit committee's review concerning matters related to the Company's stock option grants, including but not limited to, the accuracy of the stated dates of option grants and whether all proper procedures were followed; the impact of any restatement of financial statements, including but not limited to the determination, as a result of the re-auditing of certain prior period financials statements, of additional restatement items beyond the restatement of non-cash stock-based compensation items, the impact of which may be material, or the effects of other actions that may be taken or required as a result of such review; tax issues or liabilities that relate to adjustments to the measurement dates associated with Company stock options; effects relating to the Company's inability to timely file reports with the Securities and Exchange Commission; changes to the anticipated scope of the issues beyond the timing and accuracy of measurement dates for option awards to issues that the Company does not currently realize exist; risks of litigation or governmental investigations or proceedings arising out of or related to the Company's stock option grant practices or any restatement of its financial statements; and effects on the Company's ability to meet NASDAQ listing requirements. This press release should be read in conjunction with Sonic's most recent annual report on Form 10-K and Form 10-K/A and Sonic's other reports on file with the Securities and Exchange Commission, which contain a more detailed discussion of risks and uncertainties that may affect future results. The Company

does not undertake to update any forward-looking statements.

**For More Information, Contact:**
**Sonic Solutions**
A. Clay Leighton,
Chief Financial Officer

**Phone:** 415.893.8000
**Fax:** 415.893.8008
**Email:** clay_leighton@sonic.com

© 2007 Sonic Solutions. All rights reserved.
Enables the creation, management, and enjoyment of digital media content from Hollywood to home.

# Exhibit 2

*If your word processor does not honor RTF margins, you must manually set them to these to get good results*: Left - .75"; Right - .50"; Top - .75"; Bottom - .50".

**Sonic Solutions/CA · S-8 · Effective 10/27/98, On 10/27/98**
**Document 4 of 6 · EX-99.1 · 1989 Amended Stock Option Plan**

EXHIBIT 99.1

SONIC SOLUTIONS 1989
STOCK OPTION PLAN

1. PURPOSES OF THE PLAN. -- The purposes of the Stock option Plan (the "Plan") of Sonic Solutions, a California corporation (the "Company") are to:

(a) Encourage employees, consultants, officers and directors to improve operations and increase profits of the Company;

(b) Encourage employees to accept or continue employment with the Company or its Affiliates;

(c) Increase the interest of employees, consultants, officers and directors in the Company's welfare through participation in the growth in value of the common stock of the Company (the "Common Stock").

Options granted under this Plan ("Options") may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422A of the Internal Revenue Code of 1986, as amended (the "Code"), or "nonstatutory options" ("NSOs").

2. ELIGIBLE PERSONS. -- Every person who at the date of grant of an Option is an employee, consultant, officer or director of the Company or of any Affiliate (as defined below) of the Company is eligible to receive NSOs or ISOs under this Plan. The term "Affiliate" as used in the Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently (S)(S) 425(e) and (f), respectively) of the Code. The term "employee" includes an officer or director who is an employee, as well as a non-officer, non-director regular employee of the Company.

3. STOCK SUBJECT TO THIS PLAN. -- The total number of shares of stock which may be granted pursuant to this Plan is 2,090,000 shares of Common Stock. The shares covered by the portion of any grant under the Plan which expires unexercised shall become available again for grants under the Plan. Shares issued pursuant to an Option granted under the Plan which are repurchased by the Company in accordance with the terms of the Plan shall become available again for grants as NSOs under the Plan. The number of shares reserved for purchase under the Plan is subject adjustment in accordance with the provisions for adjustment in the Plan.

4. ADMINISTRATION. --

(a) This Plan shall be administered by the Board of Directors of the Company (the "Board") or by the Chief Executive Officer of the Company to whom administration of the Plan is hereby delegated (in either case, the "Administrator").

(b) To the extent required by Rule 16b-3 promulgated by the Securities and Exchange Commission ("Rule 16b-3") no Option shall be granted to (i) a director of the Company except by the Board when a majority of the members

of the Board, and a majority of the directors acting in the matter, are "disinterested persons" (as defined below), or (ii) to an officer of the Company not a member of the Board except by the Board. "Disinterested person," for the purpose, shall have the same meaning as in Rule 16b-3 or any successor rule under the Securities Exchange Act or 1934, as amended (the "Exchange Act").

(c) Subject to the other provisions of this Plan, the Administrator shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options: (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options shall be granted, and the number of shares subject to each Option; (v) to interpret this Plan; (vi) to prescribe, amend, and rescind rules and regulations relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical, including but not limited to, the time or times at which Options shall be exercisable; (viii) with the consent of the Optionee, to modify or amend any Option; (ix) to defer (with the consent of the Optionee) or accelerate the exercise date of any Option; (x) to

authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option; and (xi) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

(d)   All questions of interpretation, implementation, and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons.

5.   GRANTING OF OPTIONS; OPTION AGREEMENT. -- No Options shall be granted under this Plan after ten years from the date of adoption of this Plan by the Board of Directors.

Each option shall be evidenced by a written stock option agreement, in form satisfactory to the Company, executed by the Company and the person to whom such Option is granted; provided, however, that the failure by the Company, the Optionee, or both to execute such an agreement shall not invalidate the granting of an Option. The agreement shall specify whether each Option it evidences is a NSO or an ISO.

The Administrator may approve the grant of Options under the Plan to persons who are expected to become employees of the Company, but are not employees at the date or approval. In such cases, the Option shall be deemed granted, without further approval, on the date the grantee becomes an employee and must satisfy all requirements of this Plan for Options granted on that date.

6.   TERMS AND CONDITIONS OF OPTIONS. -- Each Option granted under this Plan shall be designated as an NSO or an ISO. Each Option shall be subject to the terms and conditions set forth in (S) 6.1. NSOs shall be also subject to the terms and conditions set forth in (S) 6.2, but not those set forth in (S) 6.3. ISOs shall also be subject to the terms and conditions set forth in (S) 6.3, but not those set forth in (S) 6.2.

6.1   TERMS AND CONDITIONS TO WHICH ALL OPTIONS ARE SUBJECT. -- All Options granted under this Plan shall be subject to the following terms and conditions:

6.1.1   CHANGES IN CAPITAL STRUCTURE. -- Subject to (S) 6.1.2, if the stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend, or recapitalization, or converted into or exchanged for other securities as a result of a merger, consolidation or reorganization, appropriate adjustments shall be made in (a) the number and class of shares of stock subject to this Plan and each Option outstanding under this Plan, and (b) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be subject to approval by the Board or Directors in its sole discretion.

6.1.2   CORPORATE TRANSACTIONS. -- New option rights may be substituted for the option rights granted under this Plan, or the Company's obligations as to Options outstanding under this Plan may be assumed, by an employer corporation other than the Company, or by a parent or subsidiary of such employer corporation, in connection with any merger, consolidation, acquisition, separation, reorganization, liquidation or like occurrence in which the Company is involved, in such manner that the then

Sonic Solutions/CA · S-8 · Effective 10/27/98, On 10/27/98
Document 4 of 6 · EX-99.1 · 1989 Amended Stock Option Plan

outstanding Options which are ISOs will continue to be "incentive stock options" within the meaning or (S) 422A of the Code to the full extent permitted thereby. Notwithstanding the foregoing or the provisions or (S) 6.1.1, if such employer corporation, or parent or subsidiary or such employer corporation, does not substitute new and substantially equivalent option rights for the option rights granted hereunder, or assume the option rights granted hereunder, the option rights granted hereunder shall terminate (a) upon dissolution or liquidation or the Company, or similar occurrence, or (b) upon any merger, consolidation, acquisition, separation, or similar occurrence, where the Company will not be a surviving corporation; provided, however, that each Optionee shall be mailed notice at least thirty-five (35) days prior to such dissolution, liquidation, merger, consolidation, acquisition, separation, or similar occurrence, and shall have at least

SONIC SOLUTIONS 1989 STOCK OPTION PLAN
PAGE 2 OF 6

*Source:* SEC Info · www.secinfo.com · *Fran Finnegan & Company* · 4/12

thirty (30) days after the mailing or such notice to exercise any unexpired option rights granted hereunder to the extent exercisable on the date of such event.

6.1.3   TIME OF OPTION EXERCISE. -- Except as necessary to satisfy the requirements of (S) 422A of the Code and subject to (S)(S) 5 and 6.1.8, Options granted under this Plan shall be exercisable (a) immediately as of the effective date of the stock option agreement granting the Option, or (b) at such other times as are specified in the written stock Option agreement relating to such Option; provided, however, that if the Optionee is a director, such Option may not be exercisable, in whole or in part, at any time prior to the first anniversary of the date of Option grant, unless the Administrator determines that the foregoing provision is not necessary to comply with the provisions of Rule 16b-3 or that Rule 16b-3 is not applicable to the Plan.

6.1.4   OPTION GRANT DATE. -- Except in the case of advance approvals described in (S) 5, the date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant. No Option shall be exercisable, however, until a written stock option agreement in form satisfactory to the Company is executed by the Company and the Optionee.

6.1.5   NONASSIGNABILITY OF OPTION RIGHTS. -- No Option granted under this Plan shall be assignable or otherwise transferable by the Optionee except by will or by the laws of descent and distribution. During the life of the Optionee, an Option shall be exercisable only by the Optionee.

6.1.6   PAYMENT. -- Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. At the time an Option is granted or exercised, the Administrator, in the exercise of its absolute discretion, may authorize any one or more the following additional methods of payment:

(a)   Acceptance of the Optionee's full recourse promissory note for all or part of the option price, payable on such terms and bearing such interest rate as determined by the Administrator (but in no event less than the minimum interest rate specified by federal tax law at which no additional interest on debt instruments of such type would be imputed), which promissory note may be either secured or unsecured in such manner as the Administrator shall approve (including, without limitation, by a security interest in the shares of the Company); and

(b)   Delivery by the Optionee of Common Stock already owned by the Optionee for all or part of the option price, provided the value (determined as set forth in (S) 6.1.11) of such Common Stock is equal on the date of exercise to the option price, or such portion thereof as the Optionee is authorized to pay by delivery of such stock.

6.1.7   TERMINATION OF EMPLOYMENT OR SERVICE. -- Unless determined otherwise by the Administrator in its absolute discretion, to

the extent not already expired or exercised, an Option shall terminate: (i) for Optionees not subject to (S) 16(b) of the Exchange Act at the earlier of (a) the Expiration Date or (b) three months after termination of employment or service as a consultant with the Company or any Affiliate; (ii) for Optionees who are non-employee directors, at the earlier of (a) the Expiration Date (as defined in (S) 6.1.12) or (b) seven months after the last day served as a director of the Company or any Affiliate; and (iii) for Optionees who are employees and either directors or otherwise subject to (S) 16(b) of the Exchange Act, at the earlier of (a) the Expiration Date, (b) three months after termination of employment with the Company or any Affiliate in the case of ISOs, and (c) in the case of NSOs, seven months after the later of termination of employment or services as a consultant with the Company or any Affiliate or the last day served as a director of the Company or any Affiliate; provided,

that an Option shall be exercisable after the date of termination of employment or service as a consultant only to the extent exercisable on the date of termination; and provided further, that if termination of employment or service as a consultant is due to the Optionee's death or "disability" (as determined in accordance with (S) 22(e)(3) of the Code), the Optionee, or the Optionee's personal representative (or any other person who acquires the Option from the Optionee by will or the applicable laws of descent and distribution), may at any time within 12 months after the termination of employment or service as a consultant (or such lesser period as is specified in the option agreement but in no event after the Expiration Date of the Option), exercise the rights to the extent they were exercisable on the date of the termination. A transfer of an Optionee from the Company to an Affiliate or vice versa, or from one Affiliate to another, or a leave of absence due to sickness, military service, or other cause duly approved by the Company, shall not be deemed a termination of employment or service as a consultant for purposes of this Plan.

6.1.8 REPURCHASE OF STOCK .-- Unless otherwise determined by the Administrator at the time of grant, the stock to be delivered pursuant to the exercise of any Option granted to an Optionee under this Plan will be subject to a right or repurchase in favor of the Company with respect to any Optionee whose employment or service with the Company is terminated. Such right of repurchase shall be at the option exercise price and, unless otherwise determined by the Administrator at the time of grant, shall expire in accordance with the following schedule related to the date of the grant of the Option, the date of first employment, or such other date as may be set by the Administrator (in any case, the "Vesting Base Date") with respect to each Option grant:

- One year after the Vesting Base Date the repurchase right shall expire with respect to 25% of the stock subject to grant.

- Thereafter, the repurchase right shall expire with respect to 2.0833 1/3% of the shares subject to grant at the end of each succeeding calendar month.

Determination of the number of shares subject to such right of repurchase shall be made as of the date the employee's employment by or consultant's service with the Company terminates. The Company's repurchase right may be waived by the Board.

6.1.9 WITHHOLDING AND EMPLOYMENT TAXES. -- At the time of exercise of an Option, the Optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. The Administrator may, in the exercise of its sole discretion, permit an Optionee to pay some or all of such taxes by means of a promissory note on such terms as the Administrator deems appropriate.

6.1.10 TAX STATUS OF COMPANY. -- Notwithstanding any other term or condition of the Plan, no option shall be exercisable if issuance of shares upon exercise would cause the Company to

cease to be a Subchapter S corporation under the relevant provisions of the Code.

6.1.11 OTHER PROVISIONS. -- Each Option granted under this Plan may contain such other terms, provisions, and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall includes such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of (S) 422A of the Code. If Options provide for a right of first refusal in favor of the Company with respect to stock acquired by employees, such Options shall further provide that the right of first refusal shall terminate upon the earlier of (i) the closing of the Company's initial registered public offering to the public generally, or (ii) the date ten (10) years after the grant date as set forth in (S) 6.1.4.

*Source:* SEC Info · www.secinfo.com · *Fran Finnegan & Company* · 8/12

6.1.12 DETERMINATION OF VALUE. -- For purposes of the Plan, the value of Common Stock or other securities of the Company shall be determined as follows:

(a) If the stock of the Company is listed on any established stock exchange or a national market system, including without limitation the National Market System of the National Association of Securities Dealers Automated Quotation System, its fair market value shall be the closing sales price for such stock or the closing bid if no sales were reported, as quoted on such system or exchange (or the largest such exchange) for the date the value is to be determined (or if there are no sales for such date, then for the last preceding business day on which there were sales), as reported in the Wall Street Journal or similar publication.

(b) If the stock of the Company is regularly quoted by a recognized securities dealer but selling prices are not reported, its fair market value shall be the mean between the high bid and low asked prices for the stock on the date the value is to be determined (or if there are no quoted prices for the date of grant, then for the last preceding business day on which there were quoted prices).

(c) In the absence of an established market for the stock, the fair market value thereof shall be determined by the Administrator, with reference to the Company's net worth, prospective earning power, dividend-paying capacity, and other relevant factors, including the goodwill of the Company, the economic outlook in the Company's industry, the Company's position in the industry and its management, and the values of stock of other corporation in the same or a similar line of business.

6.1.13 OPTION TERM. -- No Option shall be exercisable more than ten years after the date of grant, or such lesser period of time as is set forth in the option agreement (the end of the maximum exercise period stated in the option agreement is referred to in this Plan as the "Expiration Date"). No Option granted to a Ten Percent Shareholder (as defined in (S) 6.2.1) shall be exercisable more than five years after the date of grant.

6.2 TERMS AND CONDITIONS TO WHICH ONLY NSOS ARE SUBJECT. -- Options granted under this Plan which are designated as NSOs shall be subject to the following terms and conditions:

6.2.1 EXERCISE PRICE. -- The exercise price of a NSO shall be not less than 85 percent of the fair market value (determined in accordance with (S) 6.1.11) of the stock subject to the Option on the date of grant, except that the exercise price of a NSO granted to any person who owns, directly or by attribution, stock possessing more than ten percent of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent Shareholder"), shall in no event be less than 110 percent of such fair market value.

6.3 TERMS AND CONDITIONS TO WHICH ONLY ISOS ARE SUBJECT. -- Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

6.3.1 EXERCISE PRICE. -- The exercise price of an ISO, which shall be approved by the Board of Directors, shall be determined in accordance with the applicable provisions of the

*Source:* SEC Info · www.secinfo.com · *Fran Finnegan & Company* · 10/12

Code and shall in no event be less than the fair market value (determined as described in (S) 6.1.11) of the stock covered by the Option at the time the Option is granted, except that the exercise price of an ISO granted to any Ten Percent Shareholder shall in no event be less than 110 percent of such fair market value.

6.3.2 DISQUALIFYING DISPOSITIONS. -- If stock acquired upon exercise of an ISO is disposed of in a "disqualifying disposition" within the meaning of (S) 422A of the Code, the holder of the stock immediately before the disposition shall notify the Company in writing of the date and terms of the disposition and comply with any other requirements imposed by the Company in order to enable the Company to secure any related income tax deduction to which it is entitled.

6.3.3 LIMITATIONS ON ISO EXERCISABILITY. -- To the extent required to cause ISOs granted under this Plan to constitute "incentive stock options" within the meaning of (S) 422A(b) of the Code, notwithstanding any other provision in this Plan, all ISOs taken together granted to an Optionee under this Plan and under all incentive stock option plans of the Company or its Affiliates may not first become exercisable ("vest") at a rate of more than $100,000 worth of stock (measured on the grant date(s)) in any calendar year.

7. MANNER OF EXERCISE. -- An Optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price as provided in (S) 6.1.6. The date the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price and, if required, by payment of any federal or state withholding or employment taxes required to be withhold by virtue of exercise of the Option will be considered as the date such Option was exercised.

Promptly after receipt of written notice of exercise of an Option, the Company shall, without stock issue or transfer taxes to the Optionee or other person entitled to exercise the Option, deliver to the Optionee or such other person a certificate or certificates for the requisite number of shares of stock. An Optionee or transferee of an Option shall not have any privileges as a shareholder with respect to any stock covered by the Option until the date of issuance of a stock certificate.

8. EMPLOYMENT RELATIONSHIP. -- Nothing in this Plan or any Option granted thereunder shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any Optionee's employment or consulting at any time, nor confer upon any Optionee any right to continue in the employ or as a consultant of the Company or any of its Affiliates.

9. AMENDMENTS TO PLAN. -- The Board may amend this Plan at any time. Without the consent of an Optionee, no amendment may affect outstanding Options except to conform this Plan and ISOs granted under this Plan to federal or other tax laws relating to incentive stock options. No amendment shall require shareholder approval unless shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes of the Board otherwise concludes that shareholder approval is advisable.

10. SHAREHOLDER APPROVAL; TERM. -- This Plan shall become effective upon

adoption by the Board of Directors, provided, however, that no Option shall be exercisable unless and until written consent of the shareholders of the Company, or approval by shareholders of the Company voting at a validly called shareholders' meeting and holding a majority (or such greater number as may be required by law or applicable governmental regulations or orders) of the shares entitled to vote is obtained within 12 months after adoption by the Board of Directors. This Plan shall terminate ten years after adoption by the Board unless terminated earlier by the Board. the Board may terminate this Plan at any time without shareholder approval. No Options shall be granted after termination of this Plan, but termination shall not affect rights and obligations under then outstanding Options. Options may be granted and exercised under this Plan only after there has been compliance with all applicable federal and state securities laws.

***Source:*** **SEC Info · www.secinfo.com ·** ***Fran Finnegan & Company*** **· 2/12/08**

*Source:* SEC Info · www.secinfo.com · *Fran Finnegan & Company* · 12/12

# Exhibit 3

***If your word processor does not honor RTF margins, you must manually set them to these to get good results:*** Left - .75"; Right - .50"; Top - .75"; Bottom - .50".

**Sonic Solutions/CA · S-8 · Effective 10/27/98, On 10/27/98**
**Document 5 of 6 · EX-99.2 · 1994 Nonemployee Directors Stock Option Plan**

EXHIBIT 99.2

SONIC SOLUTIONS
1994 NONEMPLOYEE DIRECTORS STOCK OPTION PLAN
(as amended through June 1998)

1. Purpose.

The purpose of this Plan is to offer Nonemployee Directors of Sonic Solutions an opportunity to acquire a proprietary interest in the success of the Company, or to increase such interest, by purchasing shares of the Company's Common Stock. This Plan provides for the grant of Options to purchase Shares. Options granted hereunder shall be "Nonstatutory Options," and shall not include "incentive stock options" intended to qualify for treatment under Sections 421 and 422 of the Internal Revenue Code of 1986, as amended.

2. Definitions.

As used herein, the following definitions shall apply:

(a) "Administrator" shall mean the entity, either the Board or the committee of the Board, responsible for administering this Plan, as provided in Section 3.

(b) "Affiliate" means a parent or subsidiary corporation as defined in the applicable provisions (currently, Sections 424(e) and (f), respectively) of the Code.

(c) "Board" shall mean the Board of Directors of the Company, as constituted from time to time.

(d) "Beneficially Own" shall mean (a) any interest in a security which entitles a person to any of the rights or benefits of ownership even though such person may not be the owner of record or (b) securities owned by a person directly or indirectly, including (i) securities held by such person for such person's own benefit (regardless of how registered), (ii) securities held by others for such person's benefit (regardless of how registered), such as by custodians, brokers, nominees, pledgees, etc., (iii) securities held by an estate or trust in which such person has an interest as legatee or beneficiary, (iv) securities owned by a partnership of which such person is a partner, (v) securities held by a personal holding company of which such person is a shareholder, etc., (vi) securities held in the name of such person's spouse,

minor children and any other family member (sharing the same home) and (vii) securities held by such person as trustee for the benefit of family members (whether or not sharing the same household). A "beneficial owner" of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise has or shares: (a) voting power which includes the power to vote, or to direct the voting of, such security; and/or (b) investment power which includes the power to dispose, or to direct the disposition, of such security.

(e) "Change in Control" shall mean the occurrence of any one of the following:

(i) any "person", as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, an Affiliate, or a Company employee benefit plan, including any trustee of such plan acting as trustee) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 20% or more of the combined voting power of the Company's then outstanding securities;

(ii) the solicitation of proxies (within the meaning of Rule 14a-1(k) under the Exchange Act and any successor rule) with respect to the election of any director of the Company where such solicitation is for any candidate who is not a candidate proposed by a majority of the Board in office prior to the time of such election; or

(iii) the dissolution or liquidation (partial or total) of the Company or a sale of assets involving 30% or more of the assets of the Company, or any merger or reorganization of the Company, whether or not another entity is the survivor, or other transaction pursuant to which the holders, as a group, of all of the shares of the Company outstanding prior to the transaction hold, as a group, less than 70% of the shares of the Company outstanding after the transaction.

(f) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

(g) "Company" shall mean Sonic Solutions, a California corporation.

(h) "Common Stock" shall mean the Common Stock of the Company.

(i) "Disability" means permanent and total disability as determined by the Administrator in accordance with the standards set forth in Section 22(e)(3) of the Code.

(j) "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

(k) "Expiration Date" shall mean the last day of the term of an Option established under Section 6(c).

(l) "Fair Market Value" means as of any given date (a) the closing price of the Common Stock on the Nasdaq National Market as reported in the Wall Street Journal, or (b) if the Common Stock is no longer quoted on the Nasdaq National Market but is listed on an established stock exchange or quoted on any other established interdealer quotation system, the closing price for the Common Stock on such exchange or system, as reported in the Wall Street Journal, or if not so reported, as reported by any such exchange or system.

(m) "Nonemployee Director" shall mean any person who is (a) a member of the Board but is not an employee of the Company or any Affiliate of the Company, (b) has not been an employee of the Company or any Affiliate of the Company at any time during the preceding twelve months and (c) does not directly or indirectly beneficially own more than 5% of the Company's Common Stock. Service as a director does not in itself constitute employment for purposes of this definition.

(n) "Option" shall mean a stock option granted pursuant to this Plan. Each Option shall be a nonstatutory option not intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

(o) "Option Agreement" shall mean the written agreement described in Section 6 evidencing the grant of an Option to a Nonemployee Director and containing the terms, conditions and restrictions pertaining to such Option.

(p) "Optionee" shall mean a Nonemployee Director who holds an Option.

(q) "Plan" shall mean this Sonic Solutions 1994 Nonemployee Directors Stock Option Plan, as it may be amended from time to time.

(r) "Section" unless the context clearly indicates otherwise, shall refer to a Section of this Plan.

(s) "Shares" shall mean the shares of Common Stock subject to an Option granted under this Plan.

(t) "Tax Date" means the date defined in Section 7(c).

(u) "Termination" means, for purposes of the Plan, with respect to an Optionee, that the Optionee has ceased to be, for any reason, a director of the Company.

(v) "Window Period" means any 10-day period beginning on the third business day following the date of release for publication of the Company's quarterly or annual summary statements of earnings or such other period as is specified in Rule 16b-3(e) under the Exchange Act, as such rule may be amended from time to time, or any successor to such rule.

3. Administration.

(a) Administrator. The Plan shall be administered by the Board or, upon delegation by the Board, by a committee consisting of not less than two directors (in either case, the "Administrator"). Subject to the other provisions of this Plan, the Administrator shall have the authority, in its discretion: (i) with the consent of the optionee, to modify, amend or cancel any Option; (ii) to defer (with the consent of the optionee) or to accelerate the exercise date of any Option or to defer (with the consent of the optionee) or to accelerate the expiration of any right of repurchase which the Company may have with respect to shares issued or issuable upon exercise of any Option; (iii) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option; and (iv) to make all other determinations deemed necessary or advisable for the administration of this Plan. In connection with the administration of the Plan, the Administrator shall have the powers possessed by the Board. The Administrator may act only by a majority of its members. The Administrator may delegate administrative duties to such employees of the Company as it deems proper, so long as such delegation is not otherwise prohibited by

Rule 16b-3 under the Exchange Act. The Board at any time may terminate the authority delegated to any committee of the Board pursuant to this Section 3(a) and revest in the Board the administration of the Plan.

(b) Administrator Determinations Binding. Subject to the limitations set forth in Section 3(a), the Administrator may adopt, alter and repeal administrative rules, guidelines and practices governing the Plan as it from time to time shall deem advisable, may interpret the terms and provisions of the Plan, any Option and any Option Agreement and may otherwise supervise the administration of the Plan. All decisions made by the Administrator under the Plan shall be binding on all persons, including the Company and Optionees. No member of the Administrator shall be liable for any action that he or she has in good faith taken or failed to take with respect to this Plan or any Option.

4. Eligibility.

Only Nonemployee Directors may receive Options under this Plan.

5. Shares Subject to Plan.

(a) Aggregate Number. Subject to Section 9, the total number of shares of Common Stock reserved and available for issuance pursuant to Options under this Plan shall be 50,000 shares. Such shares may consist, in whole or in part, of authorized and unissued shares or shares reacquired in private transactions or open market purchases, but all shares issued under the Plan regardless of source shall be counted against the 50,000 share limitation. If any Option terminates or expires without being exercised in full, the shares issuable under such Option shall again be available for issuance in connection with other Options. If shares of Common Stock issued pursuant to an Option are repurchased by the Company, such Common Stock shall not again be available for issuance in connection with Options. To the extent the number of shares of Common Stock issued pursuant to an Option is reduced to satisfy withholding tax obligations, the number of shares withheld to satisfy the withholding tax obligations shall not be available for later grant under the Plan.

(b) No Rights as a Shareholder. An Optionee shall have no rights as a shareholder with respect to any Shares covered by his or her Option until the issuance (as evidenced by the appropriate entry on the

books of the Company or its duly authorized transfer agent) of a stock certificate evidencing such Shares. Subject to Section 9, no adjustment shall be made for dividends (ordinary or extraordinary, whether in cash, securities or other property), distributions, or other rights for which the record date is prior to the date the certificate is issued.

6. Grant of Options.

(a) Mandatory Initial Option Grants. Subject to the terms and conditions of this Plan, if any Nonemployee Director who is not, and has not been in the preceding twelve months, an officer or employee of the Company and who either (i) is a member of the Board of Directors at the date of adoption of this Plan by the Board or (ii) has not previously been a member of the Board and is elected or appointed as a member of the Board, then on the date of adoption of this Plan by the Board or the effective date of such appointment or election as the case may be, the Company shall grant to such Nonemployee Director an Option to purchase 5,000 Shares at an exercise price equal to the Fair Market Value of such Shares on the date of such option grant.

(b) Mandatory Annual Option Grants. Subject to the terms and conditions of this Plan, on the date of the first meeting of the Board immediately following the annual meeting of shareholders of the Company (even if held on the same day as the meeting of shareholders) commencing with the annual meeting of shareholders held in 1995, the Company shall grant to each such Nonemployee Director then in office an Option to purchase 5,000 Shares at an exercise price equal to the Fair Market Value of such Shares on the date of such option grant.

(c) Terms; Vesting. Subject to the terms and conditions of this Plan, each Option granted pursuant to this Plan shall be for a term of ten years. Each Option granted under Section 6(a) and Section 6(b) shall become exercisable with respect to 1/48th of the number of Shares covered by such Option for each calendar month which elapses after the date of grant, so that such Option shall be fully exercisable on the fourth anniversary of the date such Option was granted.

(d) [deleted]

(e) Option Agreement. As soon as practicable after the grant of an Option, the Optionee and the Company shall enter into a written

Option Agreement which specifies the date of grant, the number of Shares, the option price, the vesting period and the other terms and conditions applicable to the Option.

(f) Transferability. No Option shall be transferable other than by will or the laws of descent and distribution, and an Option shall be exercisable during the Optionee's lifetime only by the Optionee.

(g) Limits on Exercise. Subject to the other provisions of this Plan, an Option shall be exercisable in such amounts as are specified in the Option Agreement.

(h) Exercise Procedures. To the extent the right to purchase Shares has accrued, Options may be exercised, in whole or in part, from time to time, by written notice from the Optionee to the Company stating the number of Shares being purchased, accompanied by payment of the exercise price for the Shares, and other applicable amounts, as provided in Section 7.

(i) Termination. In the event of Termination, Options held at the date of Termination (and only to the extent then exercisable) may be exercised in whole or in part at any time within three months after the date of Termination (but in no event after the Expiration Date), but not thereafter. Notwithstanding the foregoing, if Termination is due to retirement or to death or Disability, Options held at the date of Termination (and only to the extent then exercisable) may be exercised in whole or in part by the Optionee in the case of retirement or Disability, by the participant's guardian or legal representative or by the person to whom the Option is transferred by will or the laws of descent and distribution, at any time within two years from the date of Termination (but in no event after the Expiration Date).

7. Payment and Taxes upon Exercise of Options.

(a) Purchase Price. The purchase price of Shares issued under this Plan shall be paid in full at the time an Option is exercised.

(b) Tax Withholding. The Optionee shall pay to the Company, promptly upon exercise of an Option or, if later, the date that the amount of such obligations becomes determinable (in either case, the "Tax Date"), all applicable federal, state, local and foreign withholding taxes that the Administrator, in its discretion, determines to result upon exercise of an

Source: SEC Info · www.secinfo.com · Fran Finnegan & Company · 7/11

Option or from a transfer or other disposition of shares of Common Stock acquired upon exercise of an Option or otherwise related to an Option or shares of Common Stock acquired in connection with an Option.

(c) Delivery of Purchase Price and Tax Withholding. Optionees may make all or any portion of any payment due to the Company:

(i) upon exercise of an Option; or

(ii) with respect to federal, state, local or foreign tax payable in connection with the exercise of an Option, by delivery of (x) check, (y) a promissory note of the Optionee or (z) shares of Common Stock so long as, if applicable, such property constitutes valid consideration for the Common Stock under, and otherwise complies with, applicable law. No promissory note under the Plan shall have a term (including extensions) of more than five years or shall be of a principal amount exceeding 90% of the purchase price paid by the borrower. Exercise of an Option may be made pursuant to a "cashless exercise/sale" procedure pursuant to which funds to pay for exercise of the Option are delivered to the Company by a broker upon receipt of stock certificates from the Company, or pursuant to which Optionees obtain margin loans from brokers to fund the exercise of the Option.

(d) Tax Payment Election. A person who has exercised an Option may make an election (i) to deliver to the Company a promissory note of the Optionee on the terms set forth in Section 7(b), (ii) to tender to the Company previously-owned shares of Common Stock held for at least six months, or (iii) to have shares of Common Stock to be obtained upon exercise of the Option withheld by the Company on behalf of the Optionee, to pay the amount of tax that the Administrator, in its discretion, determines to be required to be withheld by the Company. Any election pursuant to clause (iii) above by a Optionee subject to Section 16 of the Exchange Act shall be subject to the following limitations: (1) such election must be made at least six months before the Tax Date and shall be irrevocable; or (2) such election must be made in (or made earlier to take effect in) any Window Period (and the withholding of the shares of Common Stock shall take place during such Window Period) and shall be subject to approval by the Board, which approval may be given any time after such election has been made, and the Option must be held at least six months prior to the Tax Date; provided, that, the election referenced in clause 7(d)(ii) above may not be made unless (A) such election is consistent with Rule 16b-3(c)(2)(ii) under

the Exchange Act, and (B) the Company has been subject to the reporting requirements of Section 13(a) of the Exchange Act for at least one year and has filed all reports and statements required to be filed pursuant to that section for that year. The right to so withhold shares of Common Stock shall relate separately to each Option.

(e) Valuation of Shares. Any shares tendered to or withheld by the Company will be valued at Fair Market Value on such date. The value of the shares of Common Stock tendered or withheld may not exceed the required federal, state, local and foreign withholding tax obligations as computed by the Company.

8. Use of Proceeds.

Proceeds from the sale of Shares pursuant to this Plan shall be used for general corporate purposes.

9. Adjustment of Shares.

In the event of any merger, reorganization, consolidation, recapitalization, stock dividend, stock split or other change in corporate structure affecting the Common Stock, appropriate adjustments shall be made by the Administrator in the aggregate number and kind of shares of Stock reserved for issuance under the Plan and in the number, kind and exercise price of shares subject to outstanding Options; provided, however, that the number of shares subject to any Option shall always be a whole number.

10. Effect of Change in Control.

In the event of a "Change in Control," any Options outstanding as of the date such Change in Control is determined to have occurred and not then exercisable and vested shall become fully exercisable and vested.

11. No Right to Directorship.

Neither this Plan nor any Option granted hereunder shall confer upon any Optionee any right with respect to continuation of the Optionee's membership on the Board or shall interfere in any way with provisions in the Company's Articles of Incorporation and Bylaws relating to the nomination,

election, appointment, terms of office, and removal of members of the Board.

12. Legal Requirements.

The Company shall not be obligated to offer or sell any Shares upon exercise of any Option unless the Shares are at that time effectively registered or exempt from registration under the federal securities laws and the offer and sale of the Shares are otherwise in compliance with all applicable securities laws and the regulations of any stock exchange on which the Company's securities may then be listed. The Company shall have no obligation to register the securities covered by this Plan under the federal securities laws or take any other steps as may be necessary to enable the securities covered by this Plan to be offered and sold under federal or other securities laws. Upon exercising all or any portion of an Option, an Optionee may be required to furnish representations or undertakings deemed appropriate by the Company to enable the offer and sale of the Shares or subsequent transfers of any interest in the Shares to comply with applicable securities laws. Certificates evidencing Shares acquired upon exercise of Options shall bear any legend required by, or useful for purposes of compliance with, applicable securities laws, this Plan or the Option Agreements.

13. Duration and Amendments.

(a) Duration. This Plan shall become effective upon adoption by the Board provided, however, that no Option shall be exercisable unless and until written consent of the shareholders of the Company, or approval of shareholders of the Company voting at a validly called shareholders' meeting, is obtained within 12 months after adoption by the Board. If such shareholder approval is not obtained within such time, Options granted hereunder shall terminate and be of no force and effect from and after expiration of such 12-month period.

(b) Amendment and Termination. The Board may amend, alter or discontinue the Plan or any Option, but no amendment, alteration or discontinuance shall be made which would impair the rights of an Optionee under an outstanding Option without the Optionee's consent. In addition, the Board may not amend or alter the Plan without the approval of shareholders of the Company entitled to vote at a duly held shareholders' meeting or by an action by written consent and, if at a meeting, a quorum of

the voting power of the Company is represented in person or by proxy, where such amendment or alteration would, except as expressly provided in the Plan, increase the total number of shares reserved for issuance pursuant to Options under the Plan or in such other circumstances as the Board deems appropriate to comply with Rule 16b-3 under the Exchange Act or otherwise. Notwithstanding any other provision of this Section 12(b), the provisions of the Plan governing (A) who is granted Options, (B) the number of Shares to be covered by each Option, (C) the exercise price of each Option, (D) the timing of the grant of each Option, or (E) the period within which each Option may be exercised, shall not be amended more than once every six months, other than to comport with changes in the Code or the rules thereunder, the Employee Retirement Income Security Act of 1974, as amended, or the rules thereunder, or the Exchange Act or the rules and regulations thereunder.

(c) Effect of Amendment or Termination. No Shares shall be issued or sold under this Plan after the termination hereof, except upon exercise of an Option granted before termination. Termination or amendment of this Plan shall not affect any Shares previously issued and sold or any Option previously granted under this Plan.

14. Rule 16b-3.

With respect to persons subject to Section 16 of the Exchange Act, transactions under this Plan are intended to comply with the applicable conditions of Rule 16b-3 under the Exchange Act. To the extent any provision of this Plan or action by the Administrator fails to so comply, it shall be adjusted to comply with Rule 16b-3, to the extent permitted by law and deemed advisable by the Administrator. It shall be the responsibility of persons subject to Section 16 of the Exchange Act, not of the Company or the Administrator, to comply with the requirements of Section 16 of the Exchange Act; and neither the Company nor the Administrator shall be liable if this Plan or any transaction under this Plan fails to comply with the applicable conditions of Rule 16b-3, or if any such person incurs any liability under Section 16 of the Exchange Act.

***Source:*** **SEC Info · www.secinfo.com ·** ***Fran Finnegan & Company*** **· 2/12/08**

*Source:* SEC Info · www.secinfo.com · *Fran Finnegan & Company* · 11/11

# Exhibit 4

*If your word processor does not honor RTF margins, you must manually set them to these to get good results:* Left - .75"; Right - .50"; Top - .75"; Bottom - .50".

**Sonic Solutions/CA · S-8 · Effective 10/27/98, On 10/27/98**
**Document 6 of 6 · EX-99.3 · 1998 Stock Option Plan**

EXHIBIT 99.3

1998 STOCK OPTION PLAN
OF
SONIC SOLUTIONS

1. PURPOSES OF THE PLAN

The purposes of the 1998 Stock Option Plan (the "Plan") of Sonic Solutions, a California corporation (the "Company"), are to:

(a) Encourage selected employees, directors and consultants to improve operations and increase profits of the Company;

(b) Encourage selected employees, directors and consultants to accept or continue employment or association with the Company or any Affiliate (as defined below); and

(c) Increase the interest of selected employees, directors and consultants in the Company's welfare through participation in the growth in value of the common stock of the Company (the "Common Stock").

Options granted under this Plan ("Options") may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or "nonqualified options" ("NQOs").

2. ELIGIBLE PERSONS

Every person who at the date of grant of an Option is an employee of the Company or of any Affiliate of the Company is eligible to receive NQOs or ISOs under this Plan. Every person who at the date of grant is a director of or consultant to the Company or to any Affiliate of the Company is eligible to receive NQOs under this Plan. The term "Affiliate" as used in the Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently Sections 425(e) and (f), respectively) of the Code. The term "employee" includes an officer or director who is an employee, of the Company. The term "consultant" includes persons employed by, or otherwise affiliated with, a consultant.

3. STOCK SUBJECT TO THIS PLAN

Subject to the provisions of Section 6.1(a) of the Plan, the initial maximum aggregate number of shares of stock which may be issued on exercise of Options granted pursuant to this Plan is 1,000,000 shares of Common Stock (the "Share Limit"). The Share Limit shall automatically be increased on the last business day of each fiscal year by an amount equal to 2% of the total number of shares of Common Stock outstanding on such date; provided,

however, that in no event shall such automatic share increase cause the Share Limit to exceed 2,000,000 shares. The shares covered by the portion of any grant under the Plan which expires unexercised shall become available again for grants under the Plan. Shares issued pursuant to an Option which are repurchased by the Company in accordance with the terms of the Plan shall become available again for grants as NQOs under the Plan.

4. ADMINISTRATION

4.1 This Plan shall be administered by the Board of Directors of the Company (the "Board"), or by a committee (the "Committee") of at least two (2) Board members to which administration of the Plan is delegated or, with respect to persons other than directors and "executive officers" as defined in the Securities Exchange Act and the rules and regulations thereunder, by the Chief Executive Officer of the Company (in each case, the "Administrator"), in accordance with the provisions of Rule 16b-3 promulgated by the Securities and Exchange Commission ("Rule 16b-3"), or by any successor rule thereto.

4.2 Subject to the other provisions of this Plan, the Administrator shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options shall be granted, and the number of shares subject to each Option; (v) to interpret this Plan; (vi) to prescribe, amend and rescind rules, regulations and guidelines relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical), including, but not limited to, the time or times at which Options shall be exercisable; (viii) with the consent of the optionee, to modify or amend any Option; (ix) to defer (with the consent of the optionee) or to accelerate the exercise date of any Option or to defer (with the consent of the optionee) or to accelerate the expiration of any right of repurchase which the Company may have with respect to shares issued or issuable upon exercise of any Option; (x) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option; and (xi) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

4.3 All questions of interpretation, implementation and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons, including the Company and all options.

5. GRANTING OF OPTIONS; OPTION AGREEMENT

5.1 No Options shall be granted under this Plan after ten (10) years from the date of adoption of this Plan by the Board.

5.2 Each Option shall be evidenced by a written stock option agreement, in form satisfactory to the Company, executed by the Company and the person to whom such Option is granted; provided, however, that the failure by the Company, the optionee or both to execute such an agreement shall not invalidate the granting of an Option.

5.3 The agreement shall specify whether each Option it evidences is a NQO or an ISO. However, notwithstanding such designations, if the aggregate fair market value of the shares under Options designated as ISOs would become exercisable for the first time by any optionee at a rate in excess of $100,000 in any calendar year (under all plans of the Company), then unless otherwise provided in the stock option agreement or by the Administrator, the exercisability of ISOs (or portions thereof) having the highest per share exercise price shall be delayed until the earliest time at which their exercisability would not cause the $100,000 limitation to be exceeded. For purposes of this Section 5.3, Options shall be taken into account in the order in which they were granted, and the fair market value of the shares shall be determined as of the time the Option with respect to such shares is granted.

5.4 The Administrator may approve the grant of Options under the Plan to persons who are expected to become employees, directors or consultants of the Company, but are not employees, directors or consultant at the date of approval. In such cases, the Option shall be deemed granted, without further approval, on the date the grantee assumes the employment or consulting relationship forming the basis for such grant, and, in addition, satisfies all requirements of this Plan for Options granted on that date.

6. TERMS AND CONDITIONS OF OPTIONS

Each Option granted under this Plan shall be designated as an NQO or an ISO. Each Option shall be subject to the terms and conditions set forth in Section 6.1. NQOs shall also be subject to the terms and conditions set forth in Section 6.2, but not those set forth in Section 6.3. ISOs shall also be subject to the terms and conditions set forth in Section 6.3, but not those set forth in Section 6.2.

6.1 Terms and Conditions to Which All Options Are Subject. All Options granted under this Plan shall be subject to the following terms and conditions:

(a) Changes in Capital Structure. Subject to Section 6.1(b), if the Common Stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend or recapitalization, or converted into or exchanged for other securities as a result of a merger, consolidation or reorganization, appropriate adjustments or substitutions shall be made in: (i) the number and class of shares of Common Stock subject to this Plan and each Option outstanding under this Plan; and (ii) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be at the discretion of and subject to approval by the Administrator in its sole discretion.

(b) Corporate Transactions. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each optionee at least 30 days prior to such proposed action. To the extent not previously exercised, all Options will terminate immediately prior to the consummation of such proposed action. In the event of a merger or consolidation involving the Company in which the Company is not the surviving corporation (other than with a subsidiary of the Company solely to effect a reincorporation) or in which the shareholders of the Company prior to such transaction own less than 50% of the shares entitled to vote of the surviving entity, or in the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Options shall be assumed or equivalent options shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Options or to substitute equivalent options therefor, unless the Administrator shall determine otherwise, all Options shall be fully exercisable for a period of thirty (30) days from the date notice is given under this Section 6.1(b) and shall terminate upon expiration of such 30-day period.

(c) Time of Option Exercise. Except as necessary to satisfy the requirements of Section 422 of the Code and subject to Section 5, Options granted under this Plan shall be exercisable: (a) immediately as of the effective date of the stock option agreement granting the Option; or (b) at such other times as are specified in the written stock option agreement relating to such Option. No Option shall be exercisable, however, until a written stock option agreement in form satisfactory to the Company is executed by the Company and the optionee.

(d) Option Grant Date. Except in the case of advance approvals described in Section 5.4, the date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant.

(e) Nonassignability of Option Rights. No Option granted under this Plan shall be assignable or otherwise transferable by the optionee except by will or by the

laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code, except, with respect to NQOs, which may be assignable or otherwise transferable by the optionee as the Administrator may determine in its sole discretion. During the life of the optionee, an Option shall be exercisable only by the optionee, except, with respect to NQOs, as the Administrator may determine in its sole discretion.

(f) Payment. Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. At the time an Option is granted or exercised, the Administrator, in the exercise of its absolute discretion, may authorize any one or more of the following additional methods of payment: (i) acceptance of the optionee's full recourse promissory note for all or part of the Option price, payable on such terms and bearing such interest rate as determined by the Administrator (but in no event less than the minimum interest rate specified under the Code at which no additional interest on debt instruments of such type would be imputed), which promissory note may be either secured or unsecured in such manner as the Administrator shall approve (including, without limitation, by a security interest in the shares of the Company); or (ii) delivery by the optionee of Common Stock already owned by the optionee for all or part of the Option price, provided the value (determined as set forth in Section 6.1(k) of such Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by delivery of such stock; provided, however, that if an optionee has exercised any portion of any option granted by the Company by delivery of Common Stock, the optionee may not, within six (6) months following such exercise, exercise any Option granted under this Plan by delivery of Common Stock.

(g) Termination of Employment or Service. Unless determined otherwise by the Administrator in its absolute discretion, to the extent not already expired or exercised, an Option shall terminate at the earlier of: (i) the Expiration Date (as defined in Section 6.1(k); or (ii) three (3) months after termination of employment with the Company or any Affiliate (with respect to employees) or three (3) months after the last day served as a director or consultant to the Company or any Affiliate (with respect to consultants); provided, that an Option shall be exercisable after the date of termination of employment or service as a consultant only to the extent exercisable on the date of termination; and provided further, that if termination of employment or service as a consultant is due to the optionee's death or "disability" (as determined in accordance with Section 22(e)(3) of the Code), the optionee, or the optionee's personal representative (or any other person who acquires the Option from the optionee by will or the applicable laws of descent and distribution), may at any time within twelve (12) months after the termination of employment or service as a consultant (or such lesser period as is specified in the option agreement but in no event after the Expiration Date of the Option), exercise the rights to the extent they were exercisable on the date of the termination. A transfer of an optionee from the Company to an Affiliate or vice versa, or from one Affiliate to another, or a leave of absence due to sickness, military service or other cause duly

approved by the Company, shall not be deemed a termination of employment or the consulting relationship for purposes of this Plan.

(h) Repurchase of Stock. Unless otherwise provided for by the Administrator in the option agreement, the Common Stock to be delivered pursuant to the exercise of any Option granted to an employee or consultant under this Plan may be subject to a right of repurchase in favor of the Company, with respect to any employee or consultant whose employment or consulting relationship with the Company is terminated, at the Option exercise price per share, and such shares shall be held by the Company in escrow to facilitate the Company's repurchase right. Unless otherwise provided for by the Administrator in the option agreement, the Company's repurchase right shall expire as to 25% of the total amount of the shares subject to the Option on the first anniversary date of the Option grant or such other date as may be set by the Administrator and shall expire as to an additional 2.0833-1/3% of such shares at the end of each succeeding calendar month. Determination of the number of shares subject to such right of repurchase shall be made as of the date the employee's employment by or consultant's consulting relationship with, the Company terminates, not as of the date that any Option granted to such employee or consultant is thereafter exercised. The Company's repurchase right may be waived by the Board.

(i) Withholding and Employment Taxes. At the time of exercise of an Option (or at such later time(s) as the Company may prescribe), the optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. If and to the extent authorized by the Committee, in its sole discretion, an optionee may make an election (i) to deliver to the Company a promissory note of the participant on the terms set forth in Section 6.1(f), (ii) to tender to the Company previously owned shares of Common Stock, or (iii) to have shares of Common Stock to be obtained upon exercise of the Option withheld by the Company on behalf of the participant, to pay the amount of tax that the Committee, in its discretion, determines to be required to be withheld by the Company. Any shares tendered to or withheld by the Company shall be valued at fair market value on such date. The value of the shares of Stock tendered or withheld may not exceed the required federal, state, local and foreign withholding tax obligations as computed by the Company.

(j) Other Provisions. Each Option granted under this Plan may contain such other terms, provisions and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall include such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of Section 422 of the Code.

(k) Option Term. No Option shall be exercisable more than ten (10) years after the date of grant, or such lesser period of time as is set forth in the option

agreement (the end of the exercise period stated in the option agreement is referred to in this Plan as the "Expiration Date"). Notwithstanding the foregoing, no ISO granted to a Ten Percent Stockholder (as defined in Section 6.3(a) shall be exercisable more than five (5) years after the date of grant

(l) Limitation on Option Grants. The Company may not grant options under the Plan for more than 500,000 shares to any one participant in any fiscal year.

6.2 Terms and Conditions to Which Only NQOs Are Subject. The exercise price of a NQO shall be determined by the Administrator and shall in no event be less than 85% of the fair market value of the Common Stock subject to the Option on the date of grant. For purposes of the Plan, the "Fair Market Value" of the Common Stock means, as of any given date, the closing sales price of the Common Stock reported on the Nasdaq National Market System or, if the Common Stock is not traded on the Nasdaq National Market, the fair market value of the Common Stock as determined by the Administrator in good faith.

6.3 Terms and Conditions to Which Only ISOs Are Subject. Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

(a) Exercise Price. The exercise price of an ISO shall be determined in accordance with the applicable provisions of the Code and shall in no event be less than the Fair Market Value of the Common Stock subject to the Option on the date of grant, except that the exercise price of an ISO granted to any person who owns, directly or by attribution, shares possessing more than 10% of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent Stockholder") shall in no event be less than 110% of such Fair Market Value.

(b) Disqualifying Dispositions. If stock acquired upon exercise of an ISO is disposed of in a "disqualifying disposition" within the meaning of Section 422 of the Code, the holder of the stock immediately before the disposition shall notify the Company in writing of the date and terms of the disposition and comply with any other requirements imposed by the Company in order to enable the Company to secure any related income tax deduction to which it is entitled.

7. MANNER OF EXERCISE

7.1 An optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price as provided in Section 6.1(f) and, if required, by payment of any federal or state withholding or employment taxes required to be withheld by virtue of exercise of the Option. The date

the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price and any required federal or state withholding or employment taxes will be considered as the date such Option was exercised. There is no limit on the number of times Options may be exercised in any calendar year, unless the President of the Company or the Board prescribes such a limit.

7.2 Promptly after the date an Option is exercised, the Company shall, without stock issue or transfer taxes to the optionee or other person entitled to exercise the Option, deliver to the optionee or such other person a certificate or certificates for the requisite number of shares of Common Stock. An optionee or transferee of an optionee shall not have any privileges as a shareholder with respect to any Common Stock covered by the Option until the date of issuance of a stock certificate.

8. EMPLOYMENT OR CONSULTING RELATIONSHIP

Nothing in this Plan or any Option granted thereunder shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any optionee's employment or consulting at any time, nor confer upon any optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

9. FINANCIAL INFORMATION

The Company shall provide to each optionee during the period such optionee holds an outstanding Option a copy of the financial statements of the Company as prepared either by the Company or independent certified public accountants of the Company. Such financial statements shall be delivered as soon as practicable following the end of the Company's fiscal year during the period Options are outstanding.

10. LEGAL REQUIREMENTS

The Company shall not be obligated to offer or sell any shares upon exercise of any Option unless the shares are at that time effectively registered or exempt from registration under the federal securities laws and the offer and sale of the shares are otherwise in compliance with all applicable securities laws and the regulations of any stock exchange on which the Company's securities may then be listed. The Company shall have no obligation to register the shares of Common Stock covered by this Plan under the federal securities laws or take any other steps as may be necessary to enable the shares of Common Stock covered by this Plan to be offered and sold under federal or other securities laws. Upon exercising all or any portion of an Option, an optionee may be required to furnish representations or undertaking deemed appropriate by the Company to enable the offer and sale of the shares or subsequent transfers of any interest in the shares to comply with applicable securities laws. Certificates evidencing shares acquired

upon exercise of Options shall bear any legend required by, or useful for purposes of compliance with, applicable securities laws, this Plan or the option agreements.

11. AMENDMENTS TO PLAN

The Board may amend this Plan at any time. Without the consent of an optionee, no amendment may adversely affect outstanding Options except to conform this Plan and ISOs granted under this Plan to federal or other tax laws relating to incentive stock options. No amendment shall require shareholder approval unless:

(a) shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes;

(b) shareholder approval is required to meet the exemptions provided by Rule 16b-3, or any successor rule thereto; or

(c) the Board otherwise concludes that shareholder approval is advisable.

12. STOCKHOLDER APPROVAL; TERM

This Plan shall become effective upon adoption by the Board of Directors; provided, however, that no Option shall be exercisable unless and until written consent of holders of a majority of the outstanding shares of capital stock of the Company, or approval by holders of a majority of shares of capital stock of the Company present, or represented, and entitled to vote at a validly called shareholders' meeting (or such greater number as may be required by law or applicable governmental regulations or orders) is obtained within twelve (12) months after adoption by the Board. This Plan shall terminate ten (10) years after adoption by the Board unless terminated earlier by the Board. The Board may terminate this Plan at any time without shareholder approval. No Options shall be granted after termination of this Plan, but termination shall not affect rights and obligations under then outstanding Options.

# Exhibit 5

deductible loss on the surrendered shares. Instead, shares acquired upon exercise that are equal in value to the fair market value of the shares surrendered

<PAGE>

in payment are treated as substitute for the surrendered shares, taking as their basis and holding period the basis and holding period that the Optionee had in the surrendered shares. The value of the additional shares is taxable as ordinary income (subject to the discussion above on restricted stock) and the additional shares will be treated as newly acquired and will have a basis equal to their fair market value on the exercise date.

If the surrendered shares are statutory option stock as described above under "Incentive Stock Options", with respect to which the applicable holding period requirements for favorable income tax treatment have not expired, then the newly acquired shares substituted for the statutory option shares should remain subject to the federal income tax rules governing the surrendered shares, but the surrender should not constitute a Disqualifying Disposition of the surrendered stock.

<PAGE>

## INDEPENDENT PUBLIC ACCOUNTANTS

The Board has selected KPMG LLP as independent public accountants to audit the financial statements of the Company for the 2001 fiscal year. KPMG LLP has acted as the Company's auditors since March 31, 1993. Representatives of KPMG LLP are expected to be present at the Annual meeting and will have an opportunity to make a statement if they desire to do so. The representatives of KPMG LLP also will be available to respond to questions raised during the meeting.

## SHAREHOLDER PROPOSALS

Proposals of shareholders of the Company which are intended to be presented at the Company's 2001 annual meeting of shareholders must be received by the Secretary of the Company no later than March 31, 2001 in order to be included in the proxy soliciting material relating to that meeting.

## OTHER MATTERS

The Company knows of no other matters to be submitted at the Annual Meeting. If any other matters properly come before the Annual Meeting, it is the intention of the persons named in the enclosed proxy to vote the shares they represent as the Board may recommend.

THE BOARD OF DIRECTORS

Dated: July 28, 2000

<PAGE>

## 2000 STOCK OPTION PLAN
## OF
## SONIC SOLUTIONS

1. PURPOSES OF THE PLAN

The purposes of the 2000 Stock Option Plan (the "Plan") of Sonic Solutions, a California corporation (the "Company"), are to:

(a) Encourage selected employees, directors and consultants to improve operations and increase profits of the Company;

(b) Encourage selected employees, directors and consultants to accept or continue employment or association with the Company or any Affiliate (as defined below); and

(c) Increase the interest of selected employees, directors and consultants in the Company's welfare through participation in the growth in value of the common stock of the Company (the "Common Stock").

Options granted under this Plan ("Options") may be "incentive stock options" ("ISOs") intended to satisfy the requirements of Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or "nonqualified options" ("NQOs").

2. ELIGIBLE PERSONS

Every person who at the date of grant of an Option is an employee of the Company or of any Affiliate of the Company is eligible to receive NQOs or ISOs under this Plan. Every person who at the date of grant is a director of or consultant to the Company or to any Affiliate of the Company is eligible to receive NQOs under this Plan. The term "Affiliate" as used in the Plan means a parent or subsidiary corporation as defined in the applicable provisions (currently Sections 425(e) and (f), respectively) of the Code. The term "employee" includes an officer or director who is an employee, of the Company. The term "consultant" includes persons employed by, or otherwise affiliated with, a consultant.

3. STOCK SUBJECT TO THIS PLAN

Subject to the provisions of Section 6.1(a) of the Plan, the initial maximum aggregate number of shares of stock which may be issued on exercise of Options granted pursuant to this Plan is 3,000,000 shares of Common Stock (the "Share Limit"). The Share Limit shall automatically be increased on the last day of each fiscal year by an amount up to the lesser of (i) 5% of the total number of shares of Common Stock
<PAGE>

outstanding on such date, (ii) 750,000 shares of Common Stock, or (iii) an amount determined by the Company's Board of Directors (the "Board"). The shares covered by the portion of any grant under the Plan which expires unexercised shall become available again for grants under the Plan. Shares issued pursuant to an Option which are repurchased by the Company in accordance with the terms of the Plan shall become available again for grants as NQOs under the Plan.

4. ADMINISTRATION

4.1 This Plan shall be administered by the Board, or by a committee (the "Committee") of at least two Board members to which administration of the Plan is delegated or, with respect to persons other than directors and "executive

officers" as defined in the Securities Exchange Act and the rules and regulations thereunder, by the Chief Executive Officer of the Company (in each case, the "Administrator"), in accordance with the provisions of Rule 16b-3 promulgated by the Securities and Exchange Commission ("Rule 16b-3"), or by any successor rule thereto.

4.2 Subject to the other provisions of this Plan, the Administrator shall have the authority, in its discretion: (i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options shall be granted, and the number of shares subject to each Option; (v) to interpret this Plan; (vi) to prescribe, amend and rescind rules, regulations and guidelines relating to this Plan; (vii) to determine the terms and provisions of each Option granted (which need not be identical), including, but not limited to, the time or times at which Options shall be exercisable; (viii) with the consent of the optionee, to modify or amend any Option; (ix) to defer (with the consent of the optionee) or to accelerate the exercise date of any Option or to defer (with the consent of the optionee) or to accelerate the expiration of any right of repurchase which the Company may have with respect to shares issued or issuable upon exercise of any Option; (x) to authorize any person to execute on behalf of the Company any instrument evidencing the grant of an Option; and (xi) to make all other determinations deemed necessary or advisable for the administration of this Plan. The Administrator may delegate nondiscretionary administrative duties to such employees of the Company as it deems proper.

4.3 All questions of interpretation, implementation and application of this Plan shall be determined by the Administrator. Such determinations shall be final and binding on all persons, including the Company and all options.

5. GRANTING OF OPTIONS; OPTION AGREEMENT

<PAGE>

5.1 No Options shall be granted under this Plan after ten years from the date of adoption of this Plan by the Board.

5.2 Each Option shall be evidenced by a written stock option agreement, in form satisfactory to the Company, executed by the Company and the person to whom such Option is granted; provided, however, that the failure by the Company, the optionee or both to execute such an agreement shall not invalidate the granting of an Option. No Option shall be exercisable, however, until a written stock option agreement in form satisfactory to the Company is executed by the Company and the optionee.

5.3 The agreement shall specify whether each Option it evidences is a NQO or an ISO.

5.4 The Administrator may approve the grant of Options under the Plan to persons who are expected to become employees, directors or consultants of the Company, but are not employees, directors or consultant at the date of approval. In such cases, the Option shall be deemed granted, without further approval, on the date the grantee assumes the employment or consulting relationship forming the basis for such grant, and, in addition, satisfies all requirements of this Plan for Options granted on that date.

6. TERMS AND CONDITIONS OF OPTIONS

Each Option granted under this Plan shall be designated as an NQO or an ISO. Each Option shall be subject to the terms and conditions set forth in Section 6.1. NQOs shall also be subject to the terms and conditions set forth in Section 6.2, but not those set forth in Section 6.3. ISOs shall also be subject to the terms and conditions set forth in Section 6.3, but not those set forth in Section 6.2.

6.1 Terms and Conditions to Which All Options Are Subject. All Options granted under this Plan shall be subject to the following terms and conditions:

(a) Changes in Capital Structure. Subject to Section 6.1(b), if the Common Stock of the Company is changed by reason of a stock split, reverse stock split, stock dividend or recapitalization, or converted into or exchanged for other securities as a result of a merger, consolidation or reorganization, appropriate adjustments or substitutions shall be made in: (i) the number and class of shares of Common Stock subject to this Plan and each Option outstanding under this Plan, including the number of shares to be added to the Plan pursuant to Section 3; and (ii) the exercise price of each outstanding Option; provided, however, that the Company shall not be required to issue fractional shares as a result of any such adjustments. Each such adjustment shall be at the discretion of and subject to approval by the Administrator in its sole discretion.

<PAGE>

(b) Corporate Transactions. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each optionee at least 30 days prior to such proposed action. To the extent not previously exercised, all Options will terminate immediately prior to the consummation of such proposed action. In the event of a merger or consolidation involving the Company in which the Company is not the surviving corporation (other than with a subsidiary of the Company solely to effect a reincorporation) or in which the shareholders of the Company prior to such transaction own less than 50% of the shares entitled to vote of the surviving entity, or in the event of a sale of all or substantially all of the assets of the Company in which the shareholders of the Company receive securities of the acquiring entity or an affiliate thereof, all Options shall be assumed or equivalent options shall be substituted by the successor corporation (or other entity) or a parent or subsidiary of such successor corporation (or other entity); provided, however, that if such successor does not agree to assume the Options or to substitute equivalent options therefor, unless the Administrator shall determine otherwise, all Options shall be fully vested and exercisable for a period of 30 days before the merger or consolidation and shall terminate upon such merger or consolidation.

(c) Time of Option Exercise. Except as necessary to satisfy the requirements of Section 422 of the Code and subject to Section 5, Options granted under this Plan shall be exercisable: (a) immediately as of the effective date of the stock option agreement granting the Option; or (b) at such other times as are specified in the written stock option agreement relating to such Option.

(d) Option Grant Date. Except in the case of advance approvals

described in Section 5.4, the date of grant of an Option under this Plan shall be the date as of which the Administrator approves the grant.

(e) Nonassignability of Option Rights. No Option granted under this Plan shall be assignable or otherwise transferable by the optionee except by will or by the laws of descent and distribution, except, with respect to NQOs, which may be assignable or otherwise transferable by the optionee as the Administrator may determine in its sole discretion. During the life of the optionee, an Option shall be exercisable only by the optionee, except, with respect to NQOs, as the Administrator may determine in its sole discretion.

(f) Payment. Except as provided below, payment in full, in cash, shall be made for all stock purchased at the time written notice of exercise of an Option is given to the Company, and proceeds of any payment shall constitute general funds of the Company. At the time an Option is granted or exercised, the Administrator, in the exercise of its absolute discretion, may authorize any one or more of the following additional methods of payment: (i) acceptance of the optionee's full recourse promissory note for all or part of the Option price, payable on such terms and bearing such interest

<PAGE>

rate as determined by the Administrator (but in no event less than the minimum interest rate specified under the Code at which no additional interest on debt instruments of such type would be imputed), which promissory note may be either secured or unsecured in such manner as the Administrator shall approve (including, without limitation, by a security interest in the shares of the Company); or (ii) delivery by the optionee of Common Stock already owned by the optionee for all or part of the Option price, provided the fair market value (determined as set forth in Section 6.2 of such Common Stock is equal on the date of exercise to the Option price, or such portion thereof as the optionee is authorized to pay by delivery of such stock; provided, however, that if an optionee has exercised any portion of any option granted by the Company by delivery of Common Stock, the optionee may not, unless authorized by the Adminstrator, within six months following such exercise, exercise any Option granted under this Plan by delivery of Common Stock.

(g) Termination of Employment or Service. Unless determined otherwise by the Administrator in its absolute discretion, to the extent not already expired or exercised, an Option shall terminate at the earlier of: (i) the Expiration Date (as defined in Section 6.1(k); or (ii) three months after termination of employment with the Company or any Affiliate (with respect to employees) or three months after the last day served as a director or consultant to the Company or any Affiliate (with respect to consultants); provided, that an Option shall be exercisable after the date of termination of employment or service as a consultant only to the extent exercisable on the date of termination; and provided further, that if termination of employment or service as a consultant is due to the optionee's death or if the optionee is "permanently or totally disabled" (as determined in accordance with Section 22(e)(3) of the Code), the optionee, or the optionee's personal representative (or any other person who acquires the Option from the optionee by will or the applicable laws of descent and distribution), may at any time within twelve months after the termination of employment or service as a consultant (or such lesser period as is specified in the option agreement but in no event after the

Expiration Date of the Option), exercise the rights to the extent they were exercisable on the date of the termination. A transfer of an optionee from the Company to an Affiliate or vice versa, or from one Affiliate to another, or a leave of absence due to sickness, military service or other cause duly approved by the Company, shall not be deemed a termination of employment or the consulting relationship for purposes of this Plan.

(h) Repurchase of Stock. Unless otherwise provided for by the Administrator in the option agreement, the Common Stock to be delivered pursuant to the exercise of any Option granted to an employee or consultant under this Plan may be subject to a right of repurchase in favor of the Company, with respect to any employee or consultant whose employment or consulting relationship with the Company is terminated, at the Option exercise price per share, and such shares shall be held by the Company in escrow to facilitate the Company's repurchase right. Unless otherwise provided for by

<PAGE>

the Administrator in the option agreement, the Company's repurchase right shall expire as to 25% of the total amount of the shares subject to the Option on the first anniversary date of the Option grant or such other date as may be set by the Administrator and shall expire as to an additional 2.0833-1/3% of such shares at the end of each succeeding calendar month. Determination of the number of shares subject to such right of repurchase shall be made as of the date the employee's employment by or consultant's consulting relationship with, the Company terminates, not as of the date that any Option granted to such employee or consultant is thereafter exercised. The Company's repurchase right may be waived by the Board.

(i) Withholding and Employment Taxes. At the time of exercise of an Option (or at such later time(s) as the Company may prescribe), the optionee shall remit to the Company in cash all applicable federal and state withholding and employment taxes. If and to the extent authorized by the Committee, in its sole discretion, an optionee may make an election (i) to deliver to the Company a promissory note of the participant on the terms set forth in Section 6.1(f), (ii) to tender to the Company previously owned shares of Common Stock, or (iii) to have shares of Common Stock to be obtained upon exercise of the Option withheld by the Company on behalf of the participant, to pay the amount of tax that the Committee, in its discretion, determines to be required to be withheld by the Company. Any shares tendered to or withheld by the Company shall be valued at fair market value on the date of tender or withholding. The value of the shares of Stock tendered or withheld may not exceed the required federal, state, local and foreign withholding tax obligations as computed by the Company.

(j) Other Provisions. Each Option granted under this Plan may contain such other terms, provisions and conditions not inconsistent with this Plan as may be determined by the Administrator, and each ISO granted under this Plan shall include such provisions and conditions as are necessary to qualify the Option as an "incentive stock option" within the meaning of Section 422 of the Code.

(k) Option Term. No Option shall be exercisable more than ten years after the date of grant, or such lesser period of time as is set forth in the option agreement (the end of the exercise period stated in the option agreement is referred to in this Plan as the "Expiration Date"). Notwithstanding the

foregoing, no ISO granted to a Ten Percent Shareholder (as defined in Section 6.3(a) shall be exercisable more than five years after the date of grant

(l) Limitation on Option Grants. The Company may not grant options under the Plan for more than 500,000 shares to any one participant in any fiscal year.

6.2 Terms and Conditions to Which Only NQOs Are Subject. The exercise price of a NQO shall be determined by the Administrator and shall in no event be less than

<PAGE>

85% of the fair market value of the Common Stock subject to the Option on the date of grant. For purposes of the Plan, the fair market value of the Common Stock means, as of any given date, the closing sales price of the Common Stock reported on the Nasdaq National Market System or, if the Common Stock is not traded on the Nasdaq National Market, the fair market value of the Common Stock as determined by the Administrator in good faith.

6.3 Terms and Conditions to Which Only ISOs Are Subject. Options granted under this Plan which are designated as ISOs shall be subject to the following terms and conditions:

(a) Exercise Price. The exercise price of an ISO shall be determined in accordance with the applicable provisions of the Code and shall in no event be less than the Fair Market Value of the Common Stock subject to the Option on the date of grant, except that the exercise price of an ISO granted to any person who owns, directly or by attribution, shares possessing more than 10% of the total combined voting power of all classes of stock of the Company or of any Affiliate (a "Ten Percent Shareholder") shall in no event be less than 110% of such Fair Market Value.

(b) Disqualifying Dispositions. If stock acquired upon exercise of an ISO is disposed of in a "disqualifying disposition" within the meaning of Section 422 of the Code, the holder of the stock immediately before the disposition shall notify the Company in writing of the date and terms of the disposition and comply with any other requirements imposed by the Company in order to enable the Company to secure any related income tax deduction to which it is entitled.

7. MANNER OF EXERCISE

7.1 An optionee wishing to exercise an Option shall give written notice to the Company at its principal executive office, to the attention of the officer of the Company designated by the Administrator, accompanied by payment of the exercise price as provided in Section 6.1(f) and, if required, by payment of any federal or state withholding or employment taxes required to be withheld by virtue of exercise of the Option. The date the Company receives written notice of an exercise hereunder accompanied by payment of the exercise price and any required federal or state withholding or employment taxes will be considered as the date such Option was exercised. There is no limit on the number of times Options may be exercised in any calendar year, unless the President of the

Company or the Board prescribes such a limit.

7.2 Promptly after the date an Option is exercised, the Company shall, without stock issue or transfer taxes to the optionee or other person entitled to exercise the Option,

<PAGE>

deliver to the optionee or such other person a certificate or certificates for the requisite number of shares of Common Stock.

8. EMPLOYMENT OR CONSULTING RELATIONSHIP

Nothing in this Plan or any Option granted thereunder shall interfere with or limit in any way the right of the Company or of any of its Affiliates to terminate any optionee's employment or consulting at any time, nor confer upon any optionee any right to continue in the employ of, or consult with, the Company or any of its Affiliates.

9. FINANCIAL INFORMATION

The Company shall provide to each optionee during the period such optionee holds an outstanding Option a copy of the financial statements of the Company as prepared either by the Company or independent certified public accountants of the Company. Such financial statements shall be delivered as soon as practicable following the end of the Company's fiscal year during the period Options are outstanding.

10. LEGAL REQUIREMENTS

The Company shall not be obligated to offer or sell any shares upon exercise of any Option unless the shares are at that time effectively registered or exempt from registration under the federal securities laws and the offer and sale of the shares are otherwise in compliance with all applicable securities laws and the regulations of any stock exchange on which the Company's securities may then be listed. The Company shall have no obligation to register the shares of Common Stock covered by this Plan under the federal securities laws or take any other steps as may be necessary to enable the shares of Common Stock covered by this Plan to be offered and sold under federal or other securities laws. Upon exercising all or any portion of an Option, an optionee may be required to furnish representations or undertaking deemed appropriate by the Company to enable the offer and sale of the shares or subsequent transfers of any interest in the shares to comply with applicable securities laws. Certificates evidencing shares acquired upon exercise of Options shall bear any legend required by, or useful for purposes of compliance with, applicable securities laws, this Plan or the option agreements.

11. AMENDMENTS TO PLAN

The Board may amend this Plan at any time. Without the consent of an optionee, no amendment may adversely affect outstanding Options except to conform this Plan and ISOs granted under this Plan to federal or other tax laws relating to incentive stock options. No amendment shall require shareholder approval unless:

<PAGE>

(a) shareholder approval is required to preserve incentive stock option treatment for federal income tax purposes;

(b) shareholder approval is required to meet the exemptions provided by Rule 16b-3, or any successor rule thereto; or

(c) the Board otherwise concludes that shareholder approval is advisable.

12. SHAREHOLDER APPROVAL; TERM

This Plan shall become effective upon adoption by the Board of Directors;

provided, however, that no Option shall be exercisable unless and until written consent of holders of a majority of the outstanding shares of capital stock of the Company, or approval by holders of a majority of shares of capital stock of the Company present, or represented, and entitled to vote at a validly called shareholders' meeting (or such greater number as may be required by law or applicable governmental regulations or orders) is obtained within twelve months after adoption by the Board. This Plan shall terminate ten years after adoption by the Board unless terminated earlier by the Board. The Board may terminate this Plan at any time without shareholder approval. No Options shall be granted after termination of this Plan, but termination shall not affect rights and obligations under then outstanding Options.

Plan adopted by the Board of Directors on , 2000.

Plan approved by Shareholders on , 2000.

<PAGE>

SONIC SOLUTIONS

PROXY

THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned hereby appoint(s) Robert J. Doris and A. Clay Leighton, or either of them, each with full power of substitution, the lawful attorneys and proxies of the undersigned to vote as designated on the reverse side, and in their discretion, upon such other business as may properly be presented to the meeting, all of the shares of SONIC SOLUTIONS which the undersigned shall be entitled to vote at the Annual Meeting of Shareholders to be held September 5, 2000, and at any adjournments or postponements thereof.

This proxy, when properly executed, will be voted in the manner directed by the undersigned shareholder. WHEN NO CHOICE IS INDICATED, THIS PROXY WILL BE VOTED FOR THE NOMINEES LISTED ON THE REVERSE SIDE. The proxy holders in their discretion may cumulate votes for the election of directors. This proxy may be revoked at any time prior to the time it is voted by any means described in the accompanying Proxy Statement.

(CONTINUED, AND TO BE MARKED, DATED AND SIGNED, ON THE OTHER SIDE)

# Exhibit 6

10-K 1 v104179_10k.htm

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended March 31, 2007**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _______ to ________**

**Commission file number: 72870**

# SONIC SOLUTIONS

(Exact Name of Registrant as Specified in Its Charter)

| **California** | **93-0925818** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**101 Rowland Way, Suite 110,**
**Novato, California 94945**

(Address of Principal Executive Office) (Zip Code)

**(415) 893-8000**

(Registrant's Telephone Number, Including Area Code)

Securities registered pursuant to Section 12(b) of the Act:

Securities registered pursuant to Section 12(g) of the Act: None

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common Stock, no par value | The Nasdaq Stock Market LLC |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes

| | | | | | |
|---|---|---|---|---|---|
| Net income (loss) per share – basic | $ (0.11) | $ 0.08 | $ 0.12 | $ 0.78 | $ 0.24 |
| Net income (loss) per share – diluted | $ (0.11) | $ 0.07 | $ 0.11 | $ 0.74 | $ 0.23 |
| Shares used in per share calculation – basic | 16,391 | 20,459 | 23,347 | 24,750 | 25,982 |
| Shares used in per share calculation – diluted | 16,391 | 23,550 | 24,952 | 26,234 | 27,431 |
| **Balance Sheet Data (at year end):** | | | | | |
| Working capital | $ 4,925 | $ 28,001 | $ 13,112 | $ 41,923 | $ 35,789 |
| Long term obligations[3] | $ — | $ 75 | $ 30,041 | $ 30,002 | $ — |
| Total assets | $ 28,353 | $ 70,945 | $ 164,459 | $ 214,336 | $ 214,777 |
| Shareholders' equity | $ 16,347 | $ 51,287 | $ 93,253 | $ 137,482 | $ 150,833 |

(1) See Note 2, "Restatement of Consolidated Financial Statements and Change in Accounting Policy" in Notes to Consolidated Financial Statements.

(2) Includes share-based compensation expense as follows:

| | | | | | |
|---|---|---|---|---|---|
| Marketing and sales | $ 1,332 | $ 3,257 | $ 1,345 | $ 3,846 | $ 1,284 |
| Research and development | 365 | 2,724 | 1,527 | 3,460 | 740 |
| General and administrative | 1,010 | 2,195 | 1,620 | 2,928 | 741 |
| Total share-based compensation expense | $ 2,707 | $ 8,176 | $ 4,492 | $ 10,234 | $ 2,765 |

(3) Consists of long term capital lease and debt obligations.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**The discussion and analysis set forth below in this Item 7 with respect to fiscal years 2005 and 2006 has been amended to reflect adjustments resulting from our voluntary review of our historical stock option grant practices and related accounting, the retrospective application of a change in accounting policy and other adjustments as described in the Explanatory Note Regarding Restatement and Change in Accounting Policy at the beginning of this Annual Report on page 2 and in Note 2 of Notes to Consolidated Financial Statements. For this reason, the data set forth in this Item 7 may not be comparable to discussions and data in our previously filed annual reports on Form 10-K. All dollar amounts are presented in thousands unless otherwise noted.**

**Certain Factors That Make Future Results Difficult to Predict; Certain Items to Remember when Reading Our Financial Statements**

Our quarterly and annual operating results vary significantly depending on the timing of new product introductions, product enhancements by us and by our competitors, and the finalization of the terms of and deliveries under our larger software license agreements. Our results also depend on the volume and timing of our professional customer orders and on shipments of our original equipment manufacturer ("OEM") partners, which are difficult to forecast. Because our professional customers generally order on an as-needed basis and we normally ship products within one week after receipt of an order, and because our OEM partners report shipments during or at the end of the period, we do not have an order backlog that can assist us in forecasting results. For these reasons, as well as those described under "Risk Factors," in Item 1A above, our results of operations for any quarter or any year are a poor indicator of the results to be expected in any future quarter or year.

TABLE OF CONTENTS

Our ongoing operating expenses are relatively fixed, and we plan our expenditures based primarily on sales forecasts. As a result, operating results can be negatively affected if OEM partner shipments do not meet our forecast, if professional revenue generated in the last few weeks of a quarter or year do not meet our forecast, or if large license agreements are not finalized

when forecasted.

**Restatement and Related Proceedings**

***Restatement of Consolidated Financial Statements***

We have restated our consolidated balance sheet as of March 31, 2006, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the fiscal years ended March 31, 2005 and March 31, 2006.

We have also restated the unaudited quarterly financial information and condensed financial statements for interim periods of fiscal year 2006, and the unaudited condensed financial statements for the quarters ended June 30, 2006 and September 30, 2006. These restatements reflect (a) additional cash and non-cash share-based compensation expense and the associated payroll tax and other expenses relating to employee stock option grants through the second quarter of fiscal year 2007, (b) adjustments to revenue and cost of revenue due to a voluntary change in revenue recognition policy, (c) other adjustments, and (d) related tax adjustments.

Effective October 1, 2006, we changed our method of recognizing OEM royalty revenue. We applied this change in accounting policy retrospectively to the fiscal year ended March 31, 2006, and the fiscal quarters ended June 30, 2006 and September 30, 2006, but determined that it was not practicable to apply the change to prior periods.

***Stock Options Accounting***

On February 1, 2007, we announced that we had commenced a voluntary review of our historical stock option grant practices and related accounting. The review was initiated by our management and was conducted by the audit committee (the "Audit Committee") of our board of directors, comprised solely of independent directors, with the assistance of legal counsel and outside consultants.

The Audit Committee and its advisors conducted an extensive review of our historical stock option grant practices and related accounting, including an assessment and review of our options granting policies and procedures, internal records, supporting documentation and e-mail communications, as well as interviews of Company personnel. The review focused on the period from March 3, 1998, when we engaged in a general repricing of our then-outstanding underwater options, through the present (the "Review Period").

The review included all stock options granted during the Review Period, as well as certain already-outstanding options that were repriced at the commencement of the Review Period. In all, the review covered a total of approximately 2,300 stock option grants encompassing approximately 14 million shares of common stock under a total of seven stock option plans, and representing option grants to our directors, founders, officers and other employees (and including, among others, grants to newly-hired employees, individual or group performance awards, grants awarded in connection with acquisitions, and a limited number of grants to contractors).

During the course of the review, legal counsel to the Audit Committee, with the assistance of outside consultants, collected, processed and analyzed physical and electronic Company documents and records, including hard copy files, networked electronic documents and the computer hard drives of Company personnel who were involved in the administration of our stock option programs. Counsel to the Audit Committee was further assisted by an independent consulting firm engaged to assist in the collection, processing and analysis of options-related documentation. In all, approximately 665,000 electronic documents were collected and processed, and approximately 215,000 electronic documents and 35,000 pages of paper documents were reviewed. In addition, counsel conducted interviews of various Company personnel.

Supplementing the activities performed by and on behalf of the Audit Committee, our management engaged in a detailed process of compiling, analyzing and assessing the information available to it relating to our granting of stock options and administration of stock option plans during the Review Period. Information

TABLE OF CONTENTS

reviewed included, without limitation, documentation related to acquisitions and other transactions completed by us, public filings (by us and by individual grant recipients), board minutes and written consents, spreadsheets and databases used to memorialize and maintain option-related information, email communications and other transmittals of information to and from outside accountants, payroll information, standard forms used to record decisions regarding hiring and termination of employees and related salary and option grant decisions known as Employee Action Forms ("EAFs"), grant notices, offer letters, option

statements, tax records, personnel files and other information.

With assistance from the independent consulting firm and input from the Audit Committee and its advisors, as well as based upon discussions with our independent auditors, our management created and maintained an extensive group of spreadsheets showing all options-related issuances, exercises and related data.

Based on the results of the review, we have concluded that a substantial number of stock options granted during the Review Period were not correctly accounted for in accordance with accounting principles generally accepted in the United States applicable at the time those grants were made. As a result, we are restating our historical financial statements to record adjustments for additional share-based compensation expense relating to past stock option grants in accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R (revised 2004), "Share-Based Payment," and Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees," and related payroll taxes, penalties, and other related amounts, to record additional share-based compensation expense associated with options granted to consultants and to record additional adjustments that were previously considered to be immaterial.

The review also identified less frequent errors in other categories including: grants to non-employees for which an incorrect amount of share-based compensation expense had been recognized, grants cancelled after the expiration date, and exercises occurring before vesting and after expiration. These errors were also addressed and reflected in the restatement of our historical financial statements.

***Audit Committee Conclusions***

*Lack of Contemporaneous Grant Documentation; Focus on Quarterly Financial Reporting*

For a large portion of options issued by us, particularly prior to September 23, 2005 (other than with respect to certain categories of options such as founder grants, director grants, grants issued associated with acquisitions, or grants issued as part of certain programs), there is little or no contemporaneous grant-specific documentation that satisfies the requirements for "measurement dates" under APB No. 25 and that would allow us to maintain the original grant date used for accounting purposes (the "Record Date"). Much of the transaction-specific documentation that was available in our records was unhelpful in establishing the date on which all required APB No. 25 elements were satisfied. For example, option grant agreements were typically dated "as of" with no separate date for the signature of a Company officer, and Company personnel indicated that these agreements were typically generated as part of the end-of-quarter reporting cycle, notwithstanding the Record Date appearing on the documents themselves.

Stock options were considered to be a routine part of employee compensation at the Company and, given this and the informal nature of our processes in general, it appears that insufficient attention was devoted to ensuring that grant documentation was prepared or finalized by the Record Date. Instead, while individual grants were identified and/or committed to on an ongoing basis, grant documentation was typically assembled and finalized in anticipation of quarterly SEC filings.

Our former Chief Executive Officer ("CEO"), to whom authority to make grants to employees other than executive officers had been delegated until September 23, 2005, indicated that he and others involved in the option granting process focused on the quarterly financial reporting cycle as the primary driver of decisions and completion of associated documentation regarding the granting of options. These decisions were recorded in spreadsheets which were then used to generate option tables for financial statement footnotes as well as diluted share counts for our financial statements. These spreadsheets (the "Periodic Spreadsheets"), were sent to an outside accounting firm to perform the necessary calculations as we prepared our quarterly and annual filings and remained subject to change until the point of transmittal.

TABLE OF CONTENTS

In early 2005, as part of our efforts to improve internal control compliance and reporting as required by the Sarbanes-Oxley Act, we commenced a process of formalizing and improving our stock option granting and administration processes. Thereafter, at a meeting of our board of directors held on September 23, 2005, the board adopted a resolution creating an employee options subcommittee of the compensation committee comprised of our CEO and Chief Financial Officer ("CFO"). The purpose of the employee options subcommittee was to: serve as administrator for our various option plans (except for option awards to executive officers and to members of our board of directors, which awards are subject to approval by the board of directors); report to the board and to the compensation committee of the board at each regular quarterly meeting concerning grants made by the employee options subcommittee during the prior quarter; and to propose suggested changes to our various option plans as necessary and appropriate. In early 2006, we transitioned recordkeeping with respect to our employee equity awards to an external service, E*Trade. Although grants issued after September 23, 2005 did involve better contemporaneous documentation

of grant decisions, the Audit Committee determined that there were still some specific grants where the documentation was incomplete for financial reporting purposes.

*No Self Dealing or Favoritism*

The Audit Committee did not find evidence that the officers or directors with responsibility for administration of our stock option programs had taken steps to provide themselves with options at better prices than those granted to other employees.

Our founders and directors typically received grants at preset times, normally at the meeting of our board of directors that immediately follows each annual shareholders meeting. Because the shareholders meetings and the board meeting immediately following the shareholders meeting were well documented, these grants were generally not determined to have Record Dates that required adjustment. In one case where full minutes were not available, certain measurement date adjustments were made based upon the supporting documentation that was available. Additionally, the Audit Committee identified two instances where written consents were used and the Company deemed the measurement date to be the date of the last signature. In both instances the change in measurement date was one day. Because the dates of the annual shareholders meetings and the board meetings scheduled to occur immediately following the annual shareholders meetings had been set well in advance (typically 60 to 90 days in advance), the Audit Committee found no evidence that knowledge of likely share price movements had been involved in selecting these dates in anticipation of the granting of options on these dates. Under this arrangement, our former CEO, who was empowered to issue grants to non-founder employees until September 23, 2005, received grants at preset times and was not in a position to benefit from the grants he made from time to time to our other employees.

Additionally, our more senior employees, including those involved in the administration of our option programs, generally received grants issued by our former CEO at the same times and by the same mechanisms as our less senior employees and officers. Our Audit Committee determined that stock option grant practices during the Review Period were applied uniformly by those of our management personnel who were directly and indirectly involved in the administration of our stock option programs, and that these processes were not used to selectively benefit any one group or individual within the Company.

*No Intent to Decieve*

After reviewing the available documentary evidence and information gathered through interviews of Company personnel, the Audit Committee concluded that the conduct of those who administered our options plans was not intentionally or knowingly wrongful. Specifically, the Audit Committee did not find any evidence that officers, employees, or directors of the Company had any knowledge that their handling of option grants violated stock option accounting rules during the Review Period. To the extent Sonic personnel authorized grants using incorrect or unreliable dates, the Audit Committee found no evidence of an intent to purposefully circumvent stock option accounting rules or to otherwise inaccurately report the financial results of the Company during the Review Period. Moreover, the Audit Committee found no indication of intent by those with responsibility for selecting grant dates to benefit personally at the expense of the Company. No Company personnel stated that they observed management back-date grants or commit other misconduct. Moreover, there were no documents indicating an intent to violate known accounting rules, or indicating any knowledge of misconduct in that regard.

TABLE OF CONTENTS

The Audit Committee received full support and cooperation from our management and employees during the course of the options review.

Additionally, the Audit Committee found that our personnel did not act with an intent to mislead auditors. While the Audit Committee noted instances in which personnel actively discussed how to correct mistakes related to the documentation and related accounting treatment, and when to inform auditors of those mistakes, it determined that such personnel took no actions designed to conceal information from our auditors.

*Restatement Methodologies*

In light of the review and in accordance with APB No. 25, other applicable literature (including, for the period commencing on April 1, 2006, SFAS No. 123R), and the guidance published by Conrad Hewitt, Chief Accountant, SEC, in a September 19, 2006 letter (the “SEC Letter”), we considered and applied the methodologies described below to determine the appropriate measurement dates for our historical stock option grants.

*Applicable Standards*

In determining corrected measurement dates for our historical option grants, we followed the requirements of APB No. 25,

which deems the measurement date for an option grant to be the first date on which all of the following are known: (a) the identity of the individual employee who is entitled to receive the option grant; (b) the number of options that the individual employee is entitled to receive; and (c) the option's exercise price. Under APB No. 25, the measurement date cannot be earlier than the date on which the grant is approved. In each instance where we determined that we cannot rely on the Record Date previously associated with an option, we considered alternate measurement dates based on our ability to establish or confirm, in our reasonable judgment, whether through other documentation or credible circumstantial information, when each of the elements associated with the determination of a measurement date for the option grant had been satisfied under applicable accounting principles. In making such determinations, we considered, among other things, the guidance in the SEC Letter, which provides that, where a company lacks definitive and complete documentation, it "must use all available relevant information" to form a reasonable conclusion with respect to, among other things, the appropriate dating for the option grant.

*Information Types Considered*

We analyzed all available information for each option grant. In considering this information relating to each option grant, we reached the following general conclusions:

- *Board Minutes.* For certain grants (primarily grants to board members and founders), board minutes (typically from board meetings held immediately after annual shareholder meetings) were considered to be definitive, reasonable and appropriate evidence of the best measurement dates for the grants in question.
- *Board Consents.* Although not widely used, unanimous written consents of the board were similarly considered to be definitive, reasonable and appropriate evidence of the best measurement dates for grants described in such consents, subject to analysis of the date on which all board members had signed the consent.
- *Acquisition Dates.* We evaluated the extrinsic information associated with certain company acquisitions and, except as described in *Acquisition-Related Grants* below, generally were able to conclude that the original Record Dates were reasonably supportable as the appropriate measurement dates for the options granted in connection with such transactions.
- *Individual Public Filings.* Forms 3, 4 and/or 5 filed by grant recipients were considered to represent reasonable evidence of the existence of the underlying grants and to be a basis for establishing appropriate measurement dates. To the extent that the applicable Form was filed within two days of the Record Date described in the Form, we concluded that it is reasonable to consider this Record Date to be the appropriate measurement date. If, on the other hand, the Form was filed more than two days after the specified Record Date, we concluded that the filing date is an appropriate measurement date (absent information supporting an earlier date), but that the Record Date referenced in the Form is not, without additional reliable support, usable as the measurement date.

TABLE OF CONTENTS

- *Employee Offer Letters.* Based upon the specific facts and circumstances described in *Hiring Grants* below, we determined that certain of our offer letters triggered variable accounting treatment for a substantial portion of options issued to new employees during the Review Period.
- *Date of Hire.* The hiring date (first day of work) was not, in itself, considered to be a valid measurement date, as there is no indication that our closing stock price on such dates was considered or memorialized in any way for stock grant purposes. However, as noted above with respect to employee offer letters, we determined that the date of hire may constitute the appropriate date for commencing variable accounting treatment for new hire grants, as described in more detail in *Hiring Grants* below.
- *Employee Action Forms.* Our EAFs do not provide sufficient evidence to establish appropriate measurement dates. While EAFs sometimes refer to a number of shares to be granted, they typically do not contain exercise price information, and they contemplate that future actions will be necessary to finalize the granting process. Further, although in some instances our former CEO (who had full authority to grant options to non-executive officer employees prior to September 23, 2005) signed EAFs, he did not typically date his signature and EAFs, in contrast to offer letters, were not usually provided to, or countersigned by, grant recipients. In addition, it appears that we did not follow a consistent policy, practice or pattern with regard to our use and execution of EAFs in connection with the option granting process. Accordingly, even though in some instances it is possible to reasonably conclude that an EAF was approved or otherwise recognized by a particular date — for example, sometimes EAFs were date-stamped when submitted to our payroll

department or to our external payroll service, Automatic Data Processing, Inc., for processing — it does not necessarily follow that this approval constituted the final act in granting underlying stock options. Based on the totality of the facts and circumstances, we concluded that, in the absence of additional extrinsic information, EAFs do not constitute a reasonable basis for establishing measurement dates.

- *Vesting Base Dates.* Stock options that were granted would be assigned a "base date" which would be used to calculate time options were held for purposes of calculating vesting. Stock option vesting base dates did not generally coincide with grant dates (vesting often would be designated to commence prior to the option grant reflected in our records, and would often correspond with other events or milestones such as the date of a performance review or the first date of employment at Sonic), and based on all available information, we concluded that vesting base dates should not be considered to establish appropriate measurement dates for APB No. 25 purposes.
- *Signed Grant Notices.* A signed and dated grant notice (which would contain the date of grant, number of shares, recipient identity and exercise price) would, absent contrary information, be considered to represent definitive evidence of a measurement date for the applicable grant. To the extent any such grant notices were available, they were, absent evidence to the contrary, used in determining the proper measurement dates for the grants in question. As a general matter, though, until we changed our processes in September 23, 2005, we did not issue or retain signed/dated grant notices.
- *Periodic Spreadsheets.* We concluded that option grant measurement dates can often reasonably be established by the dates on which extrinsic evidence demonstrates the existence of a Periodic Spreadsheet in final form. For example, in each applicable period through September 23, 2005, our practice was to send final Periodic Spreadsheets to an outside accounting firm used by us to assist in the calculation of compensation expense, diluted outstanding shares, and other matters relating to our SEC filings. In some cases, we were able to find evidence of the dates on which we sent final Periodic Spreadsheets to the outside accounting firm; in other cases, we located evidence showing the dates on which final Periodic Spreadsheets were sent back to us by the outside accounting firm. Absent additional evidence suggesting a different measurement date should be used, we used the date of transmission of these spreadsheets to or from our outside auditors as evidence of a measurement date.
- *Company Public Filings.* In instances where no earlier reliable information exists, we concluded that the required granting actions would have occurred with finality no later than the dates on which

TABLE OF CONTENTS

we filed our quarterly and annual reports. By this time, the Periodic Spreadsheet would need to have been finalized and provided to (and received back from) the outside accounting firm, so that applicable share-based compensation and earnings per diluted share disclosures, including options granted during the period in question, could be calculated and included in our filings. Accordingly, in the absence of other reliable information, we considered these dates, in some instances, to be the earliest dates that would qualify as measurement dates for purposes of APB No. 25.

*Methodology by Grant and Grant Category*

The following analysis sets forth the methodologies applied to certain grants and grant categories. In addition to these general methodological approaches, where we had specific information regarding particular grants, we communicated with our independent auditors and our advisers, and reached consensus on the appropriate approach to accounting for such grants, consistent with the criteria of APB No. 25, related accounting literature, and the guidance of the SEC Letter.

*Founder and Director Grants*

The vast majority of grants to founders and directors were issued to coincide with our annual shareholder meeting. Grants of this type were typically authorized at our board meetings held immediately after our annual shareholder meetings, reflected in board minutes, and issued on the same date. We concluded that we have sufficient contemporaneous, extrinsic and reliable information to support and substantiate most of our founder and director Record Dates as appropriate measurement dates for purposes of APB No. 25 and other applicable literature. One exception to this general conclusion is that, in the single instance where we implemented the founders and directors grants agreed-upon at a board meeting by means of a subsequently- executed unanimous written consent, we concluded that the appropriate measurement date is the date of the final signature on the consent, rather than the original Record Date (which was the date of the meeting). In addition, a unanimous written consent was used to grant initial options to one of our directors when he was first elected to the board, and we concluded that the appropriate

measurement date for that grant is the date that the final signature was added to the consent. Further, in one case where full minutes were not available, certain measurement date adjustments were made based upon the supporting documentation that was available. Finally, our conclusions regarding certain salary reduction grants are described in *Salary Reduction Grants* below.

*Non-Founder Section 16 Officer Grants*

Prior to September 23, 2005, our CEO would typically make grants to our non-founder executive officer(s) who are considered "executive officers" for purposes of Section 16 of the Exchange Act in the same manner as he would for non-executive employees of the Company. Pursuant to the delegation to him under our various option plans, the CEO generally did not have express authority to grant options to Section 16 officers, as this power was reserved for the board. Nevertheless, these grants were made in a consistent fashion and it is apparent that our board was aware of these option grants and did not disapprove of them. Furthermore, we have disclosed these grants in filed proxy statements, periodic reports and other public documents, and the parties to these grants (both the Company and the Section 16 officer recipient) have consistently honored the terms of the grants over a large number of years.

We concluded that, based on the facts and circumstances, the most appropriate and reasonable approach to these grants is to apply all APB No. 25 criteria in the same manner as such criteria are being applied to grants to our non-management employees (see discussion *Other Employee Grants* below) — that is, to recognize and acknowledge the existence of these grants, but to change measurement dates where there is insufficient information to reasonably conclude that the original Record Date satisfies the requirements of APB No. 25.

Since September 23, 2005, it has been our policy that all grants to our non-founder executive officers be made by the board, and be memorialized by contemporaneous documentation. As a practical matter, no such grants were issued after September 23, 2005.

*Other Employee Grants*

Under each of our various options plans, our CEO was delegated the authority to make grants to employees other than executive officers. As described above, except in particular circumstances (for example, grants made in the context of acquisitions and certain grants made after September 23, 2005), the Company

TABLE OF CONTENTS

employed a quarterly-focused grant process for non-founder employees and generally lack contemporaneous grant documentation sufficient to support the Record Dates for these option grants. Accordingly, we analyzed all available relevant information for each stock option grant in an attempt to determine the earliest point in time at which the evidence reasonably shows that all requisites for the establishment of a measurement date under APB No. 25 were satisfied. Except in specific circumstances (see *Hiring Grants*, *Salary Reduction Grants*, *Acquisition-Related Grants* and *Other*, below), or where we were able to locate contemporaneous grant documentation, this approach generally has resulted in our determining that the most appropriate measurement dates occur some time after the original Record Date in our records, often the date on which final Periodic Spreadsheets were sent to or received from the outside accounting firm we used for financial statement calculations, or the date on which we filed our quarterly or annual reports with respect to the grant(s) in question. Given the generally upward trend of our stock price during a substantial portion of the Review Period, moving to these "end of quarter" measurement dates generally results in a larger compensation charge and restatement amount.

As noted above, on September 23, 2005, our board created an employee options subcommittee to make grants under our option plans to recipients other than executive officers and to board members. This subcommittee reported on its activities to the board and compensation committee at each regularly-scheduled board meeting.

*Hiring Grants*

We concluded that variable accounting is the most appropriate restatement methodology for initial grants to newly-hired employees made after December 15, 1998 and prior to the adoption of new procedures in September 23, 2005, other than in connection with acquisitions. This conclusion is based upon Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 44 (March 2000), "Accounting for Certain Transactions Involving Stock Compensation — An Interpretation of APB Opinion No. 25," which provides that "if the exercise price of a fixed stock option award is reduced, the award shall be accounted for as variable from the date of the modification to the date the award is exercised, is forfeited, or expires unexercised."

In reaching this conclusion, we considered the following facts and circumstances: (a) offer letters sent to new employees

during this period were signed by our CEO, the same person who had full authority to make grants to such employees, (b) while the offer letters inform the new employees that an option grant will be made "shortly after" the commencement of employment, our actual practice — as reflected in our own grant records and documentation — was to make these initial grants over a significant period of time, up to several months after the start of employment, and (c) the offer letters, once signed by the employee, arguably constitute a legally binding commitment by us to issue option shares in the stated amount, as the grant obligation is not subject to any contingencies such as board approval. Under these facts and circumstances, we concluded that the most appropriate approach under APB No. 25 and FIN 44 is to treat the offer letters as constituting a grant at the initial hire date, with a subsequent repricing on a later date (whether the Record Date or an alternate measurement date determined as a result of the review).

Even though in a number of instances our share price at the subsequent measurement date was higher than the price on the initial hire date, due to the fact that the price declined in other instances we concluded that it is appropriate to apply variable accounting to this entire category of hiring grants, with the initial option grant date and vesting base date being deemed to have occurred on the hire date in all cases. Further, although we were not been able to locate signed copies of all offer letters associated with initial hire grants, because our practice was to utilize substantially similar letters signed by the former CEO for all new hires, we concluded that it is appropriate to apply variable accounting to these grants as well, based on the analysis described above.

*Salary Reduction Grants*

In March of 1998 and July of 2001, we offered salary reduction programs to certain of our senior employees. The programs allowed these employees to reduce their compensation and, for each dollar of reduced pay, the employee was entitled to an option to purchase one share of our common stock. For example, if an employee reduced his or her pay by $25,000, the employee was entitled to options to purchase 25,000 shares of our common stock. We never created any formal plans to document these programs, and

TABLE OF CONTENTS

formal board approval was not obtained, although a notation describing the 1998 salary reduction program was included in supporting materials provided to directors at the board meeting immediately prior to the reduction.

The 2001 salary reduction program was for one year, beginning July 1, 2001 and ending June 30, 2002. Payroll was paid semi-monthly, five days after the end of the payment period (that is, for mid-month payrolls, payment would be on the 20th; for month-end payrolls, payment would be on the 5th of the following month). The options under this program were issued and dated July 12, 2001, which was the payroll processing date for the semi-monthly pay period beginning on July 1, 2001. We concluded that this date is the appropriate measurement date.

The 1998 salary reduction program was also for one year, beginning May 1, 1998 and ending April 30, 1999. The options under this program were dated and issued March 3, 1998. As noted above, this salary reduction program was discussed at the March 3, 1998 board meeting, based on a package of supporting materials attached to the March 3, 1998 board minutes. Consistent with our approach to the 2001 salary reduction program, however, we concluded that the appropriate measurement date for these options should be May 12, 1998, the payroll processing date for the first payment period during the program period, since in theory a potential participant may have decided in the interim not to take part.

*Acquisition-Related Grants*

During the Review Period, we completed certain corporate acquisitions and, in connection with these transactions, issued certain option grants. Generally, these grants were described in offer letters signed by our then-CEO in which acquired employees were informed that they would receive the options at the time of closing of the relevant acquisition. These transactions include:

- *Daikin.* At a January 24, 2001 meeting, our board unanimously resolved to enter into an asset purchase agreement with and to acquire the assets of Daikin Industries, Ltd. The transaction closed on February 27, 2001 and was announced on February 28, 2001. As part of the acquisition, key members of Daikin joined the Company and were issued options dated February 27, 2001, the date of acquisition, at the closing price of our stock on that date.

- *Veritas.* At a November 1, 2002 meeting, our board unanimously resolved to enter into an asset purchase agreement with and to acquire the assets of the Desktop and Mobile Division of VERITAS Software Corporation. On November 13, 2002, we entered into the asset purchase agreement, and the transaction closed and was announced on December 18,

2002. At the time of the acquisition, we issued options to employees who joined the Company through this acquisition. These options were issued on December 18, 2002 and the exercise price was the closing price on that date.

- *InterActual.* At a December 2, 2003 meeting, our board unanimously resolved to acquire InterActual Technologies, Inc., by way of merger. We entered into the definitive agreement on January 31, 2004, the transaction closed on February 13, 2004, and was announced on February 19, 2004. At the time of the acquisition, we issued inducement grants to employees who joined the Company as a result of this transaction. These options were dated February 13, 2004 and the exercise price was the closing price on that date.
- *Ravisent.* On May 29, 2002, we announced that we had entered into an agreement under which Axeda exclusively licensed its Ravisent software to us under terms that were essentially equivalent to ownership and, in connection with this transaction, we hired a number of Ravisent (Axeda) employees. Board minutes were not available but board materials dated May 28, 2002 indicate that the transaction closed Friday, May 24, 2002. Grants were issued on two different dates. One group of grants to 10 individuals was issued on May 28, 2002, with an exercise price equal to the closing stock price on that date. The other group of grants to 11 individuals was dated January 2, 2003, with an exercise price equal to our closing price on that date. For contractual reasons, Ravisent (Axeda) employees from the Pennsylvania office could not receive shares until January 2, 2003, their date of hire by us — accordingly, their options were issued on January 2, 2003, with the exercise price

TABLE OF CONTENTS

equal to our closing price on that date. Based on the contractual terms, the hiring dates of these Pennsylvania employees, and the language in their offer letters, we concluded that we had reasonable evidence to support the Record Date of January 2, 2003 as the measurement date for accounting purposes.

- *Roxio (U.S. Grants).* On December 17, 2004, we entered into an amended and restated asset purchase agreement and acquired Roxio's consumer software division. We announced this acquisition on December 20, 2004 and filed a Form 8-K on December 23, 2004. At the time of the acquisition, we issued inducement grants to employees who joined the Company through this acquisition. In particular, we issued options to Roxio employees located in the United States on December 17, 2004, the closing date, and the exercise price was the closing price on that date.
- *Roxio (Foreign Grants).* Because no appropriate foreign option plan was in place at the time that the Roxio transaction closed, we were unable to issue options to Roxio employees located outside of the United States at the time of closing of the transaction. Thereafter, at a meeting on March 15, 2005, our board adopted the 2005 Stock Incentive Plan (Non-U.S. Employees) and, according to our stock options records, options were issued to the non-U.S. Roxio employees on April 6, 2005, with the exercise price equal to the closing price on that date. Because the offer letters for these employees stated that the grants would be made at the time the acquisition closed, we concluded that variable accounting is the most appropriate restatement methodology for these options.

With the exception of the Roxio foreign grants, which are described above, we determined that we have sufficient reliable evidence to reasonably support and maintain the original Record Dates as the appropriate measurement dates for purposes of APB No. 25 for our acquisition-related grants.

*Other*

In a number of isolated cases, we identified accounting errors that we corrected in accordance with APB No. 25 and other applicable accounting literature, including miscellaneous situations involving acceleration of vesting, extensions of exercise periods for vested options, grants to consultants that were erroneously accounted for as if they had been made to employees, repricing previously issued grants, missed grants, and other "one-off" situations.

***Remedial Steps***

As noted above, in early 2005, as part of our efforts to improve internal control compliance and reporting as required by the Sarbanes-Oxley Act, we commenced a process of formalizing and improving our stock option granting and administration processes and transitioned administration of our employee equity awards to an external service, E*Trade. We have adopted policies relating to granting employees restricted stock units ("RSUs"), which do not raise certain of the measurement date issues that exist for stock options, and in November 2006 made a grant of RSUs to employees as the general form of deferred equity compensation to these employees.

As a result of the options review, the Audit Committee additionally recommended, and our board of directors has adopted, certain other policies and procedures and actions with regard to stock option grants, including the following:

- The board has revoked all prior delegations of authority for granting equity awards, including its September 23, 2005 delegation to the employee options subcommittee, which was comprised of our CEO and CFO.
- All equity awards will be made by the Compensation Committee or the full board of directors at scheduled meetings (either live or telephonic). Both the Compensation Committee and the board of directors will continue to avoid, whenever practicable, using unanimous written consents in lieu of live or telephonic meetings. To the extent unanimous written consents are used, each signature will be paired with a "dated" line, which will only be dated with the date the signatory actually signs the document. Email or electronic signatures will be used when possible to facilitate accurate documentation.

TABLE OF CONTENTS

  - Annual review grants to both non-Section 16 officers and Section 16 officers, and directors' and founders' grants, will occur once a year at a standard time (for example,at the Board meeting following the annual shareholders meeting). An exception process will be developed to deal with special needs and circumstances.
  - New hire and merit grants to non-Section 16 officers will occur at regular, predetermined intervals throughout the year. An exception process will be developed to deal with special needs and circumstances.
- The Compensation Committee or the full board will receive, in advance of the relevant meeting, a written proposal of grants to be issued. The proposal will include all recipient names and positions, the number of shares proposed, the relevant plan, the vesting date and period, and a brief description of the business justification of the proposed award.
- A finance department person will be made available to provide support and assistance to the Compensation Committee and the full board regarding equity grants.
- The minutes for each applicable Compensation Committee or the full board meeting will document each decision relating to equity awards during the meeting in which decisions are made.
- The Compensation Committee or the full board will designate management personnel to have primary responsibility, under the ultimate responsibility of the Compensation Committee and the board, to monitor our options processes to ensure that the processes contained in our incentive plans and the Compensation Committee's charter are fully carried out with respect to each equity award. Management personnel will maintain, for a reasonable time, appropriate records of all equity awards proposed to the Compensation Committee or full board, whether approved or not.
- To the extent not already in place, procedures will be established to ensure that our finance and accounting departments are timely advised of all equity grants and their terms, and to consider the accounting implications of each. In addition, to the extent not already in place, procedures will be established to ensure the adequate involvement of our human resources, finance and accounting departments in all employment arrangements that may have accounting implications.
- Once approved, grants will not be modified except as expressly approved by the Compensation Committee or the full board. Approved awards will be promptly entered into our financial records and equity award database.
- Our management has been directed to ensure that a training program is developed and implemented concerning:
  - the procedures and controls concerning equity grants; and
  - related accounting and legal implications.

  Employees with responsibility for equity grants will be required to participate in the training program. This training will also be incorporated into the new hire orientation program for people assuming similar roles. In addition, each member of senior management and the board will be directed to attend a Sonic-sponsored training program (including the services of outside experts as appropriate) concerning corporate governance and including discussions of public company accounting.
- Management has been directed to conduct regular reviews of equity grant records and processes, and to ensure that our processes are properly documented.
- On a quarterly basis, management has been directed to confirm to the Audit Committee that equity grants made during

the quarter comply with our internal procedures, proper accounting principles, and SEC disclosure requirements. The Audit Committee has been directed to discuss with our external auditors, on a regular basis, the external auditors' review of our equity awards and their compliance with our internal procedures, proper accounting principles, and SEC disclosure requirements.

TABLE OF CONTENTS

- Our CEO and CFO will report regularly at board meetings regarding the implementation of the measures described above.

As noted above, the measurement dates of options issued to members of our board of directors ("Director Options") were generally not changed as a result of the review. In a few cases, though, measurement dates have been revised to dates on which our closing stock price was higher than on the original Record Date. In order to avoid any question surrounding the treatment of such options, all of the members of our board of directors, including the board's chairman (formerly the Company's CEO), voluntarily agreed: (a) for unexercised Director Options with adjusted measurement dates, to re-price such options so that the new exercise price matches the price of our stock on the new measurement dates; and (b) for exercised Director Options with adjusted measurement dates, to repay to us the net difference between the initial exercise price and the price of our stock on the new measurement dates. Further, our former CFO, who was our only non-director Section 16 officer during the Review Period until September 23, 2005, also voluntarily agreed to the same re-pricing and repayment terms, in each case tied to the aggregate dollar amount of the re-pricing and repayment, respectively, agreed to by the person with the next highest dollar amount of re-pricing and repayment, who was our board chairman and former CEO. The aggregate dollar amount of the re-pricing described in this paragraph totals approximately $276,000, and the aggregate dollar amount of the repayments described in this paragraph totals approximately $106,000.

Our board of directors has taken steps to move the administration of our equity compensation plans away from management personnel and into the hands of the board and/or Compensation Committee. As noted above, our board of directors has revoked the delegation of authority to the employee options subcommittee, which was comprised of our CEO and CFO, and has implemented a variety of enhancements designed to ensure that all of our equity grants are properly made and documented. In addition, our board of directors has directed management to ensure that our CFO and/or chief accounting officer (or, if there is no chief accounting officer, controller) have significant public company accounting experience and qualify as a certified public accountant. Further, our board is considering the addition of another director with significant accounting or finance experience.

***Tax Considerations***

Based on measurement date changes resulting from our options review, certain grants of stock options made during the Review Period were priced below fair market value, rather than at fair market value. Consequently, certain grants intended to be classified as incentive stock options ("ISOs"), requiring pricing at no less than fair market value on the date of grant, should have been classified as nonqualified stock options ("NQs"). Additionally, certain options should have been treated as NQs since date of grant due to either plan limitations or ISO limitations. We did not withhold federal income taxes, state income taxes, FICA or Medicare on the options that were issued as ISOs that should have been treated as NQ stock options (due to their below-market grant pricing, plan limitations or ISO rules). We accrued payroll tax, penalty, and interest expenses related to NQ stock options originally classified as ISOs in the periods in which the underlying stock options were exercised. Then, in periods in which the liabilities were legally extinguished due to statutes of limitations, the expenses were reversed and recognized as a reduction of expense.

We informed the Internal Revenue Service ("IRS") of potential payroll tax liabilities resulting from changes in measurement dates for stock options. However, no formal settlement negotiations have taken place. On January 15, 2008, we were notified by the IRS of a payroll tax audit covering the calendar years 2004, 2005 and 2006.

We recorded deferred tax assets as a result of the share-based compensation expense recorded through the restatement based on unexercised and uncanceled nonqualified stock options at the end of each reporting period. The recognized tax benefit related to affected stock options granted to officers was limited, in certain instances, due to the potential non-deductibility of the related expenses under Section 162(m) of the Code. This IRS rule limits the amount of executive compensation that may be deducted for U.S. tax purposes under certain circumstances.

Section 409A of the Code imposes additional taxes on our employees for stock options granted with an exercise price lower than the fair market value on the date of grant for all options or portions of options that vest after December 31, 2004. As a result of the change in measurement dates described above, certain stock

TABLE OF CONTENTS

options granted during the Review Period were issued at prices below fair market value on the revised measurement date. Management is considering possible ways to address the impact that Section 409A may have on our employees as a result of the exercise price of stock options being less than the fair market value of our common stock on the revised measurement dates. The IRS has issued transition rules under Section 409A that allow for a correction or cure for some of these options subject to Section 409A. We may offer non-officer employees who hold outstanding options the opportunity to cure their affected stock options. In connection with this cure, we may make future cash bonus payments to our non-officer employees in an undetermined amount. We recorded approximately $1.7 million in operating expense for estimated employee Section 409A taxes that we have elected to cover with respect to options that were exercised during the fourth quarter of fiscal year 2007.

***Stock Options Restatement***

Based on the errors noted above, we have recorded adjustments to share-based compensation, including payroll taxes, Section 409A penalties and other tax expense. There was no impact on revenue or net cash provided by operating activities as a result of this additional share-based compensation and related tax expense during the restatement periods.

The following table sets forth the effect of the stock option review restatement for each of the applicable fiscal years (in thousands):

| | Stock Option Review Adjustments | | | | |
|---|---|---|---|---|---|
| **Fiscal Year Ended** | **Pre-Tax Share-Based Compensation Expense Adjustments** | **Pre-Tax Payroll Related Tax Expense (Benefit) Adjustments** | **Total Pre-Tax Impact** | **Related Income Tax Expense (Benefit) Adjustments** | **Net Expense (Benefit) After-Tax Adjustments** |
| March 31, 1998 (unaudited) | $ 60 | $ — | $ 60 | $ — | $ 60 |
| March 31, 1999 (unaudited) | 613 | 6 | 619 | — | 619 |
| March 31, 2000 (unaudited) | 1,175 | 218 | 1,393 | — | 1,393 |
| March 31, 2001 (unaudited) | 812 | 642 | 1,454 | — | 1,454 |
| March 31, 2002 (unaudited) | 3,026 | 509 | 3,535 | — | 3,535 |
| March 31, 2003 (unaudited) | 2,707 | 1,705 | 4,412 | — | 4,412 |
| March 31, 2004 (unaudited) | 8,177 | 1,356 | 9,533 | — | 9,533 |
| Cumulative effect at March 31, 2004 (unaudited) | 16,570 | 4,436 | 21,006 | — | 21,006 |
| March 31, 2005 | 4,492 | 583 | 5,075 | (69) | 5,006 |
| March 31, 2006[(1)] | 10,103 | 2,782 | 12,885 | (13,196) | (311) |
| Six Months Ended September 30, 2006 (unaudited) | 316 | (1,514) | (1,198) | 225 | (973) |
| Total | $ 31,481 | $ 6,287 | $ 37,768 | $ (13,040) | $ 24,728 |

(1) Prior to fiscal year 2006, we maintained a valuation allowance against our deferred tax assets. In fiscal year 2006, we reversed the majority of our valuation allowance against deferred tax assets due to our assessment, made at that time, that it was more likely than not that deferred tax assets would be realized. As a result of the restatement, we recorded additional deferred tax assets with respect to the periods covered by our options review. The $13.2 million income tax benefit in fiscal year 2006 relates to the release of valuation allowance against the additional deferred tax assets recorded with respect to fiscal years 2005 and prior as a result of the restatement, net of the current year effect.

**Change in Accounting Policy**

Effective October 1, 2006, we elected to change our method of recognizing OEM royalty revenue. Previously, we generally recognized OEM royalty revenue in the period the OEM product shipped, provided we received the OEM royalty report before the preparation of our financial statements. We now generally recognize OEM revenue in the period we receive the OEM royalty

report. We adopted the new method to improve

TABLE OF CONTENTS

reporting consistency across our OEM customers and reduce the length of the accounting close cycle. Comparative financial statements for fiscal year 2006 and quarterly financial information for the quarters ended June 30, 2006 and September 30, 2006 have been adjusted to apply the new method retrospectively.

Due primarily to a change in our accounting software in fiscal year 2005, retrospective application of this change in accounting policy to fiscal year 2005 and prior periods was not practicable. Therefore, we recorded the cumulative effect of the change as an adjustment to accumulated deficit at the beginning of fiscal year 2006.

The following table summarizes the effects of the retrospective application of this change in accounting policy on our consolidated statements of operations for fiscal year 2006, and for the quarters ended June 30 and September 30, 2006, and for the on-going current period charges to fiscal year 2007, as applicable (in thousands):

| | As Restated | | | |
|---|---|---|---|---|
| | | Three Months Ended | | |
| | Year Ended March 31, 2006 | June 30, 2006 | September 30, 2006 | Year Ended March 31, 2007 |
| Increase (decrease) in revenue | $ (1,068) | $ 475 | $ (609) | $ 841 |
| Decrease (increase) in costs | (14) | (207) | 62 | (237) |
| Tax benefit (expense) | 433 | (107) | 219 | (242) |
| Increase (decrease) in net income | $ (649) | $ 161 | $ (328) | $ 362 |
| Increase (decrease) in earnings per share | $ (0.02) | $ 0.01 | $ (0.01) | $ 0.01 |

The following table summarizes the effect of the retrospective application of this change in accounting policy on our consolidated balance sheets for fiscal year 2006, and for the on-going current period charges to fiscal year 2007, and for the quarters ended June 30 and September 30, 2006, as applicable (in thousands):

| | As Restated | | | |
|---|---|---|---|---|
| | March 31, 2006 | June 30, 2006 | September 30, 2006 | March 31, 2007 |
| Decrease in accounts receivable | $ (4,161) | $ (3,849) | $ (4,936) | $ (632) |
| Increase in deferred tax assets | $ 433 | $ 327 | $ 545 | $ 242 |
| Decrease in accrued expenses | $ 560 | $ 554 | $ 620 | $ 449 |
| (Increase) decrease in deferred revenue | $ (366) | $ (403) | $ 70 | $ (421) |
| Increase (decrease) in accumulated deficit(1) | $ 3,534 | $ 3,371 | $ 3,701 | $ (362) |

(1) Amount includes cumulative adjustment of $2.9 million to the beginning retained earnings balance in fiscal year 2006.

**Other Adjustments**

***Revenue Adjustment***

We identified that we had incorrectly recorded a sales transaction during the quarter ended June 30, 2006. This occurred from a sales agreement that we subsequently learned had additional terms that precluded us from recognizing revenue until full

delivery was performed. As a result, an adjustment was made to decrease net revenues and increase deferred revenue by $0.4 million in the first quarter of fiscal year 2007. We will recognize $0.3 million of this amount as revenue during the first six months of fiscal year 2008.

TABLE OF CONTENTS

***Adjustments to Goodwill and Income Taxes Related to the Roxio CSD Acquisition***

In December 2004, we acquired the assets of the Roxio Consumer Software Division ("Roxio CSD"), which included a Canadian subsidiary. During 2007, we filed income tax returns for the acquired Canadian subsidiary covering the period from April 1, 2004 to March 31, 2006. As a result of filing the Canadian income tax returns and a review of our original acquisition accounting, we made the following adjustments:

- In fiscal 2005, we decreased goodwill by approximately $2.0 million and increased deferred tax assets, net of valuation allowance, to recognize deferred tax assets in the acquired Canadian subsidiary. These deferred tax assets relate to pre-acquisition net operating losses and other temporary items.
- We recorded additional Canadian income tax expense for the fiscal years 2005 and 2006 of approximately $0.8 million and $0.3 million, respectively.
- In fiscal year 2006, we reduced goodwill by $0.4 million and increased deferred tax assets for transactional costs incurred in connection with the Roxio CSD acquisition that are deductible for tax purposes.

The adjustments did not result in any changes to cash flows in these fiscal years.

**Income Statement Impact**

The income statement impact of all adjustments and restatements are as follows (in thousands):

| | | Restatement Adjustments, Net of Tax | | | | |
|---|---|---|---|---|---|---|
| **Fiscal Year Ended March 31,** | **Net Income (Loss), As Previously Reported** | **Stock Options** | **Change in Accounting Policy** | **Other** | **Total** | **Net Income (Loss), As Restated** |
| | | | | (Decrease) Increase | | |
| 1998 (unaudited) | $ (5,876) | $ (60) | $ — | $ — | $ (60) | $ (5,936) |
| 1999 (unaudited) | (1,859) | (619) | — | — | (619) | (2,478) |
| 2000 (unaudited) | (5,694) | (1,393) | — | — | (1,393) | (7,087) |
| 2001 (unaudited) | (5,855) | (1,454) | — | — | (1,454) | (7,309) |
| 2002 (unaudited) | (4,182) | (3,535) | — | — | (3,535) | (7,717) |
| 2003 (unaudited) | 2,537 | (4,412) | — | — | (4,412) | (1,875) |
| 2004 (unaudited) | 11,084 | (9,533) | — | — | (9,533) | 1,551 |
| Totals through March 31, 2004 (unaudited) | | (21,006) | — | — | (21,006) | |
| 2005 | 8,542 | (5,006) | — | (789) | (5,795) | 2,747 |
| 2006 | 19,927 | 311 | (649) | (255) | (593) | 19,334 |
| **Fiscal Year 2007 Quarter Ended** | | | | | | |
| June 30, 2006 (unaudited) | 4,090 | 1,007 | 161 | (257) | 911 | 5,001 |
| September 30, 2006 (unaudited) | 2,669 | (34) | (328) | — | (362) | 2,307 |
| | | $(24,728) | $ (816) | $ (1,301) | $(26,845) | |

TABLE OF CONTENTS

The effects of these restatements on diluted earnings (loss) per share for fiscal years 2003 through 2006 and the first two quarters of fiscal year 2007 are as follows:

| | | Restatement Adjustments, Net of Tax | | | | |
|---|---|---|---|---|---|---|
| **Fiscal Year Ended March 31,** | **Diluted Earnings per Share, As Previously Reported** | **Stock Options** | **Change in Accounting Policy** | **Other** | **Total** | **Diluted Earnings (Loss) per Share, As Restated** |
| 2003 (unaudited) | $ 0.13 | $ (0.24) | $ 0.00 | $ 0.00 | $ (0.24) | $ (0.11) |
| 2004 (unaudited) | $ 0.46 | $ (0.39) | $ 0.00 | $ 0.00 | $ (0.39) | $ 0.07 |
| 2005 | $ 0.32 | $ (0.19) | $ 0.00 | $ (0.02) | $ (0.21) | $ 0.11 |
| 2006 | $ 0.73 | $ 0.03 | $ (0.01) | $ (0.01) | $ 0.01 | $ 0.74 |
| **Fiscal Year 2007 Quarter Ended** | | | | | | |
| June 30, 2006 (unaudited) | $ 0.15 | $ 0.04 | $ (0.00) | $ (0.01) | $ 0.03 | $ 0.18 |
| September 30, 2006 (unaudited) | $ 0.10 | $ 0.00 | $ (0.02) | $ 0.00 | $ (0.02) | $ 0.08 |

### Expenses Incurred in Connection with Options Review

We have incurred substantial expenses related to the review and analysis of the stock option grants, including approximately $6.7 million (unaudited) in costs for legal fees, external audit firm fees and external consulting fees through December 31, 2007. We expect to incur substantial additional fees in connection with stock option matters.

### Legal Proceedings

Between March and May 2007, we were notified that a total of five shareholder derivative lawsuits had been filed by persons identifying themselves as Sonic shareholders and purporting to act on our behalf, naming us as a nominal defendant and naming some of our current and former officers and directors as defendants. Four of these actions were filed in the United States District Court for the Northern District of California, and one was filed in the Superior Court of California for the County of Marin.

In these actions, the plaintiffs assert claims against the individual defendants for violations of the Exchange Act, violations of the California Corporations Code, breach of fiduciary duty and/or aiding and abetting, abuse of control, gross mismanagement, corporate waste, unjust enrichment, rescission, constructive fraud, and an accounting and a constructive trust. The plaintiffs' claims concern the granting of stock options by us and the alleged filing of false and misleading financial statements. All of these claims are asserted derivatively on our behalf. The plaintiffs seek, among other relief, an indeterminate amount of damages from the individual defendants and a judgment directing us to reform our corporate governance.

The federal cases have been consolidated into one action captioned *Wilder v. Doris, et al.*, and on September 20, 2007, the court in the state action granted our motion to stay that proceeding in its entirety until final resolution of the consolidated federal action.

In addition to the derivative actions, two putative shareholder class actions have been filed against us and various of our executive officers and directors. On October 4, 2007, a putative shareholder class action was filed in the United States District Court for the Northern District of California, against us and various of our executive officers and directors on behalf of a proposed class of plaintiffs comprised of persons that purchased our shares between October 4, 2002 and May 17, 2007. This action alleges various violations of the Exchange Act and the rules promulgated thereunder, and is based on substantially similar factual allegations and claims as in the derivative actions. Thereafter, on November 16, 2007, a putative shareholder class action was filed in the Superior Court of California for the County of Marin, against us and various of our executive officers and directors on behalf of a proposed class of plaintiffs comprised of persons that purchased our shares between July 12, 2001 and May 17, 2007. This action alleges breach of fiduciary duties, and is based on substantially similar factual allegations and claims as in the other lawsuits.

TABLE OF CONTENTS

## SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto, duly authorized on February 25, 2008.

**SONIC SOLUTIONS**

By:/s/ David C. Habiger
David C. Habiger
President and Chief Executive Officer

Pursuant to the requirements of the Exchange Act, this report has been signed below by the following persons on behalf of Sonic Solutions and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/ David C. Habiger<br>David C. Habiger | President and Chief Executive Officer<br>(Principal Executive Officer) | February 25, 2008 |
| /s/ Robert J. Doris<br>Robert J. Doris | Director | February 25, 2008 |
| /s/ Robert M. Greber<br>Robert M. Greber | Director | February 25, 2008 |
| /s/ Peter J. Marguglio<br>Peter J. Marguglio | Director | February 25, 2008 |
| /s/ R. Warren Langley<br>R. Warren Langley | Director | February 25, 2008 |
| /s/ Mary C. Sauer<br>Mary C. Sauer | Director | February 25, 2008 |
| /s/ Paul F. Norris<br>Paul F. Norris | Executive Vice President, Interim Chief Financial Officer and General Counsel<br>(Principal Financial/Accounting Officer) | February 25, 2008 |

# Exhibit 7



U.S. Securities and Exchange Commission

Mr. Lawrence Salva, Chairman
Committee on Corporate Reporting
Financial Executives International
200 Campus Park Drive, PO Box 674
Florham Park, NJ 07932-0674

Mr. Sam Ranzilla, Chairman
Center for Public Company Audit Firms
American Institute of Certified Public Accountants
Harborside Financial Center
201 Plaza Three
Jersey City, NJ 07311-3881

September 19, 2006

Dear Sirs:

Several companies have recently issued press releases announcing the restatement of their financial statements due to errors in their accounting for grants of stock options to employees, members of the board of directors, and other service providers. Many other companies have announced that they are currently looking into their past practices related to the granting of stock options. The Office of the Chief Accountant has prepared this letter to discuss certain of the existing accounting guidance related to grants of stock options. As with all staff guidance, this letter has not been approved by the Commission.

The accounting guidance applicable to the grants in question was, in most cases, Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (Opinion 25). The accounting under Opinion 25 relies heavily on the determination of the *measurement date*, which is defined as "the first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any." Under Opinion 25, the final amount of compensation cost of an option is measured as the difference between the exercise price and the market price of the underlying stock at the measurement date. As such, for the purpose of determining compensation cost pursuant to Opinion 25, it is important to determine whether a company's stock option granting practices resulted in the award of stock options with an exercise price that was lower than the market price of the underlying stock at the date on which the terms and recipients of those stock options were determined with finality. The topics addressed in this letter largely relate to questions about whether a company's determination of the measurement date of past stock option awards was appropriate.

This letter expresses only the views of the Office of the Chief Accountant on accounting issues related to Opinion 25, and its limited application should not be extended by analogy or relied upon in any other circumstances.

Certain option granting practices might raise legal or regulatory issues. It should be noted that the views presented herein are limited to the ramifications of these questions to the financial statements (including the footnotes thereto), and that this letter does not address how these questions might affect disclosures outside of the financial statements or the circumstances under which any of these practices could violate laws or regulations. Of course, any analysis will be heavily dependent on the particular facts and circumstances of each company, and evidence of fraudulent or manipulative conduct would require different or additional analysis.

As can be seen from the views expressed in this letter, the staff believes that many of the issues that have been raised in public disclosures or uncovered in reviews of option granting practices resulted in the grant of in-the-money options and accordingly do have an accounting consequence under Opinion 25. On the other hand, there may also be situations where an at-the-money grant was actually decided with finality, but there were unimportant delays in the completion of administrative procedures to document the grant that did not involve misrepresentation of the option granting actions. In those situations, if compensation cost would not have otherwise been recorded pursuant to Opinion 25, short delays in completing the administrative procedures to finalize the grant would not result in an accounting consequence.

The staff's views are presented in several sections. In the discussion regarding each issue, we briefly describe the issue and the application of the applicable accounting guidance. For ease of discussion, each section of the letter addresses a particular question or issue on its own, and implicitly assumes no other issues exist. That is, we have not attempted to provide specific discussion on all possible combinations of issues that might arise. Therefore, companies may need to consider the views expressed in multiple sections of the letter. As always, we encourage companies that have questions about the application of the accounting literature to consult with us. Instructions for doing so may be found at http://www.sec.gov/about/offices/oca/ocaaccount.htm.

---

### A. Dating an Option Award to Predate the Actual Award Date

As noted previously, pursuant to paragraph 10(b) of Opinion 25, the measurement date for determining the compensation cost of a stock option is the first date on which both of the following are known: (1) the number of options that an individual employee is entitled to receive and (2) the option or purchase price. Thus, even if documents related to an award of options are dated as of an earlier date, the measurement date cannot occur until the date the terms of the award and its recipient are actually determined. As such, dating the underlying stock option grant documents as of a date prior to the date on which the terms of the award and its recipient are determined does not affect the appropriate measurement date under Opinion 25.

### B. Option Grants with Administrative Delays

In most instances, the determination of the measurement date of a stock

option involves little or no uncertainty. Typically, a company's corporate governance provisions, stock option plans, and applicable laws specify the actions required in order to effect the grant of a stock option (collectively referred to as "required granting actions"). Absent provisions of the option or company practices that indicate the terms of the award could change at a later date, the date when these actions are completed in full has generally been regarded as the measurement date.

However, we understand that some companies have accounted for their option grants using a measurement date that is other than the date at which all required granting actions have been completed. Two such examples that we have become aware of are as follows.

a) Companies may have been awarding stock options by obtaining oral authorization from the board of directors (or compensation committee thereof) and subsequently completing the documents evidencing the award at a later date, or

b) Companies may have delegated the authority to award options to a member or committee of management. That member or committee of management determined option awards to be made to subordinates within specific parameters previously communicated by the board of directors (or compensation committee thereof) and obtained any appropriate approvals at a later date.

The delay in completion of all required granting actions suggests that options terms may not have been final until the completion of those actions. Nonetheless, some companies that utilized the practices described above have asserted that the measurement date occurred before the required granting actions were completed because all option terms and recipients were final and known at an earlier date, and the completion of required granting actions represented only an administrative delay, rather than a period during which any of the terms of the award remained under consideration or subject to change.

The staff believes that a conclusion that a measurement date occurred before the completion of required granting actions must be considered carefully, as the fact that the applicable corporate governance provisions, terms of the stock option plans, or applicable laws require certain procedures to be completed in order to effect a stock option grant suggests that option terms may not have been final (or "known") until those procedures were completed. Question 18 of FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation" (Interpretation 44) addresses a similar circumstance, noting that a measurement date for an option cannot occur before shareholder approval except in the very limited circumstance that management and the board of directors control sufficient shareholder votes to approve the plan. That guidance illustrates the underlying principle that the terms of a stock option cannot be considered known and no longer subject to change until the persons empowered to make grants have determined, *with finality*, the terms and recipients of those awards.

In many cases, when options were awarded before (or in the absence of) completion of required granting actions, the terms cannot be considered to have been determined with finality until (and unless) such actions were

completed. Indeed, as evidenced by some of the option granting practices and patterns of conduct that the staff has become aware of, awarding options in a manner that did not comply with the required granting actions does suggest that the terms and recipients of the options may have been subject to change. For example, in the event that the company's stock price declined prior to finalizing the required granting actions, the company may have retracted awards (e.g., failed to follow through with the initially determined awards) or lowered the exercise price of options. This type of practice indicates that, for all awards (including those awards for which the terms were not changed), the terms and recipients were not determined with finality (and therefore were not "known") prior to the completion of all required granting actions. Similarly, any evidence indicating that the preparation of documentation was done in a manner calculated to disguise the true nature of the option granting actions would preclude a company from concluding that a measurement date occurred prior to the completion of all required granting actions. **If a company operated as if the terms of its awards were not final prior to the completion of all required granting actions (such as by retracting awards or changing their terms), the staff believes the company should conclude that the measurement date for all of its awards (including those awards that were not changed) would be delayed until the completion of all required granting actions.**

On the other hand, in certain instances where a company's facts, circumstances, and pattern of conduct evidence that the terms and recipients of a stock option award were determined with finality on an earlier date prior to the completion of all required granting actions, it may be appropriate to conclude that a measurement date under Opinion 25 occurred prior to the completion of these actions. This would only be the case, however, when a company's facts, circumstances, and pattern of conduct make clear that the company considered the terms and recipients of the awards to be *fixed and unchangeable* at the earlier date. The practices described in the preceding paragraph would, of course, preclude a company from concluding that a measurement date occurred prior to the completion of all required granting actions.

In evaluating whether a company's facts and circumstances do support a conclusion that the terms of stock option awards were fixed ("known") prior to the completion of all required granting actions, it is important that all information be considered. As previously noted, the fact that such actions were not yet completed suggests that the terms may not have been final. As such, we believe that the existence of other evidence indicating that option terms or recipients were not yet considered final until all required granting actions were complete would make a conclusion that a measurement date occurred at an earlier time difficult to reach. Reference should be made to Section G of this letter for a discussion of certain factors that should be considered in this analysis, such as the company's pattern of historical stock option grants and the presence or absence of documentation of past stock option granting actions.

Any analysis will be heavily dependent upon the particular facts and circumstances of each company, and evidence of fraudulent or manipulative conduct would affect the analysis. Additionally, as a company's practices may have varied for different groups of employees or categories of awards, the staff recognizes that a company may reach different conclusions with respect to these matters for different employee groups or award categories.

Of course, any changes to an award subsequent to the completion of required granting actions must be evaluated to determine whether a modification (such as a repricing) or cancellation has occurred. We encourage companies to discuss unique facts and circumstances with the staff.

### C. Validity of Prior Grants

We understand that, in certain circumstances, the validity of past option grants has been called into question, even though both the company and the affected employees have and continue to comply with the terms of such options. For example, an option plan may preclude grants that are in-the-money at the grant date, or may contain a cap on the number of options that may be issued. Notwithstanding these restrictions, options that may not have complied with the terms of the plan were awarded to employees. This could arise due to some of the practices described in this letter.

Questions have arisen as to whether an option can be accounted for as a fixed option with a measurement date on the date that the terms and recipient of the award were determined if uncertainty exists as to the validity of the grant. Specifically, the following questions have arisen:

a) If, for example, a shareholder-approved option plan only permits at-the-money grants, some have questioned whether the compensation committee may have lacked the authority under the entity's corporate governance procedures to authorize an in-the-money grant. If that were the case, under the plan, only the shareholders had the ability to approve such a grant and shareholder approval was not obtained. Pursuant to Question 18 of Interpretation 44, absent such authorization, it is possible that a measurement date did not occur at the date that the terms and recipient of the award were determined.

b) Some have questioned whether the non-compliance of options with the company's option plan may create uncertainty as to whether the company will ultimately have the ability to settle the award in stock or instead may be required to settle the award in cash. Absent an ability to settle the award in stock, it is possible that the option would be accounted for as a cash-settled stock appreciation right pursuant to FASB Interpretation No. 28, "Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans."

We understand that, in many of these cases, (a) the company has, as applicable, been honoring the awards and settling in stock, (b) the company intends to honor outstanding unexercised awards and has a reasonable basis to conclude that the most likely outcome is that the awards will be honored, and (c) the company intends to settle the outstanding unexercised awards in stock and has a reasonable basis to conclude that it will be able to do so (even if such settlement is not entirely within the company's control). In those circumstances, the staff believes that the substantive arrangement that is mutually understood by both the company and its employees represents the underlying economic substance of the past option grants, and should serve as the basis for the company's accounting. Accordingly, assuming all other conditions for the establishment of a measurement date have been satisfied, the staff believes it would be appropriate to account for the awards as fixed options

with a measurement date on the date that the terms and recipients were determined with finality. While legal opinions regarding the validity of the option grant and the company's ability to honor the award would be helpful, the staff does not believe that a company would necessarily be required to obtain a legal opinion in order to reach these accounting conclusions.

When a company either does not intend to or does not have a reasonable basis to conclude that it will be able to honor the award or settle it in stock, further analysis of the facts and circumstances would be necessary to determine the appropriate accounting for the options. The staff understands that significant uncertainty as to a company's ability to honor options arises more often for grants that were made to senior officers of the company (particularly officers who were involved in the option granting process), and less often for grants made to rank-and-file employees. Accordingly, the staff believes that the need for a legal analysis may be greater when questions exist as to the validity of grants made to senior officers who participated in the option granting process.

### D. Uncertainty as to Individual Award Recipients

We understand that some companies may have approved option awards before the number of options to be granted to each individual employee was finalized. For example, the compensation committee may have approved an award by authorizing an aggregate number of options to be granted prior to the preparation of a final list of individual employee recipients. In these cases, the allocation of options to individual employees was completed by management after the award approval date, or the unallocated options were reserved for grants to future employees. Pursuant to paragraph 10(b) of Opinion 25, no measurement date can occur until "the number of shares that an individual employee is entitled to receive" is known.

In certain circumstances, the approved award may contain sufficient specificity to determine the number of options to be allocated to individual employees, notwithstanding the absence of a detailed employee list. If management's role was limited to ensuring that an allocation was made in accordance with definitive instructions (e.g., the approved award specified the number of options to be granted based on an individual's level within the organization), the measurement date could appropriately be the date the award was approved. However, if management was provided with discretion in determining the number of options to be allocated to each individual employee, a measurement date could not occur for such options prior to the date on which the allocation to the individual employees was finalized. If the allocation of a portion of the award is specified at the award approval date with the allocation of the remainder left to the discretion of management, the measurement date could appropriately be the date the award was approved only for those options whose allocation was specified.

The staff also has become aware that some companies may have changed the list of recipients or the number of options allocated to each recipient subsequent to the preparation of the initial list at the award approval date. When changes to a list are made subsequent to the preparation of the list that was prepared on the award approval date, based on an evaluation of the facts and circumstances, the staff believes companies should conclude that either (a) the list that was prepared on the award approval date did

not constitute a grant, in which case the measurement date for the entire award would be delayed until a final list has been determined or (b) the list that was prepared on the award approval date constituted a grant, in which case any subsequent changes to the list would be evaluated to determine whether a modification (such as a repricing) or cancellation has occurred. When a company determines that a repricing occurred, variable accounting should be applied to the option from the date of modification to the date the award is exercised, is forfeited, or expires unexercised.

### E. Exercise Price Set by Reference to a Future Market Price

Some companies have awarded options with provisions designed to protect an employee from immediate declines in the stock price. Typically, these awards do not have a stated exercise price at the award approval date but instead include a formula for establishing the exercise price. For example, an award may establish an exercise price as the lowest market price of the company's stock over a 30-day period beginning with the award approval date. If the market price of the company's stock increases following the award approval date, the exercise price will be equal to the price of the company's stock on the award approval date. If the market price of the company's stock declines following the award approval date, the exercise price will be equal to the lowest price of the company's stock during the 30-day period following the award approval date.

Pursuant to paragraph 10(b) of Opinion 25 and Question 11(a) of Interpretation 44, if the original terms of a stock option award provide for a reduction to the award's exercise price if a specified future event or condition occurs, variable accounting would be required from the award approval date until that uncertainty is resolved. However, a measurement date would occur and variable accounting would cease at the date the contingency is resolved or the contingency provision expires. In the fact pattern described above, the amount of compensation cost related to the option would be the difference between the market price of the underlying stock at the end of the 30-day contingency period and the lowest market price of the stock during the contingency period, which would be the exercise price of the option.

In contrast, if the original terms of an award do not include terms that would cause an adjustment of the exercise price upon the occurrence of a contingent event and the exercise price is nonetheless reduced after the award approval date, the staff believes a repricing of the award has occurred. Variable accounting would therefore be appropriate for the option from the date of modification to the date the award is exercised, is forfeited, or expires unexercised.

It should be noted that the views expressed in this section of the letter do not apply to arrangements that meet the criteria for a noncompensatory plan pursuant to paragraph 7 of Opinion 25.

### F. Grants Prior to the Commencement of Employment

Many companies grant options to new employees at the commencement of their employment. We understand that, in some cases, companies have determined the terms and conditions of awards to certain new employees prior to the commencement of employment. For example, the exercise

price for a stock option may have been determined based on the market price of the stock on the date an offer of employment was extended to and accepted by an individual, with employment commencing subsequent to the date of offer. The appropriate accounting in this circumstance will depend upon whether the individual performs services in the capacity of a non-employee prior to commencing employment. If awards were provided to individuals who rendered services to the company prior to the commencement of employment, the provisions of FASB Statement No. 123, "Accounting for Stock-Based Compensation" (Statement 123) and EITF Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services" should be applied. Once the individual becomes an employee, the accounting for the change in grantee status should be evaluated pursuant to Interpretation 44.

If the individual provided no services to the company prior to commencing employment, the staff believes that, generally, a measurement date cannot occur prior to the date that the individual begins rendering employee service in exchange for the stock options. Opinion 25 applies only to share-based payment awards issued to *employees*; as clarified by Question 1(b) of Interpretation 44, prior to commencing employment, the individual would not be considered an employee. As such, the staff believes compensation cost for a fixed stock option would be measured based on the difference between the exercise price of the option and the market price of the underlying stock at the commencement of employment.

### G. Documentation of Option Granting Activities is Incomplete or Cannot be Located

We understand that, in the course of reviewing their option-granting activities several years after the fact, some registrants have not been able to locate definitive and complete documentation evidencing certain of their past option granting activities. For example, (a) the legal documents evidencing past grants may not exist in the company's records, (b) contemporaneous documentation of the date on which a telephonic or in-person meeting of the compensation committee was held may not have been prepared, (c) written documentation includes only "as of" dates, and not the dates the documentation was actually prepared and approved, or (d) the company may have reason to believe that the documentation that is contained in the company's records is not accurate.

The appropriate accounting in circumstances where records cannot be located or may be inaccurate will depend on the particular facts and circumstances. We understand that, in some cases, the lack of documentation or existence of contradictory documentation may lead a company to conclude either that the terms of options cannot reasonably be considered fixed, resulting in the application of variable accounting, or that awards do not substantively exist until the board of directors affirms which awards will be honored. However, the staff does not believe that the lack of complete documentation being available several years after the activities occurred should necessarily result in a "default" to variable accounting or to treating the awards as if they had never been granted. Rather, a company must use *all available relevant information* to form a reasonable conclusion as to the most likely option granting actions that occurred and the dates on which such actions occurred in determining what to account for. The existence of a pattern of past option grants with an exercise price equal to

or near the lowest price of the entity's stock during the time period surrounding those grants could indicate that the terms of those grants were determined with hindsight. Further, in some cases, the absence of documentation, in combination with other relevant factors, may provide evidence of fraudulent conduct. The staff expresses no view in this letter as to the manner in which various facts and forms of evidence should be evaluated under Opinion 25 to determine whether a company's historical accounting records are accurate. We encourage companies to discuss unique facts and circumstances with the staff.

### H. Timing of Option Grants

Some companies appear to have engaged in techniques to select their award dates in coordination with the disclosure of information to the public. For example, a company may have granted stock options while it knew of material non-public information that was likely to result in an increase to the stock price. Alternatively, a company may have delayed the grant of options until after material information that was expected to result in a decrease to the stock price was issued. To the extent such practices were used, questions have been raised as to whether an adjustment would be necessary to the market price of the stock at the measurement date for the purpose of measuring compensation cost. Pursuant to paragraph 10(a) of Opinion 25, the staff believes that compensation cost must be computed on the measurement date by reference to the unadjusted market price of a share of stock of the same class that trades freely in an established market.

### I. Changes to Option Grants Due to the Release of New Information

The staff is aware that some companies may have changed the terms of previously granted awards due to the release of new information to the public. For example, a company may have granted options to employees at one date, subsequently released information to the public that caused the stock price to decline, and lowered the exercise price of the previously granted options to the market price immediately following the release of the unfavorable news. In that circumstance, the staff believes a repricing of the award has occurred. Variable accounting should therefore be applied to the option from the date of modification to the date the award is exercised, is forfeited, or expires unexercised.

### J. Income Tax Benefits Related to Options

We understand that some companies may have documented option exercises as though such exercises occurred as of a date other than the actual date of exercise, which resulted in a reduction of the amount of income taxes due by the employee, with a corresponding reduction in the income tax benefit received by the company. Pursuant to paragraph 17 of Opinion 25, any tax deduction that the company is entitled to receive in excess of the compensation cost recorded for financial reporting purposes is recorded as an addition to paid-in capital. Accordingly, the staff believes that the company should record the excess tax benefit it otherwise would have been entitled to receive on the actual exercise date as an addition to paid-in capital. Any amount of such benefit forgone by the company due to the mischaracterized exercise, and any other tax obligations of the employee paid by the company, should be recorded as compensation cost to the employee.

We also understand that the discovery of information about option practices, such as the practices discussed in the previous paragraphs, have caused some companies to question the availability or amount of income tax deductions related to options, the period in which those deductions would be available, and the possibility of other obligations including interest, penalties, and additional payroll taxes. Prior to the adoption of FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes," companies should consider the guidance in FASB Statement No. 5, "Accounting for Contingencies" and FASB Statement No. 109, "Accounting for Income Taxes" with respect to these tax contingencies.

The determination of the grant date for income tax purposes may differ from the determination of the measurement date pursuant to Opinion 25. The income tax determination will depend upon the statutes, laws, and regulations of the jurisdictions in which a company operates. The staff expresses no view as to the appropriate grant date of an option for income tax purposes, or on the manner in which the issues addressed in this letter should be evaluated in regard to income tax considerations.

*   *   *   *   *

The views noted herein are based upon and in accordance with pre-existing accounting literature. Companies that determine their prior accounting to be in error and that those errors are material should restate their financial statements to reflect the correction of those errors. Evaluation of materiality requires a consideration of all relevant facts and circumstances. Qualitative factors (for example, if the error is intentional) may cause misstatements of quantitatively small amounts to be material. When disclosures of these issues are made, it is important that the registrant discuss not only the accounting restatements, but also the circumstances that gave rise to the errors.

Generally, previously filed reports containing financial statements determined to be materially misstated require amendment. The staff understands that errors related to the issues addressed in this letter may affect several years of filings, and that companies may believe that amending all of the affected filings is unnecessary. Companies that propose to correct material errors without amending all previously filed reports should contact the staff of the Division of Corporation Finance. No amendment of previously filed reports is necessary to correct prior financial statements for immaterial errors. Such corrections, if necessary, may be made the next time the registrant files the prior financial statements.

Registrants that have applied Opinion 25 in historical periods for recognition purposes and provided the footnote disclosures required by Statement 123 may determine that the amount of pro forma compensation cost previously disclosed pursuant to Statement 123 was in error. Although the staff's views expressed herein are discussed in the context of awards accounted for pursuant to Opinion 25, these views may also be useful to registrants in their determination of the grant date and measurement date under Statement 123. While a complete reconsideration of measurements made under Statement 123 to adjust inputs such as volatility and expected term may not be possible, the staff would expect registrants to make appropriate adjustments to the input related to the market price of the underlying stock used in the measurement of fair value under Statement 123. If a registrant

determines that material errors existed in the amount of pro forma compensation cost previously disclosed, the staff believes that the registrant should correct the footnote disclosures provided for prior periods. It should be noted that, because of differences in standards, the views expressed herein are not necessarily representative of the staff's views with respect to the determination of the grant date and measurement date pursuant to FASB Statement No. 123R, "Share-Based Payment."

As you know, the staff is continuing to consider these and related matters and may have further discussions on the accounting for stock options with companies and their independent auditors. We encourage companies that wish to discuss the particular facts and circumstances of their stock option grants and the accounting conclusions they have reached to contact the Office of the Chief Accountant.

Further questions about these matters should be directed to Joe Ucuzoglu, Professional Accounting Fellow in the Office of the Chief Accountant (202-551-5301), or Alison Spivey, Associate Chief Accountant in the Office of the Chief Accountant (202-551-5305). Questions on filing requirements should be directed to the staff of the Division of Corporation Finance (202-551-3400).

Sincerely,

Conrad Hewitt
Chief Accountant

cc: Carol Stacey, Chief Accountant, Division of Corporation Finance
Robert Herz, Chairman, Financial Accounting Standards Board
Mark Olson, Chairman, Public Company Accounting Oversight Board

*http://www.sec.gov/info/accountants/staffletters/fei_aicpa091906.htm*

---

# Exhibit 8

news release

FOR RELEASE:
February 15, 2007

NASDAQ: SNIC

# Sonic Solutions Reports Selected Preliminary Financial Results for Third Quarter Ended December 31, 2006; Updates Guidance

**Novato, California (February 15, 2007)** – Sonic Solutions® (NASDAQ: SNIC) today announced the following selected preliminary unaudited financial results for the quarter ended December 31, 2006.

**Selected Preliminary Financial Results**

Net revenue for the quarter was $39,120,000. Cost of revenue, excluding any stock based compensation costs, was $8,838,000. Included in cost of revenue is $1,236,000 of expense related to the amortization of acquired intangibles. Marketing and sales expenses, excluding any stock based compensation costs, were $8,003,000. Research and development expenses, excluding any stock based compensation costs, were $10,875,000. General and administrative expenses, excluding any stock based compensation costs, were $4,788,000. Sonic recorded a $3,400,000 charge for acquired in-process research and development, on a preliminary basis, related to the November 2006 acquisition of System OK AB, a private Swedish software concern. Other income (net of other expenses) was $311,000. For the quarter ended December 31, 2006, the number of shares outstanding on a fully diluted basis was approximately 27,500,000.

As of December 31, 2006, Sonic had cash and cash equivalents of $22,543,000 and short term investments of $33,450,000. Bank debt at December 31, 2006 was $20,000,000. During the quarter and as part of the acquisition of System OK, Sonic paid $7,920,000 to System OK's shareholders.

**Guidance**

In addition, Sonic announced the following guidance:

For the fourth fiscal quarter ending March 31, 2007, management anticipates net revenue, on a GAAP basis, will be between $37 million and $41 million. Cost of revenue, as a percentage of net revenue and excluding expenses related to the amortization of intangibles and stock based compensation, is estimated to be 18%. Operating expenses, excluding stock based compensation and any costs associated with Sonic's options review, are estimated to be $24 million. Other income (net of other expenses) is estimated to be $350,000. The number of shares outstanding on a fully diluted basis is estimated to be 27.5 million.

For Sonic's Roxio Division, during fiscal year 2008, management expects net revenue in the bricks and mortar retail business channel to be roughly flat compared to fiscal 2007, OEM business channel net revenue to grow by 10-15%, and direct online sales growth of more than 25%. Sonic's management further expects Advanced Technology Group revenues to grow by more than 25% over fiscal 2007. Sonic will forecast relatively flat revenue for its Professional Products Group until the Company sees clear evidence of Hollywood's commitment to volume title production in high-definition formats.

**Options Review**

The Company's selected preliminary results and guidance may be adjusted as a result of possible restatement of historical results. As previously announced on February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting. Based on the review, the audit committee and Sonic management have preliminarily concluded that, under applicable accounting guidance, Sonic lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants will need to be adjusted. Further, as previously announced, the audit committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements may no longer be relied upon.

**Sonic believes it will have to record additional non-cash charges for stock-based compensation expense and restate previous financial statements, and that such charges will be material.** Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions. Sonic intends to file its restated financial results and related periodic reports as quickly as possible.

All results and guidance reported today are presented without taking into account any adjustments to either current or previously reported results that may be required in connection with any restatement and should be considered preliminary until Sonic files its quarterly report on Form 10-Q for the third quarter ended December 31, 2006 and any required amended historical financial statements. **Investors are cautioned that Sonic is unable to provide reconciliations to corresponding U.S. Generally Accepted Accounting Principles ("GAAP") measures for the non-GAAP information provided in this press release due to the ongoing options practice and accounting review. The non-GAAP information includes those measures that exclude stock based compensation costs and/or other expenses that would otherwise be included in the applicable GAAP measures.**

Sonic will conduct a conference call at 1:30 p.m. PST, or 4:30 p.m. EST, today to discuss its preliminary financial results for the third quarter ended December 31, 2006. Investors are invited to listen to Sonic's quarterly conference call on the investor section of Sonic's website at www.sonic.com. A replay of the web cast will be available approximately two hours after the conclusion of the call. An audio replay of the conference call will also be made available approximately two hours after the conclusion of the call. The audio replay will remain available until 9:00 PM PST, midnight EST, February 22, 2007, and can be accessed by dialing 719-457-0820 or 888-203-1112 and entering confirmation code 9663492.

**About Sonic Solutions**

Sonic Solutions (NASDAQ:SNIC - News; http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform-independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio®-branded CD and DVD creation, playback and backup solutions that have become the premier choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers as well as online at Sonic.com and Roxio.com, and are bundled with PCs, after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the U.S. and/or other countries. All other company or product names are trademarks or registered trademarks of their respective owners and, in some cases, are used by Sonic under license.

**Forward-Looking Statements**

This press release and Sonic's quarter ended December 31, 2006 earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include revenue and guidance for the quarter ended March 31, 2007; revenue guidance for the fiscal year ended March 31, 2008; views regarding opportunities presented by the "download and burn" business model, our ability to strengthen our

relationships with end-users, the opportunities and benefits achieved through Sonic's integration of the Roxio Consumer Software Division, the evolution of, and opportunities for Sonic arising from, next-generation high definition formats and channels, future market opportunities, the potential benefits of our acquisition of System OK, views regarding the status and preliminary conclusions of Sonic's review of its historical and current stock option grant practices and related accounting, the expected impact and consequences of this review, including the expected restatement of Sonic's historical financial statements, and the time for completing the process.

These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, the timely introduction and acceptance of new products, including but not limited to Sonic's high definition series products; the costs associated with new product introduction and the possible adverse effect on gross margin; any fluctuation in demand for Sonic products; the transition of products to new hardware configurations and platforms; unforeseen increases in operating expenses, new product introductions, cost of Sarbanes Oxley ("SOX") compliance or business expansion; loss of significant customers or key suppliers; risks related to acquisitions and international operations; costs associated with litigation or prosecution and intellectual property claims; and changes in effective tax rates. Other risks and uncertainties that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements include, but are not limited to, the timing, final results and final conclusions of the audit committee's review concerning matters related to Sonic's stock option grants, including but not limited to, the accuracy of the stated dates of option grants and whether all proper procedures were followed; the impact of any restatement of financial statements, including but not limited to the determination, as a result of the re-auditing of certain prior period financials statements, of additional restatement items beyond the restatement of non-cash stock-based compensation items, the impact of which may be material, or the effects of other actions that may be taken or required as a result of such review; tax issues or liabilities that relate to adjustments to the measurement dates associated with Company stock options; effects relating to Sonic's inability to timely file reports with the Securities and Exchange Commission; changes to the anticipated scope of the issues beyond the timing and accuracy of measurement dates for option awards to issues that Sonic does not currently realize exist; risks of litigation or governmental investigations or proceedings arising out of or related to Sonic's stock option grant practices or any restatement of its financial statements; and Sonic's failure to successfully appeal a NASDAQ determination to delist Sonic's common stock from the NASDAQ Global Market for failure to meet continued listing requirements. This press release should be read in conjunction with Sonic's most recent annual report on Form 10-K and Form 10-K/A and Sonic's other reports on file with the Securities and Exchange Commission, which contain a more detailed discussion of risks and uncertainties that may affect future results. Sonic does not undertake to update any forward-looking statements.

**For More Information, Contact:**

**Sonic Solutions**

A. Clay Leighton,
Chief Financial Officer

**Phone:** 415.893.8000
**Fax:** 415.893.8008

**Email:** clay_leighton@sonic.com

**StreetSmart Investor Relations**

Brooke Deterline
**Phone:** 415.893.7824

Anne Leschin
**Phone:** 415.775.1788

**Email:** investinsonic@sonic.com

# Exhibit 9

**Sonic Solutions Reports Selected Preliminary Financial Results for Fourth Quarter Ended March 31, 2007; Updates Guidance**

**Novato, California (May 17, 2007)** - Sonic Solutions® (NASDAQ: SNIC)today announced the following selected preliminary unaudited financial results for the fourth quarter ended March 31, 2007.

**Selected Preliminary Financial Results**

Net revenue for the quarter was $38.1 million. Cost of revenue, excluding any stock-based compensation costs, was $9.0 million. Included in cost of revenue is $1.4 million of expense related to the amortization of acquired intangibles. Marketing and sales expenses, excluding any stock-based compensation costs, were $8.6 million. Research and development expenses, excluding any stock-based compensation costs, were $11.7 million. General and administrative expenses, excluding any stock-based compensation costs, were $4.9 million, of which $0.6 million represented legal and professional expenses associated with the stock option review. Other income (net of other expenses) was $0.2 million. For the quarter ended March 31, 2007, the number of shares outstanding on a fully diluted basis was approximately 27.5 million.

As of March 31, 2007, Sonic had cash and cash equivalents of $17.1 million and short term investments of $47.3 million. Bank debt at March 31, 2007 was $20.0 million.

**Guidance**

For the first fiscal quarter ending June 30, 2007, the Company's management anticipates net revenue, on a GAAP basis, will be between $33 million and $35 million. Cost of revenue, as a percentage of net revenue and excluding expenses related to the amortization of intangibles and stock-based compensation, is estimated to be 19%. Operating expenses, excluding stock-based compensation costs and any one-time charges associated with the Company's option review, are estimated to be $25 million.

**Options Review**

The Company's selected preliminary results and guidance may be adjusted as a result of the expected restatement of historical results. As previously announced on February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting. Based on the review, the audit committee and Sonic management have concluded that, under applicable accounting guidance, Sonic lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants will need to be adjusted. Further, as previously announced, the audit committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements may no longer be relied upon.

Sonic believes it will have to record additional cash and non-cash charges for stock-based compensation expense and restate previous financial statements, and that such charges will be material. Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions. Sonic intends to file its restated financial results and related periodic reports as quickly as possible.

All results and guidance reported today are presented without taking into account any adjustments to either current or previously reported results that may be required in connection with any restatement and should be considered preliminary until Sonic files its annual report on Form 10-K for the fiscal year ended March 31, 2007, its quarterly report on Form 10-Q for the third quarter ended December 31, 2006, and any required restatement of historical financial statements. Investors are cautioned that Sonic is unable to provide reconciliations to corresponding U.S. Generally Accepted Accounting Principles ("GAAP") measures for the non-GAAP information provided in this press release due to the ongoing options practice and accounting review. The non-GAAP information includes those measures that exclude stock-based compensation costs and/or other expenses that would otherwise be included in the applicable GAAP measures.

**Continued Nasdaq Listing**

As previously announced, on April 23, 2007, the Company received a letter from a Nasdaq Listing Qualifications Panel (the "Panel") notifying the Company that the Panel had granted the Company's request for continued listing of its securities on the Nasdaq Global Select Market. The Company's continued listing is subject to certain conditions, including: (1) on or before June 20, 2007, the Company must file its Form 10-Q for the quarter ended December 31, 2006, as well as any required restatements; (2) on or before July 23, 2007, the Company must hold its 2006 annual shareholder meeting; and (3) the Company must provide Nasdaq with additional information regarding the Company's previously announced voluntary review of its historical and current stock option grant practices and related accounting. The Company is currently unable to determine if it will be able to satisfy the conditions specified by the Panel by their respective deadlines. Should the Company be unable to meet the conditions set forth in the Panel's decision, there can be no assurance that Nasdaq will grant an additional extension of time or that the Company's securities will continue to be listed on The Nasdaq Stock Market.

**Call Details**

Sonic will conduct a conference call at 1:30 p.m. PDT, or 4:30 p.m. EDT, today to discuss its preliminary financial results for the fourth quarter ended March 31, 2007. Investors are invited to listen to Sonic's quarterly conference call on the investor section of Sonic's website at www.sonic.com. A replay of the web cast will be available approximately two hours after the conclusion of the call. An audio replay of the conference call will also be made available approximately two hours after the conclusion of the call. The audio replay will remain available until 9:00 p.m. PDT, midnight EDT, Monday May 21, 2007, and can be accessed by dialing 719/457-0820 or 888/203-1112 and entering confirmation code 5035094.

**About Sonic Solutions**

Sonic Solutions (NASDAQ: SNIC; http://www.sonic.com) enables the creation, management, and enjoyment of digital media content from Hollywood to home. Sonic's products range from the advanced authoring systems used to produce Hollywood DVD, HD DVD, and Blu-ray Disc film releases to the award-winning Roxio®-branded photo, video, music, and digital-media management applications. Sonic's patented technologies and AuthorScript® media engine are relied upon by leading technology firms to define rich media experiences on a wide array of consumer electronics, mobile devices, set-top players, retail kiosks, and PCs. Always an innovator, Sonic has taken a leading role in helping professional and consumer markets make the successful transition to the new high-definition media formats and, through Sonic DVD On Demand™, defining new models for the digital distribution of premium Hollywood entertainment. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, AuthorScript, Sonic DVD On Demand and Roxio are trademarks or registered trademarks of Sonic Solutions or its subsidiaries in the United States and/or other countries. All other company or product names are trademarks or registered trademarks of their respective owners and, in some cases, are used by Sonic under license.

**Forward-Looking Statements**

This press release and Sonic's quarter ended March 31, 2007 earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include expectations regarding revenue, income, expenses, capitalization and other guidance for the quarter ending June 30, 2007, and the fiscal year ending March 31, 2008; views regarding opportunities presented by the "download and burn" business model; Sonic's ability to strengthen relationships with end-users; the evolution of, and opportunities for Sonic arising from, next-generation high-definition formats and channels; future market opportunities; views regarding the status and preliminary conclusions of Sonic's review of its historical and current stock option grant practices and related accounting; the expected impact and consequences of this review, including the expected restatement of Sonic's historical financial statements; the time required to complete the review process; Sonic's ability to satisfy the conditions imposed by a Nasdaq Listing Qualifications Panel for continued listing of Sonic's securities on the Nasdaq Global Select Market; and potential impact of pending litigation in which the Company, its directors, and/or its executive officers may be involved.

These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, the timely introduction and acceptance of new products, including but not limited to Sonic's high-definition series products; the costs associated with new product introduction and the possible adverse effect on gross margin; any fluctuation in demand for Sonic products; the transition of products to new hardware configurations and platforms; unforeseen increases in operating expenses, new product introductions, cost of Sarbanes Oxley ("SOX") compliance or business expansion; loss of significant customers or key suppliers; risks related to acquisitions and international operations; costs associated with litigation or prosecution and intellectual property claims; and changes in effective tax rates. Other risks and uncertainties that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements include, but are not limited to, the timing, final results and final conclusions of the audit committee's review concerning matters related to Sonic's stock option grants, including but not limited to, the accuracy of the stated dates of option grants and whether all proper procedures were followed; the impact of any restatement of financial statements, including but not limited to the determination, as a result of the re-auditing of certain prior period financials statements, of additional restatement items beyond the restatement of non-cash stock-based compensation items, the impact of which may be material, or the effects of other actions that may be taken or required as a result of such review; tax issues or liabilities that relate to adjustments to the measurement dates associated with Company stock options; effects relating to Sonic's inability to timely file reports with the Securities and Exchange Commission; changes to the anticipated scope of the issues beyond the timing and accuracy of measurement dates for option awards to issues that Sonic does not currently realize exist; the impact of any litigation or governmental investigations or proceedings arising out of or related to Sonic's stock option grant practices or any restatement of its financial statements; Sonic's failure to satisfy conditions for continued listing on the NASDAQ Global Select Market; and the impact of any further determinations by the Nasdaq Listing Qualifications Panel. This press release should be read in conjunction with Sonic's most recent annual report on Form 10-K and Form 10-K/A and Sonic's other reports on file with the Securities and Exchange Commission, which contain more detailed discussion of risks and uncertainties that may affect future results. Sonic does not undertake to update any forward-looking statements.

**For More Information, Contact:**

**Sonic Solutions**
A. Clay Leighton,
Chief Financial Officer

**Phone:** 415.893.8000
**Fax:** 415.893.8008
**Email:** clay_leighton@sonic.com

**StreetSmart Investor Relations**
Brooke Deterline
**Phone:**415.893.7824

Anne Leschin
**Phone:**Phone: 415.775.1788

**Email:** investinsonic@sonic.com

© 2007 Sonic Solutions. All rights reserved.
Enables the creation, management, and enjoyment of digital media content from Hollywood to home.

# Exhibit 10



**Roxio Reports Fourth Quarter and Fiscal 2003 Results**

**Fourth Quarter Revenues Rise to $34 Million Based on Successful Launch of Roxio's Digital Media Suite**

**Recent Acquisition of Pressplay Paves the Way for Re-Launch of Napster**

**Santa Clara, California - (May 21, 2003) -** Roxio, Inc. (Nasdaq: ROXI), The Digital Media Company™, provider of the best selling digital media software in the world, today reported financial results for its fourth quarter and year ended March 31, 2003. Net revenue for the fourth quarter grew 28% sequentially to $33.8 million from $26.4 million in the preceding third quarter. Pro forma net income, which excludes non-cash charges related to the amortization of intangible assets and deferred stock-based compensation, was $3.8 million, or $0.19 per basic and diluted share, and therefore approximately the same as pro forma net income of $3.8 million, or $0.21 per basic and $0.19 per diluted share, for the fourth quarter of the prior fiscal year.

Roxio's reported GAAP net income for the fourth quarter of fiscal 2003 was $2.3 million, or $0.12 per basic and diluted share, as compared with net income in the fourth quarter of the prior fiscal year of $340,000, or $0.02 per basic and diluted share.

Net revenue for the fiscal year ended March 31, 2003 was $120.4 million, as compared to net revenue of $142.5 million for fiscal 2002. Pro forma net loss excluding non-cash charges was $3.1 million, or $0.16 per basic and diluted share, as compared to pro forma net income of $16.5 million, or $0.96 per basic and $0.94 per diluted share for the prior fiscal year.

Roxio's GAAP net loss for fiscal 2003 was $9.9 million, or $0.51 per basic and diluted share, compared to GAAP net income of $2.3 million, or $0.14 per basic and $0.13 per diluted share, in fiscal 2002. A reconciliation of pro forma results described in this press release with the reported GAAP results is included in the attached table.

"Our fourth quarter financial results reflect a solid launch of Easy CD & DVD Creator 6, the Digital Media Suite," said Chris Gorog, Roxio's President and Chief Executive Officer. "Other notable achievements include the launch in late March of our PhotoSuite 5 Platinum digital photo editing software and our first major DVD OEM win for Creator 6 on TDK's new Indi DVD Multiformat burner. With the sale of our GoBack software assets to Symantec, Roxio is now focused exclusively on its core digital media business. Additionally, our recent acquisition of Pressplay, as the foundation for the re-launch of Napster should allow us to capitalize on the tremendous opportunity in online music and is an important step toward diversifying our revenues for the long-term growth of the company."

Elliot Carpenter, Roxio's Chief Financial Officer, commented, "We are pleased with the response to our recent product launch and execution on our fourth quarter financial objectives. At the same time, we are forecasting that the combined effects of a difficult retail environment, the sale of the GoBack product line to Symantec and our previously issued guidance that OEM revenues will continue to decline, will result in a June quarter outlook for our software business of approximately $23.0 million in revenue and GAAP net income of $0.05 per fully diluted share. These estimates do not include the accounting impact of the Pressplay acquisition for the remainder of the June quarter, which has not yet been fully determined. Roxio's cash and short-term investments were $58.0 million as of April 30, 2003. Taking into account the $12.5 million in cash consideration paid for the Pressplay acquisition and the approximately $20.0 million currently expected to be spent to re-launch Napster, we believe that we have sufficient cash to drive our software business and support our online music initiative."

**Earnings Call Information**
The Roxio Fourth Quarter and Fiscal 2003 teleconference and webcast is scheduled to begin at 1:30 p.m., Pacific Time, on Wednesday, May 21, 2003. To participate on the live call, analysts and investors should dial 800-216-6962 at least ten minutes prior to the call and reference conference ID: 9730870. Roxio will also offer a live and archived webcast of the conference call, accessible from the "Investor Relations" section of the company's Web site at http://investor.roxio.com. A telephonic replay of the conference call will also be available for 48 hours by dialing 800-642-1687 and entering the passcode: 9730870.

**Non-GAAP Financial Measures**
Roxio discloses pro forma or non-GAAP measures of net income and earnings per share. Roxio believes that this pro forma information provides greater comparability regarding its ongoing operating performance. These measures should not be considered an alternative to measurements required by accounting principles generally accepted in the United States ("U.S. GAAP"), such as net income and earnings per share. These pro forma measures are unlikely to be comparable to pro forma information provided by other companies. In accordance with SEC regulations, reconciliation of the Roxio U.S. GAAP information to the pro forma information is provided in the table attached. We will also make available on the investor relations page of our web site at http://investor.roxio.com this press release, a replay of the Webcast, and a reconciliation of the difference between the GAAP and non-GAAP financial measures.

---

**Safe Harbor Statement**
Except for historical information, the matters discussed in this press release, in particular matters related to Roxio's future revenue, net income (loss), cash flow, the re-launch of Napster, OEM relationships, upgrades by existing users and product development, are forward-looking statements that are subject to certain risks and uncertainties such as decreased demand for our products, increased competition, failure to successfully integrate Pressplay, failure to develop new products or improvements to existing products, general economic conditions and third party claims, that could cause actual results to differ materially from those projected. Additional information on these and other factors are contained in Roxio's reports filed with the Securities and Exchange Commission (SEC), including the Company's Annual Report on Form 10-K and Quarterly Report on Form 10-Q as filed with the SEC on July 1, 2002 and February 14, 2003, respectively, copies of which are available at the website maintained by the SEC at http://www.sec.gov. Roxio assumes no obligation to update the forward-looking statements included in this press release.

ROXIO INC.
CONDENSED CONSOLIDATED BALANCE SHEETS
(In thousands, except per share data)

| | March 31, 2003 | March 31, 2002 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $36,820 | $47,280 |
| Short-term investments | 16,677 | 4,700 |
| Accounts receivable, net of allowance for doubtful accounts of $850 at March 31, 2003 and $775 at March 31, 2002 | 12,637 | 24,260 |
| Inventories | 460 | 363 |
| Prepaid expenses and other current assets | 3,366 | 3,409 |
| Income taxes receivable | -- | 2,378 |
| Deferred income taxes | 4,709 | 3,880 |
| Total current assets | 74,669 | 86,270 |
| Long-term investment | 3,059 | -- |
| Property and equipment, net | 9,058 | 7,122 |
| Goodwill, net | 55,247 | 51,447 |
| Other intangibles assets, net | 10,314 | 11,248 |
| Other assets | 589 | 545 |
| Total assets | $152,936 | $156,632 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $11,952 | $9,563 |
| Income taxes payable | 1,353 | -- |
| Accrued liabilities | 16,153 | 21,972 |
| Current portion of long-term debt | 606 | 526 |
| Total current liabilities | 30,064 | 32,061 |
| Long term liabilities: | | |
| Long term debt | 5,490 | 921 |
| Deferred income taxes | 1,190 | 1,922 |
| Total liabilities | 36,744 | 34,904 |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value; Authorized: 10,000 shares; Issued and outstanding: none at March 31, 2003 and 2002 | -- | -- |
| Common stock, $0.001 par value; Authorized: 100,000 shares; Issued and outstanding: 19,574 shares at March 31, 2003 and 19,474 shares at March 31, 2002 | 20 | 20 |
| Additional paid-in capital | 127,804 | 129,804 |
| Deferred stock-based compensation | (2,886) | (7,487) |
| Accumulated deficit | (10,675) | (731) |
| Accumulated other comprehensive income | 1,929 | 122 |
| Total stockholders' equity | 116,192 | 121,728 |
| Total liabilities and stockholders' equity | $152,936 | $156,632 |

ROXIO INC.
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share data)

| | Three Months Ended March 31, | | Year Ended March 31, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Net revenues | $33,756 | $38,894 | $120,408 | $142,521 |
| Cost of revenues (excluding stock-based compensation charges of $10, $14, $49 and $103, respectively) | 8,523 | 8,084 | 31,410 | 29,154 |
| Gross profit | 25,233 | 30,810 | 88,998 | 113,367 |
| Operating expenses: | | | | |
| Research and development (excludes stock-based | | | | |

| | | | | |
|---|---|---|---|---|
| compensation charges of $142, $208 $715 and $1,515, respectively) | 5,886 | 5,679 | 21,623 | 21,637 |
| Sales and marketing (excludes stock-based compensation charges of $127, $1,194, $113 and $4,158, respectively) | 9,282 | 14,098 | 41,553 | 49,247 |
| General and administrative (excludes stock-based compensation charges of $210, $1,419, $1,059 and $3,443 respectively.) | 5,777 | 6,178 | 26,990 | 19,327 |
| Amortization of intangible assets | 1,637 | 1,849 | 6,401 | 6,146 |
| Stock-based compensation charges | 489 | 1,726 | 1,936 | 8,110 |
| In-process research and development | -- | 1,110 | -- | 1,110 |
| Total operating expenses | 23,071 | 30,640 | 98,503 | 105,577 |
| Income (loss) from operations | 2,162 | 170 | (9,505) | 7,790 |
| Other income (loss), net | (94) | 292 | 471 | 1,285 |
| Income (loss) before provision for income taxes | 2,068 | 462 | (9,034) | 9,075 |
| Provision (benefit) for income taxes | (256) | 122 | 910 | 6,726 |
| Net income (loss) | $2,324 | $340 | $(9,944) | $2,349 |
| Other comprehensive gain (loss) : | | | | |
| Foreign currency translation adjustment | -- | -- | 1,785 | (280) |
| Unrealized gain on short-term investment | | -- | 24 | -- |
| Comprehensive income (loss) | $2,324 | $340 | $(8,135) | $2,069 |
| Earnings per share: | | | | |
| Basic | $0.12 | $0.02 | $(0.51) | $0.14 |
| Diluted | $0.12 | $0.02 | $(0.51) | $0.13 |
| Weighted average shares used in computing basic and diluted net income per share | | | | |
| Basic | 19,498 | 18,568 | 19,477 | 17,216 |
| Diluted | 19,783 | 19,767 | 19,477 | 17,518 |

Reconciliation of Reported Earnings (Loss) to Pro Forma Earnings (Loss):

| | Three Months Ended March 31, 2003 | | | Three Months Ended March 31, 2002 | | |
|---|---|---|---|---|---|---|
| | Net Income | Basic EPS | Diluted EPS | Net Income | Basic EPS | Diluted EPS |
| Reported earnings | $2,324 | $0.12 | $0.12 | $340 | $0.02 | $0.02 |
| Adjustments: | | | | | | |
| Amortization of intangible assets | 1,637 | 0.08 | 0.08 | 1,849 | 0.10 | 0.09 |
| Stock-based compensation charges | 489 | 0.02 | 0.02 | 1,726 | 0.09 | 0.09 |
| Write-off of in-process research and development | -- | -- | -- | 1,110 | 0.06 | 0.06 |
| Tax effect of pro forma entries | (682) | (0.03) | (0.03) | (1,180) | (0.06) | (0.06) |
| Pro forma earnings | $3,768 | $0.19 | $0.19 | $3,845 | $0.21 | $0.19 |

| | Year Ended March 31, 2003 | | | Year Ended March 31, 2002 | | |
|---|---|---|---|---|---|---|
| | Net Income | Basic EPS | Diluted EPS | Net Income | Basic EPS | Diluted EPS |
| Reported earnings | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| (loss) | $(9,944) | $(0.51) | $(0.51) | $2,349 | $0.14 | $0.13 |
| Adjustments: | | | | | | |
| Amortization of intangible assets | 6,401 | 0.33 | 0.33 | 6,146 | 0.36 | 0.35 |
| Stock-based compensation charges | 1,936 | 0.10 | 0.10 | 8,110 | 0.47 | 0.46 |
| Write-off of in-process research and development | -- | -- | -- | 1,110 | 0.06 | 0.06 |
| Tax effect of pro forma entries | (1,517) | (0.08) | (0.08) | (1,180) | (0.07) | (0.07) |
| Pro forma earnings (loss) | $(3,124) | $(0.16) | $(0.16) | $16,535 | $0.96 | $0.94 |

ROXIO, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)
(unaudited)

| | Years Ended March 31, 2003 | 2002 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income | $(9,944) | 2,349 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 9,742 | 7,439 |
| Stock-based compensation charges | 1,936 | 8,110 |
| Provision for doubtful accounts | 649 | 790 |
| Write-off of acquired in-process technology | -- | 1,110 |
| Deferred income taxes | (1,549) | (1,076) |
| Change in operating assets and liabilities: | | |
| Accounts receivable | 12,356 | 8,544 |
| Inventories | (172) | 875 |
| Prepaid expenses and other assets | (199) | (2,160) |
| Accounts payable | 2,162 | (10,189) |
| Income taxes payable (receivable) | 4,065 | 363 |
| Accrued liabilities | (9,926) | 7,921 |
| Net cash provided by operating activities | 9,120 | 24,076 |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (4,235) | (3,839) |
| Proceeds from sale of property and equipment | -- | -- |
| Purchases of other intangible assets | (5,667) | (251) |
| Purchases of short-term investments | (27,578) | (4,700) |
| Proceeds from sale of short-term investments | 11,075 | -- |
| Maturities of short-term investments | 4,526 | -- |
| Investment in nonconsolidated companies | (3,059) | -- |
| Acquisition of MGI Software Corp, net of acquired cash of $770 | -- | (1,988) |
| Net cash used in investing activities | (24,938) | (10,778) |
| Cash flows from financing activities: | | |
| Net cash transfers from Adaptec | -- | 27,446 |
| Principal payment of capital lease obligation | (557) | (199) |
| Proceeds from line of credit | 5,000 | -- |
| Issuance of common stock to strategic partner | -- | 1,999 |
| Issuance of common stock under employee stock plan | 1,367 | 4,740 |
| Repurchase of common stock | (1,064) | -- |
| Net cash provided by financing activities | 4,746 | 33,986 |
| Effect of exchange rates on cash | 612 | (4) |
| Change in cash and cash equivalents | (10,460) | 47,280 |
| Cash and cash equivalents at beginning of period | 47,280 | -- |
| Cash and cash equivalents at end of period | $36,820 | $47,280 |

| | | |
|---|---|---|
| Supplemental cash flow information: | | |
| Cash paid for interest | $220 | $47 |
| Cash paid for income taxes | $1,832 | $5,258 |
| Non-cash disclosure of financing and investing activities: | | |
| Transfer of other assets from Adaptec upon legal separation | $-- | $4,608 |
| Adjustment to the purchase price allocation of MGI Software Corp | $3,802 | $-- |
| Issuance of stock for acquisition of MGI Software Corp. | $-- | $31,421 |
| Deferred stock compensation | $-- | $12,880 |
| Issuance and remeasurement of warrants for services | $(705) | $-- |
| Issuance of warrant for services | $329 | $1,840 |
| Assets acquired under capital leases | $203 | $1,624 |

**About Roxio**

Roxio, a division of Sonic Solutions, develops and markets the best-selling digital media software in the world. Roxio offers award-winning software products for CD/DVD burning, photo editing and video editing and has an installed base of over 150 million users. Roxio distributes its products globally through strategic partnerships with major hardware manufacturers, through leading retailers, through Internet partnerships and through direct sales at www.roxio.com. Roxio's parent company, Sonic Solutions (NASDAQ: SNIC; http://www.sonic.com) is the leader in digital media software and provides a broad range of software tools and applications for creative professionals, business and home users and technology partners. Sonic's products range from professional DVD authoring systems and interactive content delivery technologies that are used to produce the majority of Hollywood movies released on DVD, to the award-winning Roxio- and Sonic-branded CD and DVD creation, playback and backup applications that have become the premiere solutions for consumers and business users worldwide. Sonic's AuthorScript® is the de facto standard for CD and DVD burning and formatting and has been licensed by major software and hardware manufacturers, including Adobe, Broadcom, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, Roxio, MyDVD, CineMagic, Plug & Burn, LiveShare, Roxio Easy Media Creator, and AuthorScript are trademarks or registered trademarks of Sonic Solutions or its subsidiaries in the United States and/or other countries. Dolby is a trademark of Dolby Laboratories. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic Solutions under license. Specifications, pricing and delivery schedules are subject to change without notice.

© 2007 Sonic Solutions. All rights reserved.
Enables the creation, management, and enjoyment of digital media content from Hollywood to home.

# Exhibit 11

<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>3
<FILENAME>a4445024ex99.txt
<DESCRIPTION>EXHIBIT 99.1 PRESS RELEASE
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results For First Fiscal Quarter Ended June 30, 2003; Record Quarterly Revenue Drives Record Quarterly Profit

NOVATO, Calif.--(BUSINESS WIRE)--July 30, 2003--Sonic Solutions (Nasdaq:SNIC) announced today results for the Company's first fiscal quarter ended June 30, 2003.

Net revenue for the quarter was $12,022,000 compared to $7,384,000 for the same period in the prior fiscal year. Operating income for the quarter was $2,024,000 and net income per diluted share was $0.08 compared to operating income of $582,000 and net income per diluted share of $0.03 for the same period of the prior fiscal year.

"We are very pleased by the momentum Sonic continues to generate with our OEM customers and technology partners, and the fact that it's now showing up strongly in our reported financial results," commented Bob Doris, Sonic's president. "In the June quarter Sonic generated the highest quarterly revenue, gross margin and net income in the history of the company. This is a great start to what we believe will be a very rewarding year for our shareholders."

Sonic will hold its fiscal first quarter 2004 earnings conference call on Wednesday, July 30, 2003 at 1:30 p.m. (PT)/4:30 p.m. (ET). Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call will also be available via Webcast at www.sonic.com.

Sonic Solutions
Condensed Statement of Operations
(in thousands, except per share amounts)

| | Three Months Ended June 30, (unaudited) | |
|---|---|---|
| | 2003 | 2002 |
| Net revenue | $12,022 | $7,384 |
| Cost of revenue | 1,748 | 1,907 |
| Gross profit | 10,274 | 5,477 |
| Operating expenses | | |
| Marketing and sales | 3,092 | 2,146 |
| Research and development | 4,181 | 1,892 |
| General and administrative | 977 | 857 |
| Total operating expenses | 8,250 | 4,895 |
| Operating income | 2,024 | 582 |

| | | |
|---|---|---|
| Other income (expense), net | (50) | 34 |
| Income before income taxes | 1,974 | 616 |
| Provision for income taxes | 331 | 40 |
| Net income | $1,643 | 576 |
| Net income per share applicable to common shareholders: | | |
| Basic | $0.09 | $0.03 |
| Diluted | $0.08 | $0.03 |
| Shares used in computing net income per share: | | |
| Basic | 18,434 | 15,289 |
| Diluted | 21,557 | 19,307 |

Sonic Solutions
Condensed Balance Sheets
(in thousands)

| | June 30, 2003 | March 31, 2003 * |
|---|---|---|
| Assets | (unaudited) | |
| Current assets: | | |
| Cash, cash equivalents and investments | $12,022 | $9,708 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $411 and $425, at June 30, 2003 and March 31, 2003, respectively | 5,287 | 5,823 |
| Inventory | 746 | 531 |
| Prepaid expenses and other current assets | 915 | 869 |
| Total current assets | 18,970 | 16,931 |
| Fixed assets, net | 1,884 | 1,745 |
| Purchased and internally developed software costs, net | 968 | 920 |
| Acquired intangibles | 1,211 | 1,345 |
| Goodwill | 6,715 | 6,715 |
| Other assets | 1,214 | 697 |
| Total assets | $30,962 | $28,353 |
| Liabilities and Shareholders' Equity | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $6,902 | $7,087 |
| Deferred revenue and deposits | 2,143 | 1,840 |

| | | |
|---|---|---|
| Total current liabilities | 9,045 | 8,927 |
| Shareholders' equity: | | |
| Common stock | 46,613 | 45,765 |
| Preferred stock | 0 | 0 |
| Accumulated deficit | (24,696) | (26,339) |
| Total shareholders' equity | 21,917 | 19,426 |
| Total liabilities and shareholders' equity | $30,962 | $28,353 |

* March 31, 2003 balances are derived from the audited financial statements included in the Company's 2003 Annual Report on Form 10-K.

About Sonic Solutions (NASDAQ: SNIC - News)

Based in Marin County, California, Sonic Solutions (http://www.sonic.com) is the world's leading supplier of DVD creation software for professional, industrial and consumer applications. The majority of major film releases on DVD have been produced on Sonic's professional DVD authoring systems in studios around the world. Sonic's MyDVD(R) and DVDit!(R) are the most widely used DVD creation applications by consumers and video enthusiasts and are the solutions of choice among the key PC and after-market drive suppliers. Sonic's RecordNow(TM) is a leading solution for audio and data mastering. Sonic's AuthorScript(R), the DVD and CD formatting and burning engine that underlies Sonic's applications, is the most widely deployed DVD software engine and has been licensed by Adobe, Microsoft, Sony, and many others.

Forward Looking Statements

The above paragraphs of this press release may contain forward looking statements that are based upon current expectations. Actual results could differ materially from those projected in the forward looking statements as a result of various risks and uncertainties including, among others, the timely introduction and acceptance of new products, costs associated with new product introductions, the transition of products to new hardware configurations and platforms and other factors, including those discussed in the Company's annual and quarterly reports on file with the Securities and Exchange Commission. This press release should be read in conjunction with the Company's most recent annual report on Form 10-K, Form 10-Q and Registration Statement on file with the Securities and Exchange Commission, which contain a more detailed discussion of the Company's business including risks and uncertainties that may affect future results. The Company does not undertake to update any forward looking statements.

Sonic, the Sonic logo, Backup MyPC, CinePlayer, DVD PrePlay, DVD Producer, Edit-on-DVD, OpenDVD, PrimeTime, RecordNow and Simple Backup are trademarks of Sonic Solutions. AuthorScript, AutoDVD, DVD-Audio Creator, DVD Creator, DVDit!, DVD Fusion, MyDVD, NoNOISE, ReelDVD, Scenarist and Sonic Solutions are registered trademarks of Sonic Solutions. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic under license. Specifications, pricing and delivery schedules are subject to change without notice.

CONTACT: Sonic Solutions
A. Clay Leighton, 415-893-8000 (Chief Financial Officer)
clay_leighton@sonic.com
or
Market Street Partners
Carolyn Bass, 415-321-2455
carolyn@marketstreetpartners.com
Rob Hawkins, 415-321-2455
rob@marketstreetpartners.com

</TEXT>
</DOCUMENT>

# Exhibit 12

<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>3
<FILENAME>a4505849_991.txt
<DESCRIPTION>SONIC SOLUTIONS EXHIBIT 99.1
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results For Second Fiscal Quarter Ended September 30, 2003; Revenue Increase Drives Record Quarterly Profitability

NOVATO, Calif.--(BUSINESS WIRE)--Oct. 30, 2003--Sonic Solutions (Nasdaq:SNIC) announced today results for the Company's second fiscal quarter ended September 30, 2003.

Net revenue for the quarter was $12,695,000 compared to $7,488,000 for the same period in the prior fiscal year. Operating income for the quarter was $2,261,000 and net income per diluted share was $0.08 compared to operating income of $726,000 and net income per diluted share of $0.04 for the same period of the prior fiscal year.

Net revenue for the six months ended September 30, 2003 was $24,717,000 compared to $14,872,000 for the same period in the prior fiscal year. Operating income for the six months was $4,284,000 and net income per diluted share was $0.16 compared to operating income of $1,308,000 and net income per diluted share of $0.07 for the same period of the prior fiscal year.

"Sonic's revenues grew during the September quarter, as DVD recorder shipments continued to ramp and as our business expanded on several fronts," noted Bob Doris, president & CEO of Sonic Solutions. "The company's financial performance was excellent, on virtually all income statement and balance sheet metrics. We're very much looking forward to the last two quarters of our 2004 fiscal year, when we expect that growth will accelerate, taking Sonic to new levels of performance."

Sonic will hold its fiscal second quarter 2004 earnings conference call on Thursday, October 30, 2003 at 1:30 p.m. (PT)/4:30 p.m. (ET). Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call will also be available via Webcast at www.sonic.com.

Sonic Solutions
Condensed Statement of Operations
(in thousands, except per share amounts)
(unaudited)

| | Three Months Ended September 30, | | Six Months Ended September 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Net Revenue | $12,695 | $ 7,488 | $24,717 | $14,872 |
| Cost of Revenue | 1,653 | 1,789 | 3,401 | 3,696 |
| Gross Profit | 11,042 | 5,699 | 21,316 | 11,176 |

| | | | | |
|---|---|---|---|---|
| Operating expenses | | | | |
| Marketing and sales | 2,890 | 2,001 | 5,982 | 4,147 |
| Research and development | 4,840 | 2,250 | 9,021 | 4,142 |
| General and administrative | 1,051 | 722 | 2,029 | 1,579 |
| Total operating expenses | 8,781 | 4,973 | 17,032 | 9,868 |
| Operating income | 2,261 | 726 | 4,284 | 1,308 |
| Other income, net | 51 | 28 | 1 | 62 |
| Income before income taxes | 2,312 | 754 | 4,285 | 1,370 |
| Provision for income taxes | 414 | 18 | 745 | 58 |
| Net income | $ 1,898 | 736 | 3,540 | 1,312 |
| Net income per share applicable to common Shareholders: | | | | |
| Basic | $ 0.09 | $ 0.04 | $ 0.18 | $ 0.08 |
| Diluted | $ 0.08 | $ 0.04 | $ 0.16 | $ 0.07 |
| Shares used in computing net income per share: | | | | |
| Basic | 20,118 | 16,032 | 19,276 | 15,660 |
| Diluted | 23,462 | 19,138 | 22,620 | 18,767 |

Sonic Solutions
Condensed Balance Sheets
(in thousands)

| | September 30, 2003 | March 31, 2003 * |
|---|---|---|
| Assets | (unaudited) | |
| Current assets: | | |
| Cash, cash equivalents and investments | $ 37,574 | $ 9,708 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $411, at September 30, 2003 and March 31, 2003, respectively | 4,489 | 5,823 |
| Inventory | 655 | 531 |
| Prepaid expenses and other current assets | 844 | 869 |
| Total current assets | 43,562 | 16,931 |
| Fixed assets, net | 2,381 | 1,745 |

| | | |
|---|---|---|
| Purchased and internally developed software costs, net | 956 | 920 |
| Acquired intangibles | 1,077 | 1,345 |
| Goodwill | 6,715 | 6,715 |
| Other assets | 1,417 | 697 |
| Total assets | $ 56,108 | $ 28,353 |
| | | |
| Liabilities and Shareholders' Equity | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 7,054 | $ 7,087 |
| Deferred revenue and deposits | 2,286 | 1,840 |
| Total current liabilities | 9,340 | 8,927 |
| Shareholders' equity: | | |
| Common stock | 69,567 | 45,765 |
| Preferred stock | 0 | 0 |
| Accumulated deficit | (22,799) | (26,339) |
| Total shareholders' equity | 46,768 | 19,426 |
| Total liabilities and shareholders' equity | $ 56,108 | $ 28,353 |

* March 31, 2003 balances are derived from the audited financial statements included in the Company's 2003 Annual Report on Form 10-K.

About Sonic Solutions (NASDAQ: SNIC - News)

Based in Marin County, California, Sonic Solutions (http://www.sonic.com) is the world's leading supplier of DVD creation software for professional, industrial and consumer applications. The majority of major film releases on DVD have been produced on Sonic's professional DVD authoring systems in studios around the world. Sonic's MyDVD(R) and DVDit!(R) are the most widely used DVD creation applications by consumers and video enthusiasts and are the solutions of choice among the key PC and after-market drive suppliers. Sonic's RecordNow!(TM) is a leading solution for audio and data mastering. Sonic's AuthorScript(R), the DVD and CD formatting and burning engine that underlies Sonic's applications, is the most widely deployed DVD software engine and has been licensed by Adobe, Microsoft, Sony, and many others.

Forward Looking Statements

The above paragraphs of this press release may contain forward looking statements that are based upon current expectations. Actual results could differ materially from those projected in the forward looking statements as a result of various risks and uncertainties including, among others, the timely introduction and acceptance of new products, costs associated with new product introductions, the transition of products to new hardware configurations and platforms and other factors, including those discussed in the Company's annual and quarterly reports on file with the Securities and Exchange Commission. This press release should be read in conjunction with the

Company's most recent annual report on Form 10-K, Form 10-Q and
Registration Statement on file with the Securities and Exchange
Commission, which contain a more detailed discussion of the Company's
business including risks and uncertainties that may affect future
results. The Company does not undertake to update any forward looking
statements.

    Sonic, the Sonic logo, Backup MyPC, CinePlayer, DVD Producer,
Edit-on-DVD, NoNoise, OpenDVD, Sonic PrimeTime, RecordNow! and Simple
Backup are trademarks of Sonic Solutions. AuthorScript, AutoDVD,
DVDit!, DVD Fusion, MyDVD, PrePlay, ReelDVD, Scenarist, Sonic DVD
Creator and Sonic Solutions are registered trademarks of Sonic
Solutions. All other company or product names are trademarks of their
respective owners and, in some cases, are used by Sonic under license.
Specifications, pricing and delivery schedules are subject to change
without notice.

    Sonic Solutions -- 101 Rowland Way -- Novato, CA 94945 -- tel:
415.893.8000 -- fax: 415.893.8008 -- www.sonic.com

    CONTACT: Sonic Solutions
             A. Clay Leighton, 415-893-8000
             Chief Financial Officer
             clay_leighton@sonic.com
             or
             Market Street Partners
             Carolyn Bass or Rob Hawkins, 415-321-2455
             carolyn@marketstreetpartners.com
             rob@marketstreetpartners.com


</TEXT>
</DOCUMENT>

# Exhibit 13



**Roxio Reports Third Quarter Results**

**Roxio Reports Third Quarter Results and New University License Deal for Napster**

**Santa Clara, California - (February 4, 2004) -** Roxio®, a division of Sonic Solutions® (NASDAQ: SNIC), the leader in digital media software, today reported financial results for its fiscal third quarter ended December 31, 2003. Separately, Napster today announced an agreement with the University of Rochester(New York) whereby all students at the university will have access to Napster's premium service and Napster will receive a license fee from the university for that access. This follows Napster's ground-breaking deal with Penn State University which launched in January.

Roxio's net revenue for the third quarter of fiscal 2004 was $18.8 million compared to $26.4 million in the third quarter of the prior fiscal year. Roxio's reported net loss for the third quarter was $25.6 million, or $0.92 per basic and diluted share, as compared to a net loss of $9.2 million, or $0.47 per basic and diluted share, in the third quarter of the prior fiscal year. Shares used for computing basic and fully diluted earnings per share were approximately 27.9 million for the third fiscal quarter ended December 31, 2003 and 19.4 million shares for the third quarter of the prior fiscal year.

"In its first few months of operations Napster has firmly established itself as one of the top two online music services in the country and was named the 'Best Online Music Store' by PC Magazine," said Chris Gorog, Roxio's Chairman and CEO. "Napster's sales of downloads and subscriptions continue to grow and the Napster brand continues to prove itself as a unique and very powerful asset which has enabled us to create new Napster products sold through major retail outlets such as Best Buy, Target and Comp USA. The company is also well-positioned to leverage Napster's scalable music delivery platform into international markets later this year. It's clear the online music business is gaining substantial traction and Forrester Research recently raised its projections, estimating that the sector is poised to become a multi-billion dollar industry over the next few years."

"Our software results exceeded our expectations last quarter and we are very excited as we approach the launch of our next generation Digital Media Suite, Easy Media Creator 7, at the prestigious DEMO 2004 forum next week. Roxio pioneered the integrated digital media experience, and we believe the next edition of Creator will be a very exciting product for consumers and retailers. In addition, our Toast product for the Mac continues to outperform on all fronts and we were proud to receive a 'Best in Show' award at Macworld for Toast with Jam 6," concluded Mr. Gorog.

For the quarter, Roxio's digital media software division recorded revenues of $15.2 million and a pretax loss of $10.1 million. This included restructuring charges of $4.4 million. Revenues for the company's online music division totaled approximately $3.6 million, representing two months of operation for Napster, and pretax loss was $15.1 million. Combined pretax loss for the two divisions was approximately $25.2 million.

Nand Gangwani, Roxio's Chief Financial Officer, commented, "Our efforts to consolidate the organization towards profitability are proceeding on plan and, as evident in our third quarter results, have already resulted in a positive impact on our expense structure. With the pending launch of Easy Media Creator 7, we expect fourth quarter revenues for the software business to be approximately $25 million and to report positive operating margins for this segment. Revenues from our Napster division are expected to be approximately $5 million. Our recent private placement in which we raised an additional $22.5 million in capital increased our cash position on the closing date to approximately $64 million. We expect spending in our online music division to decrease over the next several quarters, and remain very confident that our balance sheet can support the substantial growth opportunities before us."

**Roxio Division Highlights**

- Was invited to participate in DEMO, one of the world's foremost forums for new product innovations, at which Roxio will unveil its next generation Digital Media Suite on February 15 - 17 in Scottsdale, Arizona.
- Unveiled Toast with Jam 6, the newest version of Roxio's best-selling CD and DVD burning software for the Macintosh
- Announced that more than 100,000 units of Toast 6 have been shipped since launch in September of 2003. The product has been recognized through a MacUser Award and "Editor's Choice 2003" Awards from eMedia and TechEdge-zine. Reviewers have also rated the latest version of Toast "5 out of 5" in publications ranging from MacWorld, Applelinks and MacHome.

**Napster Division Highlights**

- Announced a nationwide music promotion with Miller Brewing Company offering music fans the opportunity to win Samsung Napster portable music players and $50 in music credits on Napster as a part of Rolling Stone magazine's celebration of 50 years of Rock and Roll, beginning in June 2004.
- Was selected to feature exclusive content from Tom Petty's best-selling works, now available for streaming, album and individual song burning and transfer to portable devices.
- Introduced Napster Burnpak, an affordable digital music product which couples Roxio's Easy CD & DVD Creator 6 Starter Kit, with Napster, in one convenient box available at leading retailers including Best Buy, CompUSA and Fry's Electronics.
- Announced a strategic partnership with Imation (exclusive distributor of Napster-branded optical media products in North America), Case Logic and Target to launch the first "one-stop shop" at retail offering everything needed for a complete digital music experience including pre-paid Napster download cards, a Napster Burnpak, blank Napster-brand optical products and Napster-brand CD cases.
- Launched pre-paid Napster cards available for sale in over 20,000 retail locations including RadioShack, RiteAid, Best Buy, CompUSA, Safeway and ExxonMobil.
- Partnered with Digital 5 to bring Napster 2.0's Premium service to the living room by enabling users of the service to access Napster's catalog of over half a million tracks through connected DVD players and other similar consumer electronics devices powered by Digital

5.

**Earnings Call Information**
The Roxio third quarter teleconference and webcast is scheduled to begin at 1:30 p.m., Pacific Time, on Wednesday, February 4, 2004. To participate on the live call, analysts and investors should dial 800-374-1636 at least ten minutes prior to the call and reference conference ID: 4808210. Roxio will also offer a live and archived webcast of the conference call, accessible from the "Investor Relations" section of the company's Web site at http://investor.roxio.com. A telephonic replay of the conference call will also be available for 48 hours by dialing 800-642-1687 and entering the passcode: 4808210.

---

**About Roxio**
Roxio, a division of Sonic Solutions, develops and markets the best-selling digital media software in the world. Roxio offers award-winning software products for CD/DVD burning, photo editing and video editing and has an installed base of over 150 million users. Roxio distributes its products globally through strategic partnerships with major hardware manufacturers, through leading retailers, through Internet partnerships and through direct sales at www.roxio.com. Roxio's parent company, Sonic Solutions (NASDAQ: SNIC; http://www.sonic.com) is the leader in digital media software and provides a broad range of software tools and applications for creative professionals, business and home users and technology partners. Sonic's products range from professional DVD authoring systems and interactive content delivery technologies that are used to produce the majority of Hollywood movies released on DVD, to the award-winning Roxio- and Sonic-branded CD and DVD creation, playback and backup applications that have become the premiere solutions for consumers and business users worldwide. Sonic's AuthorScript® is the de facto standard for CD and DVD burning and formatting and has been licensed by major software and hardware manufacturers, including Adobe, Broadcom, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

**Safe Harbor Statement**
Except for historical information, the matters discussed in this press release, in particular matters related to Roxio's future revenue, net income (loss) and cash flow; growth of the online music industry; the international launch of Napster; the development and launch of Roxio's Easy Media Creator 7; OEM relationships; relationships with content providers; and product development, are forward-looking statements that are subject to certain risks and uncertainties such as decreased demand for our products; flaws inherent in our products or services; intense competition; failure to obtain content licenses in domestic and international markets; failure to maintain relationships with strategic partners and content providers; failure to develop new products or improvements to existing products; general economic conditions and third party claims, that could cause actual results to differ materially from those projected. Additional information on these and other factors are contained in Roxio's reports filed with the Securities and Exchange Commission (SEC), including the Company's Quarterly Report on Form 10-Q as filed with the SEC on November 14, 2003, copies of which are available at the website maintained by the SEC at http://www.sec.gov. Roxio assumes no obligation to update the forward-looking statements included in this press release.

ROXIO INC.
CONDENSED CONSOLIDATED BALANCE SHEETS
(In thousands, except per share data, unaudited)

| | December 31, 2003 | March 31, 2003 |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $28,038 | $36,820 |
| Restricted cash | 6,708 | -- |
| Short-term investments | 6,856 | 16,677 |
| Accounts receivable, net of allowance for doubtful accounts of $1,380 and $850, respectively | 12,633 | 18,196 |
| Inventories | 182 | 460 |
| Prepaid expenses and other current assets | 8,614 | 3,366 |
| Income taxes receivable | 6 | -- |
| Deferred income taxes | 2,346 | 4,709 |
| Total current assets | 65,383 | 80,228 |
| Long-term investment | 3,000 | 3,059 |
| Property and equipment, net | 11,782 | 9,058 |
| Goodwill, net | 89,654 | 55,247 |
| Other intangibles assets, net | 6,728 | 10,314 |
| Other assets | 2,212 | 589 |
| Total assets | $178,759 | $158,495 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Accounts payable | $8,487 | $11,952 |
| Income taxes payable | -- | 1,353 |
| Accrued liabilities | 35,254 | 20,987 |
| Deferred Revenue | 1,144 | 725 |
| Current portion of long-term debt | 5,684 | 606 |
| Total current liabilities | 50,569 | 35,623 |
| Long term liabilities: | | |
| Long term debt | 80 | 5,490 |
| Deferred income taxes | 1,014 | 1,190 |
| Other liabilities | 480 | -- |
| Total liabilities | 52,143 | 42,303 |
| Stockholders' equity: | | |
| Common stock, $0.001 par value; 100,000 shares authorized; 27,910 and 19,574 issued and outstanding | 28 | 20 |
| Additional paid-in capital | 174,172 | 127,804 |
| Deferred stock-based compensation | (1,936) | (2,886) |

| | | |
|---|---|---|
| Accumulated deficit | (48,523) | (10,675) |
| Accumulated other comprehensive income | 2,875 | 1,929 |
| Total stockholders' equity | 126,616 | 116,192 |
| Total liabilities and stockholders' equity | $178,759 | $158,495 |

ROXIO INC.
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share data, unaudited)

| | Three Months Ended December 31, | | Nine Months Ended December 31, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Net revenues | $18,763 | $26,430 | $65,737 | $86,652 |
| Cost of revenues (1) | 7,984 | 7,522 | 22,234 | 22,867 |
| Gross profit | 10,779 | 18,908 | 43,503 | 63,785 |
| Operating expenses: | | | | |
| Research and development (2) | 8,764 | 5,067 | 24,494 | 15,710 |
| Sales and marketing (3) | 15,415 | 10,043 | 34,175 | 32,057 |
| General and administrative (4) | 5,350 | 9,308 | 18,065 | 21,043 |
| Restructuring charges | 4,374 | 207 | 6,467 | 431 |
| Amortization of intangible assets | 1,267 | 1,428 | 3,730 | 4,764 |
| Stock-based compensation charges | 512 | 659 | 1,550 | 1,447 |
| Total operating expenses | 35,682 | 26,712 | 88,481 | 75,452 |
| Loss from operations | (24,903) | (7,804) | (44,978) | (11,667) |
| Gain on sale of GoBack product line | -- | -- | 10,592 | -- |
| Other income (loss), net (5) | (338) | 150 | (41) | 565 |
| Loss before provision (benefit) for income taxes | (25,241) | (7,654) | (34,427) | (11,102) |
| Provision for income taxes | 357 | 1,546 | 3,421 | 1,166 |
| Net loss | $(25,598) | $(9,200) | $(37,848) | $(12,268) |
| Earnings per share: | | | | |
| Basic and Diluted | $(0.92) | $(0.47) | $(1.47) | $(0.63) |
| Weighted average shares used in computing basic and diluted net income per share | 27,852 | 19,422 | 25,799 | 19,470 |

(1) Excludes stock-based compensation charges of $9 and $13 for the three months ended December 31, 2003 and 2002, respectively, and $29 and $39 for the nine months ended December 31, 2003 and 2002, respectively.
Excludes restructuring charges of $596 and $7 for the three months ended December 31, 2003 and 2002, respectively, and $963 and $20 for the nine months ended December 31, 2003 and 2002, respectively.

(2) Excludes stock-based compensation charges of $132 and $191 for the three months ended December 31, 2003 and 2002, respectively, and $425 and $573 for the nine months ended December 31, 2003 and 2002, respectively.
Excludes restructuring charges of $69 and $0 for the three months ended December 31, 2003 and 2002, respectively, and $597 and $27 for the nine months ended December 31, 2003 and 2002, respectively.

(3) Excludes stock-based compensation charges of $119 and $172 for the three months ended December 31, 2003 and 2002, respectively, and $382 and $(14) for the nine months ended December 31, 2003 and 2002, respectively.
Excludes restructuring charges of $238 and $70 for the three months ended December 31, 2003 and 2002, respectively, and $909 and $214 for the nine months ended December 31, 2003 and 2002, respectively.

(4) Excludes stock-based compensation charges of $252 and $283 for the three months ended December 31, 2003 and 2002, respectively, and $714 and $849 for the nine months ended December 31, 2003 and 2002, respectively.
Excludes restructuring charges of $2,226 and $130 for the three months ended December 31, 2003 and 2002, respectively, and $2,301 and $170 for the nine months ended December 31, 2003 and 2002, respectively.

(5) Excludes restructuring charges of $1,245 and $0 for the three months ended December 31, 2003 and 2002 respectively, and $1,697 and $0 for the nine months ended December 31, 2003 and 2002, respectively.

ROXIO, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)
(unaudited)

| | Nine Months Ended December 31, 2003 | 2002 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $(37,848) | $(12,268) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 7,817 | 7,170 |
| Stock-based compensation charges | 1,550 | 1,447 |
| Provision for doubtful accounts | (255) | 423 |
| Loss on retirement of assets | 1,982 | -- |
| Gain on sale of GoBack assets | (10,592) | -- |
| Deferred income taxes | 2,371 | (802) |
| Change in operating assets and liabilities: | | |
| Accounts receivable | 5,455 | 5,541 |
| Inventories | 214 | 134 |
| Prepaid expenses and other current assets | (357) | 357 |
| Other assets | (64) | -- |
| Accounts payable | (3,337) | 1,530 |
| Income taxes payable | (1,241) | (738) |
| Accrued liabilities | 6,303 | (5,819) |
| Deferred revenues | 1,140 | -- |
| Other liabilities | 480 | -- |
| Net cash used in operating activities | (26,382) | (3,025) |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (3,693) | (3,783) |
| Proceeds from sale of GoBack assets | 10,250 | -- |
| Purchases of other intangible assets | (1,805) | (5,667) |
| Purchases of short-term investments | (5,669) | (25,158) |
| Proceeds from sale of short-term investments | 12,816 | 10,694 |
| Maturities of short-term investments | 4,309 | 3,285 |
| Transfer to restricted cash account | (6,708) | -- |
| Investment in nonconsolidated companies | -- | (3,000) |
| Acquisition of Pressplay, net of cash acquired | (14,600) | -- |
| Net cash used in investing activities | (5,100) | (23,629) |
| Cash flows from financing activities: | | |
| Principal payment on capital lease obligation | (456) | (411) |
| Proceeds from short-term borrowing | 403 | -- |
| Principal payment on short-term borrowing | (281) | -- |
| Issuance of common stock under employee stock plan | 2,081 | 928 |
| Issuance of common stock from private equity financing | 20,405 | -- |
| Repurchase of common stock | -- | (1,065) |
| Proceeds from line of credit | -- | 5,000 |
| Net cash provided by financing activities | 22,152 | 4,452 |
| Effect of exchange rates on cash | 548 | 562 |
| Change in cash and cash equivalents | (8,782) | (21,640) |
| Cash and cash equivalents at beginning of period | 36,820 | 47,280 |
| Cash and cash equivalents at end of period | $28,038 | 25,640 |
| Supplemental cash flow information: | | |
| Cash paid for interest | $193 | $88 |
| Cash paid for income taxes | $514 | $1,543 |
| Non-cash activities: | | |
| Issuance of stock in connection with the acquisition of Napster, LLC | $23,486 | $-- |
| Adjustment to goodwill resulting | | |

| | | |
|---|---|---|
| from the acquisition of Napster, LLC | $34,407 | $-- |
| Adjustment to goodwill resulting from the acquisition of MGI Software Corp | $-- | $3,802 |
| Issuance and remeasurement of warrant for services | $-- | $(705) |
| Issuance of warrant in asset purchase | $-- | $329 |
| Assets acquired under capital leases | $-- | $134 |

Sonic, the Sonic logo, Sonic Solutions, Roxio, MyDVD, CineMagic, Plug & Burn, LiveShare, Roxio Easy Media Creator, and AuthorScript are trademarks or registered trademarks of Sonic Solutions or its subsidiaries in the United States and/or other countries. Dolby is a trademark of Dolby Laboratories. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic Solutions under license. Specifications, pricing and delivery schedules are subject to change without notice.

© 2007 Sonic Solutions. All rights reserved.
Enables the creation, management, and enjoyment of digital media content from Hollywood to home.

# Exhibit 14

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a4693521ex99.txt
<DESCRIPTION>EXHIBIT 99.1 PRESS RELEASE
<TEXT>

Exhibit 99.1

# Sonic Solutions Reports Record Results for First Quarter Ended June 30, 2004; 11th Consecutive Quarter of Increasing Revenues

NOVATO, Calif.--(BUSINESS WIRE)--Aug. 2, 2004--Sonic Solutions (Nasdaq:SNIC) announced today the financial results for the Company's first quarter ended June 30, 2004.

Net revenue for the quarter was $17,909,000 compared to $12,022,000 for the same period in the prior fiscal year. Net income for the quarter was $3,987,000 or $0.16 per diluted share compared to net income of $1,643,000 or $0.08 per diluted share for the same period in the prior fiscal year.

Sonic will hold its first quarter ended June 30, 2004 earnings conference call on Monday, August 2, 2004 at 1:30 p.m. (PT)/4:30 p.m. (ET). Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call will also be available via Webcast at www.sonic.com.

Sonic Solutions
Condensed Statement of Operations
(in thousands, except per share amounts)

| | Three Months Ended June 30, (unaudited) | |
|---|---|---|
| | 2004 | 2003 |
| Net Revenue | $17,909 | $12,022 |
| Cost of Revenue | 1,861 | 1,748 |
| Gross Profit | 16,048 | 10,274 |
| Operating expenses | | |
| Marketing and sales | 3,912 | 3,092 |
| Research and development | 6,548 | 4,181 |
| General and administrative | 1,200 | 977 |
| Total operating expenses | 11,660 | 8,250 |
| Operating income | 4,388 | 2,024 |
| Other income (expense), net | 60 | (50) |
| Income before income taxes | 4,448 | 1,974 |
| Provision for income taxes | 461 | 331 |

| | | |
|---|---|---|
| Net income | $ 3,987 | 1,643 |
| Net income per share applicable to common Shareholders: | | |
| Basic | $ 0.18 | $ 0.09 |
| Diluted | $ 0.16 | $ 0.08 |
| Shares used in computing net income per share: | | |
| Basic | 22,044 | 18,434 |
| Diluted | 25,461 | 21,557 |

Sonic Solutions
Condensed Balance Sheets
(in thousands)

| | June 30, 2004 (unaudited) | March 31, 2004 (a) |
|---|---|---|
| Assets | | |
| Current assets: | | |
| Cash, cash equivalents and investments | $ 67,781 | $ 36,182 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $243 and $284, at March 31, 2004 and June 30, 2004, respectively | 6,990 | 9,443 |
| Inventory | 596 | 560 |
| Prepaid expenses and other current assets | 1,197 | 1,399 |
| Total current assets | 76,564 | 47,584 |
| Fixed assets, net | 3,800 | 3,610 |
| Purchased and internally developed software costs, net | 1,195 | 1,042 |
| Acquired intangibles | 2,689 | 2,898 |
| Goodwill | 15,533 | 15,533 |
| Other assets | 298 | 278 |
| Total assets | $100,079 | $ 70,945 |
| Liabilities and Shareholders' Equity | | |
| Current liabilities: | | |
| Accounts payable | $ 1,419 | $ 1,145 |
| Accrued liabilities | 8,690 | 8,977 |
| Deferred revenue and deposits | 5,165 | 4,965 |
| Capital Leases | 65 | 60 |
| Total current liabilities | 15,339 | 15,147 |
| Capital lease, net of current portion | 50 | 75 |

| | | |
|---|---|---|
| Total liabilities | 15,389 | 15,222 |
| Shareholders' equity: | | |
| Common stock | 95,977 | 70,994 |
| Cumulative foreign translation adjustment | (19) | (16) |
| Accumulated deficit | (11,268) | (15,255) |
| Total shareholders' equity | 84,690 | 55,723 |
| Total liabilities and shareholders' equity | $100,079 | $ 70,945 |

(a) March 31, 2004 balances are derived from the audited financial statements included in the Company's 2004 Annual Report on Form 10-K.

About Sonic Solutions (Nasdaq:SNIC)

Based in Marin County, California, Sonic Solutions (Nasdaq "SNIC") (http://www.sonic.com/) is the world's leading supplier of DVD creation software for professional, industrial and consumer applications. The majority of major film releases on DVD have been produced on Sonic's professional DVD authoring systems in studios around the world. Sonic's MyDVD(R) and DVDit(R) are the most widely used DVD creation applications by consumers and video enthusiasts and are the solutions of choice among the key PC and after-market drive suppliers. Sonic's RecordNow(TM) is a leading solution for audio and data mastering. InterActual, a subsidiary of Sonic Solutions, is the leading provider of software and services that enable cutting-edge DVD interactivity in computers and next-generation home entertainment platforms. Sonic's AuthorScript(R), the DVD and CD formatting and burning engine that underlies Sonic's applications, is the most widely deployed DVD software engine and has been licensed by Adobe, Microsoft, Sony and many others.

Sonic, the Sonic logo, Sonic Solutions, AuthorScript, AutoDVD, Backup MyPC, CinePlayer, DVD Fusion, DVDit, DVD Producer, Edit-on-DVD, HyperMux DL, InterActual, MyDVD, NoNOISE, OpenDVD, PrePlay, RecordNow, ReelDVD, Scenarist, Simple Backup, Sonic DVD Creator, Sonic JumpSafe, Sonic PrimeTime, and Sonic SmartBalance, are trademarks or registered trademarks of Sonic Solutions in the U.S. and/or other countries. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic under license. Specifications, pricing and delivery schedules are subject to change without notice.

CONTACT: Sonic Solutions
A. Clay Leighton, 415-893-8000
clay_leighton@sonic.com
or
Market Street Partners
Carolyn Bass, 415-445-3234
carolyn@marketstreetpartners.com
Rob Walker, 415-445-3234
rwalker@marketstreetpartners.com

</TEXT>
</DOCUMENT>

# Exhibit 15

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a4761006ex99.txt
<DESCRIPTION>EXHIBIT 99.1 PRESS RELEASE
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results for Second Quarter Ended September 30, 2004; Quarterly Revenue Increases 37%; Quarterly Net Income Increases 88% Year Over Year

NOVATO, Calif.--(BUSINESS WIRE)--Nov. 8, 2004--Sonic Solutions (Nasdaq:SNIC) announced today the financial results for the Company's second quarter ended September 30, 2004.

Net revenue for the quarter was $17,437,000 compared to $12,695,000 for the same period in the prior fiscal year. Net income for the quarter was $3,575,000 or $0.14 per diluted share compared to net income of $1,898,000 or $0.08 per diluted share for the same period in the prior fiscal year.

Net revenue for the six months was $35,346,000 compared to $24,717,000 for the same period in the prior fiscal year. Net income for the six months was $7,562,000 or $0.29 per diluted share compared to net income of $3,540,000 or $0.16 per diluted share for the same period in the prior fiscal year.

Sonic will hold its second quarter ended September 30, 2004 earnings conference call on Monday, November 8, 2004 at 1:30 p.m. (PT)/4:30 p.m. (ET). Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call will also be available via Webcast at www.sonic.com.

Sonic Solutions
Condensed Statement of Operations
(in thousands, except per share amounts)
(unaudited)

| | Three Months Ended September 30, 2004 | Three Months Ended September 30, 2003 | Six Months Ended September 30, 2004 | Six Months Ended September 30, 2003 |
|---|---|---|---|---|
| Net Revenue | $17,437 | $12,695 | $35,346 | $24,717 |
| Cost of Revenue | 1,639 | 1,653 | 3,500 | 3,401 |
| Gross Profit | 15,798 | 11,042 | 31,846 | 21,316 |
| Operating expenses | | | | |
| Marketing and sales | 3,686 | 2,890 | 7,598 | 5,982 |
| Research and development | 7,107 | 4,840 | 13,655 | 9,021 |
| General and administrative | 1,387 | 1,051 | 2,587 | 2,029 |
| Total operating expenses | 12,180 | 8,781 | 23,840 | 17,032 |
| Operating income | 3,618 | 2,261 | 8,006 | 4,284 |
| Other income, net | 171 | 51 | 231 | 1 |

| | | | | |
|---|---|---|---|---|
| Income before income taxes | 3,789 | 2,312 | 8,237 | 4,285 |
| Provision for income taxes | 214 | 414 | 675 | 745 |
| Net income | $ 3,575 | 1,898 | 7,562 | 3,540 |
| Net income per share applicable to common Shareholders: | | | | |
| Basic | $ 0.15 | $ 0.09 | $ 0.33 | $ 0.18 |
| Diluted | $ 0.14 | $ 0.08 | $ 0.29 | $ 0.16 |
| Shares used in computing net income per share: | | | | |
| Basic | 23,422 | 20,118 | 22,733 | 19,276 |
| Diluted | 26,400 | 23,462 | 25,711 | 22,620 |

Sonic Solutions
Condensed Balance Sheets
(in thousands)

| | September 30, 2004 (unaudited) | March 31, 2004 (a) |
|---|---|---|
| Assets | | |
| Current assets: | | |
| Cash, cash equivalents and investments | $ 66,239 | $ 36,182 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $243 and $343, at March 31, 2004 and September 30, 2004, respectively | 9,471 | 9,443 |
| Inventory | 734 | 560 |
| Prepaid expenses and other current assets | 2,276 | 1,399 |
| Total current assets | 78,720 | 47,584 |
| Fixed assets, net | 4,329 | 3,610 |
| Purchased and internally developed software costs, net | 1,405 | 1,042 |
| Acquired intangibles | 2,491 | 2,898 |
| Goodwill | 15,533 | 15,533 |
| Other assets | 511 | 278 |
| Total assets | $102,989 | $ 70,945 |
| Liabilities and Shareholders' Equity | | |
| Current liabilities: | | |

| | | |
|---|---|---|
| Accounts payable | $ 1,845 | $ 1,145 |
| Accrued liabilities | 8,112 | 8,977 |
| Deferred revenue and deposits | 4,701 | 4,965 |
| Capital leases | 66 | 60 |
| Total current liabilities | 14,724 | 15,147 |
| Capital lease, net of current portion | 38 | 75 |
| Total liabilities | 14,762 | 15,222 |
| Shareholders' equity: | | |
| Common stock | 95,942 | 70,994 |
| Cumulative foreign translation adjustment | (22) | (16) |
| Accumulated deficit | (7,693) | (15,255) |
| Total shareholders' equity | 88,227 | 55,723 |
| Total liabilities and shareholders' equity | $102,989 | $ 70,945 |

(a) March 31, 2004 balances are derived from the audited financial
    statements included in the Company's 2004 Annual Report on
    Form 10-K.

About Sonic Solutions (NASDAQ: SNIC - News)

Based in Marin County, California, Sonic Solutions (Nasdaq:SNIC)
(http://www.sonic.com/) is the world's leading supplier of DVD
creation software for professional, industrial and consumer
applications. The majority of major film releases on DVD have been
produced on Sonic's professional DVD authoring systems in studios
around the world. Sonic's MyDVD(R) and DVDit(R) are the most widely
used DVD creation applications by consumers and video enthusiasts and
are the solutions of choice among the key PC and after-market drive
suppliers. Sonic's RecordNow(TM) is a leading solution for audio and
data mastering. InterActual, a subsidiary of Sonic Solutions, is the
leading provider of software and services that enable cutting-edge DVD
interactivity in computers and next-generation home entertainment
platforms. Sonic's AuthorScript(R), the DVD and CD formatting and
burning engine that underlies Sonic's applications, is the most widely
deployed DVD software engine and has been licensed by Adobe,
Microsoft, Sony and many others.
Sonic, the Sonic logo, Sonic Solutions, AuthorScript, DVDit,
InterActual, MyDVD, and RecordNow are trademarks or registered
trademarks of Sonic Solutions in the U.S. and/or other countries. All
other company or product names are trademarks of their respective
owners and, in some cases, are used by Sonic under license.
Specifications, pricing and delivery schedules are subject to change
without notice.

CONTACT: Sonic Solutions
         A. Clay Leighton, 415-893-8000
         clay_leighton@sonic.com
         or
         Market Street Partners
         Carolyn Bass or Rob Walker, 415-445-3234
         carolyn@marketstreetpartners.com  email

rwalker@marketstreetpartners.com email

</TEXT>
</DOCUMENT>

# Exhibit 16



**Sonic Solutions Reports Results for Third Quarter Ended December 31, 2004**

**Record Revenues and Strong Profitability (Non GAAP) Mark First Quarter Report Post Roxio Acquisition**

**Novato, California (February 8, 2005) - —** Sonic Solutions (NASDAQ: SNIC) announced today the financial results for the Company's third quarter ended December 31, 2004.

**Summary Financial Results (in thousands, except per share amounts)**

| | Three Months Ended December 31 | | | Nine Months Ended December 31 | |
|---|---|---|---|---|---|
| | 2004 (Non GAAP) | 2004 (GAAP) | 2003 (GAAP) | 2004 (GAAP) | 2003 (GAAP) |
| Net revenue | $20,615 | $19,677 | $14,834 | $55,023 | $39,551 |
| Net income (loss) | $4,941 | $(419) | $3,208 | $7,143 | $6,748 |
| Net income (loss) per diluted share | $0.18 | $(0.02) | $0.13 | $0.25 | $0.27 |

**Summary**

On a GAAP basis, net revenue for the quarter was $19,677,000 compared to $14,834,000 for the same period in the prior fiscal year. Net loss for the quarter was $419,000 or $0.02 per diluted share compared to net income of $3,208,000 or $0.13 per diluted share for the same period in the prior fiscal year.

On a GAAP basis, net revenue for the nine months was $55,023,000 compared to $39,551,000 for the same period in the prior fiscal year. Net income for the nine months was $7,143,000 or $0.25 per diluted share compared to net income of $6,748,000 or $0.27 per diluted share for the same period in the prior fiscal year.

On a Non GAAP basis, net revenue for the quarter was $20,615,000 and net income was $4,941,000 and net income per diluted share was $0.18. Non GAAP Presentation

During the quarter ended December 31, 2004, and as previously announced, Sonic Solutions acquired substantially all of the assets and liabilities of the Consumer Software Division of Roxio, Inc. This press release discloses Non GAAP financial measures, including Non GAAP net revenue, net income (loss), diluted earnings per share, and gross profit and margin figures, which exclude certain expense items associated with the acquisition and include certain royalty revenue associated with the sale of Roxio product, each as more fully described below. Sonic Solutions believes that this Non GAAP presentation is useful to investors in analyzing the results for the quarter ended December 31, 2004 because it includes certain items that management considers meaningful and excludes other items that management does not consider meaningful for purposes of analyzing Sonic's operating results. Sonic Solutions plans to continue to provide a Non GAAP presentation in future quarters for as long as such a presentation continues to be meaningful.

The Non GAAP presentation adjusts the following items: Revenue - Under purchase accounting rules, OEM royalties received by Sonic on account of Roxio's business may only be included in revenue if they reflect OEM shipments occurring after the date of the acquisition (December 17, 2004). The Non GAAP presentation includes in revenue royalties for which Sonic received reports of shipments from OEM's after December 17, 2004 for shipments prior to December 17, 2004 and for which Sonic has invoiced the OEMs and expects to collect the amounts due in cash. Sonic has also excluded in the Non GAAP presentation an end of life reserve related to some of the Roxio products. Acquisition Related Intangible Amortization - Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such as core and developed technology and customer contracts, which are then amortized over various periods of time. The GAAP presentation includes amortization on all acquired intangibles. These non-cash charges are eliminated in the Non GAAP presentation in calculating operating income. Acquired in-process Technology - In the GAAP presentation, the write-off of acquired in-process technology is included in operating expenses. This expense has been eliminated in the Non GAAP presentation. Business Integration Expenses - Certain charges that occur at or around the time of an acquisition, and that are not expected to recur, are considered to be non-recurring charges. The Non GAAP presentation eliminates any of these charges included in operating expense. Sonic will hold its third quarter ended December 31, 2004 earnings conference call on Tuesday, February 8, 2005 at 1:30 p.m. (PT)/4:30 p.m. (ET). Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call will also be available via Webcast at www.sonic.com.

**Sonic Solutions Condensed Statement of Operations**
**(in thousands, except per share amounts)**
**(unaudited)**

| | Three Months Ended December 31 | | Nine Months Ended December 31 | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Net Revenue | $19,677 | 14,834 | 55,023 | 39,551 |
| Cost of Revenue | 2,497 | 1,734 | 5,997 | 5,135 |
| Gross Profit | 17,180 | 13,100 | 49,026 | 34,416 |

| | | | | |
|---|---|---|---|---|
| Operating expenses | | | | |
| Marketing and sales | 4,553 | 3,304 | 12,151 | 9,286 |
| Research and development | 7,503 | 4,986 | 21,158 | 14,007 |
| General and administrative | 1,673 | 1,174 | 4,260 | 3,203 |
| Acquired in-process technology | 3,100 | 0 | 3,100 | 0 |
| Business integration | 1,087 | 0 | 1,087 | 0 |
| Total operating expenses | 17,916 | 9,464 | 41,756 | 26,496 |
| Operating income (loss) | (736) | 3,636 | 7,270 | 7,920 |
| Other income, net | 365 | 101 | 596 | 102 |
| Income (loss) before income taxes | (371) | 3,737 | 7,866 | 8,022 |
| Provision for income taxes | 48 | 529 | 723 | 1,274 |
| Net income (loss) | $(419) | 3,208 | 7,143 | 6,748 |
| Net income (loss) per share applicable to commonShareholders | | | | |
| Basic | ($0.02) | $0.15 | $0.31 | $0.34 |
| Diluted | ($0.02) | $0.13 | $0.25 | $0.27 |
| Shares used in computing net income (loss) per share | | | | |
| Basic | 23,627 | 21,516 | 23,031 | 20,023 |
| Diluted | 23,627 | 24,770 | 28,408 | 24,829 |

**Sonic Solutions**
**Condensed Balance Sheets**
**(in thousands)**

| | December 31, 2004 (unaudited) | March 31,2004 * |
|---|---|---|
| Assets | | |
| Current assets: | | |
| Cash, cash equivalents and investments | $29,214 | $36,182 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $243 and $10,818, at March 31, 2004 and December 31, 2004, respectively | 14,790 | 9,443 |
| Unbilled receivables | 397 | 0 |
| Inventory | 1,350 | 560 |
| Prepaid expenses and other current assets | 3,283 | 1,399 |
| Total current assets | 49,034 | 47,584 |
| Fixed assets, net | 6,857 | 3,610 |
| Purchased and internally developed software costs, net | 1,675 | 1,042 |
| Acquired intangibles | 50,065 | 2,898 |
| Goodwill | 54,236 | 15,533 |
| Other assets | 1,924 | 278 |
| Total assets | $163,791 | $70,945 |
| Liabilities and Shareholders' Equity | | |
| Current liabilities: | | |
| Accounts payable | $5,204 | $1,145 |
| Accrued liabilities | 21,768 | 8,977 |
| Deferred revenue and deposits | 7,123 | 4,965 |
| Capital leases | 57 | 60 |
| Total current liabilities | 34,152 | 15,147 |
| Bank note payable | 30,000 | 0 |
| Other long term liabilities | 2,068 | 0 |
| Capital lease, net of current portion | 101 | 75 |
| Total liabilities | 66,321 | 15,222 |
| Shareholders' equity: | | |
| Common stock | 105,596 | 70,994 |
| Cumulative foreign translation adjustment | (14) | (16) |

| | | |
|---|---|---|
| Accumulated deficit | (8,112) | (15,255) |
| Total shareholders' equity | 97,470 | 55,723 |
| Total liabilities and shareholders' equity | $163,791 | $70,945 |

* March 31, 2004 balances are derived from the audited financial statements included in the Company's 2004 Annual Report on Form 10-K.

**Sonic Solutions**
**Reconciliation of Reported Operating Results to Non GAAP Operating Results:**
**(in thousands, except per share amounts and percentages, unaudited)**

| | Three Months Ended December 31 | |
|---|---|---|
| | 2004 | 2003 |
| Reported revenue | 19,677 | 14,834 |
| Adjustment: | | |
| CSD Royalty reports received after December 17, 2004 for OEM shipments prior to December 17, 2004 | 731 | - |
| CSD end of life reserve | 207 | - |
| Non GAAP revenue | $ 20,615 | $14,834 |
| Non GAAP gross profit | 18,444 | 13,100 |
| Non GAAP gross margin | 89.5% | 88.3% |
| GAAP Operating income (loss) | (736) | 3,636 |
| GAAP Net income (loss) | (419) | 3,208 |
| Adjustments: | (419) | 3,208 |
| CSD royalty reports received after December 17, 2004 For OEM shipments prior to December 17, 2004 | 731 | - |
| CSD end of life reserve | 207 | - |
| Acquired in-process technology | 3,100 | - |
| Business integration expenses | 1,087 | - |
| Amortization of intangible assets | 326 | 134 |
| Tax impact on Non GAAP adjustments | (91) | (59) |
| Non GAAP operating income (loss) basis | $ 4,715 | $ 3,770 |
| Non GAAP net income (loss) basis | $ 4,941 | $ 3,283 |
| Non GAAP | $ 0.18 | $ 0.13 |
| GAAP | $ (0.02) | $ 0.13 |
| Shares used in computing per share amounts | 27,986 | 24,770 |

**About Sonic Solutions (NASDAQ: SNIC - News)**
Based in Marin County, California, Sonic Solutions (NASDAQ: SNIC) (http://www.sonic.com/) is the leader in digital media software, providing a broad range of interoperable, platform independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio- and Sonic-branded CD and DVD creation, playback and backup solutions that have become the premiere choice for consumers, prosumers and business users worldwide. Sonic products are globally available from major retailers, online at Sonic.com and Roxio.com, and are bundled with PCs, after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Volume Licensing | Affiliate Program | Legal | Privacy | Contact Us | Site Map | [+] Feedback

© 2007 Sonic Solutions. All rights reserved.
Enables the creation, management, and enjoyment of digital media content from Hollywood to home.

# Exhibit 17

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a4890156ex991.txt
<DESCRIPTION>EXHIBIT 99.1 - PRESS RELEASE
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results for Fourth Quarter and Fiscal Year Ended March 31, 2005;
Record Revenues Drive Profitable First Full Quarter of Roxio/Sonic Integration

NOVATO, Calif.--(BUSINESS WIRE)--May 16, 2005--Sonic Solutions (NASDAQ:SNIC) ("Sonic") announced today its financial results for the fourth quarter and fiscal year ended March 31, 2005.

Summary Financial Results
(in thousands, except per share amounts)

| | Three Months Ended March 31, | | | Twelve Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2005 (Non-GAAP) | 2005 (GAAP) | 2004 (GAAP) | 2005 (GAAP) | 2004 (GAAP) |
| Net revenue | $37,475 | $35,604 | $17,302 | $90,627 | $56,853 |
| Net income | $7,505 | $1,220 | $4,336 | $8,363 | $11,084 |
| Net income per diluted share | $0.28 | $0.05 | $0.17 | $0.32 | $0. 46 |

On the basis of generally accepted accounting principles ("GAAP"), net revenue for the quarter was $35,604,000 compared to $17,302,000 for the same period in the prior fiscal year. Net income for the quarter was $1,220,000, or $0.05 per diluted share, compared to net income of $4,336,000, or $0.17 per diluted share, for the same period in the prior fiscal year.

On a GAAP basis, net revenue for the fiscal year ended March 31, 2005 was $90,627,000 compared to $56,853,000 for the prior fiscal year. Net income for the fiscal year was $8,363,000, or $0.32 per diluted share, compared to net income of $11,084,000, or $0.46 per diluted share, for the prior fiscal year.

On a non-GAAP basis, net revenue for the quarter was $37,475,000, net income was $7,505,000 and net income per diluted share was $0.28.

Non-GAAP Presentation

During the quarter ended December 31, 2004, and as previously announced, Sonic acquired substantially all of the assets and liabilities of the Consumer Software Division of Roxio, Inc. In this press release, Sonic provides certain adjustments to financial information calculated on the basis of GAAP as supplemental information relating to its results of operations. These non-GAAP financial measures include non-GAAP net revenue, net income, diluted earnings per share, and gross profit and margin figures, which exclude

certain expense items associated with the acquisition and include certain revenue associated with the sale of Roxio products, each as more fully described below. The non-GAAP financial measures also exclude the third party costs incurred by Sonic in the fourth quarter in connection with Sonic's implementation of the requirements of Section 404 of the Sarbanes-Oxley Act (see "SOX Compliance" below). Management believes that this non-GAAP presentation allows investors to better understand the operating results of Sonic for the quarter ended March 31, 2005 because this presentation excludes non-recurring acquisition-related charges and other non-recurring expenses, includes revenue-related items management considers meaningful and provides insight into how management evaluates operating results. In addition, Sonic has reported similar non-GAAP results in the past and believes the inclusion of this non-GAAP presentation provides consistency in its financial reporting. However, these non-GAAP measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and other companies may use different non-GAAP measures and presentations of results.

The non-GAAP presentation adjusts the following items:

Revenue. Under purchase accounting rules, Original Equipment Manufacturer ("OEM") royalties received by Sonic on account of Roxio's business may be included in revenue only if they reflect OEM shipments occurring after the date of the acquisition (December 17, 2004). The non-GAAP presentation includes in revenue royalties for which Sonic received reports of shipments from OEMs after December 17, 2004 for shipments prior to December 17, 2004 and for which Sonic has invoiced the OEMs and expects to collect the amounts due in cash. Sonic has also excluded in the non-GAAP presentation an end of life reserve related to shipments of Easy Media Creator 7.0, which Sonic shipped to and invoiced distributors during the fourth quarter and expects to collect the amounts due in cash but was not able to record the revenue due to the pending launch of Easy Media Creator 7.5 (see below).

Acquisition-Related Intangible Amortization. Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such as core and developed technology and customer contracts, which are then amortized over various periods of time. The GAAP presentation includes amortization on all acquired intangibles. These non-cash charges are eliminated in the non-GAAP presentation in calculating operating income.

Easy Media Creator 7.5 Launch Expenses. After completion of the acquisition, Sonic immediately began preparations for a previously unplanned release of a new version of Easy Media Creator. The Roxio organization had been planning to release a new version of Easy Media Creator in the fall of 2005. Sonic management took this step because it believed that an early release of a new version of Easy Media Creator, incorporating some Sonic technology and identifiable branding, would accelerate integration of the Roxio business into Sonic both from a market as well as an internal organizational perspective. The incremental costs of this release, including the related end of life reserve discussed above, are included in the GAAP presentation and excluded in the non-GAAP presentation.

Third-Party Expenses Related to Compliance with the Sarbanes-Oxley Act of 2002 ("SOX"). The third-party expenses related to SOX compliance work for the 2005 fiscal year are included in the GAAP presentation and excluded in the non-GAAP presentation. The expenses excluded in the non-GAAP presentation are primarily the fees paid to compliance consultants and to Sonic's external auditors for work in connection with Sonic's SOX compliance. As discussed further below,

Sonic management believes that SOX compliance efforts were
significantly complicated by the impact of the Roxio acquisition,
including management's decision to migrate Sonic's accounting into
systems that were acquired as part of the Roxio combination. Hence,
Sonic management believes the level of SOX expenses is extraordinary
and is unlikely to recur in future periods.

Business Integration Expenses. Certain charges that occurred at or
around the time of an acquisition, and that are not expected to recur,
are considered to be non-recurring charges. The non-GAAP presentation
eliminates these charges included in operating expense.

Guidance

For its fiscal quarter ending June 30, 2005, Sonic anticipates
GAAP revenues to be in the range of $32 million to $34 million and
GAAP fully diluted earnings to be between $0.13 and $0.15 per share.

Sonic is maintaining our prior fiscal year 2006 guidance, for its
fiscal year ending March 31, 2006, Sonic anticipates GAAP revenues to
be in the range of $155 million to $165 million and GAAP fully diluted
earnings to be between $1.20 and $1.30 per share.

SOX Compliance

The SEC's rules implementing Section 404 of the Sarbanes-Oxley Act
of 2002 require Sonic management to assess the effectiveness of its
internal control over financial reporting annually, and to include in
Sonic's Annual Report on Form 10-K for the fiscal year ended March 31,
2005 and subsequent years a management report on that assessment,
together with an opinion thereon by Sonic's independent registered
public accounting firm. Sonic expects to comply with these disclosure
requirements on a timely basis. Management is in the process of
reviewing internal control systems and, in connection with this
evaluation, has identified certain deficiencies. Although none of
these deficiencies have been identified as a significant deficiency or
material weakness at this time, the evaluation of internal control
over financial reporting is not yet complete and there can be no
assurance that, as a result of the ongoing evaluation, additional
deficiencies will not be identified or that any deficiencies
identified, either alone or in combination with others, will not be
considered a significant deficiency or a material weakness. Although
certain remediation efforts have been undertaken, any deficiency or
weakness will not be considered effectively remediated until new
internal controls are operational for a period of time and are tested,
and management and Sonic's independent registered public accounting
firm conclude that these controls are operating effectively. As a
result of the recent Roxio acquisition, management has actively been
working to integrate the operations of the acquired business,
particularly with respect to accounting, accounting systems and
financial reporting. In part due to these acquisition and integration
efforts, many of Sonic's processes and procedures in these areas have
been recently restructured, and the evaluations relate to the
restructured process and procedures. Due to the nature of and the time
necessary to effectively remediate and test each of the deficiencies
identified to date, Sonic expects to conclude that some of the
deficiencies identified to date had not been effectively remediated as
of March 31, 2005.

At this time, management does not believe that the results of its
evaluation of internal control over financial reporting will preclude
an unqualified opinion from Sonic's auditor with respect to the annual
financial statements; however, there can be no assurance that the

results of such evaluation will not cause an adjustment to the financial statements to be included in the Annual Report on Form 10-K.

Further, while at this time Sonic has completed a review with its independent auditors of the financial statements presented in this press release, the dependency of the evaluation of internal controls mentioned above, as well as lack of completion of all financial audit test procedures means that the presentation contained in this press release is unaudited and subject to further change prior to the filing of Sonic's Annual Report on Form 10-K.

Sonic will hold its fourth quarter and fiscal year ended March 31, 2005 earnings conference call on Monday, May 16, 2005 at 1:30 p.m. (PDT)/4:30 p.m. (EDT). Investors are invited to listen to Sonic's conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call also will be available via webcast at www.sonic.com.

Sonic Solutions
Condensed Statement of Operations
(in thousands, except per share amounts)

| | Three Months Ended March 31, 2005 | Three Months Ended March 31, 2004 | Twelve Months Ended March 31, 2005 | Twelve Months Ended March 31, 2004(a) |
|---|---|---|---|---|
| | (unaudited) | (unaudited) | (unaudited) | |
| Net Revenue | $35,604 | $17,302 | $90,627 | $56,853 |
| Cost of Revenue | 7,376 | 1,917 | 13,373 | 7,052 |
| Gross Profit | 28,228 | 15,385 | 77,254 | 49,801 |
| Operating expenses | | | | |
| Marketing and sales | 9,028 | 3,343 | 21,179 | 12,629 |
| Research and development | 10,523 | 5,724 | 31,681 | 19,731 |
| General and administrative | 5,607 | 1,466 | 9,867 | 4,668 |
| Acquired in-process technology | 0 | 0 | 3,100 | 0 |
| Business integration | 1,103 | 0 | 2,190 | 0 |
| Total operating expenses | 26,261 | 10,533 | 68,017 | 37,028 |
| Operating income | 1,967 | 4,852 | 9,237 | 12,773 |
| Other income (expense), net | (378) | 136 | 218 | 237 |
| Income before income taxes | 1,589 | 4,988 | 9,455 | 13,010 |
| Provision for income taxes | 369 | 652 | 1,092 | 1,926 |

| | | | | |
|---|---|---|---|---|
| Net income | $1,220 | $4,336 | $8,363 | $11,084 |
| Net income per share applicable to common Shareholders: | | | | |
| Basic | $0.05 | $0.20 | $0.36 | $0.54 |
| Diluted | $0.05 | $0.17 | $0.32 | $0.46 |
| Shares used in computing net income per share: | | | | |
| Basic | 24,303 | 21,766 | 23,346 | 20,459 |
| Diluted | 26,979 | 25,917 | 26,022 | 23,889 |

(a) March 31, 2004 balances are derived from the audited financial statements included in the Company's 2004 Annual Report on Form 10-K.

Sonic Solutions
Condensed Balance Sheets
(in thousands)

| | March 31, 2005 (unaudited) | March 31, 2004(a) |
|---|---|---|
| Assets | | |
| Current assets: | | |
| Cash, cash equivalents and investments | $35,436 | $36,182 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $243 and $10,377, at March 31, 2004 and 2005, respectively | 12,839 | 9,443 |
| Unbilled receivables | 121 | 0 |
| Inventory | 755 | 560 |
| Prepaid expenses and other current assets | 2,106 | 1,399 |
| Total current assets | 51,257 | 47,584 |
| Fixed assets, net | 6,544 | 3,610 |
| Purchased and internally developed software costs, net | 1,573 | 1,042 |
| Acquired intangibles | 55,164 | 2,898 |
| Goodwill | 49,046 | 15,533 |
| Other assets | 2,610 | 278 |
| Total assets | $166,194 | $70,945 |
| Liabilities and Shareholders' Equity | | |
| Current liabilities: | | |
| Accounts payable | $9,087 | $1,145 |

| | | |
|---|---|---|
| Accrued liabilities | 19,250 | 8,977 |
| Deferred revenue and deposits | 5,176 | 4,965 |
| Capital leases | 84 | 60 |
| Total current liabilities | 33,597 | 15,147 |
| Bank note payable | 30,000 | 0 |
| Other long term liabilities | 2,556 | 0 |
| Deferred revenue, net of current portion | 756 | 0 |
| Capital lease, net of current portion | 41 | 75 |
| Total liabilities | 66,950 | 15,222 |
| Shareholders' equity: | | |
| Common stock | 106,410 | 70,994 |
| Cumulative foreign translation adjustment | (274) | (16) |
| Accumulated deficit | (6,892) | (15,255) |
| Total shareholders' equity | 99,244 | 55,723 |
| Total liabilities and shareholders' equity | $166,194 | $70,945 |

(a) March 31, 2004 balances are derived from the audited financial statements included in the Company's 2004 Annual Report on Form 10-K.

Sonic Solutions
Reconciliation of Reported Operating Results
to Non-GAAP Operating Results
(in thousands, except per share amounts and percentages, unaudited)

| | Three Months Ended March 31, 2005 | 2004 |
|---|---|---|
| Reported revenue | $35,604 | $17,302 |
| Adjustment: | | |
| CSD royalty reports received after December 17, 2004 for OEM shipments prior to December 17, 2004 | 380 | 0 |
| CSD end of life reserve | 1,491 | 0 |
| Non GAAP revenue | $37,475 | $17,302 |
| Non GAAP gross profit | $31,215 | $15,385 |
| Non GAAP gross margin | 83.3% | 88.9% |
| GAAP Operating income | $1,967 | $4,852 |
| GAAP Net income | 1,220 | 4,336 |
| Adjustments: | | |
| CSD end of life reserve | 1,491 | 0 |

| | | |
|---|---|---|
| CSD royalty reports received after December 17, 2004 for OEM shipments prior to December 17, 2004 | 380 | 0 |
| Business integration expenses | 1,103 | 0 |
| C7.5 launch expenses | 823 | 0 |
| SOX compliance expenses | 1,968 | 0 |
| Amortization of intangible assets | 1,116 | 175 |
| Non GAAP operating income basic | $8,848 | $5,027 |
| Tax impact on non-GAAP adjustments | (596) | (20) |
| Non GAAP net income basic | $7,505 | $4,491 |
| Net income per diluted share | | |
| Non-GAAP | $0.28 | $0.18 |
| GAAP | $0.05 | $0.17 |
| Shares used in computing per share amounts | 26,979 | 25,197 |

About Sonic Solutions

Sonic Solutions (NASDAQ:SNIC) (http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio- and Sonic-branded CD and DVD creation, playback and backup solutions that have become the premiere choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers, online at Sonic.com and Roxio.com, and are bundled with PCs, after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, Easy Media Creator, and Roxio are trademarks or registered trademarks of Sonic Solutions in the United States and/or other countries. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic under license.

Forward-Looking Statements

This press release and Sonic's fourth quarter and fiscal year ended March 31, 2005 earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include revenue and earnings per share guidance for the fiscal quarter ending June 30, 2005 and the fiscal year ending March 31, 2006; the gross margin, operating margin, effective tax rate and cost of SOX compliance assumed for the guidance; the continuing effects of the increase in operating expenses

and headcount in connection with the Roxio acquisition; and favorable
expectations about Sonic's consumer electronics strategy and ability
to take advantage of the convergence of the PC and consumer
electronics industries. These forward-looking statements involve known
and unknown risks, uncertainties and other factors that may cause the
actual results to differ materially from any future results,
performance or achievements expressed or implied by such
forward-looking statements. Important factors that could cause such
differences include, but are not limited to, Sonic's ability to
successfully integrate Roxio's Consumer Software Division and former
employees into Sonic's business and realize the anticipated synergies
and cost savings from the acquisition; general customer and market
reaction to the Roxio acquisition; the timely introduction and
acceptance of new products, including but not limited to Sonic's high
definition series products; the costs associated with new product
introductions and the possible adverse effect on gross margin; the
transition of products to new hardware configurations and platforms;
unforeseen increases in operating expenses as a result of the Roxio
acquisition, new product introductions, cost of SOX compliance or
business expansion; loss of significant customers due to the Roxio
acquisition and other market conditions; risks related to acquisitions
and international operations; and other factors, including those
discussed in Sonic's annual and quarterly reports on file with the
Securities and Exchange Commission. This press release should be read
in conjunction with the Sonic's most recent quarterly report on Form
10-Q and Sonic's other reports on file with the Securities and
Exchange Commission, which contain a more detailed discussion of
Sonic's business including risks and uncertainties that may affect
future results. Sonic does not undertake to update any forward looking
statements.

        CONTACT: Sonic Solutions
                 A. Clay Leighton, 415-893-8000 (Chief Financial Officer)
                 clay_leighton@sonic.com
                 or
                 Market Street Partners
                 Carolyn Bass, 415-445-3232
                 Rob Walker, 415-445-3234
                 investinsonic@sonic.com
</TEXT>
</DOCUMENT>

# Exhibit 18

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a5015793ex991.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>

Exhibit 99.1

# Sonic Solutions Updates Financial Guidance

NOVATO, Calif.--(BUSINESS WIRE)--Nov. 8, 2005--Sonic Solutions (Nasdaq:SNIC) management in a conference call today updated financial guidance for the remaining two quarters in fiscal year 2006 and provided an initial forecast for fiscal year 2007.

For its third fiscal quarter ending December 31, 2005, the Company anticipates revenues to be in the range of $37 million to $40 million, and fully diluted earnings to be between $0.25 and $0.30 per share. For its fourth fiscal quarter ending March 31, 2006, the Company anticipates revenues to be in the range of $38 million to $42 million, and fully diluted earnings to be between $0.28 and $0.38 per share.

For fiscal year 2007, Sonic forecasts that revenue will be between $175 million and $190 million and that operating income will be between $42 and $55 million, or an increase over fiscal 2006 of approximately 100% (Sonic has not yet selected its method for stock option valuation under SFAS No. 123R, Share-Based Payment; for purposes of this projection the Company has included an expense of approximately $8 million for stock option compensation based upon the stock option compensation expense of approximately $7.7 million in fiscal year 2005 set forth in Footnote 1 of its most recent Annual Report on Form 10-K).

All guidance numbers are based upon U.S. generally accepted accounting principles.

## About Sonic Solutions

Sonic Solutions (Nasdaq: SNIC; http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio- and Sonic-branded CD and DVD creation, playback and backup solutions that have become the premier choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers, online at Sonic.com and Roxio.com, and are bundled with personal computers ("PCs"), after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the United States and/or other countries. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic under license.

## Forward-Looking Statements

This press release and Sonic's second quarter ended September 30, 2005 earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include revenue and earnings per share guidance for the fiscal quarters ending December 31, 2005,

March 31, 2006, the fiscal year ending March 31, 2006 and the fiscal year ending March 31, 2007; the gross margin, operating margin, effective tax rate and cost of compliance with the Sarbanes-Oxley Act of 2002, as amended ("SOX"), assumed for the guidance; the continuing effects of the increase in operating expenses and headcount in connection with the Roxio acquisition; and favorable expectations about Sonic's consumer electronics strategy and ability to take advantage of the convergence of the PC and consumer electronics industries. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, Sonic's ability to successfully integrate Roxio's Consumer Software Division and former employees into Sonic's business and realize the anticipated synergies and cost savings from the acquisition; general customer and market reaction to the Roxio acquisition; the timely introduction and acceptance of new products, including but not limited to Sonic's high definition series products; the costs associated with new product introductions and the possible adverse effect on gross margin; the transition of products to new hardware configurations and platforms; unforeseen increases in operating expenses as a result of the Roxio acquisition, new product introductions, cost of SOX compliance or business expansion; loss of significant customers due to the Roxio acquisition and other market conditions; risks related to acquisitions and international operations; and other factors, including those discussed in Sonic's annual and quarterly reports on file with the Securities and Exchange Commission. This press release should be read in conjunction with Sonic's most recent quarterly report on Form 10-Q and Sonic's other reports on file with the Securities and Exchange Commission, which contain a more detailed discussion of Sonic's business including risks and uncertainties that may affect future results. Sonic does not undertake to update any forward-looking statements.

CONTACT: Sonic Solutions
A. Clay Leighton, 415-893-8000
Fax: 415-893-8008
clay_leighton@sonic.com
or
Market Street Partners
Carolyn Bass, 415-445-3232
Susan Coss, 415-445-3237
investinsonic@sonic.com

</TEXT>
</DOCUMENT>

# Exhibit 19

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a5076216ex991.txt
<DESCRIPTION>SONIC SOLUTIONS EXHIBIT 99.1
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results for Third Quarter Ended December 31, 2005; Sonic Solutions Reports Record Revenues and Profits for its Fiscal Third Quarter

NOVATO, Calif.--(BUSINESS WIRE)--Feb. 8, 2006--Sonic Solutions (NASDAQ:SNIC) today announced its financial results for the third quarter of fiscal 2006. Quarterly revenues were a record $40.8 million, up 28% from $31.9 million in the second fiscal quarter of the year, and up more than 100% from $19.7 million for the third quarter of fiscal 2005.

Operating income for the third quarter of fiscal 2006 was $9.3 million or 22.8% of revenue compared to $3.2 million or 10.1% of revenue for the second quarter of fiscal 2006 and an operating loss of $0.7 million or 3.7% for the third quarter of fiscal 2005. Net income grew to $8.2 million or $0.30 per share in the third quarter of fiscal 2006 versus $3.1 million or $0.11 per share in the second quarter of fiscal 2006 and net loss of $419,000 or $0.02 per share in the third quarter of fiscal 2005.

Dave Habiger, President and Chief Executive Officer of Sonic, stated, "We are pleased with the Company's results this quarter as we celebrated the one year anniversary of the Roxio acquisition. We have begun to reap the rewards of our investment and continue to see tremendous opportunity from the integration of Sonic and Roxio. We are well positioned as the leading digital media software provider for next-generation high definition formats and channels."

Sonic will conduct a conference call at 1:30 p.m. PST, or 4:30 p.m. EST, today to discuss its financial results for the third quarter of fiscal 2006. Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Company's website at www.sonic.com. A replay of the web cast will be available approximately two hours after the conclusion of the call. An audio replay of the conference call will also be made available approximately two hours after the conclusion of the call. The audio replay will remain available until February 15, 2006, at 9 p.m. PST and can be accessed by dialing 888-203-1113 and entering confirmation code 4639317.

Sonic Solutions
Condensed Consolidated Statements of Operations
(in thousands, except per share amounts -- unaudited)

| | Three Months Ended December 31, 2005 | Three Months Ended December 31, 2004 | Nine Months Ended December 31, 2005(1) | Nine Months Ended December 31, 2004 |
|---|---|---|---|---|
| Net Revenue | $ 40,774 | $ 19,677 | $108,241 | $ 55,023 |
| Cost of Revenue | 9,435 | 3,008 | 26,353 | 6,980 |
| Gross Profit | 31,339 | 16,669 | 81,888 | 48,043 |
| Operating expenses | | | | |
| Marketing and sales | 7,751 | 4,553 | 23,628 | 12,151 |
| Research and development | 10,133 | 6,992 | 30,826 | 20,175 |

|  | | | | |
|---|---|---|---|---|
| General and administrative | 4,158 | 1,673 | 12,421 | 4,260 |
| Business integration | --- | 1,087 | 336 | 1,087 |
| Acquired in-process technology | --- | 3,100 | --- | 3,100 |
| Total operating expenses | 22,042 | 17,405 | 67,211 | 40,773 |
| Operating income (loss) | 9,297 | (736) | 14,677 | 7,270 |
| Other income (expense), net | (445) | 365 | (793) | 596 |
| Income (loss) before income taxes | 8,852 | (371) | 13,884 | 7,866 |
| Provision (benefit) for income taxes | 651 | 48 | (3,323) | 723 |
| Net income (loss) | $ 8,201 | $ (419) | $ 17,207 | $ 7,143 |
| Net income (loss) per share | | | | |
| Basic | $ 0.33 | $ (0.02) | $ 0.70 | $ 0.31 |
| Diluted | $ 0.30 | $ (0.02) | $ 0.63 | $ 0.27 |
| Shares used in computing net income (loss) per share | | | | |
| Basic | 24,806 | 23,627 | 24,581 | 23,031 |
| Diluted | 27,117 | 23,627 | 27,531 | 26,383 |

(1) The condensed consolidated statement of operations for the nine months ended December 31, 2005, reflects the impact of the additional income tax benefit described below.

Sonic Solutions
Condensed Consolidated Balance Sheets
(in thousands, except share amounts)

|  | 2005 | |
|---|---|---|
| ASSETS | March 31,(2) | December 31,(3) |
|  |  | (unaudited) |
| Current Assets: | | |
| Cash and cash equivalents | $ 35,436 | $ 15,726 |
| Short term investments | --- | 33,925 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $10,068 and $8,799 at March 31, 2005 and December 31, 2005, respectively | 12,839 | 23,664 |
| Inventory | 755 | 687 |
| Unbilled receivables | 121 | --- |
| Prepaid expenses and other current assets | 2,153 | 3,735 |
| Total current assets | 51,304 | 77,737 |

| | | |
|---|---|---|
| Fixed assets, net | 6,756 | 5,447 |
| Purchased and internally developed software costs, net | 1,595 | 1,347 |
| Goodwill | 54,664 | 54,159 |
| Acquired intangibles, net | 49,046 | 45,115 |
| Other assets | 2,583 | 6,322 |
| Total assets | $ 165,948 | $ 190,127 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current Liabilities: | | |
| Accounts payable | $ 9,087 | $ 6,123 |
| Accrued liabilities | 19,164 | 24,209 |
| Deferred revenue | 5,176 | 10,237 |
| Obligations under capital leases, current portion | 84 | 48 |
| Total current liabilities | 33,511 | 40,617 |
| Bank note payable | 30,000 | 30,000 |
| Other long term liabilities, net of current portion | 2,217 | 172 |
| Deferred revenue, net of current portion | 756 | 481 |
| Obligations under capital leases, net of current portion | 41 | 3 |
| Total liabilities | 66,525 | 71,273 |
| Shareholders' Equity: | | |
| Convertible preferred stock, no par value, 10,000,000 shares authorized; 0 shares issued and outstanding at March 31, 2005, and December 31, 2005, respectively | --- | --- |
| Common stock, no par value, 100,000,000 shares authorized; 24,308,730 and 24,832,986 shares issued and outstanding at March 31, 2005 and December 31, 2005, respectively | 106,410 | 109,256 |
| Accumulated other comprehensive loss | (274) | (896) |
| Accumulated earnings (deficit) | (6,713) | 10,494 |
| Total shareholders' equity | 99,423 | 118,854 |
| Total liabilities and shareholders' equity | $ 165,948 | $ 190,127 |

(2) The consolidated balance sheet at March 31, 2005 has been derived from the Company's audited consolidated financial statements on Form 10-K at that date, but does not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.
(3) The consolidated balance sheet at December 31, 2005 reflects the impact of the additional income tax benefit described below.

Increase in Historical Earnings due to Tax Benefit

As a result of the recent completion and filing of our fiscal 2005 federal and California income tax returns, we have revised the amount of our Research and Development tax credits. This revision increases our tax benefit and net income for our first quarter of fiscal 2006 by $1,891,000 and increases earnings per share for that quarter from the $0.15 previously reported to $0.21. The impact of this revision is reflected in the results for the nine months ended December 31, 2005 provided herewith. We plan to file amended Quarterly Reports on Form 10-Q for the first and second quarters ended June 30, 2005 and September 30, 2005, originally filed with the Securities and Exchange Commission on August 15, 2005 and November 9, 2005, respectively, to reflect this change and to restate the financial statements for those periods.

About Sonic Solutions

Sonic Solutions (NASDAQ:SNIC)(http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio and Sonic-branded CD and DVD creation, playback and backup solutions that have become the premier choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers, online at Sonic.com and Roxio.com, and are bundled with personal computers ("PCs"), after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the United States and/or other countries. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic under license.

Forward-Looking Statements

This press release and Sonic's third quarter ended December 31, 2005 earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include revenue and earnings per share guidance for the fiscal quarter ending March 31, 2006, the fiscal year ending March 31, 2006 and the fiscal year ending March 31, 2007; the gross margin, operating margin, effective tax rate and cost of compliance with the Sarbanes-Oxley Act of 2002, as amended ("SOX"), assumed for the guidance; and views regarding the opportunities and benefits achieved through Sonic's integration of the Roxio Consumer Software Division, as well as by deepening OEM relationships, mobile entertainment developments, on-demand media business models and next-generation high definition formats. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, Sonic's ability to successfully complete its integration of Roxio's Consumer Software Division and former employees into Sonic's business and realize the anticipated synergies and cost savings from the acquisition; the timely introduction and acceptance of new products, including but not limited to Sonic's high definition series products; the costs associated with new product

introductions and the possible adverse effect on gross margin; any fluctuation in demand for Sonic products; the transition of products to new hardware configurations and platforms; unforeseen increases in operating expenses, new product introductions, cost of SOX compliance or business expansion; loss of significant customers or key suppliers; risks related to acquisitions and international operations; costs associated with the defense of litigation and intellectual property claims; and other factors, including those discussed in Sonic's annual and quarterly reports on file with the Securities and Exchange Commission. This press release should be read in conjunction with Sonic's most recent quarterly report on Form 10-Q and Sonic's other reports on file with the Securities and Exchange Commission, which contain a more detailed discussion of Sonic's business including risks and uncertainties that may affect future results. Sonic does not undertake to update any forward-looking statements.

CONTACT: Sonic Solutions
A. Clay Leighton, 415-893-8000 (Chief Financial Officer)
Fax: 415-893-8008
clay_leighton@sonic.com
or
StreetSmart Investor Relations
Brooke Deterline, 415-893-7824
Anne Leschin, 415-775-1788
investinsonic@sonic.com
</TEXT>
</DOCUMENT>

# Exhibit 20

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a5155617ex991.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results for Fourth Quarter and Fiscal Year Ended March 31, 2006;
Sonic Reports Record Revenues and Profits for Its Full Fiscal Year

NOVATO, Calif.--(BUSINESS WIRE)--May 23, 2006--Sonic Solutions(R) (Nasdaq:SNIC) today announced its financial results for the fourth quarter and fiscal year ended March 31, 2006.

Summary Financial Results
(in thousands, except per share amounts)

| | Three Months Ended March 31, | | | Twelve Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2006 (Non-GAAP) (unaudited) | 2006 (GAAP) (unaudited) | 2005 (GAAP) (unaudited) | 2006 (GAAP) (unaudited) | 2005 (GAAP) |
| Net revenue | $40,436 | $40,436 | $35,604 | $148,676 | $90,627 |
| Net income | $8,501 | $2,094 | $1,399 | $19,301 | $8,542 |
| Net income per diluted share | $0.31 | $0.08 | $0.05 | $0.70 | $0.32 |

For the fiscal year, net revenue, gross profit and operating profit all reached record levels. Net revenue grew 64% in fiscal 2006 to $148.7 million from $90.6 million in fiscal 2005. Gross profit climbed 51% to $114.6 million compared to $75.9 million in fiscal 2005. Operating income rose 155% to $24.0 million, from $9.4 million in fiscal 2005. Net income for fiscal 2006 was a record $19.3 million or $0.70 per diluted share versus $8.5 million or $0.32 per diluted share in fiscal 2005.

For the quarter, net revenue was $40.4 million, reflecting an increase of more than 13% from $35.6 million for the fourth quarter of fiscal 2005. Gross profit was $32.7 million compared to $27.8 million for the fourth quarter of fiscal 2005, representing an increase of 18%. Operating income was $9.3 million or 23% of revenue compared to $2.1 million or 6% of revenue for the fourth quarter of fiscal 2005. Net income was $2.1 million or $0.08 per share in the fourth quarter of fiscal 2006 including an unusually high provision for income taxes. The non-GAAP presentation below is calculated based upon the same effective income tax rate (7.4%) as we used in our fiscal fourth quarter guidance. As a result, non-GAAP net income for the quarter was $8.5 million and net income per diluted share on a non-GAAP basis was $0.31.

Dave Habiger, President and Chief Executive Officer of Sonic, stated, "We are very pleased with the Company's performance this quarter and for the fiscal year, as we met or exceeded all of our operating goals. We expanded our technology and OEM partnerships, which continued to drive all areas of our business. As new formats and

channels such as HD and download and burn, emerge and develop, we
believe Sonic is well positioned to continue to lead the market for
digital media software."

    Non-GAAP Presentation

    In this press release, Sonic provides an adjustment to financial
information calculated on the basis of GAAP as supplemental
information relating to its results of operations. These non-GAAP
financial measures are used in addition to and in conjunction with
results presented in accordance with GAAP, and are intended to provide
additional insight into our operations that, when viewed with our GAAP
results and the accompanying reconciliations to corresponding GAAP
financial measures, offer a more complete understanding of factors and
trends affecting our business. These non-GAAP measures should be
considered as a supplement to, and not as a substitute for or superior
to, the corresponding measures calculated in accordance with GAAP. The
non-GAAP disclosures and the non-GAAP adjustments, including the basis
for such adjustments and the impact on our operations, are outlined
below:
    Tax Adjustment. In our non-GAAP presentation, we have shown our
net income calculated based upon the same effective income tax rate
(7.4%) as we used in our fourth quarter guidance. As we have
previously noted and due to our recent history of profitability, Sonic
is in the process of transitioning from a company with substantial
valuation allowances on its deferred tax assets and a low effective
tax rate to a company with substantially reduced valuation allowances
and an effective tax rate close to statutory rates. Over the past year
and during this transition period, Sonic has experienced fluctuations
in its effective tax rate based upon changes in its net value of
deferred tax assets that it has accumulated over time. We believe that
these fluctuations are not indicative of the overall fundamentals of
our business and that they may have a disproportionate impact on our
operating results for the fourth quarter of fiscal 2006. In this case,
due to these transitional fluctuations and the results of a phase I
study of the estimated value of our deferred research tax credits
accumulated over time, our effective tax rate in March 2006 was 77.2%
rather than the 7.4% rate that we experienced in the third quarter and
that was the basis for our fourth quarter earnings per share ("EPS")
guidance.
    Accordingly, and as set forth in more detail in the reconciliation
table below, we have provided a non-GAAP fully diluted EPS that
adjusts for the difference between the two rates. Although we do not
anticipate that the 7.4% will continue to be indicative of our tax
rate in the future, we believe our non-GAAP presentation provides
important and useful information to investors, as it enables them to
reconcile our results based upon our actual tax rate to those
forecasted based upon tax rate assumptions per our prior guidance. In
the absence of such information, we believe that investors may find it
difficult to evaluate our fiscal fourth quarter results apart from the
tax impact or compare them to our results in prior periods. We have
used this non-GAAP measure internally in order to evaluate the
operating results of our business on a consistent basis and to measure
our performance of business goals that we establish in advance. The
economic substance behind our decision to use this non-GAAP measure is
an increase of $0.23 per fully diluted share over the comparable GAAP
measure. Material limitations associated with the use of this measure
versus the comparable GAAP EPS measure are (a) the non-GAAP measure
provides a view of our earnings that does not include all of our tax
obligations for the period in question, and (b) this may not enhance

the comparability of our results to those of other companies undergoing similar tax rate transitions. We compensate for these limitations, by providing full disclosure of the effects of this non-GAAP measure, by presenting the corresponding treatment prepared in conformity with GAAP in this release and in our financial statements and by providing a reconciliation to the corresponding GAAP measure so that investors can use the information to perform their own analysis.

Sonic will conduct a conference call at 1:30 p.m. PDT, or 4:30 p.m. EDT, today to discuss its financial results for the fourth quarter of fiscal 2006. Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Company's website at www.sonic.com. A replay of the web cast will be available approximately two hours after the conclusion of the call. An audio replay of the conference call will also be made available approximately two hours after the conclusion of the call. The audio replay will remain available until May 30, 2006, at 9 p.m. PDT and can be accessed by dialing 719-457-0820 or 888-203-1112 and entering confirmation code 2948445.

Sonic Solutions
Condensed Consolidated Statements of Operations
(in thousands, except per share amounts)

| | Three Months Ended March 31, | | Twelve Months Ended March 31, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005(1) |
| | (unaudited) | (unaudited) | (unaudited) | |
| Net revenue | $40,436 | $35,604 | $148,676 | $90,627 |
| Cost of revenue | 7,764 | 7,795 | 34,118 | 14,775 |
| Gross profit | 32,672 | 27,809 | 114,558 | 75,852 |
| Operating expenses | | | | |
| Marketing and sales | 7,977 | 8,966 | 31,605 | 21,117 |
| Research and development | 9,734 | 10,041 | 40,560 | 30,216 |
| General and administrative | 5,659 | 5,588 | 18,080 | 9,845 |
| Business integration | --- | 1,100 | 336 | 2,190 |
| Acquired in-process technology | --- | --- | --- | 3,100 |
| Total operating expenses | 23,370 | 25,695 | 90,581 | 66,468 |
| Operating income | 9,302 | 2,114 | 23,977 | 9,384 |
| Other income (expense), net | (122) | (387) | (914) | 209 |
| Income before income taxes | 9,180 | 1,727 | 23,063 | 9,593 |
| Provision for income taxes | 7,086 | 328 | 3,762 | 1,051 |

| | | | | |
|---|---|---|---|---|
| Net income | $ 2,094 | $ 1,399 | $ 19,301 | $ 8,542 |
| Net income per share | | | | |
| Basic | $ 0.08 | $ 0.06 | $ 0.78 | $ 0.37 |
| Diluted | $ 0.08 | $ 0.05 | $ 0.70 | $ 0.32 |
| Shares used in computing net income per share | | | | |
| Basic | 25,259 | 24,292 | 24,750 | 23,347 |
| Diluted | 27,043 | 26,963 | 27,421 | 26,529 |

(1) March 31, 2005 balances are derived from the audited financial statements included in the Company's 2005 Annual Report on Form 10-K.

Sonic Solutions
Condensed Consolidated Balance Sheets
(in thousands, except share amounts)

| ASSETS | March 31, 2006 (unaudited) | March 31, 2005(2) |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 18,731 | $ 35,436 |
| Short term investments | 42,350 | --- |
| Accounts receivable, net of allowance for returns and doubtful accounts of $10,068 and $6,296 at March 31, 2005 and 2006, respectively | 22,080 | 12,839 |
| Inventory | 689 | 755 |
| Unbilled receivables | --- | 121 |
| Prepaid expenses and other current assets | 7,650 | 2,153 |
| Total current assets | 91,500 | 51,304 |
| Fixed assets, net | 4,833 | 6,756 |
| Purchased and internally developed software costs, net | 1,266 | 1,595 |
| Goodwill | 55,153 | 54,664 |
| Acquired intangibles, net | 43,914 | 49,046 |
| Other assets | 11,744 | 2,583 |
| Total assets | $208,410 | $165,948 |

| LIABILITIES AND SHAREHOLDERS' EQUITY | | |
|---|---|---|
| Current liabilities: | | |
| Accounts payable | $ 7,727 | $ 9,087 |
| Accrued liabilities | 23,945 | 19,164 |

| | | |
|---|---|---|
| Deferred revenue | 7,795 | 5,176 |
| Obligations under capital leases, current portion | 35 | 84 |
| Total current liabilities | 39,502 | 33,511 |
| Bank note payable | 30,000 | 30,000 |
| Other long term liabilities, net of current portion | 373 | 2,217 |
| Deferred revenue, net of current portion | 2 | 756 |
| Obligations under capital leases, net of current portion | 2 | 41 |
| Total liabilities | 69,879 | 66,525 |
| Shareholders' equity: | | |
| Convertible preferred stock, no par value, 10,000,000 shares authorized; 0 shares issued and outstanding at March 31, 2005, and 2006, respectively | --- | --- |
| Common stock, no par value, 100,000,000 shares authorized; 24,308,730 and 25,685,953 shares issued and outstanding at March 31, 2005 and 2006, respectively | 126,880 | 106,410 |
| Accumulated other comprehensive loss | (937) | (274) |
| Accumulated earnings (deficit) | 12,588 | (6,713) |
| Total shareholders' equity | 138,531 | 99,423 |
| Total liabilities and shareholders' equity | $208,410 | $165,948 |

(2) The consolidated balance sheet at March 31, 2005 has been derived from the Company's audited consolidated financial statements on Form 10-K at that date.

Sonic Solutions
Reconciliation of Reported Operating Results
to Non-GAAP Operating Results
(in thousands, except per share amounts and percentages, unaudited)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2006 | 2005 |
| Net income | $ 2,094 | $ 1,399 |
| Tax adjustment | 6,407 | --- |
| Non-GAAP net income | $ 8,501 | $ 1,399 |
| GAAP net income per share applicable to common | | |
| Basic | $ 0.08 | $ 0.06 |

| | | |
|---|---|---|
| Diluted | $ 0.08 | $ 0.05 |
| Non-GAAP net income per share applicable to common | | |
| Basic | $ 0.34 | $ 0.06 |
| Diluted | $ 0.31 | $ 0.05 |
| Shares used in computing per share amounts | | |
| Basic | 25,259 | 24,292 |
| Diluted | 27,043 | 26,963 |

About Sonic Solutions

Sonic Solutions (Nasdaq:SNIC)(http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio and Sonic-branded CD and DVD creation, playback and backup solutions that have become the premier choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers, online at Sonic.com and Roxio.com, and are bundled with personal computers ("PCs"), after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the United States and/or other countries. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic under license.

Forward-Looking Statements

This press release and Sonic's fourth quarter and fiscal year ended March 31, 2006, earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include revenue and earnings per share guidance for the fiscal year ending March 31, 2007; the gross margin, operating margin, effective tax rate and cost of compliance with the Sarbanes-Oxley Act of 2002, as amended ("SOX"), assumed for the guidance; and views regarding the opportunities and benefits achieved through Sonic's integration of the Roxio Consumer Software Division, as well as by next-generation high definition formats and channels. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, the timely introduction and acceptance of new products, including but not limited to Sonic's high definition series products; the costs

associated with new product introductions and the possible adverse effect on gross margin; any fluctuation in demand for Sonic products; the transition of products to new hardware configurations and platforms; unforeseen increases in operating expenses, new product introductions, cost of SOX compliance or business expansion; loss of significant customers or key suppliers; risks related to acquisitions and international operations; costs associated with the defense of litigation or prosecution and intellectual property claims; changes in effective tax rates; and other factors, including those discussed in Sonic's annual and quarterly reports on file with the Securities and Exchange Commission. This press release should be read in conjunction with Sonic's most recent quarterly report on Form 10-Q and Sonic's other reports on file with the Securities and Exchange Commission, which contain a more detailed discussion of Sonic's business including risks and uncertainties that may affect future results. Sonic does not undertake to update any forward-looking statements.

CONTACT: Sonic Solutions
A. Clay Leighton, 415-893-8000
clay_leighton@sonic.com
fax: 415-893-8008
or
StreetSmart Investor Relations
Brooke Deterline, 415-893-7824
Anne Leschin, 415-775-1788
investinsonic@sonic.com

</TEXT>
</DOCUMENT>

# Exhibit 21

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a5205680ex99-1.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results for First Quarter Ended June 30, 2006

NOVATO, Calif.--(BUSINESS WIRE)--Aug. 8, 2006--Sonic Solutions(R) (NASDAQ:SNIC) today announced its financial results for the quarter ended June 30, 2006.

Summary Financial Results
(in thousands, except per share amounts)

| | Three Months Ended June 30, | | |
|---|---|---|---|
| | 2006 (Non-GAAP) (unaudited) | 2006 (GAAP) (unaudited) | 2005 (GAAP) (unaudited) |
| Net revenue | $36,886 | $36,886 | $35,519 |
| Net income | $ 4,492 | $ 4,090 | $ 5,904 |
| Net income per diluted share | $ 0.16 | $ 0.15 | $ 0.21 |

For the quarter ended June 30, 2006, net revenue was $36.9 million, reflecting an increase of 4% from $35.5 million for the quarter ended June 30, 2005. Gross profit was $29.2 million compared to $25.8 million for the quarter ended June 30, 2005, representing an increase of 13%. Net income was $4.1 million or $0.15 per fully diluted share in the quarter ended June 30, 2006. The non-GAAP presentation below is calculated excluding the stock based compensation charge as a result of our adoption of Statement of Financial Accounting Standard 123R ("SFAS 123R") "Share-Based Payments." As a result, non-GAAP net income for the first quarter ended June 30, 2006 was $4.5 million and non-GAAP net income per diluted share was $0.16.

Dave Habiger, President and Chief Executive Officer of Sonic, stated, "We are pleased with our first quarter performance and believe Sonic is well-positioned for strong future growth. We have made significant progress in key initiatives, including our partnership with Movielink and the continued success of our Roxio business, as we continued to establish and enhance relationships with our end-users. The industry is crossing the tipping point into HD and download and burn, and Sonic is positioned to benefit significantly from this development."

Non-GAAP Presentation

In this press release, Sonic provides an adjustment to financial information calculated on the basis of GAAP as supplemental information relating to its results of operations. The non-GAAP financial measure is used in addition to and in conjunction with results presented in accordance with GAAP, and is intended to provide additional insight into our operations that, when viewed with our GAAP results and the accompanying reconciliations to corresponding GAAP

financial measure, offers a more complete understanding of factors and trends affecting our business. The non-GAAP measure should be considered as a supplement to, and not as a substitute for or superior to, the corresponding measure calculated in accordance with GAAP. The non-GAAP disclosure and the non-GAAP adjustment, including the basis for such adjustment and the impact on our operations, is outlined below:

Stock Compensation Expense Adjustment. As of April 1, 2006, we adopted SFAS 123R. In our non-GAAP presentation, we have excluded the impact of the stock option expense pursuant to SFAS 123R recorded in the income statement in the amount of $669,000, or $0.01 per fully diluted share tax affected, for the quarter ended June 30, 2006. SFAS 123R stock compensation was recorded in the income statement as follows: $36,000 to cost of revenue; $410,000 to marketing and sales; $142,000 to research and development; and $81,000 to general and administrative. Given the significance and non-cash nature of this expense, and for the reasons set forth below, management has excluded such expense from the non-GAAP earnings presentation for the quarter ended June 30, 2006. Further, we believe the exclusion of stock compensation expenses recorded in the first quarter of fiscal 2007 improves the comparability to our results for the first quarter of fiscal 2006. There is no adjustment for the quarter ended June 30, 2005, as the adoption of SFAS 123R occurred during the current fiscal year.

We believe our non-GAAP presentation that excludes stock compensation expense is useful to investors for the reasons described above and because results for the quarter ended June 30, 2005 did not include stock compensation expenses relating to SFAS 123R. Management uses this non-GAAP presentation to understand how the expenses associated with the application of SFAS 123R are reflected on our statements of income. The economic substance behind our decision to use this non-GAAP measure is an increase in net income of $0.01 per fully diluted share for the quarter ended June 30, 2006. Material limitations associated with the use of this measure versus the comparable GAAP earnings per share measure are (a) the non-GAAP measure provides a view of our earnings that does not include all of our expense obligations for the period in question, and (b) this may not enhance the comparability of our results to those of other companies undergoing similar transition as a result of the adoption of SFAS 123R. We compensate for these limitations by providing full disclosure of the effects of this non-GAAP measure, by presenting the corresponding treatment prepared in conformity with GAAP in this release and in our financial statements and by providing a reconciliation to the corresponding GAAP measure so that investors can use the information to perform their own analysis.

Sonic will conduct a conference call at 1:30 p.m. PDT, or 4:30 p.m. EDT, today to discuss its financial results for the quarter ended June 30, 2006. Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Company's website at www.sonic.com. A replay of the web cast will be available approximately two hours after the conclusion of the call. An audio replay of the conference call will also be made available approximately two hours after the conclusion of the call. The audio replay will remain available until 9:00 PM PDT, August 10, 2006, and can be accessed by dialing 719.457.0820 or 888.203.1112 and entering confirmation code 6841288.

Sonic Solutions

Condensed Consolidated Statements of Operations
(in thousands, except per share amounts)

| | Three Months Ended June 30, 2006 (unaudited) | Three Months Ended June 30, 2005 (unaudited) |
|---|---|---|
| Net revenue | $36,886 | $35,519 |
| Cost of revenue | 7,716 | 9,765 |
| Gross profit | 29,170 | 25,754 |
| Operating expenses | | |
| Marketing and sales | 7,529 | 8,523 |
| Research and development | 10,732 | 9,874 |
| General and administrative | 4,264 | 4,909 |
| Business integration | --- | 295 |
| Total operating expenses | 22,525 | 23,601 |
| Operating income | 6,645 | 2,153 |
| Other income (expense), net | 158 | (113) |
| Income before income taxes | 6,803 | 2,040 |
| Provision (benefit) for income taxes | 2,713 | (3,864) |
| Net income | $ 4,090 | $ 5,904 |
| Net income per share | | |
| Basic | $ 0.16 | $ 0.24 |
| Diluted | $ 0.15 | $ 0.21 |
| Shares used in computing net income per share | | |
| Basic | 25,778 | 24,350 |
| Diluted | 27,413 | 27,499 |

Sonic Solutions
Condensed Consolidated Balance Sheets
(in thousands, except share amounts)

| | June 30, 2006 (unaudited) | March 31, 2006(1) |
|---|---|---|
| ASSETS | | |

| | March 31, 2006 | June 30, 2006 |
|---|---|---|
| **Current assets:** | | |
| Cash and cash equivalents | $ 11,719 | $ 18,731 |
| Short term investments | 53,375 | 42,350 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $5,235 and $4,329 at March 31, 2006 and June 30, 2006, respectively | 23,760 | 23,141 |
| Inventory | 515 | 689 |
| Deferred tax benefit | 3,879 | 3,879 |
| Prepaid expenses and other current assets | 3,767 | 3,771 |
| Total current assets | 97,015 | 92,561 |
| Fixed assets, net | 4,145 | 4,833 |
| Purchased and internally developed software costs, net | 1,053 | 1,266 |
| Goodwill | 54,151 | 54,151 |
| Acquired intangibles, net | 42,745 | 43,914 |
| Deferred tax benefit, net | 11,391 | 11,391 |
| Other assets | 1,089 | 1,355 |
| Total assets | $211,589 | $209,471 |

LIABILITIES AND SHAREHOLDERS' EQUITY

| | March 31, 2006 | June 30, 2006 |
|---|---|---|
| **Current liabilities:** | | |
| Accounts payable | $ 5,185 | $ 7,727 |
| Accrued liabilities | 24,518 | 24,380 |
| Deferred revenue | 6,033 | 7,795 |
| Obligations under capital leases, current portion | 24 | 35 |
| Total current liabilities | 35,760 | 39,937 |
| Bank note payable | 30,000 | 30,000 |
| Other long term liabilities, net of current portion | 334 | 373 |
| Deferred revenue, net of current portion | 82 | 2 |
| Obligations under capital leases, net of current portion | 1 | 2 |
| Total liabilities | 66,177 | 70,314 |
| **Shareholders' equity:** | | |
| Convertible preferred stock, no par value, 10,000,000 shares authorized; 0 shares issued and outstanding at March 31, 2006, and June 30, 2006, respectively | --- | --- |
| Common stock, no par value, 100,000,000 shares authorized; 25,685,953 and 25,870,642 shares issued and outstanding at March 31, 2006 and June 30, 2006, respectively | 129,180 | 126,880 |
| Accumulated other comprehensive loss | (1,072) | (937) |
| Accumulated earnings | 17,304 | 13,214 |
| Total shareholders' equity | 145,412 | 139,157 |

| | | |
|---|---|---|
| Total liabilities and shareholders' equity | $211,589 | $209,471 |

(1) March 31, 2006 balances are derived from the audited financial statements included in the Company's 2006 Annual Report on Form 10-K.

Sonic Solutions
Reconciliation of Reported Operating Results
to Non-GAAP Operating Results
(in thousands, except per share amounts)

| | Three Months Ended June 30, 2006 | 2005 |
|---|---|---|
| | (unaudited) | (unaudited) |
| **Reconciliation from GAAP to Non-GAAP Gross Profit** | | |
| GAAP gross profit | $29,170 | $25,754 |
| Non-GAAP adjustment: | | |
| SFAS 123R stock compensation expense included in cost of revenue | 36 | --- |
| Non-GAAP gross profit | $29,206 | $25,754 |
| **Reconciliation from GAAP to Non-GAAP Net Income** | | |
| GAAP net income | $ 4,090 | $ 5,904 |
| GAAP income before tax | 6,803 | 2,040 |
| Non-GAAP adjustment: | | |
| SFAS 123R stock compensation expense | 669 | --- |
| Tax impact of non-GAAP adjustment | (267) | --- |
| Non-GAAP net income | $ 4,492 | $ 5,904 |
| GAAP net income per share applicable to common | | |
| Basic | $ 0.16 | $ 0.24 |
| Diluted | $ 0.15 | $ 0.21 |
| Non-GAAP net income per share applicable to common | | |
| Basic | $ 0.17 | $ 0.24 |
| Diluted | $ 0.16 | $ 0.21 |

| Shares used in computing per share amounts | | |
|---|---|---|
| Basic | 25,778 | 24,350 |
| | ======== | ======== |
| Diluted | 27,413 | 27,499 |
| | ======== | ======== |

About Sonic Solutions

Sonic Solutions (Nasdaq:SNIC) (http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform-independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio(R)-branded CD and DVD creation, playback and backup solutions that have become the premier choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers as well as online at Sonic.com and Roxio.com, and are bundled with PCs, after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the U.S. and/or other countries. All other company or product names are trademarks or registered trademarks of their respective owners and, in some cases, are used by Sonic under license.

Forward-Looking Statements

This press release and Sonic's quarter ended June 30, 2006 earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include revenue and earnings per share guidance for the quarter ending September 30, 2006; and views regarding the potential benefits of our partnership with Movielink, opportunities presented by the "download and burn" business model, our ability to strengthen our relationships with end-users, the opportunities and benefits achieved through Sonic's integration of the Roxio Consumer Software Division, and the evolution of, and opportunities for Sonic arising from, next-generation high definition formats and channels. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, the timely introduction and acceptance of new products, including but not limited to Sonic's high definition series products; the costs associated with new product introductions and the possible adverse effect on gross margin; any fluctuation in demand for Sonic products; the transition of products to new hardware configurations and platforms; unforeseen increases in operating expenses, new product introductions, cost of Sarbanes Oxley ("SOX") compliance or business expansion; loss of significant customers or key suppliers; risks

related to acquisitions and international operations; costs associated
with litigation or prosecution and intellectual property claims;
changes in effective tax rates; and other factors, including those
discussed in Sonic's annual and quarterly reports on file with the
Securities and Exchange Commission. This press release should be read
in conjunction with Sonic's most recent annual report on Form 10-K and
Sonic's other reports on file with the Securities and Exchange
Commission, which contain a more detailed discussion of Sonic's
business including risks and uncertainties that may affect future
results. Sonic does not undertake to update any forward-looking
statements.

         CONTACT: Sonic Solutions
                  A. Clay Leighton, 415-893-8000
                  clay_leighton@sonic.com
                  fax: 415-893-8008
                  or
                  StreetSmart Investor Relations
                  Brooke Deterline, 415-893-7824
                  Anne Leschin, 415-775-1788
                  investinsonic@sonic.com
</TEXT>
</DOCUMENT>

# Exhibit 22

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a5270079-ex991.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results for Second Quarter Ended September 30, 2006

NOVATO, Calif.--(BUSINESS WIRE)--Nov. 8, 2006--Sonic Solutions(R) (NASDAQ: SNIC) today announced its financial results for the second quarter ended September 30, 2006.

Summary Financial Results
(in thousands, except per share amounts)

| | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2006 (Non-GAAP) | 2006 (GAAP) | 2005 (Non-GAAP) | 2005 (GAAP) |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) |
| Net revenue | $35,853 | $35,853 | $31,948 | $31,948 |
| Gross profit | $28,938 | $27,762 | $26,112 | $24,794 |
| Net income | $4,194 | $2,669 | $2,599 | $3,102 |
| Net income per diluted share | $0.15 | $0.10 | $0.09 | $0.11 |

For the quarter ended September 30, 2006, net revenue was $35.9 million, reflecting an increase of 12% from $31.9 million for the quarter ended September 30, 2005. Gross profit was $27.8 million compared to $24.8 million for the quarter ended September 30, 2005, representing an increase of 12%. Net income was $2.7 million or $0.10 per fully diluted share in the quarter ended September 30, 2006. The non-GAAP presentation contained herein excludes stock based compensation charges resulting from our adoption of Statement of Financial Accounting Standard 123R ("SFAS 123R") "Share-Based Payments," certain abandoned acquisition costs, and the amortization of acquired intangibles. Based on these adjustments, non-GAAP net income for the second quarter ended September 30, 2006 was $4.2 million and non-GAAP net income per diluted share was $0.15

"Our fiscal second quarter fell slightly below expectations due to an interruption with a key OEM partner. However, we have worked to alleviate this disruption and further enhance our relationship. We also made significant progress on our key corporate initiatives, including HD, DVD On Demand, and the launch of Easy Media Creator 9," stated Dave Habiger, President and Chief Executive Officer of Sonic. "This morning we announced the acquisition of SystemOK, a provider of system restore software. We expect this strategic move will advance our leadership position in creating, managing and editing digital media software by ensuring the safety of consumers' digital media assets and providing significant value to key OEM partners."

Non-GAAP Presentation

In this press release, Sonic provides adjustments to financial information calculated on the basis of GAAP as supplemental information relating to its results of operations. The non-GAAP financial measures are used in addition to and in conjunction with results presented in accordance with GAAP, and are intended to provide additional insight into our operations that, when viewed with our GAAP results and the accompanying reconciliations to the corresponding GAAP financial measures, offers a more complete understanding of factors and trends affecting our business. The non-GAAP measures should be considered as supplements to, and not as substitutes for or superior to, the corresponding measures calculated in accordance with GAAP. The non-GAAP disclosure and the non-GAAP adjustments, including the basis for such adjustment and the impact on our operations, are outlined below:

Stock Compensation Expense Adjustment. As of April 1, 2006, we adopted SFAS 123R. In our non-GAAP presentation for the second quarter ended September 30, 2006, we excluded $344,000, or $0.01 per fully diluted share tax affected, in stock compensation expense recorded in our GAAP income statement pursuant to SFAS 123R. SFAS 123R stock compensation expense was recorded in our GAAP income statement as follows: $7,000 to cost of revenue; $125,000 to marketing and sales; $125,000 to research and development; and $87,000 to general and administrative. Given the significance and non-cash nature of this expense, and for the reasons set forth below, management has excluded such expense from the non-GAAP earnings presentation for the second quarter ended September 30, 2006. Further, we believe the exclusion of stock compensation expenses recorded in the second quarter ended September 30, 2006 improves the comparability to our results for the second quarter ended September 30, 2005 during which there was no stock option expense recorded, as the adoption of SFAS 123R occurred during the current fiscal year.

Abandoned Acquisition Expense Adjustment. During the second quarter ended September 30, 2006, we expensed costs incurred during the due diligence phase of a potential acquisition of a company that we evaluated, but ultimately did not acquire. We excluded this amount from our non-GAAP financial measures because we believe it is a non-recurring expense that is not indicative of Sonic's ongoing business operations. Further, we believe this exclusion improves the comparability to our results for the second quarter ended September 30, 2005, since there was no comparable expense during that quarter.

Acquisition-Related Intangible Amortization. Under purchase accounting rules, some portion of an acquisition purchase price is allocated to intangibles, such as core and developed technology and customer contracts, which are then amortized over various periods of time. The GAAP presentation includes amortization on all acquired intangibles from prior transactions we have consummated. The amortization expense on acquired intangibles does not result in ongoing cash expenditures and, in management's view, does not otherwise have a material impact on Sonic's ongoing business operations.

We believe our non-GAAP presentation is useful to investors for the reasons described above, and because such presentation offers investors a better understanding of Sonic's core business operating results and budget planning decisions. Management uses these non-GAAP measures internally to plan and forecast future periods, to establish operational goals, to compare with its business plan and individual operating budgets and to allocate resources. The economic substance behind our decision to use the non-GAAP measures is an increase in net income of $0.05 per fully diluted share for the quarter ended September 30, 2006. Material limitations associated with the use of the non-GAAP financial measures versus the comparable GAAP measures are (a) the non-GAAP measures provide a view of our earnings that does not include all of our expense obligations for the period in question, and (b) this may not enhance the comparability of our results to those of other companies undergoing similar

transitions as a result of the adoption of SFAS 123R or to companies who have abandoned acquisition expenses and/or acquisition-related intangibles, but who have treated such matters differently. We compensate for these limitations by providing full disclosure of the effects of these non-GAAP measures, by presenting the corresponding treatment prepared in conformity with GAAP in this release and in our financial statements and by providing a reconciliation to the corresponding GAAP measures so that investors can use the information to perform their own analysis.

Sonic will conduct a conference call at 1:30 p.m. PST, or 4:30 p.m. EST, today to discuss its financial results for the second quarter ended September 30, 2006. Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Company's website at www.sonic.com (http://www.sonic.com/). A replay of the web cast will be available approximately two hours after the conclusion of the call. An audio replay of the conference call will also be made available approximately two hours after the conclusion of the call. The audio replay will remain available until 9:00 p.m. PST, November 15, 2006, and can be accessed by dialing 719-457-0820 or 888-203-1112 and entering confirmation code 6216407.

Sonic Solutions
Condensed Consolidated Statements of Operations
(in thousands, except per share amounts, unaudited)

| | Three Months Ended September 30, | | Six Months Ended September, 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Net Revenue | $35,853 | $31,948 | $72,740 | $67,467 |
| Cost of Revenue | 8,091 | 7,154 | 15,806 | 16,919 |
| Gross Profit | 27,762 | 24,794 | 56,934 | 50,548 |
| Operating expenses | | | | |
| Marketing and sales | 7,698 | 7,354 | 15,227 | 15,877 |
| Research and development | 10,283 | 10,819 | 21,015 | 20,692 |
| General and administrative | 4,531 | 3,354 | 8,797 | 8,264 |
| Abandoned acquisition | 1,016 | --- | 1,016 | --- |
| Business integration | --- | 41 | --- | 336 |
| Total operating expenses | 23,528 | 21,568 | 46,055 | 45,169 |
| Operating income | 4,234 | 3,226 | 10,879 | 5,379 |
| Other income (expense), net | 190 | (234) | 348 | (347) |
| Income before income taxes | 4,424 | 2,992 | 11,227 | 5,032 |
| Provision (benefit) for income taxes | 1,755 | (110) | 4,468 | (3,974) |
| Net income | $2,669 | $3,102 | 6,759 | 9,006 |
| Net income per share | | | | |

| | | | | |
|---|---|---|---|---|
| Basic | $0.10 | $0.13 | $0.26 | $0.37 |
| Diluted | $0.10 | $0.11 | $0.25 | $0.32 |
| Shares used in computing net income per share | | | | |
| Basic | 25,922 | 24,586 | 25,850 | 24,468 |
| Diluted | 27,253 | 27,975 | 27,334 | 27,738 |

Sonic Solutions
Condensed Consolidated Balance Sheets
(in thousands, except share amounts)

| | September 30, 2006 (unaudited) | March 31, 2006(1) |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 16,344 | $ 18,731 |
| Short term investments | 44,275 | 42,350 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $5,235 and $7,611 at March 31, 2006 and September 30, 2006, respectively | 22,563 | 23,141 |
| Inventory | 458 | 689 |
| Deferred tax benefit | 4,037 | 3,879 |
| Prepaid expenses and other current assets | 3,454 | 3,771 |
| Total current assets | 91,131 | 92,561 |
| Fixed assets, net | 3,775 | 4,833 |
| Purchased and internally developed software costs, net | 885 | 1,266 |
| Goodwill | 54,151 | 54,151 |
| Acquired intangibles, net | 41,576 | 43,914 |
| Deferred tax benefit, net | 8,921 | 11,391 |
| Other assets | 946 | 1,355 |
| Total assets | $ 201,385 | $ 209,471 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 4,903 | $ 7,727 |
| Accrued liabilities | 21,144 | 24,380 |
| Deferred revenue | 5,206 | 7,795 |
| Bank note payable | 20,000 | --- |
| Obligations under capital leases, current portion | 8 | 35 |

| | | |
|---|---|---|
| Total current liabilities | 51,261 | 39,937 |
| Bank note payable | --- | 30,000 |
| Other long term liabilities, net of current portion | 585 | 373 |
| Deferred revenue, net of current portion | 59 | 2 |
| Obligations under capital leases, net of current portion | --- | 2 |
| Total liabilities | 51,905 | 70,314 |
| Shareholders' equity: | | |
| Convertible preferred stock, no par value, 10,000,000 shares authorized; 0 shares issued and outstanding at March 31, 2006, and September 30, 2006, respectively | --- | --- |
| Common stock, no par value, 100,000,000 shares authorized; 25,685,953 and 25,973,792 shares issued and outstanding at March 31, 2006 and September 30, 2006, respectively | 130,571 | 126,880 |
| Accumulated other comprehensive loss | (1,064) | (937) |
| Accumulated earnings | 19,973 | 13,214 |
| Total shareholders' equity | 149,480 | 139,157 |
| Total liabilities and shareholders' equity | $ 201,385 | $ 209,471 |

(1) March 31, 2006 balances are derived from the audited financial statements included in the Company's 2006 Annual Report on Form 10-K.

Sonic Solutions
Reconciliation of Reported Operating Results to Non-GAAP Operating Results
(in thousands, except per share amounts)

| | Three Months Ended September 30, | |
|---|---|---|
| | 2006 | 2005 |
| | (unaudited) | (unaudited) |
| **Reconciliation from GAAP to Non-GAAP Gross Profit** | | |
| GAAP gross profit | $ 27,762 | $ 24,794 |
| Non-GAAP adjustment: | | |
| Amortization of acquired intangibles | 1,169 | 1,318 |
| SFAS 123R stock compensation expense included in cost of revenue | 7 | --- |
| Non-GAAP gross profit | $ 28,938 | $ 26,112 |

Reconciliation from GAAP to Non-GAAP Net Income

| | | |
|---|---|---|
| GAAP net income | $ 2,669 | $ 3,102 |
| GAAP income before tax | 4,424 | 2,992 |
| Non-GAAP adjustment: | | |
| SFAS 123R stock compensation expense | 344 | --- |
| Abandoned acquisition expense | 1,016 | --- |
| Amortization of acquired intangibles | 1,169 | 1,318 |
| Tax adjustment(1) | (1,004) | (1,821) |
| Non-GAAP net income | $ 4,194 | $ 2,599 |
| GAAP net income per share applicable to common | | |
| Basic | $ 0.10 | $ 0.13 |
| Diluted | $ 0.10 | $ 0.11 |
| Non-GAAP net income per share applicable to common | | |
| Basic | $ 0.16 | $ 0.11 |
| Diluted | $ 0.15 | $ 0.09 |
| Shares used in computing per share amounts | | |
| Basic | 25,922 | 24,586 |
| Diluted | 27,253 | 27,975 |

(1) Tax adjustment calculated by applying second quarter ended September 30, 2006 effective tax rate of 39.7%.

About Sonic Solutions

Sonic Solutions (NASDAQ:SNIC) (http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform-independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio(R)-branded CD and DVD creation, playback and backup solutions that have become the premier choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers as well as online at Sonic.com and Roxio.com, and are bundled with PCs, after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the U.S. and/or other countries. All other company or product names are trademarks or registered trademarks of their respective owners and, in some cases, are used by Sonic under license.

Forward-Looking Statements

     This press release and Sonic's quarter ended September 30, 2006 earnings
conference call contain forward-looking statements that are based upon current
expectations. Such forward-looking statements include revenue and earnings per
share guidance for the quarter ending December 31, 2006 and revenue guidance for
the fiscal year ending March 31, 2008; and views regarding opportunities
presented by the "download and burn" business model, our ability to strengthen
our relationships with end-users, the opportunities and benefits achieved
through Sonic's integration of the Roxio Consumer Software Division, the
evolution of, and opportunities for Sonic arising from, next-generation high
definition formats and channels, future market opportunities and the potential
benefits of our acquisition of SystemOK. These forward-looking statements
involve known and unknown risks, uncertainties and other factors that may cause
the actual results to differ materially from any future results, performance or
achievements expressed or implied by such forward-looking statements. Important
factors that could cause such differences include, but are not limited to, the
timely introduction and acceptance of new products, including but not limited to
Sonic's high definition series products; the costs associated with new product
introductions and the possible adverse effect on gross margin; any fluctuation
in demand for Sonic products; the transition of products to new hardware
configurations and platforms; unforeseen increases in operating expenses, new
product introductions, cost of Sarbanes Oxley ("SOX") compliance or business
expansion; loss of significant customers or key suppliers; risks related to
acquisitions and international operations; costs associated with litigation or
prosecution and intellectual property claims; changes in effective tax rates;
and other factors, including those discussed in Sonic's annual and quarterly
reports on file with the Securities and Exchange Commission. This press release
should be read in conjunction with Sonic's most recent annual report on Form
10-K and Form 10-K/A and Sonic's other reports on file with the Securities and
Exchange Commission, which contain a more detailed discussion of Sonic's
business including risks and uncertainties that may affect future results. Sonic
does not undertake to update any forward-looking statements.


     CONTACT: Sonic Solutions
              A. Clay Leighton, Chief Financial Officer, 415-893-8000
              Fax: 415-893-8008
              clay_leighton@sonic.com
              or
              StreetSmart Investor Relations
              Brooke Deterline, 415-893-7824
              Anne Leschin, 415-775-1788
              investinsonic@sonic.com
</TEXT>
</DOCUMENT>

# Exhibit 23

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a4953080-ex991.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Results for First Quarter Ended June 30, 2005

NOVATO, Calif.--(BUSINESS WIRE)--Aug. 15, 2005--Sonic Solutions (NASDAQ: SNIC) ("Sonic") announced today the financial results for its first fiscal quarter ended June 30, 2005.

Summary Financial Results
(in thousands, except per share amounts)

| | Three Months Ended June 30, | | |
|---|---|---|---|
| | 2005 (Non-GAAP) | 2005 (GAAP) | 2004 (GAAP) |
| Net revenue | $35,519 | $35,519 | $17,909 |
| Net income | $5,073 | $4,013 | $3,987 |
| Net income per diluted share | $0.18 | $0.15 | $0.16 |

On the basis of generally accepted accounting principles ("GAAP"), net revenue for the quarter was $35,519,000 compared to $17,909,000 for the same period in the prior fiscal year. Net income for the quarter was $4,013,000, or $0.15 per diluted share, compared to net income of $3,987,000, or $0.16 per diluted share, for the same period in the prior fiscal year.

On a non-GAAP basis, net revenue for the quarter was $35,519,000, net income was $5,073,000 and net income per diluted share was $0.18.

Non-GAAP Presentation

In this press release, Sonic provides certain adjustments to financial information calculated on the basis of GAAP as supplemental information relating to its results of operations. These non-GAAP financial measures include non-GAAP net income, diluted earnings per share, and gross profit and margin figures, which exclude certain expense items associated with, among other things, the acquisition of the assets and liabilities of the Consumer Software Division of Roxio, Inc., each as more fully described below. The non-GAAP financial measures also exclude the third party costs incurred by Sonic in the first quarter in connection with Sonic's implementation of the requirements of Section 404 of the Sarbanes-Oxley Act (see "SOX Compliance" below). Management believes that this non-GAAP presentation allows investors to better understand the operating results of Sonic for the quarter ended June 30, 2005 because this presentation excludes non-recurring acquisition-related charges and other non-recurring expenses, and provides insight into how management evaluates operating results. In addition, Sonic has reported similar non-GAAP results in the past and believes the inclusion of this non-GAAP presentation provides consistency in its financial reporting. However, these non-GAAP measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and other companies may use different non-GAAP measures and presentations of results.

The non-GAAP presentation adjusts the following items:

Acquisition-Related Intangible Amortization. Under purchase accounting rules, some portion of the acquisition purchase price is allocated to intangibles, such as core and developed technology and customer contracts, which are then amortized over various periods of time. The GAAP presentation includes amortization on all acquired intangibles. These non-cash charges are eliminated in the non-GAAP presentation in calculating operating income.

Acquired Patents. During the quarter ended on June 30, 2005, Sonic sold certain patents that had been acquired as part of the Roxio acquisition. In connection with that sale, the value ascribed to the cost of the patents, in the amount of $1,169,000, was included in cost of revenue in the GAAP presentation. This charge is eliminated in the non-GAAP presentation, as it is a non-cash charge that obscures the cash profit derived from the transactions.

Third-Party Expenses Related to Compliance with the Sarbanes-Oxley Act of 2002 ("SOX"). Certain third-party expenses related to SOX compliance work for the 2005 fiscal year, which were billed and accrued for during the first quarter of the 2006 fiscal year, are included in the GAAP presentation and excluded in the non-GAAP presentation. The expenses excluded in the non-GAAP presentation are primarily the fees paid to compliance consultants and to Sonic's external auditors for work in connection with Sonic's SOX compliance. Sonic management believes that SOX compliance efforts were significantly complicated by the impact of the Roxio acquisition, including management's decision to migrate Sonic's accounting into systems that were acquired as part of the Roxio combination. Sonic management believes the level of SOX expenses is extraordinary, is unlikely to recur in future periods, and in any event relates entirely to work performed relative to the fiscal 2005 audit. Hence, it is excluded from the non-GAAP presentation.

Business Integration Expenses. Certain charges that occurred in connection with the Roxio acquisition, and that are not expected to recur, are considered to be non-recurring charges. The non-GAAP presentation eliminates these charges included in operating expense.

Sonic will hold its first quarter ended June 30, 2005 earnings conference call on Monday, August 15, 2005 at 1:30 p.m. (PDT)/4:30 p.m. (EDT). Investors are invited to listen to Sonic's conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call also will be available via Webcast at www.sonic.com.

Sonic Solutions
Condensed Consolidated Statements of Operations
(in thousands, except per share amounts -- unaudited)

| | Quarters Ended June 30, | |
|---|---|---|
| | 2005 | 2004 |
| Net revenue | 35,519 | $17,909 |
| Cost of revenue | 9,249 | 1,861 |
| Gross profit | 26,270 | 16,048 |
| Operating expenses: | | |
| Marketing and sales | 8,523 | 3,912 |
| Research and development | 10,390 | 6,548 |
| General and administrative | 4,909 | 1,200 |
| Business integration | 295 | - |

| | | |
|---|---|---|
| Total operating expenses | 24,117 | 11,660 |
| Operating income | 2,153 | 4,388 |
| Other income (expense), net | (113) | 60 |
| Income before income taxes | 2,040 | 4,448 |
| Provision (benefit) for income taxes | (1,973) | 461 |
| Net income | 4,013 | $3,987 |
| Net income per share | | |
| Basic | 0.16 | $0.18 |
| Diluted | 0.15 | $0.16 |
| Shares used in computing net income per share | | |
| Basic | 24,350 | 22,044 |
| Diluted | 27,499 | 25,461 |

Sonic Solutions
Condensed Consolidated Balance Sheets
(in thousands, except share amounts)

| | 2005 | |
|---|---|---|
| ASSETS | March 31(a) | June 30 (unaudited) |
| Current Assets: | | |
| Cash and cash equivalents | $35,436 | 42,853 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $10,377 and $8,767 at March 31, 2005 and June 30, 2005, respectively | 12,839 | 13,628 |
| Inventory | 755 | 715 |
| Unbilled receivables | 121 | --- |
| Prepaid expenses and other current assets | 2,153 | 2,334 |
| Total current assets | 51,304 | 59,530 |
| Fixed assets, net | 6,756 | 6,569 |
| Purchased and internally developed software, net | 1,595 | 1,485 |
| Goodwill | 54,664 | 53,269 |
| Acquired intangibles, net | 49,046 | 47,731 |
| Other assets | 2,583 | 4,630 |
| Total assets | $165,948 | 173,214 |

LIABILITIES AND SHAREHOLDERS' EQUITY

Current Liabilities:

| | | |
|---|---|---|
| Accounts payable | $9,087 | 9,325 |
| Accrued liabilities | 19,164 | 20,389 |
| Deferred revenue | 5,176 | 6,919 |
| Obligations under capital leases, current portion | 84 | 67 |
| Total current liabilities | 33,511 | 36,700 |
| Bank note payable | 30,000 | 30,000 |
| Other long term liabilities, net of current portion | 2,217 | 2,170 |
| Deferred revenue, net of current portion | 756 | 679 |
| Obligations under capital leases, net of current portion | 41 | 21 |
| Total liabilities | 66,525 | 69,570 |
| Shareholders' Equity: | | |
| Convertible preferred stock, no par value, 10,000,000 shares authorized; 0 shares issued and outstanding at March 31, 2005, and June 30, 2005 | --- | --- |
| Common stock, no par value, 100,000,000 shares authorized; 24,308,730 and 24,392,103 shares issued and outstanding at March 31, 2005 and June 30, 2005, respectively | 106,410 | 106,669 |
| Accumulated other comprehensive loss | (274) | (325) |
| Accumulated deficit | (6,713) | (2,700) |
| Total shareholders' equity | 99,423 | 103,644 |
| Total liabilities and shareholders' equity | $165,948 | 173,214 |

(a): The consolidated balance sheet at March 31, 2005 has been derived from the Company's audited consolidated financial statements on Form 10-K at that date, but does not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.

Sonic Solutions
Reconciliation of Reported Operating Results to Non-GAAP Operating Results
(in thousands, except per share amounts and percentages, unaudited)

| | Three Months Ended June 30, | |
|---|---|---|
| | 2005 | 2004 |
| Reported revenue | $35,519 | $17,909 |
| Non GAAP gross profit | $28,866 | $16,226 |
| Non GAAP gross margin | 81% | 91% |
| GAAP Operating income | $2,153 | $4,388 |
| GAAP Net income | 4,013 | 3,987 |
| Adjustments: | | |
| Business integration expenses | 295 | --- |
| Patent cost | 1,169 | --- |
| SOX compliance expenses | 1,145 | --- |

| | | |
|---|---|---|
| Amortization of intangible assets | 1,427 | 178 |
| Tax impact on non-GAAP adjustments | ($2,976) | ($18) |
| Non GAAP net income | $5,073 | $4,147 |
| Net income per diluted share | | |
| Non-GAAP | $0.18 | $0.16 |
| GAAP | $0.15 | $0.16 |
| Shares used in computing per share amounts | 27,499 | 25,461 |

About Sonic Solutions

Sonic Solutions (NASDAQ: SNIC; http://www.sonic.com) is the leader in digital media software, providing a broad range of interoperable, platform independent software tools and applications for creative professionals, business and home users, and technology partners. Sonic's products range from advanced DVD authoring systems and interactive content delivery technologies used to produce the majority of Hollywood DVD film releases, to the award-winning Roxio- and Sonic-branded CD and DVD creation, playback and backup solutions that have become the premiere choice for consumers, prosumers and business users worldwide.

Sonic products are globally available from major retailers, online at Sonic.com and Roxio.com, and are bundled with PCs, after-market drives and consumer electronic devices. Sonic's digital media creation engine is the de facto standard and has been licensed by major software and hardware manufacturers, including Adobe, Microsoft, Scientific-Atlanta, Sony, and many others. Sonic Solutions is headquartered in Marin County, California.

Sonic, the Sonic logo, Sonic Solutions, and Roxio are trademarks or registered trademarks of Sonic Solutions in the United States and/or other countries. All other company or product names are trademarks of their respective owners and, in some cases, are used by Sonic under license.

Forward Looking Statements

This press release and Sonic's first quarter ended June 30, 2005 earnings conference call contain forward-looking statements that are based upon current expectations. Such forward-looking statements include revenue and earnings per share guidance for the fiscal quarters ending September 30, 2005, December 31, 2005, March 31, 2006, and the fiscal year ending March 31, 2006; the gross margin, operating margin, effective tax rate and cost of SOX compliance assumed for the guidance; the continuing effects of the increase in operating expenses and headcount in connection with the Roxio acquisition; and favorable expectations about Sonic's consumer electronics strategy and ability to take advantage of the convergence of the PC and consumer electronics industries. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause such differences include, but are not limited to, Sonic's ability to successfully integrate Roxio's Consumer Software Division and former employees into Sonic's business and realize the anticipated synergies and cost savings from the acquisition; general customer and market reaction to the Roxio acquisition; the timely introduction and acceptance of new products, including but not limited to Sonic's high definition series products; the costs associated with new product

introductions and the possible adverse effect on gross margin; the transition of products to new hardware configurations and platforms; unforeseen increases in operating expenses as a result of the Roxio acquisition, new product introductions, cost of SOX compliance or business expansion; loss of significant customers due to the Roxio acquisition and other market conditions; risks related to acquisitions and international operations; and other factors, including those discussed in Sonic's annual and quarterly reports on file with the Securities and Exchange Commission. This press release should be read in conjunction with Sonic's most recent quarterly report on Form 10-Q and Sonic's other reports on file with the Securities and Exchange Commission, which contain a more detailed discussion of Sonic's business including risks and uncertainties that may affect future results. Sonic does not undertake to update any forward looking statements.

CONTACT: Sonic Solutions
A. Clay Leighton, 415-893-8000 (CFO)
clay_leighton@sonic.com
fax: 415-893-8008
or
Market Street Partners
Carolyn Bass, 415-445-3232
Susan Coss, 415-445-3237
investinsonic@sonic.com

</TEXT>
</DOCUMENT>

# Exhibit 24

<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a4632667ex991.txt
<DESCRIPTION>SONIC SOLUTIONS
<TEXT>

Exhibit 99.1

Sonic Solutions Reports Record Results for Fourth Quarter and Fiscal Year Ended March 31, 2004;
10th Consecutive Quarter of Increasing Revenues Drives All-Time Record Profits

NOVATO, Calif.--(BUSINESS WIRE)--May 4, 2004--Sonic Solutions (Nasdaq:SNIC) announced today the financial results for the Company's fourth quarter and fiscal year ended March 31, 2004.

Net revenue for the quarter was $17,302,000 compared to $9,467,000 for the same period in the prior fiscal year. Net income for the quarter was $4,336,000 or $0.17 per diluted share compared to net income of $145,000 or $0.01 per diluted share for the same period in the prior fiscal year.

Net revenue for the fiscal year ended March 31, 2004 was $56,853,000 compared to $32,718,000 for the prior fiscal year. Net income for the fiscal year was $11,084,000 or $0.46 per diluted share compared to net income of $2,537,000 or $0.13 per diluted share for the prior fiscal year.

Sonic will hold its fourth quarter and fiscal year ended March 31, 2004 earnings conference call on Tuesday, May 4, 2004 at 1:30 p.m. (PT)/4:30 p.m. (ET). Investors are invited to listen to Sonic's quarterly conference call on the investor section of the Sonic Web site at www.sonic.com. A replay of the call will also be available via Webcast at www.sonic.com.

Sonic Solutions
Condensed Statement of Operations
(in thousands, except per share amounts)

| | Three Months Ended March 31, (unaudited) | | Twelve Months Ended March 31, (audited) | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Net Revenue | $17,302 | $ 9,467 | $56,853 | $32,718 |
| Cost of Revenue | 1,917 | 1,974 | 7,052 | 7,446 |
| Gross Profit | 15,385 | 7,493 | 49,801 | 25,272 |
| Operating expenses | | | | |
| Marketing and sales | 3,343 | 2,548 | 12,629 | 8,762 |
| Research and development | 5,724 | 3,825 | 19,731 | 10,625 |
| General and administrative | 1,466 | 792 | 4,669 | 3,101 |
| Total operating expenses | 10,533 | 7,165 | 37,029 | 22,488 |
| Operating income | 4,852 | 328 | 12,772 | 2,784 |
| Other income (expense), net | 136 | (70) | 238 | (47) |
| Income before income taxes | 4,988 | 258 | 13,010 | 2,737 |
| Provision for income taxes | 652 | 113 | 1,926 | 200 |
| Net income | $ 4,336 | 145 | 11,084 | 2,537 |
| Net income per share applicable to common Shareholders: | | | | |

| | | | | |
|---|---|---|---|---|
| Basic | $ 0.20 | $ 0.01 | $ 0.54 | $ 0.15 |
| Diluted | $ 0.17 | $ 0.01 | $ 0.46 | $ 0.13 |
| Shares used in computing net income per share: | | | | |
| Basic | 21,766 | 17,564 | 20,459 | 16,391 |
| Diluted | 25,197 | 20,807 | 23,889 | 19,311 |

Sonic Solutions
Condensed Balance Sheets
(in thousands)
(audited)

| | March 31, 2004 | March 31, 2003 |
|---|---|---|
| Assets | | |
| Current assets: | | |
| Cash, cash equivalents and investments | $ 36,182 | $ 9,708 |
| Accounts receivable, net of allowance for returns and doubtful accounts of $243 and $425, at March 31, 2004 and 2003, respectively | 9,443 | 5,823 |
| Inventory | 560 | 531 |
| Prepaid expenses and other current assets | 1,400 | 869 |
| Total current assets | 47,585 | 16,931 |
| Fixed assets, net | 3,610 | 1,745 |
| Purchased and internally developed software costs, net | 1,042 | 920 |
| Acquired intangibles | 2,898 | 1,345 |
| Goodwill | 15,533 | 6,715 |
| Other assets | 277 | 697 |
| Total assets | $ 70,945 | $ 28,353 |
| Liabilities and Shareholders' Equity | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 10,122 | $ 7,087 |
| Deferred revenue and deposits | 4,965 | 1,840 |
| Capital Leases | 60 | 0 |
| Total current liabilities | 15,147 | 8,927 |
| Capital lease, net of current portion | 75 | 0 |
| Total liabilities | 15,222 | 8,927 |
| Shareholders' equity: | | |
| Common stock | 70,994 | 45,765 |
| Cumulative foreign translation adjustment | (16) | 0 |
| Accumulated deficit | (15,255) | (26,339) |
| Total shareholders' equity | 55,723 | 19,426 |
| Total liabilities and shareholders' equity | $ 70,945 | $ 28,353 |

About Sonic Solutions (NASDAQ: SNIC - News)

Based in Marin County, California, Sonic Solutions (http://www.sonic.com)
is the world's leading supplier of DVD creation software for professional,
industrial and consumer applications. The majority of major film releases on DVD
have been produced on Sonic's professional DVD authoring systems in studios
around the world. Sonic's MyDVD(R) and DVDit!(R) are the most widely used DVD
creation applications by consumers and video enthusiasts and are the solutions
of choice among the key PC and after-market drive suppliers. Sonic's
RecordNow!(TM) is a leading solution for audio and data mastering. Sonic's
AuthorScript(R), the DVD and CD formatting and burning engine that underlies
Sonic's applications, is the most widely deployed DVD software engine and has
been licensed by Adobe, Microsoft, Sony, and many others.

Forward Looking Statements

The above paragraphs of this press release may contain forward looking
statements that are based upon current expectations. Such forward-looking
statements include, without limitation, statements concerning or relating to
implications of the Company's revenues and financial results for the third
quarter ended December 31, 2003, including any statements containing words such
as "believes," "expects," and words of similar import or statements of
management's opinion. These forward-looking statements involve known and unknown
risks, uncertainties and other factors that may cause the actual results,
including financial results, market performance or achievements to differ
materially from any future results, performance or achievements expressed or
implied by such forward-looking statements. Important factors that could cause
such differences include, but are not limited to, the timely introduction and
acceptance of new products, costs associated with new product introductions, the
transition of products to new hardware configurations and platforms, risks
related to the Company's acquisitions, and other factors detailed in the
Company's filings with the Securities and Exchange Commission, including its
recent filings on Forms 10-K, 10-Q and 8-K, including, but not limited to, those
described in the Company's Form 10-Q for the fiscal quarter ended September 30,
2003. The Company does not undertake to update any forward looking statements.

Sonic, the Sonic logo, Backup MyPC, CinePlayer, PrePlay, DVD Producer,
Edit-on-DVD, HyperMux DL, NoNOISE, Sonic PrimeTime, RecordNow!, Simple Backup,
Sonic JumpSafe and Sonic SmartBalance are trademarks of Sonic Solutions.
AuthorScript, AutoDVD, DVDit!, DVD Fusion, MyDVD, OpenDVD, PrePlay, ReelDVD,
Scenarist, Sonic DVD Creator and Sonic Solutions are registered trademarks of
Sonic Solutions. All other company or product names are trademarks of their
respective owners and, in some cases, are used by Sonic under license.
Specifications, pricing and delivery schedules are subject to change without
notice.


    CONTACT: Sonic Solutions
             A. Clay Leighton, 415-893-8000
             clay_leighton@sonic.com
             or
             Market Street Partners
             Carolyn Bass or Rob Walker, 415-445-3234
             carolyn@marketstreetpartners.com
             rwalker@marketstreetpartners.com


</TEXT>
</DOCUMENT>