SARA B. BRODY (Bar No. 130222)
CAROL LYNN THOMPSON (Bar No. 148079)
CECILIA Y. CHAN (Bar No. 240971)
MATTHEW D. THURLOW (Bar No. 243470)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268
Sara.Brody@hellerehrman.com
CarolLynn.Thompson@hellerehrman.com
Cecilia.Chan@hellerehrman.com
Matthew.Thurlow@hellerehrman.com

Attorneys for Defendants
SONIC SOLUTIONS, DAVID C. HABIGER,
ROBERT J. DORIS, A. CLAY LEIGHTON,
MARY C. SAUER, MARK ELY, ROBERT M. GREBER,
PETER J. MARGUGLIO and R. WARREN LANGLEY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM AND PLYMOUTH COUNTY RETIREMENT SYSTEM, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SONIC SOLUTIONS, DAVID C. HABIGER, ROBERT J. DORIS, A. CLAY LEIGHTON, MARY C. SAUER, MARK ELY, ROBERT M. GREBER, PETER J. MARGUGLIO and R. WARREN LANGLEY,<br><br>Defendants. | Case No.: C 07 5111(JSW)<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date: September 5, 2008<br>Time: 9:00 a.m.<br>Trial Date: None Set<br><br>The Honorable Jeffrey S. White |

DEFENDANTS' REQUEST FOR JUDICIAL NOTICE
CASE NO.: C 07 5111(JSW)

Pursuant to Rule 201 of the Federal Rules of Evidence and the doctrine of incorporation by reference, Defendants Sonic Solutions, David C. Habiger, Robert J. Doris, A. Clay Leighton, Mary C. Sauer, Mark Ely, Robert M. Greber, Peter J. Marguglio and R. Warren Langley (collectively, "Defendants") request this Court take judicial notice of the attached exhibit in connection with their motion to dismiss the Consolidated Class Action Complaint (the "Complaint") for violations of the federal securities laws.

Under the incorporation by reference doctrine, a court may consider on a Rule 12(b)(6) motion documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (internal citation omitted); *In re Portal Software, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 20214, at *12 (N.D. Cal. 2005) ("[C]ourts are specifically authorized, in connection with a motion to dismiss a securities fraud complaint, to consider documents and filings described in the complaint under the incorporation by reference doctrine."). Where a plaintiff fails to attach to the complaint the documents upon which the complaint is premised, a defendant may attach such documents in order to show that they do not support the plaintiff's claim. *In Re Pac. Gateway Exch., Inc.*, 169 F. Supp.2d 1160, 1164 (N.D. Cal. 2001).

In addition, Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). It is well-established in the Ninth Circuit that courts may take judicial notice of documents filed with the Securities and Exchange Commission ("SEC"). *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *see also In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (finding that court may take judicial notice of documents filed with the SEC).

Attached hereto as Exhibit A is a true and correct copy of excerpts of the Form 10-K filed by Sonic Solutions, Inc. with the SEC on February 26, 2008 (the "Restatement"). This

Court may take judicial notice of the Restatement because it is incorporated by reference into the Complaint and is judicially noticeable under Federal Rule of Evidence 201.

DATED: May 23, 2008

Respectfully submitted,

HELLER EHRMAN LLP

/s/ Sara B. Brody
SARA B. BRODY
CAROL LYNN THOMPSON
CECILIA Y. CHAN
MATTHEW D. THURLOW

Attorneys for Defendants
SONIC SOLUTIONS, DAVID C. HABIGER, ROBERT J. DORIS, A. CLAY LEIGHTON, MARY C. SAUER, MARK ELY, ROBERT M. GREBER, PETER J. MARGUGLIO and R. WARREN LANGLEY

Court may take judicial notice of the Restatement because it is incorporated by reference into the Complaint and is judicially noticeable under Federal Rule of Evidence 201.

DATED: May 23, 2008

Respectfully submitted,

HELLER EHRMAN LLP

/s/ Sara B. Brody
SARA B. BRODY
CAROL LYNN THOMPSON
CECILIA Y. CHAN
MATTHEW D. THURLOW

Attorneys for Defendants
SONIC SOLUTIONS, DAVID C. HABIGER, ROBERT J. DORIS, A. CLAY LEIGHTON, MARY C. SAUER, MARK ELY, ROBERT M. GREBER, PETER J. MARGUGLIO and R. WARREN LANGLEY

# Exhibit A

Case 4:07-cv-05111-CW   Document 30   Filed 05/23/2008   Page 4 of 15

10-K 1 v104179_10k.htm

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

**FORM 10-K**

---

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended March 31, 2007

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 72870

---

# SONIC SOLUTIONS

(Exact Name of Registrant as Specified in Its Charter)

| California | 93-0925818 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**101 Rowland Way, Suite 110,
Novato, California 94945**

(Address of Principal Executive Office) (Zip Code)

**(415) 893-8000**

(Registrant's Telephone Number, Including Area Code)

---

Securities registered pursuant to Section 12(b) of the Act:

Securities registered pursuant to Section 12(g) of the Act: None

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12(b)(2) of the Exchange Act.

Large Accelerated Filer ☐    Accelerated Filer ☒

Non-accelerated Filer ☐    Smaller Reporting Company ☐

(Do not check if a smaller reporting company)

Indicate by a check mark whether the registrant is a shell company (as defined in Rule 12(b)(2)). Yes ☐ No ☒

The aggregate market value of the voting stock held by non-affiliates of the registrant on September 30, 2006, based upon the closing price of the Common Stock on The Nasdaq Global Select Market for such date, was approximately $370 million.[1]

The number of outstanding shares of the registrant's Common Stock on February 25, 2008 was 26,353,277.

## DOCUMENTS INCORPORATED BY REFERENCE

None

---

(1) Excludes 1,689,987 shares held by directors, officers and ten percent or greater shareholders on September 30, 2006. Exclusion of such shares should not be construed to indicate that any such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the registrant or that such person is controlled by or under common control with the registrant.

TABLE OF CONTENTS

## TABLE OF CONTENTS

| | Page |
|---|---|
| Additional Information | 1 |
| Forward-Looking Statements | 1 |
| Explanatory Note Regarding Restatement and Change in Accounting Policy | 2 |

**PART I**

| | |
|---|---|
| Item 1. Business | 10 |

| | |
|---|---|
| Item 1B. Unresolved Staff Comments | 42 |
| Item 2. Properties | 42 |
| Item 3. Legal Proceedings | 42 |
| Item 4. Submission of Matters to a Vote of Security Holders | 42 |

**PART II**

| | |
|---|---|
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 43 |
| Item 6. Selected Financial Data | 45 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 46 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 78 |
| Item 8. Financial Statements and Supplementary Data | 79 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 135 |
| Item 9A. Controls and Procedures | 135 |
| Item 9B. Other Information | 137 |

**PART III**

| | |
|---|---|
| Item 10. Directors, Executive Officers and Corporate Governance | 138 |
| Item 11. Executive Compensation | 141 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 148 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 149 |
| Item 14. Principal Accounting Fees and Services | 150 |

**PART IV**

| | |
|---|---|
| Item 15. Exhibits, Financial Statement Schedules | 151 |
| Signatures | 154 |

i

TABLE OF CONTENTS

**Additional Information**

References in this report to the "Company," "Sonic," "we," "our," or "us" mean Sonic Solutions together with its subsidiaries, except where the context otherwise requires.

Quantities or results referred to as "to date" or "as of this date" mean as of or to March 31, 2007, unless otherwise specifically noted. References to "FY" or "fiscal year" refer to our fiscal year ending on March 31 of the designated year. For example, "FY 2007" and "fiscal year 2007" each refer to the fiscal year ending March 31, 2007. Other references to "years" mean calendar years.

This Annual Report includes references to certain of our trademarks and registered trademarks. Products or service names of other companies mentioned in this Annual Report may be trademarks or registered trademarks of their respective owners.

**Forward-Looking Statements**

This Annual Report includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements included or incorporated by reference into this Annual Report, other than statements that are purely historical in nature, are forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events. Our actual results could differ materially from those discussed in, or implied by, these forward-looking statements. Words such as "believe," "anticipate," "expect," "intend," "plan," "estimate," "project," "will," "may" and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these words. In addition, any statements that refer to expectations, projections or other characterizations of future events or circumstances are forward-looking statements. Forward-looking statements include, but are not necessarily limited to, those relating to:

- competing products that may, now or in the future, be available to consumers;
- our plans to develop and market new products or services, including next-generation high definition products;
- the demand for trends regarding and the impact on our business of next-generation high definition formats;
- the number or nature of potential licensees for our products;
- the strategic benefits of our patent program;
- the growth of our web-based retail channels and the decline of revenues from professional products and services;
- our expectations regarding trends in the personal computer ("PC") and consumer electronics ("CE") industries;
- our expectations regarding non-traditional bundling arrangements;
- our expectations regarding our Qflix$^{TM}$ and technology licensing programs;
- availability of additional financing to satisfy our working capital and other requirements;
- our ability to improve our financial performance;
- other competitive pressures;
- expenses associated with our stock option review, litigation defense and financial restatement;
- changes to improve our controls relating to the process of granting stock option and other deferred compensation awards;
- future acquisitions and other business combinations, if any, effected by us or our competitors;
- the impact of our efforts to comply with laws and regulations, including the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act");

1

TABLE OF CONTENTS

- potential remedial actions under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"); and
- estimated tax credits available to us and tax rates applicable to us.

Factors that could cause actual results or conditions to differ from those anticipated by these and other forward-looking statements include those more fully described under the caption "Risk Factors" in Item 1A below and elsewhere in this Annual Report. Except as required by law, we do not assume any obligation to update or revise these forward-looking statements to reflect new events or circumstances. You should assume that the information appearing in this Annual Report is accurate only as of the date on the front cover of this document. Our business, financial condition, results of operations and prospects may have changed since that date.

**Explanatory Note Regarding Restatement and Change in Accounting Policy**

In this Annual Report, we are restating our consolidated balance sheet at March 31, 2006, our consolidated statements of operations for our 2005 and 2006 fiscal years, our consolidated statements of shareholders' equity for our 2005 and 2006 fiscal years, our consolidated statements of cash flows for our 2005 and 2006 fiscal years, our quarterly financial data as of and for the quarters ended in fiscal year 2006, our selected financial data as of and for our 2003, 2004, 2005 and 2006 fiscal years, and our quarterly financial data as of and for the first two quarters in our 2007 fiscal year. In addition, this Annual Report includes a "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section, which discusses our restated results for fiscal years 2005, 2006 and 2007 and supersedes any MD&A sections included in previously filed annual reports on Form 10K to the extent applicable to those periods.

Prior fiscal periods have been restated to reflect (a) additional cash and non-cash share-based compensation expense and the associated payroll tax and other expenses relating to employee stock option grants through the second quarter of fiscal year 2007, (b) adjustments to revenue and cost of revenue due to a voluntary change in revenue recognition policy, (c) other adjustments, and (d) related tax adjustments.

Effective the third quarter ended December 31, 2006, we changed our policy on how we recognize original equipment manufacturer ("OEM") royalty revenue. We applied this change in accounting policy retrospectively to fiscal year 2006 and to the quarters ended June 30, 2006 and September 30, 2006, but determined that it was not practicable to apply the change to prior periods.

In our Quarterly Report on Form 10-Q for the three and nine month periods ended December 31, 2006, we restated our condensed consolidated balance sheets as of March 31, 2006, condensed consolidated statements of operations for the three and nine month period ended December 31, 2005, condensed consolidated statement of cash flows for the nine month period ended December 31, 2005, and the related Notes to condensed consolidated financial statements.

We expect to file quarterly reports on Form 10-Q for the three months ended June 30, 2007 and the three and six months ended September 30, 2007 in the near future. These quarterly reports will contain restated financial information for the comparable periods of the prior year.

As previously disclosed in our Form 8-K accepted by the SEC on February 2, 2007, prior filed annual reports on Form 10-K and quarterly reports on Form 10-Q should no longer be relied upon.

**Stock Options Accounting**

On February 1, 2007, we filed a Form 8-K and announced that we had commenced a voluntary review of our historical stock option grant practices and related accounting. The review was initiated by our management and was conducted by the audit committee (the "Audit Committee") of our board of directors, comprised solely of independent directors, with the assistance of legal counsel and outside consultants.

The Audit Committee and its advisors conducted an extensive review of our historical stock option grant practices and related accounting, including an assessment and review of our options granting policies and procedures, internal records, supporting documentation and e-mail communications, as well as interviews of Company personnel. The review focused on the period from March 3, 1998, when we engaged in a general repricing of our then-outstanding underwater options, through the present (the "Review Period").

2

TABLE OF CONTENTS

The review included all stock options granted during the Review Period, as well as certain already-outstanding options that were repriced at the commencement of the Review Period. In all, the review covered a total of approximately 2,300 stock option grants encompassing approximately 14 million shares of common stock under a total of seven stock option plans, and representing option grants to our directors, founders, officers and other employees (and including, among others, grants to newly-hired employees, individual or group performance awards, grants awarded in connection with acquisitions, and a limited number of grants to contractors).

During the course of the review, legal counsel to the Audit Committee, with the assistance of outside consultants, collected, processed and analyzed physical and electronic Company documents and records, including hard copy files, networked electronic documents and the computer hard drives of Company personnel who were involved in the administration of our stock option programs. Counsel to the Audit Committee was further assisted by an independent consulting firm engaged to assist in the collection, processing and analysis of options-related documentation. In all, approximately 665,000 electronic documents were collected and processed, and approximately 215,000 electronic documents and 35,000 pages of paper documents were reviewed. In addition, counsel conducted interviews of various Company personnel.

Supplementing the activities performed by and on behalf of the Audit Committee, our management engaged in a detailed process of compiling, analyzing and assessing the information available to it relating to our granting of stock options and administration of stock option plans during the Review Period. Information reviewed included, without limitation, documentation related to acquisitions and other transactions completed by us, public filings (by us and by individual grant recipients), board minutes and written consents, spreadsheets and databases used to memorialize and maintain option-related information, email communications and other transmittals of information to and from outside accountants, payroll information, standard forms used to record decisions regarding hiring and termination of employees and related salary and option grant decisions known as Employee Action Forms ("EAFs"), grant notices, offer letters, option statements, tax records, personnel files and other information.

With assistance from the independent consulting firm and input from the Audit Committee and its advisors, as well as based upon discussions with our independent auditors, our management created and maintained an extensive group of spreadsheets showing all options-related issuances, exercises and related data.

Based on the results of the review, we have concluded that a substantial number of stock options granted during the Review Period were not correctly accounted for in accordance with accounting principles generally accepted in the United States applicable at the time those grants were made. As a result, we are restating our historical financial statements to record adjustments for additional share-based compensation expense relating to past stock option grants in accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R (revised 2004), "Share-Based Payment," and Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees," and related payroll taxes, penalties, and other related amounts, to record additional share-based compensation expense associated with options granted to consultants and to record additional adjustments that were previously considered to be immaterial.

The review also identified less frequent errors in other categories including: grants to non-employees for which an incorrect amount of share-based compensation expense had been recognized, grants cancelled after the expiration date, and exercises occurring before vesting and after expiration. These errors were also addressed and reflected in the restatement of our historical financial statements.

*Audit Committee Conclusions*

*Lack of Contemporaneous Grant Documentation; Focus on Quarterly Financial Reporting*

For a large portion of options issued by us, particularly prior to September 23, 2005 (other than with respect to certain categories of options such as founder grants, director grants, grants issued associated with acquisitions, or grants issued as part of certain programs), there is little or no contemporaneous grant-specific documentation that satisfies the requirements for "measurement dates" under APB No. 25 and that would allow us to maintain the original grant date used for accounting purposes (the "Record Date"). Much of the transaction-specific documentation that was available in our records was unhelpful in establishing the date on

3

TABLE OF CONTENTS

which all required APB No. 25 elements were satisfied. For example, option grant agreements were typically dated "as of" with no separate date for the signature of a Company officer, and Company personnel indicated that these agreements were typically generated as part of the end-of-quarter reporting cycle, notwithstanding the Record Date appearing on the documents

themselves.

Stock options were considered to be a routine part of employee compensation at the Company and, given this and the informal nature of our processes in general, it appears that insufficient attention was devoted to ensuring that grant documentation was prepared or finalized by the Record Date. Instead, while individual grants were identified and/or committed to on an ongoing basis, grant documentation was typically assembled and finalized in anticipation of quarterly SEC filings.

Our former Chief Executive Officer ("CEO"), to whom authority to make grants to employees other than executive officers had been delegated until September 23, 2005, indicated that he and others involved in the option granting process focused on the quarterly financial reporting cycle as the primary driver of decisions and completion of associated documentation regarding the granting of options. These decisions were recorded in spreadsheets which were then used to generate option tables for financial statement footnotes as well as diluted share counts for our financial statements. These spreadsheets (the "Periodic Spreadsheets"), were sent to an outside accounting firm to perform the necessary calculations as we prepared our quarterly and annual filings and remained subject to change until the point of transmittal.

In early 2005, as part of our efforts to improve internal control compliance and reporting as required by the Sarbanes-Oxley Act, we commenced a process of formalizing and improving our stock option granting and administration processes. Thereafter, at a meeting of our board of directors held on September 23, 2005, the board adopted a resolution creating an employee options subcommittee of the compensation committee comprised of our CEO and Chief Financial Officer ("CFO"). The purpose of the employee options subcommittee was to: serve as administrator for our various option plans (except for option awards to executive officers and to members of our board of directors, which awards are subject to approval by the board of directors); report to the board and to the compensation committee of the board at each regular quarterly meeting concerning grants made by the employee options subcommittee during the prior quarter; and to propose suggested changes to our various option plans as necessary and appropriate. In early 2006, we transitioned recordkeeping with respect to our employee equity awards to an external service, E*Trade. Although grants issued after September 23, 2005 did involve better contemporaneous documentation of grant decisions, the Audit Committee determined that there were still some specific grants where the documentation was incomplete for financial reporting purposes.

*No Self Dealing or Favoritism*

The Audit Committee did not find evidence that the officers or directors with responsibility for administration of our stock option programs had taken steps to provide themselves with options at better prices than those granted to other employees.

Our founders and directors typically received grants at preset times, normally at the meeting of our board of directors that immediately follows each annual shareholders meeting. Because the shareholders meetings and the board meeting immediately following the shareholders meeting were well documented, these grants were generally not determined to have Record Dates that required adjustment. In one case where full minutes were not available, certain measurement date adjustments were made based upon the supporting documentation that was available. Additionally, the Audit Committee identified two instances where written consents were used and the Company deemed the measurement date to be the date of the last signature. In both instances the change in measurement date was one day. Because the dates of the annual shareholders meetings and the board meetings scheduled to occur immediately following the annual shareholders meetings had been set well in advance (typically 60 to 90 days in advance), the Audit Committee found no evidence that knowledge of likely share price movements had been involved in selecting these dates in anticipation of the granting of options on these dates. Under this arrangement, our former CEO, who was empowered to issue grants to non-founder employees until September 23, 2005, received grants at preset times and was not in a position to benefit from the grants he made from time to time to our other employees.

4

TABLE OF CONTENTS

Additionally, our more senior employees, including those involved in the administration of our option programs, generally received grants issued by our former CEO at the same times and by the same mechanisms as our less senior employees and officers. Our Audit Committee determined that stock option grant practices during the Review Period were applied uniformly by those of our management personnel who were directly and indirectly involved in the administration of our stock option

programs, and that these processes were not used to selectively benefit any one group or individual within the Company.

*No Intent to Deceive*

After reviewing the available documentary evidence and information gathered through interviews of Company personnel, the Audit Committee concluded that the conduct of those who administered our options plans was not intentionally or knowingly wrongful. Specifically, the Audit Committee did not find any evidence that officers, employees, or directors of the Company had any knowledge that their handling of option grants violated stock option accounting rules during the Review Period. To the extent Sonic personnel authorized grants using incorrect or unreliable dates, the Audit Committee found no evidence of an intent to purposefully circumvent stock option accounting rules or to otherwise inaccurately report the financial results of the Company during the Review Period. Moreover, the Audit Committee found no indication of intent by those with responsibility for selecting grant dates to benefit personally at the expense of the Company. No Company personnel stated that they observed management back-date grants or commit other misconduct. Moreover, there were no documents indicating an intent to violate known accounting rules, or indicating any knowledge of misconduct in that regard.

The Audit Committee received full support and cooperation from our management and employees during the course of the options review.

Additionally, the Audit Committee found that our personnel did not act with an intent to mislead auditors. While the Audit Committee noted instances in which personnel actively discussed how to correct mistakes related to the documentation and related accounting treatment, and when to inform auditors of those mistakes, it determined that such personnel took no actions designed to conceal information from our auditors.

*Tax Considerations*

Based on measurement date changes resulting from our options review, certain grants of stock options made during the Review Period were priced below fair market value, rather than at fair market value. Consequently, certain grants intended to be classified as incentive stock options ("ISOs"), requiring pricing at no less than fair market value on the date of grant, should have been classified as nonqualified stock options ("NQs"). Additionally, certain options should have been treated as NQs since date of grant due to either plan limitations or ISO limitations. We did not withhold federal income taxes, state income taxes, FICA or Medicare on the options that were issued as ISOs that should have been treated as NQ stock options (due to their below-market grant pricing, plan limitations or ISO rules). We accrued payroll tax, penalty, and interest expenses related to NQ stock options originally classified as ISOs in the periods in which the underlying stock options were exercised. Then, in periods in which the liabilities were legally extinguished due to statutes of limitations, the expenses were reversed and recognized as a reduction of expense.

We informed the Internal Revenue Service ("IRS") of potential payroll tax liabilities resulting from changes in measurement dates for stock options. However, no formal settlement negotiations have taken place. On January 15, 2008, we were notified by the IRS of a payroll tax audit covering the calendar years 2004, 2005 and 2006.

We recorded deferred tax assets as a result of the share-based compensation expense recorded through the restatement based on unexercised and uncanceled nonqualified stock options at the end of each reporting period. The recognized tax benefit related to affected stock options granted to officers was limited, in certain instances, due to the potential non-deductibility of the related expenses under Section 162(m) of the Code. This IRS rule limits the amount of executive compensation that may be deducted for U.S. tax purposes under certain circumstances.

Section 409A of the Code imposes additional taxes on our employees for stock options granted with an exercise price lower than the fair market value on the date of grant for all options or portions of options that vest after December 31, 2004. As a result of the change in measurement dates described above, certain stock

TABLE OF CONTENTS

options granted during the Review Period were issued at prices below fair market value on the revised measurement date.

Management is considering possible ways to address the impact that Section 409A may have on our employees as a result of the exercise price of stock options being less than the fair market value of our common stock on the revised measurement dates. The IRS has issued transition rules under Section 409A that allow for a correction or cure for some of these options subject to Section 409A. We may offer non-officer employees who hold outstanding options the opportunity to cure their affected stock options. In connection with this cure, we may make future cash bonus payments to our non-officer employees in an undetermined amount. We recorded approximately $1.7 million in operating expense for estimated employee Section 409A taxes that we have elected to cover with respect to options that were exercised during the fourth quarter of fiscal year 2007.

*Stock Options Restatement*

Based on the errors noted above, we have recorded adjustments to share-based compensation, including payroll taxes, Section 409A penalties and other tax expense. There was no impact on revenue or net cash provided by operating activities as a result of this additional share-based compensation and related tax expense during the restatement periods.

The following table sets forth the effect of the stock option review restatement for each of the applicable fiscal years (in thousands):

| | Stock Option Review Adjustments | | | | |
|---|---|---|---|---|---|
| Fiscal Year Ended | Pre-Tax Share-Based Compensation Expense Adjustments | Pre-Tax Payroll Related Tax Expense (Benefit) Adjustments | Total Pre-Tax Impact | Related Income Tax Expense (Benefit) Adjustments | Net Expense (Benefit) After-Tax Adjustments |
| March 31, 1998 (unaudited) | $ 60 | $ — | $ 60 | $ — | $ 60 |
| March 31, 1999 (unaudited) | 613 | 6 | 619 | — | 619 |
| March 31, 2000 (unaudited) | 1,175 | 218 | 1,393 | — | 1,393 |
| March 31, 2001 (unaudited) | 812 | 642 | 1,454 | — | 1,454 |
| March 31, 2002 (unaudited) | 3,026 | 509 | 3,535 | — | 3,535 |
| March 31, 2003 (unaudited) | 2,707 | 1,705 | 4,412 | — | 4,412 |
| March 31, 2004 (unaudited) | 8,177 | 1,356 | 9,533 | — | 9,533 |
| Cumulative effect at March 31, 2004 (unaudited) | 16,570 | 4,436 | 21,006 | — | 21,006 |
| March 31, 2005 | 4,492 | 583 | 5,075 | (69) | 5,006 |
| March 31, 2006[1] | 10,103 | 2,782 | 12,885 | (13,196) | (311) |
| Six Months Ended September 30, 2006 (unaudited) | 316 | (1,514) | (1,198) | 225 | (973) |
| Total | $ 31,481 | $ 6,287 | $ 37,768 | $ (13,040) | $ 24,728 |

[1] Prior to fiscal year 2006, we maintained a valuation allowance against our deferred tax assets. In fiscal year 2006, we reversed the majority of our valuation allowance against deferred tax assets due to our assessment, made at that time, that it was more likely than not the deferred tax assets would be realized. As a result of the restatement, we recorded additional deferred tax assets with respect to the periods covered by our options review. The $13.2 million income tax benefit in fiscal year 2006 relates to the release of valuation allowance against the additional deferred tax assets recorded with respect to fiscal years 2005 and prior as a result of the restatement, net of current year effect.

*Change in Accounting Policy*

Effective October 1, 2006, we elected to change our method of recognizing OEM royalty revenue. Previously, we generally recognized OEM royalty revenue in the period the OEM product shipped, provided we received the OEM royalty report before the preparation of our financial statements. We now generally recognize OEM revenue in the period we receive the OEM royalty

Case 4:07-cv-05111-CW    Document 30    Filed 05/23/2008    Page 14 of 15

channels: (1) product bundling arrangements with original equipment manufacturer ("OEM") suppliers of related products, (2) volume licensing programs ("VLP") to corporate purchasers, (3) direct-to-consumer sales on our web store and (4) retail resellers (both online and "bricks and mortar" resellers). Since the Roxio CSD acquisition in December 2004, we have transitioned all of our consumer applications software products to the Roxio brand.

- *Advanced Technology Group* — The Advanced Technology Group develops software and software components that it supplies to the other two operating units and that it licenses to PC and CE application developers. We market much of this software under the Roxio, AuthorScript®, CinePlayer, and Qflix™ brand names. Customers of our Advanced Technology Group include OEM suppliers who wish to integrate our technology into products similar to the ones we distribute directly to end users through our Roxio Division. The Advanced Technology Group also collaborates with our corporate strategy group in the management of our patent program, under which we develop, acquire, license and sell patents.

We group the Roxio Division and the Advanced Technology Group into a single segment since it is difficult to draw a clear distinction between their business activities: both sell or license CD/DVD burning, CD/DVD playback and related digital media products ultimately targeted at consumers; the Advanced Technology Group develops much of the core engine technology behind both its own and Roxio products; our engineers, sales staff and other personnel transfer and/or share responsibilities between the two units in order to efficiently manage business flow and meet client needs; the two units often share budget and management responsibilities for particular initiatives; and both units engage in similar sales processes targeted at similar potential customers. For these reasons our management does not regularly review operating results broken out separately for the Roxio Division and Advanced Technology Group in deciding how to allocate resources or in assessing performance. Our consumer segment accounted for approximately 94% of our net revenue for fiscal year 2007. See Note 11 to the consolidated financial statements included in this Annual Report for a summary of our financial data by business segment.

We were incorporated in California in 1986 and completed our initial public offering in 1994. Our principal executive headquarters are located at 101 Rowland Way, Suite 110, Novato, California 94945. Our telephone number is (415) 893-8000. Our fax number is (415) 893-8008. We maintain web sites at *www.sonic.com* and *www.roxio.com*.

Our Annual Report, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, amendments to those reports, proxy statements and other reports and filings filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through our web site at *www.sonic.com* as soon as reasonably practicable after they are filed with or furnished to the Securities and Exchange Commission ("SEC").

**DVD-Video and Related Optical Formats**

Many of our products involve the creation or playback of DVD discs and related formats.

The DVD-Video optical disc format, introduced in 1996, offers high quality video, surround audio and extensive interactivity on a CD-sized disc. DVD-Video is built upon the DVD-ROM standard, which specifies a disc capable of storing a significantly greater amount of digital information than the earlier CD format. A single-layer, single-sided DVD-ROM disc holds 4.7 gigabytes of data, which equals more than 7 times the 650 megabyte capacity of a CD-ROM. A double-layer, double-sided DVD can hold up to 17 gigabytes of information, which equals more than 26 times that stored on a CD-ROM. The DVD-Video format utilizes this large capacity to offer content publishers and video consumers a compelling set of features and options, including:

11

TABLE OF CONTENTS

- *High Quality Video* — Video can be presented in the Moving Pictures Expert Group-2 ("MPEG-2") compressed digital video format, and in multiple streams. DVD-Video's perceived video quality significantly surpasses VHS cassette or broadcast television.
- *Theater Quality Audio* — Audio for DVD-Video can be presented in compressed digital stereo and "surround" formats (in up to 8 user-selectable audio streams to support different language dialog tracks, or to allow stereo and surround