1

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
2   SHAWN A. WILLIAMS (213113)
CHRISTOPHER M. WOOD (254908)
3   100 Pine Street, Suite 2600
San Francisco, CA 94111
4   Telephone: 415/288-4545
415/288-4534 (fax)
5   shawnw@csgrr.com
cwood@csgrr.com
6
LABATON SUCHAROW LLP
7   CHRISTOPHER J. KELLER
JONATHAN GARDNER
8   140 Broadway, 34th Floor
New York, NY 10005
9   Telephone: 212/907-0700
212/818-0477 (fax)
10   ckeller@labaton.com
jgardner@labaton.com
11
Co-Lead Counsel for Plaintiffs
12
[Additional counsel appear on signature page.]
13
UNITED STATES DISTRICT COURT
14
NORTHERN DISTRICT OF CALIFORNIA
15

| | |
|---|---|
| CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM AND PLYMOUTH COUNTY RETIREMENT SYSTEM, On Behalf of Itself and All Others Similarly Situated, ) ) ) ) ) | No. C 07-05111-JSW |
| | CLASS ACTION |
| Plaintiff, ) ) | [CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW |
| vs. ) ) | |
| SONIC SOLUTIONS, DAVID C. HABIGER, ROBERT J. DORIS, A. CLAY LEIGHTON, MARY C. SAUER, MARK ELY, ROBERT M. GREBER, PETER J. MARGUGLIO and R. WARREN LANGLEY, ) ) ) ) ) ) ) | |
| Defendants. ) ) | JURY TRIAL DEMANDED |

1

**TABLE OF CONTENTS**

2

**Page**

3      I.      INTRODUCTION ..................................................................................1

4              A.      Sonic Solutions Incentive Stock Option Plans During the Class Period .................8

5              B.      Insider Stock Sales..........................................................................16

6              C.      Public Reports Disclose Widespread Stock Options Manipulation and
                       Risks..............................................................................................16

7
               D.      Defendants Admit Widespread Knowledge of Backdating of Stock
8                      Options at Sonic and Announce Restatements ........................................18

9      II.     JURISDICTION AND VENUE ..........................................................22

10     III.    PARTIES ..........................................................................................23

11     IV.     DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING
               STATEMENTS DURING THE CLASS PERIOD ........................................27
12
       V.      DEFENDANTS KNEW OR DELIBERATELY DISREGARDED THAT THE
13             COMPANY'S FINANCIAL STATEMENTS, PROXY STATEMENTS AND
               STATEMENTS REGARDING THE COMPANY'S ACCOUNTING
14             PRACTICES WERE FALSE AND MISLEADING..........................................44

15     VI.     POST CLASS PERIOD EVENTS AND ADMISSIONS ..........................48

16     VII.    SONIC'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP..................53

17             Violations of GAAP..........................................................................54

18             Sonic's GAAP Violations Were Material.............................................55

19             Sonic's Financial Statements Violated Fundamental Concepts of GAAP ........................55

20             Violations of the SEC Regulations ....................................................57

21             Violations of IRS Rules and Regulations ............................................57

22     VIII.   LOSS CAUSATION..........................................................................59

23     IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
               MARKET DOCTRINE ......................................................................61
24
       X.      APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF
25             RELIANCE........................................................................................61

26     XI.     NO SAFE HARBOR ..........................................................................62

27     XII.    CLASS ACTION ALLEGATIONS ....................................................62

28     FIRST CLAIM FOR RELIEF ......................................................................64

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAW - C 07-05111-JSW                                                    - i -

**Page**

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
    Defendants ..........................................................................................................64

SECOND CLAIM FOR RELIEF .......................................................................................69

For Violation of Section 14(a) of the Exchange Act ...................................................69

THIRD CLAIM FOR RELIEF ...........................................................................................70

For Violation of Section 20(a) of the Exchange Act Against All Defendants..............70

FOURTH CLAIM FOR RELIEF ........................................................................................70

For Violation of Section 20A of the Exchange Act Against Defendants Doris, Sauer, Ely,
    Greber, Langley, Leighton and Marguglio ........................................................70

PRAYER FOR RELIEF ......................................................................................................72

JURY DEMAND .................................................................................................................72

## I.    INTRODUCTION

1.    Lead Plaintiffs, City of Westland Police and Fire Retirement System and Plymouth County Retirement System (the "Retirement Systems" or "Lead Plaintiffs"), bring this federal securities law class action on behalf of themselves and all persons who purchased or otherwise acquired the publicly traded securities of Sonic Solutions ("Sonic" or the "Company") between October 23, 2002 and May 17, 2007 (the "Class Period"), against certain of Sonic's top officers and directors for violations of the federal securities laws.[1]  This action arises out of defendants' false statements about Sonic's earnings and their concealment of the backdating of stock option grants by Sonic's directors and top executive officers, including its President and Chief Executive Officer ("CEO"), David C. Habiger ("Habiger"); Chairman and Former CEO, Robert J. Doris ("Doris"); Chief Operating Officer ("COO") and former Chief Financial Officer ("CFO"), A. Clay Leighton ("Leighton"); director and Secretary, Mary C. Sauer ("Sauer"); and Executive Vice President, Mark Ely ("Ely").

2.    This action alleges a fraudulent scheme and numerous false and misleading statements filed with the Securities and Exchange Commission ("SEC") and disseminated to Sonic's shareholders over a period of at least eight years.  At the crux of the fraudulent scheme was a practice whereby defendants knowingly manipulated stock option grants to the Company's officers, directors and employees in order to provide the recipients with a more profitable exercise price while -reporting the Company's expenses and thereby overstating the Company's reported earnings or understating the Company's reported loss  As a result of this scheme, Sonic has recently been forced to issue a $29 million restatement to account for stock option grants which were granted in-the-money and never expensed.  Sonic's restatement admits that the Company's financial statements throughout the Class Period were materially false and misleading.

3.    During, and prior to the Class Period, Sonic's employees were compensated in large part through the issuance of stock options.  A stock option granted to an employee of a corporation

---

[1]    During the Class Period Sonic's fiscal year began on April 1 and ended on March 31.

1    allows the employee to purchase company stock at a specified price – referred to as the "exercise

2    price," typically the fair market value of the stock on the date the option is granted.  When properly

3    issued, stock options serve as a valuable part of employee compensation packages as a means to

4    create incentives to boost profitability and stock value.  When the employee exercises an option, he

5    or she purchases the stock from the company at the exercise price, regardless of the stock's price at

6    the time the option is exercised.

7        4.    However, during, and prior to, the Class Period, Sonic was finding it "difficult" and

8    "expend[ing] considerable effort" in recruiting and hiring qualified employees.  As a result, stock

9    option compensation was a particularly important component of compensation at Sonic throughout

10   the Class Period.  As Sonic stated repeatedly in its Forms 10-K filed with the SEC, "demand for

11   technology professionals has been very strong," and "[t]o a very great degree our success in the

12   future will depend on our ability to recruit, retain and motivate engineering, technical, sales,

13   marketing and operations professionals."  2003 Form 10-K at 16.  In order to attract qualified

14   employees, as well as retain existing employees, Sonic backdated stock option grants to provide

15   employees with immediate unearned compensation without recording the required compensation

16   expenses in its financial statements as required by Accounting Principles Board Opinion No. 25

17   ("APB 25"), and in violation of Sonic's shareholder-approved stock option plans.  As a result,

18   Sonic's net income was overstated, or its net loss was understated, for every year during the Class

19   Period.

20       5.    "Backdating"[2] is a practice by which a stock option is reported as having been

21   granted on a certain date, but is actually granted days or months later and is backdated to a date

22   when the Company's stock was trading at a lower price.  Backdating allows option grantees to

23   realize immediate unearned and undisclosed financial gains at the expense of the company's

24   shareholders.  Backdating of stock options has been compared to picking lottery numbers on the day

25   _____

26   [2]    Plaintiffs' use of the terms "backdating," "misdating," "backdated" and "misdated"
     throughout this Complaint may also refer to other forms of related stock option manipulation
27   perpetrated by defendants alleged in this action.

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAW - **C 07-05111-JSW**                                           - 2 -

1    after the winning numbers are announced, or betting on a horse after the race has finished.  Arthur

2    Levitt, a former chairman of the SEC was quoted stating that stock option backdating "represents the

3    ultimate in greed. . . .  It is stealing, in effect.  It is ripping off shareholders in an unconscionable

4    way."

5        6.      In addition, former SEC Chairman Harvey Pitt recently opined that the backdating of

6    stock options often involves the falsification of documents for personal gain:

> Many discussions of backdating options start with the observation that backdating is
> not, per se, illegal.  **That is wrong.  Options backdating frequently involves
> falsification of records used to gain access to corporate assets**.  That conduct
> violates the Foreign Corrupt Practices Act and its internal controls requirements.  If
> corporate directors were complicit in these efforts, state law fiduciary obligations are
> violated.  **Backdating is not only illegal and unethical, it points to a lack of
> integrity in a company's internal controls**.[3]

11       7.      Backdating stock options creates an instant paper gain to grantees who receive them

12   because the options were priced below the stock's fair market value when they were actually

13   awarded.  Under Generally Accepted Accounting Principles ("GAAP"), this instant paper gain is

14   equivalent to paying extra compensation and thus is a cost to Sonic.  Accordingly, Sonic was

15   required to record an expense on its financial statements for any options granted below the fair

16   market value on the grant date of the option, or "in-the-money" options.  However, defendants did

17   not properly record these known costs on Sonic's financial statements, causing Sonic's financial

18   statements throughout the Class Period to be issued in violation of GAAP.  Specifically, those

19   financial statements **overstated** reported earnings and **understated** reported expenses.

20       8.      On February 1, 2007, the Company announced in a press release that it was reviewing

21   its stock option granting practices, and that its financial statements should no longer be relied on:

---

23   [3]      One jurist summarized the issue in a case alleging similar facts: "[T]his case is incredibly
24   simple.  Plaintiffs claim defendants were playing a game with a stacked deck.  When awarded
     options, with deliberately selected grant dates which were already in-the-money, defendants were
25   playing a game they knew they could not lose; and, unsurprisingly, defendants won. . . .  In this
     game . . . the patsy was either the hapless corporation, which in varying ways defendants controlled,
26   or the corporation's shareholders, whose equity provided the game's antes and bloated pot."  *In re
     UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691 (JMR/FLN), 2007 U.S. Dist. LEXIS 40623, at
27   *6-*8 (D. Minn. June 4, 2007).  Unless otherwise noted, all emphasis has been added and citations
     omitted.

28

Sonic Solutions . . . announced today that it has commenced a voluntary review of its historical and current stock option grant practices and related accounting. The review was initiated by management and is being conducted by the audit committee of the board of directors, comprised solely of independent directors, with the assistance of independent legal counsel.

**Based on the review to date, the audit committee and Company management have preliminarily concluded that, under applicable accounting guidance, the Company lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants may need to be adjusted.**

\*      \*      \*

Accordingly, the audit committee, after consultation with management and the Company's board of directors, determined **that the Company's annual and interim financial statements should no longer be relied upon.**

Ex. 1.[4]

9.      Indeed, the extent of the backdating at Sonic was broad and widespread. Plaintiffs' investigation has revealed an astounding pattern of favorably timed stock option grants throughout and prior to the Class Period. Sonic reported twenty-four separate stock option grant dates between 1996 and 2004. Of those 24 grants, at least ten were non-discretionary grants awarded under Sonic's non-employee director plan. Of the 14 discretionary grant dates reported in filings with the SEC, eight grants were purportedly made on dates when Sonic's stock price was trading at its lowest price of the relevant month, and sometimes the lowest price of the fiscal quarter and/or fiscal year. **The odds that Sonic would have granted options with such a favorable date by mere luck are approximately 1 out of 11 million.** For example, the charts below illustrate several pre-Class Period grants made on the lowest or near the lowest price of the Relevant Period for Sonic's stock price.

---

[4]      All "Ex. _" references are to the Appendix to Consolidated Class Action Complaint for Violations of the Federal Securities Law, filed herewith.

10.    On February 21, 1996, defendants purportedly granted Christopher Kryzan ("Kryzan"), Sonic's Vice President of Marketing, an option for 80,000 shares of Sonic stock at a strike price of $4.88 per share.  This was the low for the entire fiscal year.  Further, according to Sonic's 1999 Form 10-K, Kryzan was not even hired at Sonic until March 1996, after the grant was purportedly approved.



1    11.    On July 16, 1996, defendants purportedly granted defendant Leighton an option for

2 20,000 shares of Sonic stock at a strike price of $5.75 per share.  This was the low for the month, for

3 Sonic's fiscal quarter, and the second lowest stock price of the entire fiscal year.



12.    On July 22, 1997, defendants purportedly granted defendant Leighton an option for

30,000 shares of Sonic stock at a strike price of $5.12 per share.  This was the low for the month, and

for Sonic's fiscal quarter.



13.    On November 30, 2000, defendants purportedly granted Leighton options for 50,000 shares of Sonic stock and Kryzan options for 48,000 shares of Sonic stock at a strike price of $1.56 per share.  This was the low for the month.



14.    On July 12, 2001, defendants purportedly granted defendants Doris, Sauer and Leighton options for 400,000 shares of Sonic stock at a strike price of $1.12 per share.  This was the low of the month, the quarter, and the second lowest price of the fiscal year.



15.   On December 3, 2001, defendants purportedly granted Kryzan 70,000 shares at a strike price of $1.35 per share.  This was the low of the month.



16.   The only plausible explanation for how 57% of Sonic's discretionary stock option grants could have been "granted" on the monthly low of Sonic's stock price is that defendants consistently backdated stock options in violation of GAAP, in violation of Sonic's internal accounting policies, in violation of their shareholder-approved stock option plans, and in violation of federal law.

**A.   Sonic Solutions Incentive Stock Option Plans During the Class Period**

17.   During the Relevant Period, Sonic issued stock options to executives and employees under four separate plans: the September 1989 Stock Option Plan (the "1989 Plan") (Ex. 2), the 1994 Non-Employee Directors Stock Option Plan (the "1994 Directors Plan") (Ex. 3), the Sonic Solutions 1998 Stock Option Plan (the "1998 Plan") (Ex. 4), and the 2000 Stock Option Plan (the "2000 Plan") (Ex. 5).  Each of the stock option plans and the manner in which they were purportedly administered by defendants was publicly reported in documents filed with the SEC.

18.   The 1989 Plan:  Under the 1989 Plan, options could be granted to employees, directors and consultants.  The 1989 Plan allowed Sonic to issue incentive stock options, which were required to be granted at fair market value at the date of grant.  Ex. 2.  Throughout the Relevant

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAW - **C 07-05111-JSW**                                                                        - 8 -

1    Period,[5] Sonic stated repeatedly that all options issued under the 1989 Plan were granted as incentive

2    stock options.  The 1989 Plan was administered by Sonic's Board of Directors ("Board") and CEO.

3         19.    The 1994 Directors Plan:  Under the 1994 Directors Plan, options could be granted to

4    Sonic's non-employee directors.  Under the 1994 Directors Plan, incentive stock options were

5    required to be granted at the fair market value of Sonic's common stock on the date of grant.  The

6    number of options granted annually was fixed by the plan.  The 1994 Directors Plan allowed Sonic

7    to issue incentive stock options, which were required to be granted at fair market value at the date of

8    grant.  Ex. 3.  Throughout the Class Period, Sonic repeatedly stated that all options issued under the

9    1994 Directors Plan were granted as incentive stock options.  The 1994 Directors Plan was

10   administered by Sonic's Board and CEO.

11        20.    The 1998 Plan:  Under the 1998 Plan, Sonic could issue incentive stock options,

12   which were required to be granted at fair market value at the date of grant.  Ex. 4.  Throughout the

13   Relevant Period, Sonic stated repeatedly that all options issued under the 1998 Plan were granted as

14   incentive stock options.  The 1998 Plan was administered by Sonic's Board and CEO.

15        21.    The 2000 Plan:  Under the 2000 Plan, Sonic issued incentive stock options, which

16   were required to be granted at fair market value at the date of grant.  Ex. 5.  Throughout the Relevant

17   Period, Sonic stated repeatedly that all options issued under the 2000 Plan were granted as incentive

18   stock options.  The 2000 Plan was administered by Sonic's Board and CEO.

19        22.    The Company's (false) Form 10-K for the fiscal year ended March 31, 2006

20   described each of the plans that were in place at the time and falsely assured investors that all stock

21   options had been issued at fair market value on the date of the grant:

22        **Stock Options**

23                           *       *       *

24        Under our September 1989 Stock Option Plan (the "1989 Plan") options to purchase
     up to an aggregate of 2,090,000 shares of common stock may be granted to key
25   employees, directors and consultants.  Grants of options to the directors of Sonic
     Solutions may not exceed 140,000 shares.  ***The 1989 Plan provides for issuing both***

26

27   [5]    The Relevant Period is 1996-2007.

28

1    *incentive stock options, which must be granted at fair market value at the date of grant, and nonqualified stock options, which must be granted at not less than 85% of fair market value of the stock.  All options to date have been granted as incentive stock options. . . . Our Board of Directors and Chief Executive Officer administer the 1989 Plan.*

2

3

4    During 1995, we adopted the 1994 Non-Employee Directors Stock Option Plan (the "Non-Employee Plan") which provides for the grant of stock options to Sonic Solutions non-employee directors.  *Under this plan, stock options are granted annually at the fair market value of Sonic Solutions' common stock on the date of grant.* . . .  *The Non-Employee Plan provides for issuing both incentive stock options, which must be granted at fair market value at the date of grant, and nonqualified stock options, which must be granted at not less than 85% of fair market value of the stock.  All options to date have been granted as incentive stock options. . . . Our Board of Directors and Chief Executive Officer administer the Non-Employee Plan.*

5

6

7

8

9    During 1998, we adopted the Sonic Solutions 1998 Stock Option Plan (the "1998 Plan"). . . . *The 1998 Plan provides for issuing both incentive stock options, which must be granted at fair market value at the date of grant, and nonqualified stock options, which must be granted at not less than 85% of fair market value of the stock.  All options to date have been granted as incentive stock options. . . . Our Board of Directors and Chief Executive Officer administer the 1998 Plan.*

10

11

12

13    In 2000, we adopted the Sonic Solutions 2000 Stock Option Plan (the "2000 Plan"). . . . *Our Board of Directors and Chief Executive Officer administer the 2000 Plan.*

14

15    Ex. 6.

16    23.     None of Sonic's stock option plans permitted the backdating of stock options.  With

17    respect to incentive stock options ("ISO"), the plans stated that "[t]he exercise price of an ISO shall

18    be determined in accordance with the applicable provisions of the [Internal Revenue] Code and shall

19    in no event be less that the Fair Market Value of the Common Stock subject to the Option on the

20    date of grant . . . ."  In turn, the date of grant was defined as follows: "the date of grant of an Option

21    under the Plan shall be the date as of which the Administrator approves the grant."

22    24.     In addition to violating GAAP, the backdating of stock options violated Sonic's

23    accounting policies, as well as Sonic's shareholder-approved stock option plans.  With respect to

24    each of Sonic's applicable stock option plans, Sonic publicly reported that its "Board of Directors

25    and Chief Executive Officer administer the Plan."  Because Sonic did not have a compensation

26    committee until March 2005 when the Audit Committee assumed the role of a Compensation

27    Committee, it was "the responsibility of the entire Board to . . . administer the Company's executive

28    compensation plans . . . ."  Thus, defendants Doris, Sauer, Robert M. Greber ("Greber"), Peter J.

1 Marguglio ("Marguglio") and R. Warren Langley ("Langley"), were directly responsible for

2 administering Sonic's stock option plans.

3      25.    According to Sonic's 1989 Plan, 1998 Plan, and 2000 Plan, defendants Doris, Sauer,

4 Greber, Marguglio and Langley were specifically given the authority:

> (i) to grant Options; (ii) to determine the fair market value of the Common Stock
> subject to Options; (iii) to determine the exercise price of Options granted; (iv) to
> determine the persons to whom, and the time or times at which, Options shall be
> granted, and the number of shares subject to each Option . . . .

Exs. 2, 4, 5.

8      26.    Because of defendants' specifically articulated duties and responsibilities with respect

to the granting and approval of stock options, as set forth in Sonic's stock option plans, SEC filings,

and February 26, 2008 Form 10-K, the defendants knew or should have known that Sonic's financial

statements throughout the Class Period, as well as defendants' statements regarding the

administration of Sonic's option plans and Sonic's compliance with APB 25 were false and

misleading.

14      27.    These same individuals repeatedly and falsely stated to Sonic's investors in filings

with the SEC that stock options were granted at fair market value, and that Sonic accounted for

options in accordance with APB 25. These statements, as well as Sonic's financial statements, were

false and misleading for over a decade because they failed to disclose defendants' practice of

backdating stock option grants to Sonic's employees, and failed to properly record the compensation

expense associated with backdated stock option grants.

20      28.    For example, defendants repeatedly and falsely represented that the Company issued

stock options at an exercise price equal to the fair market value of the Company's stock on the date

of the grant, stating that for all of Sonic's option plans, "[a]ll options to date have been granted as

incentive stock options" which "must be granted at fair market value at the date of grant."

24      29.    Further, throughout the Class Period, Sonic falsely represented that the Company

applied APB 25 in accounting for stock option grants in its annual reports filed with the SEC. Under

APB 25, public companies could grant options to employees without recording an expense so long

1  as the options were "at-the-money."  Conversely, a compensation expense had to be recorded for

2  stock options granted "in-the-money."

3         30.    As long as options were issued at fair market value, the accounting for such option

4  grants is simple and straightforward.  One leading treatise explains:

5        [T]he accounting treatment of a normal stock option that vests or becomes
   exercisable based on the passage of time is ***quite simple***.  If this kind of option is

6  granted with an exercise price that is at least equal to the full fair market value of the
   underlying stock at the time the option is granted, no compensation charge is

7  recognized for financial accounting purposes by reason of the option grant.  If such
   an option is granted with an exercise price that is less than the fair market value of

8  the underlying stock on the date of grant, there is generally a per share charge against
   earnings equal to the difference between such fair market value and such exercise

9  price.

10  Michael S. Sirkin & Lawrence K. Caghey, *Executive Compensation* §5.02 (2007).

11         31.    This accounting rule – APB 25, "Accounting for Stock Issued to Employees" – has

12  been in effect since 1972.  The rule was perhaps the most well known accounting rule in Silicon

13  Valley, particularly for companies like Sonic which relied so extensively on option grants to

14  compensate employees.  Indeed, corporate executives, audit committees, and public auditing firms

15  alike were keenly aware of, and highly resistant to, any changes to APB 25 during the Class Period,

16  since granting in-the-money options to employees could have a significant impact on the expenses

17  and income (or loss) reported to the shareholders of the public company.

18         32.    However, Sonic now admits that it was not complying with APB 25, and that it did

19  not have contemporaneous documents to determine the original grant dates:

20        For a large portion of options issued by us, particularly prior to September 23,
   2005 . . . , there is ***little or no contemporaneous grant-specific documentation*** that

21  satisfies the requirements for "measurement dates" under APB No. 25 and that would
   allow us to maintain the original grant date used for accounting purposes . . . .

22

23         33.    At the same time that defendants made these false and misleading statements,

24  defendants knew but failed to disclose that the practices employed by the Board and CEO allowed

25  stock option grants to be backdated to dates when the Company's shares were trading at or near the

26  lowest price for that month, quarter or year.

27         34.    Based on defendants' admissions in their February 26, 2008 restatement of their Form

28  10-K for fiscal year ending March 31, 2007, as well as the pattern of grants alleged herein, towards

1   the end of a quarter, defendants Doris and Leighton participated in selecting an option grant date for

2   Sonic's employees which was priced with an "as of" date that more often than not corresponded with

3   the date that Sonic's stock price was trading at its lowest price during the preceding month or

4   quarter. Ex. 6. Indeed, Leighton, Sonic's CFO, while participating in the backdating of stock

5   options at Sonic, on at least six occasions received backdated stock option grants along with Sonic's

6   rank and file employees. On February 25, 2008, Leighton was removed from the position of CFO.

7        35.    Defendants' longstanding participation of this scheme and issuance of false and

8   misleading statements to conceal their misconduct had the effect of misleading investors about the

9   Company's true financial condition when, in fact, Sonic was not recording material amounts of

10  compensation expense and was materially overstating its net income and earnings per share, in

11  violation of GAAP and causing the Company's stock price to be artificially inflated.

12       36.    These violations were material and enabled Sonic to massively overstate its earnings

13  throughout the Class Period. For example, in FY03, Sonic reported net income of $2.5 million.

14  However, because of Sonic's backdating of stock options, its restatement admits that Sonic's net

15  income was overstated by $4.4 million, and Sonic should have reported *a net loss of $1.8 million*.

16  Similarly, in FY02, Sonic's net income was ***overstated by 84.5%***. In 2004, Sonic's net income was

17  ***overstated by 86%***. The backdating of stock options also caused Sonic's earnings per share to be

18  overstated. For example, in FY03, Sonic reported earnings per share of $0.13. However, the

19  Company admits that it overstated earnings by $0.26 per share and should have reported a net loss of

20  $0.11. In 2004, Sonic's ***earnings per share were overstated by 84%***. In 2005, Sonic's earnings per

21  share were overstated by ***59%***.

| Sonic Solutions Impact of Restatement on Net Income (in thousands, except error %) | | | | |
|---|---|---|---|---|
| | As reported ($) | Adjs. ($) | As Restated ($) | % Overstated |
| **FY02** | -4,182 | -3,535 | -7,717 | 84.53% |
| **FY03** | 2,537 | -4,412 | -1,875 | 173.91% |
| **FY04** | 11,084 | -9,533 | 1,551 | 86.01% |

| Sonic Solutions Impact of Restatement on Earnings per Share | | | | |
|---|---|---|---|---|
| | **As Previously Reported** | **Change in Earnings per Share** | **Readjustment of Stock Options** | **% Overstated** |
| **FY03** | $0.13 | -$0.24 | -$0.11 | 184.62% |
| **FY04** | $0.46 | -$0.39 | $0.07 | 84.78% |

37.    In order to conceal the falsity of the Company's financial statements, inadequacy of its internal controls, and the fraudulent issuance and manipulation of the Company's stock option grants, defendants falsely assured shareholders that financial statements and associated representations were accurate.  Indeed, during the Class Period, defendants Doris and Leighton claimed that they had investigated and reviewed the Company's financial statements and internal control processes and authorized the inclusion of the financial statements in the Company's public filings.  Between 2002 and 2006, defendants Doris and Leighton signed numerous false certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") §§302 and 906.  For example, Doris's Sarbanes-Oxley certification filed with the Company's 2003 Form 10-K affirms:

I, Robert J. Doris, President, certify that:

1. I have reviewed this annual report on Form 10-K of Sonic Solutions;

2. ***Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made***, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

*    *    *

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) ***all significant deficiencies in the design or operation of internal controls which*** could ***adversely affect the registrant's ability to record***, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) ***any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and***

6. The registrant's other certifying officer and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

38.    In fact, however, defendants knew and failed to disclose that for years, the Company, its senior executives and members of the Board, had engaged in a continuing scheme and course of conduct to backdate or misdate stock option grants to themselves and other executives and employees in a manner designed to create immediate and risk free profits in direct contravention of the Company's shareholder-approved stock option plans and statements made in the Company's public filings.

39.    Defendants' manipulation of – and, in particular, the backdating of – stock option grants was not permitted under the contractual terms of the Company's stock option plans.  Instead, defendants' manipulation of Sonic's stock option grants was the linchpin of a broader fraudulent scheme to personally profit from increases in the Company's stock price with the benefit of hindsight, and to provide undisclosed compensation to Sonic's employees while fraudulently failing to disclose or expense such compensation.

40.    Furthermore, defendants knew or were deliberately reckless in not knowing that because the Company had not properly recorded compensation expense for in-the-money stock option grants, as required by APB 25, Sonic's reported earnings and expenses were false and misleading and not in compliance with GAAP.  Thus, by falsifying the date on which options were

granted, defendants materially **understated** Sonic's expenses, **overstated** its reported income and earnings per share ("EPS") and falsely represented that it had not incurred any compensation expense for option grants. If options are priced below a stock's fair market value when they are awarded, there is an instant gain. Pursuant to APB 25, the Company was obligated to recognize this gain as compensation expense over the vesting period of the option. After June 2005, Statement of Financial Accounting Standards 123, "*Accounting for Stock-Based Compensation*" ("SFAS 123"), required that the Company recognize the entire value of all option grants on the grant date amortized over the vesting period of the option. However, as defendants have now admitted, Sonic did not properly account for the backdated option grants.

### B. Insider Stock Sales

41.    At the same time that defendants were secretly issuing themselves and other Sonic executives and employees backdated stock options and falsifying the Company's financial statements, certain defendants were unloading over a million shares of Sonic stock for a total of **$23.5 million** in insider trading proceeds during the Class Period:

| DEFENDANTS' INSIDER STOCK SALES DURING THE CLASS PERIOD | | | |
|---|---|---|---|
| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
| DORIS & SAUER | 8/12/03-1/8/07 | 956,000 | $17,025,285 |
| ELY | 9/5/06 | 28,071 | $428,083 |
| GREBER | 8/4/2003-9/7/05 | 40,000 | $663,865 |
| LANGLEY | 8/4/03-9/6/05 | 38,000 | $696,462 |
| LEIGHTON | 8/12/03-8/25/05 | 261,000 | $4,440,900 |
| MARGUGLIO | 8/22/03-8/28/03 | 20,000 | $254,630 |
| TOTAL | | 1,343,071 | $23,509,225.00 |

### C. Public Reports Disclose Widespread Stock Options Manipulation and Risks

42.    In late 2005 and early 2006, a number of incidents involving stock option backdating and "spring loading" by public companies began to surface, including SEC investigations, executive resignations and financial restatements. On March 18, 2006, *The Wall Street Journal* published an article titled, "The Perfect Payday" raising questions over whether several public companies had been manipulating stock option grants to enrich executives by backdating these grants to lower

prices or granting options to executives ahead of the release of positive corporate news. While Sonic was not implicated in the growing backdating scandal at the time, this was soon to change.

43.    In May, 2006, the Center for Financial Research and Analysis ("CFRA") issued a report: "Options Backdating – Which Companies Are at Risk?" The report identified the risks for companies that engaged in options backdating:

- SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

44.    On September 19, 2006, the Office of the SEC's Chief Accountant issued a letter discussing APB 25, "Accounting for Stock Issued to Employees," expressing the views of the Office of the Chief Accountant. Ex. 7. The SEC's letter gave guidance on several potentially problematic stock option granting practices, including those that would evidence fraud.[6] Specifically, the Chief Accountant's letter highlighted the inferences of misconduct which could be drawn from facts such as those present in this case, *e.g.*, a pattern of option grants at or near the low stock price of a period and the absence of documentation evidencing the grant:

---

[6]    The impropriety of backdating is obvious. Indeed, Judge Breyer held in *United States v. Reyes*, No. C 06-00556 CRB, 2007 U.S. Dist. LEXIS 41632 (N.D. Cal. May 30, 2007) (order denying a motion to dismiss indictment), a criminal trial regarding the backdating of stock options:

> The goal of APB 25 is straightforward: it requires companies to record the "intrinsic value" of an option at the time it is granted. In other words, if an in-the-money option is granted, then APB 25 requires a company to record as compensation the amount by which the market price exceeds the strike price.

*Id.*, at *8.

*The existence of a pattern of past option grants with an exercise price equal to or near the lowest price of the entity's stock during the time period surrounding those grants could indicate that the terms of those grants were determined with hindsight. Further, in some cases, the absence of documentation, in combination with other relevant factors, may provide evidence of fraudulent conduct.*

*Id.*

45.     As alleged herein, Sonic did not have documentation to show when a large number of stock option grants were actually granted or approved, and often could not definitively determine the original measurement date.

### D.     Defendants Admit Widespread Knowledge of Backdating of Stock Options at Sonic and Announce Restatements

46.     On February 1, 2007, the Company issued a press release entitled "Sonic Announces Voluntary Review of Stock Option Accounting." The press release explained that notwithstanding prior assurances that the Company had issued stock option at fair market value on the date stock options were granted, and that the Company properly expensed for stock options in accordance with GAAP and APB 25, that the Company's annual and interim financial results could no longer be relied upon, and that the Company would need to restate previously issued financial statements in order to record additional compensation expenses related to stock option issuances. The Company made very careful, limited disclosures concerning its review and possible restatement, including emphasizing that the results were preliminary. In addition, the Company indicated that accounting adjustments would ***not*** have any impact on previously reported cash and that the Company did not know which years might be affected. Importantly, the Company stated that it did not have the documentation surrounding the stock option grants at issue; additional indicia of fraud. Moreover, the press release was silent regarding whether the amount of the restatement would be material:

*Sonic Solutions . . . announced today that it has commenced a voluntary review of its historical and current stock option grant practices and related accounting.*

*Based on the review to date, the audit committee and Company management have preliminarily concluded that, under applicable accounting guidance, the Company lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants may need to be adjusted. . . . .*

*The audit committee continues to analyze the impact of this issue, but believes it will result in significant non-cash charges. These charges will principally affect prior fiscal years, and the Company believes that the accounting adjustments will*

*not have any impact on previously reported cash positions or revenues. The Company has not yet determined the amount or materiality of any such non-cash charges, any resulting cash charges associated with tax issues, or accounting or other consequences.*

Although the timeframe for completing the review is uncertain, the Company continues to be focused on completing this review in a timely manner. *Based on the preliminary conclusions of the review, the audit committee and management believe that the Company will need to restate its previously issued financial statements in order to record additional non-cash charges for stock-based compensation expense. However, given that the audit committee review is still ongoing, the audit committee has not yet determined which years or periods will need to be restated.*

*Accordingly, the audit committee, after consultation with management and the Company's board of directors, determined that the Company's annual and interim financial statements should no longer be relied upon. Given these circumstances, the Company expects that it will not be in a position to file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2006 in a timely manner.*

Ex. 1.

47.     On February 2, 2007, as a result of the February 1, 2007 revelations, Sonic's stock price dropped from a closing price of $18.03 on February 1, 2007 to $16.68 on February 2, 2007 on over 1.1 million shares traded, which was over four times the volume of February 1, 2007.

48.     On February 15, 2007 Sonic issued a press release announcing disappointing preliminary financial results for the quarter ended December 31, 2006 and disclosing select additional information regarding its stock option review.  Contrary to what it disclosed in its February 1, 2007 press release, Sonic for the first time revealed that it expected the amount of charges to be material:

*The Company's selected preliminary results and guidance may be adjusted as a result of possible restatement of historical results*.  As previously announced on February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting.  Based on the review, the audit committee and Sonic management have preliminarily concluded that, under applicable accounting guidance, *Sonic lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants will need to be adjusted*.  Further, as previously announced, the audit committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements may no longer be relied upon.

*Sonic believes it will have to record additional non-cash charges for stock-based compensation expense and restate previous financial statements, and that such charges will be material*.  Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions. . . .

1     All results and guidance reported today are presented without taking into account any
2     adjustments to either current or previously reported results that may be required in
      connection with any restatement and should be considered preliminary until Sonic
3     files its quarterly report on Form 10-Q for the third quarter ended December 31, 2006
      and any required amended historical financial statements.

4  Ex. 8.

5      49.     On February 16, 2007, in light of the Company's revelations including the materiality

6  of its expected charges, Sonic's stock price dropped from a high of $16.20 on February 15, 2007 to

7  as low as $13.75 on February 16, 2007 on 2,080,300 volume shares traded, as compared to only

8  196,000 shares traded on February 15, 2007.

9      50.     On May 17, 2007, Sonic issued a press release containing preliminary financial

10  results and providing, among other things, additional information on the Company's stock option

11  review.  The May 17, 2007 press release revealed for the first time that Sonic now expected to "have

12  to record ***additional cash and non-cash charges*** for stock-based compensation expense and restate

13  previous financial statements, and that such charges will be material."

14     The Company's selected preliminary results and guidance may be adjusted as a result
      of the expected restatement of historical results. As previously announced on
15     February 1, 2007, Sonic has commenced a voluntary review of its historical and
      current stock option grant practices and related accounting. Based on the review, the
16     audit committee and Sonic management have concluded that, under applicable
      accounting guidance, Sonic lacks sufficient documentation for certain historical
17     option grants and that the measurement dates associated with these option grants will
      need to be adjusted. Further, as previously announced, the audit committee, after
18     consultation with management and the Company's board of directors, has determined
      that the Company's annual and interim financial statements may no longer be relied
19     upon.

20     Sonic believes it will have to record ***additional cash and non-cash charges*** for
      stock-based compensation expense and restate previous financial statements, and that
21     such charges will be material. Sonic is not yet able to determine the amount of such
      charges or the resulting tax and accounting impact of these actions. Sonic intends to
22     file its restated financial results and related periodic reports as quickly as possible.

23  Ex. 9.

24      51.     On May 18, 2007, Sonic's stock price dropped from a high of $13.37 on May 17,

25  2007, to a low of $12.08 on May 18, 2007 on 1,843,600 volume shares traded.  That was compared

26  to only 550,500 shares traded on May 17, 2007.

27      52.     On February 26, 2008, the Company filed its Form 10-K with the SEC for the fiscal

28  year ending March 31, 2007, finally detailing, in part, the broadbased manipulation of stock option

issuances.  The overwhelming majority of categories of stock option grants during the Relevant Period were admittedly granted and/or accounted for improperly.  The Company has re-priced, now claimed to be properly in accordance with APB 25, grants described as founder director grants, non-founder Section 16 officer grants, other employee grants, hiring grants, salary reduction grants, and acquisition related grants.  While many categories of stock option grants admittedly violated GAAP, certain grants, made by defendant Doris were the most egregious in terms of impact on the financial statements:

> *Other Employee Grants*
>
> Under each of our various options plans, our CEO was delegated the authority to make grants to employees other than executive officers.  As described above, except in particular circumstances . . . the Company employed a quarterly-focused grant process for non-founder employees and generally lack contemporaneous grant documentation sufficient to support the Record Dates for these option grants.
>
> *[W]e analyzed all available relevant information for each stock option grant in an attempt to determine the earliest point in time at which the evidence reasonably shows that all requisites for the establishment of a measurement date under APB No. 25 were satisfied.  Except in specific circumstances (see Hiring Grants, Salary Reduction Grants, Acquisition-Related Grants and Other, below), or where we were able to locate contemporaneous grant documentation, this approach generally has resulted in our determining that the most appropriate measurement dates occur some time after the original Record Date in our records, often the date on which final Periodic Spreadsheets were sent to or received from the outside accounting firm we used for financial statement calculations, or the date on which we filed our quarterly or annual reports with respect to the grant(s) in question.*
>
> *Given the generally upward trend of our stock price during a substantial portion of the Review Period, moving to these "end of quarter" measurement dates generally results in a larger compensation charge and restatement amount.*

Ex. 6.

53.    Further, defendants admit that the members of the Board (comprised of defendants Doris, Sauer, Greber, Marguglio and Langley) knew that defendant Doris was issuing stock options in violation of the specific terms of shareholder approved stock option plans but did nothing to prevent these violations or to make certain that stock options were issued at fair market value on the date of the grant or that they were accounted for appropriately.  These grants were also restated/repriced to reflect to proper measurement dates and compensation expense:

*Non-Founder Section 16 Officer Grants*

Prior to September 23, 2005, our CEO would typically make grants to our non-founder executive officer(s) who are considered "executive officers" for purposes of Section 16 of the Exchange Act in the same manner as he would for non-executive employees of the Company. Pursuant to the delegation to him under our various option plans, ***the CEO generally did not have express authority to grant options to Section 16 officers, as this power was reserved for the board. Nevertheless, these grants were made in a consistent fashion and it is apparent that our board was aware of these option grants and did not disapprove of them***. . . .

We concluded that, based on the facts and circumstances, the most appropriate and reasonable approach to these grants is to apply all APB No. 25 criteria in the same manner as such criteria are being applied to grants to our non-management employees (*see* discussion *Other Employee Grants* below) that is, to recognize and acknowledge the existence of these grants, but to change measurement dates where there is insufficient information to reasonably conclude that the original Record Date satisfies the requirements of APB No. 25.

Ex. 6.

54.      These admissions, coupled with the undeniable results of Lead Plaintiffs' investigation regarding the timing of Sonic's historical stock option grants, shows a pattern of misconduct and false and misleading statements perpetrated by Sonic's highest level executives and directors. Lead Plaintiffs suffered damages when this misconduct was revealed in a series of partial disclosures causing Sonic's stock price to decline.

## II.    JURISDICTION AND VENUE

55.      The claims asserted herein arise under §§10(b), 14(a), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78a *et seq.*, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder. In connection with the acts, conducts and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

56.      Jurisdiction exists pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

57.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Sonic's

1    corporate headquarters are located in this district in Novato, California.  Further, the Individual

2    Defendants conduct business in this District.

3    **III.    PARTIES**

4        58.    On January 10, 2008, the Court appointed the City of Westland Police and Fire

5    Retirement System and Plymouth County Retirement System as Lead Plaintiffs in this matter.  Lead

6    Plaintiffs purchased Sonic's publicly-traded securities during the Class Period at artificially inflated

7    prices and suffered economic loss and damages as a result of the violation of the securities laws

8    alleged herein.

9        59.    Defendant Sonic develops and markets computer software related to digital media,

10   such as data, photographs, audio and video in digital formats.  Sonic is a California corporation with

11   its executive offices and principal place of business located at 101 Rowland Way, Novato, California

12   94945.

13       60.    Defendant David C. Habiger served as President and COO of Sonic since April 2005,

14   and as President and CEO of the Company since September 2005.  Habiger joined the Company in

15   1993 and served in a variety of sales and management positions until his promotion in April 2005.

16   Because of Habiger's position, he knew the adverse non-public information about the business of

17   Sonic, as well as its finances, markets and present and future business prospects, via access to

18   internal corporate documents, conversations and connections with other corporate officers and

19   employees, attendance at Board meetings and via reports and other information provided to him in

20   connection therewith.  During the Relevant Period, Habiger participated in the issuance of false

21   and/or misleading statements, including the preparation of the false and/or misleading press releases

22   and SEC filings.  Habiger signed the false Forms 10-K and Forms 10-Q during the Class Period.

23       61.    Defendant Robert J. Doris co-founded Sonic in 1986 and has served as the

24   Company's Chairman of the Board and a director since its inception.  Doris additionally served as

25   the Company's President from its inception until April 2005, and its CEO from the Company's

26   inception until September 2005.  Doris is or was married to defendant Mary C. Sauer.

27   Notwithstanding his knowledge of material non-public information regarding the Company,

28   defendant Doris sold (with Sauer) 956,000 shares of Sonic stock for proceeds of over $17 million

1  during the Class Period. Because of Doris's position, he knew the adverse non-public information

2  about the business of Sonic, as well as its finances, markets and present and future business

3  prospects, via access to internal corporate documents, conversations and connections with other

4  corporate officers and employees, attendance at Board meetings and via reports and other

5  information provided to him in connection therewith. During the Relevant Period, Doris participated

6  in the issuance of false and/or misleading statements, including the preparation of the false and/or

7  misleading press releases and SEC filings. Doris signed the false Forms 10-K and Forms 10-Q

8  during the Class Period. Doris also received backdated options as detailed herein.

9       62.    Defendant A. Clay Leighton has served as CFO of Sonic from January 1999 until

10  February 2008, when, in connection with Sonic's restatement, Leighton ceased serving as Sonic's

11  CFO and took on the role of COO. Additionally, Leighton has served as Executive Vice President

12  since September 2006. Leighton joined the Company in 1993 as Vice President, Finance and was

13  named Senior Vice President, Worldwide Sales and Finance, from January 1999 until September

14  2006. Notwithstanding his knowledge of material non-public information regarding the Company,

15  defendant Leighton sold 261,000 shares of Sonic stock for proceeds of over $4.4 million during the

16  Class Period. Because of Leighton's position, he knew the adverse non-public information about the

17  business of Sonic, as well as its finances, markets and present and future business prospects, via

18  access to internal corporate documents, conversations and connections with other corporate officers

19  and employees, attendance at Board meetings and via reports and other information provided to him

20  in connection therewith. During the Relevant Period, Leighton participated in the issuance of false

21  and/or misleading statements, including the preparation of the false and/or misleading press releases

22  and SEC filings. Leighton signed the false Forms 10-K and Forms 10-Q during the Class Period.

23  Leighton also received backdated options as detailed herein.

24       63.    Defendant Mary C. Sauer co-founded Sonic in 1986 and has served as a director and

25  Secretary since its inception. Sauer additionally served as Vice President of the Company from 1986

26  to September 2005 and as Senior Vice President, Marketing and Sales from February 1993 to

27  September 2005. Sauer is or was married to defendant Doris. Based on her knowledge of material

28  non-public information regarding the Company, defendant Sauer sold (with defendant Doris)

1    956,000 shares of Sonic stock for proceeds of over $17 million during the Class Period. Because of

2    Sauer's position, she knew the adverse non-public information about the business of Sonic, as well

3    as its finances, markets and present and future business prospects, via access to internal corporate

4    documents, conversations and connections with other corporate officers and employees, attendance

5    at Board meetings and via reports and other information provided to her in connection therewith.

6    During the Relevant Period, Sauer participated in the issuance of false and/or misleading statements,

7    including the preparation of the false and/or misleading press releases and SEC filings. Sauer also

8    received backdated options as detailed herein.

9           64.    Defendant Mark Ely has served as Executive Vice President, Strategy of Sonic since

10    September 2006. Ely joined the Company in 1992, serving in various management roles until his

11    promotion to his current position in 2006. Notwithstanding his knowledge of material non-public

12    information regarding the Company, defendant Ely sold 28,071 shares of Sonic stock for proceeds of

13    $428,083 during the Class Period. Because of Ely's position, he knew the adverse non-public

14    information about the business of Sonic, as well as its finances, markets and present and future

15    business prospects, via access to internal corporate documents, conversations and connections with

16    other corporate officers and employees, attendance at Board meetings and via reports and other

17    information provided to him in connection therewith. During the Relevant Period, Ely participated

18    in the issuance of false and/or misleading statements, including the preparation of the false and/or

19    misleading press releases and SEC filings.

20           65.    Defendant Robert M. Greber has served as a director of Sonic since August 1993. As

21    a member of Sonic's Board of Directors, Greber was responsible for administering Sonic's stock

22    option plans and for approving and granting stock options thereunder. Because of Greber's position,

23    he knew the adverse non-public information about the business of Sonic, as well as its finances,

24    markets and present and future business prospects, via access to internal corporate documents,

25    conversations and connections with other corporate officers and employees, attendance at Board

26    meetings and via reports and other information provided to him in connection therewith. During the

27    Relevant Period, Greber participated in the issuance of false and/or misleading statements, including

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAW - C 07-05111-JSW                                                    - 25 -

1   the preparation of the false and/or misleading press releases and SEC filings.  Greber signed the false

2   Forms 10-K during the Class Period.

3       66.    Defendant Peter J. Marguglio has served as a director of Sonic since August 1996.

4   As a member of Sonic's Board of Directors, Marguglio was responsible for administering Sonic's

5   stock option plans and for approving and granting stock options thereunder.  Because of Marguglio's

6   position, he knew the adverse non-public information about the business of Sonic, as well as its

7   finances, markets and present and future business prospects, via access to internal corporate

8   documents, conversations and connections with other corporate officers and employees, attendance

9   at Board meetings and via reports and other information provided to him in connection therewith.

10  During the Relevant Period, Marguglio participated in the issuance of false and/or misleading

11  statements, including the preparation of the false and/or misleading press releases and SEC filings.

12  Marguglio signed the false Forms 10-K during the Class Period.

13      67.    Defendant R. Warren Langley has served as a director of Sonic and as a member of

14  Sonic's Audit Committee since June 2001.  As a member of Sonic's Board of Directors, Langley

15  was responsible for administering Sonic's stock option plans and for approving and granting stock

16  options thereunder.  Because of Langley's position, he knew the adverse non-public information

17  about the business of Sonic, as well as its finances, markets and present and future business

18  prospects, via access to internal corporate documents, conversations and connections with other

19  corporate officers and employees, attendance at Board meetings and via reports and other

20  information provided to him in connection therewith.  During the Relevant Period, Langley

21  participated in the issuance of false and/or misleading statements, including the preparation of the

22  false and/or misleading press releases and SEC filings.  Langley signed the false Forms 10-K during

23  the Class Period.

24      68.    Defendants Habiger, Doris, Leighton, Sauer, Ely, Greber, Marguglio and Langley

25  (the "Individual Defendants"), because of their positions with the Company, possessed the power

26  and authority to control the contents of Sonic's quarterly reports, press releases and presentations to

27  securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They

28  were provided with copies of the Company's reports and press releases alleged herein to be

1  misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their

2  issuance or cause them to be corrected.  Because of their positions as a President, COO, CEO,

3  Chairman, CFO, director and Secretary, and Executive Vice President, the Individual Defendants

4  knew that the adverse facts specified herein had not been disclosed to and were being concealed

5  from the public and that the representations being made were then materially false and misleading.

6  The Individual Defendants are liable for the false statements pleaded herein.

7       69.    The following chart shows the positions of the Individual Defendants at Sonic during

8  the Relevant Period:

| Year | Board of Directors | CEO | CFO | Audit Committee |
|---|---|---|---|---|
| 2000 | Doris, Sauer, Greber, Marguglio | Doris | Leighton | Greber, Marguglio |
| 2001 | Doris, Sauer, Greber, Marguglio | Doris | Leighton | Greber, Marguglio, Langley |
| 2002 | Doris, Sauer, Greber, Marguglio, Langley | Doris | Leighton | Greber, Marguglio, Langley |
| 2003 | Doris, Sauer, Greber, Marguglio, Langley | Doris | Leighton | Greber, Marguglio, Langley |
| 2004 | Doris, Sauer, Greber, Marguglio, Langley | Doris | Leighton | Greber, Marguglio, Langley |
| 2005 | Doris, Sauer, Greber, Marguglio, Langley | Doris | Leighton | Greber, Marguglio, Langley |
| 2006 | Doris, Sauer, Greber, Marguglio, Langley | Doris (until 9/05) / Habiger (after 9/05) | Leighton | Greber, Marguglio, Langley |
| 2007 | Doris, Sauer, Greber, Marguglio, Langley | Habiger | Leighton (until 2/28/08) | Greber, Marguglio, Langley |

## IV.    DEFENDANTS' FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

    70.    Throughout the Class Period, and dating back as early as 1996, Sonic routinely backdated stock option grants to its employees and executives in violation of their shareholder-approved stock option plans.  Sonic then issued false and misleading statements, including press releases, Forms 10-K, Forms 10-Q, and Proxy Statements, which failed to account for or disclose the backdated stock options that were being issued by defendants.

    71.    While Sonic's restatement carefully attempts to avoid discussing what actually took place at Sonic to cause its $29 million restatement, Lead Plaintiffs' investigation has revealed a clear

1  and unambiguous pattern of stock option grants so fortuitously timed that backdating is the only

2  plausible explanation.

3        72.    From 1996 until 2004, Sonic's public filings with the SEC disclose twenty-four

4  separate dates on which stock option grants were purportedly granted.  Of these twenty-four grant

5  dates, ten grants were non-discretionary grants to Sonic's directors under the 1994 Directors Plan.

6  Because these grants fell on the day of, or the day after Sonic's annual shareholder meeting, they

7  were not easy to manipulate.  However, as detailed herein, of the fourteen discretionary grants

8  reported between 1996 and 2004, *eight* grants were purportedly granted on dates where Sonic's

9  stock price was trading at least at its lowest price of the month, and in some instances, at its lowest

10 price of the fiscal quarter or fiscal year.  Such an astounding pattern can only be the result of

11 deliberate and systematic backdating by the individuals charged with administering Sonic's stock

12 option plans – the Board and the CEO.

13       73.    The practice and pattern of backdating stock option grants at Sonic began as early as

14 1996.  This pattern of stock option backdating, which began even before the Class Period, coupled

15 with defendants' most recent admissions, shows that defendants' misconduct was not merely an

16 isolated occurrence, but was part of a scheme which lasted for at least eight years.

17       74.    <u>False and Misleading October 23, 2002 Press Release</u>: On October 23, 2002, Sonic

18 issued a press release reporting its financial results of its second quarter ended September 30, 2002.

19 The repeated financial results, as well as earnings projections, were materially false and misleading

20 and presented in violation of GAAP due to the Company's failure to properly expense stock options

21 in accordance with APB 25.

22       Net revenue for the second quarter was $27.9 million, and pro forma net loss was
         $169,000, or $0.01 per basic and diluted share, excluding non-cash charges related to
23       the amortization of intangible assets and deferred stock-based compensation. This
         compares with net revenue of $30.5 million and pro forma net income of $2.0
24       million, or $0.12 per basic and diluted share, for the second quarter of the prior fiscal
         year.
25
                              *       *       *
26
         We are aggressively managing expenses and significantly reduced costs on a
27       sequential basis.  We expect revenues in the third fiscal quarter to be approximately
         $25 million and to incur a proforma net loss of up to $2.4 million, or $0.12 per share
28       . . .

1    75.    During the Class Period, defendants issued a series of false and misleading statements

2    in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants issued false and misleading

3    statements regarding: (i) the Company's periodic financial results in press releases, conference calls

4    and documents filed with the SEC; (ii) the terms and value of the options granted to officers,

5    directors, and employees; (iii) the Company's internal controls relating to stock option grants and

6    related financial reporting; and (iv) the Company's application of GAAP, APB 25 and SFAS 123

7    regarding the accounting for stock option grants due to the failure to disclose the backdating of stock

8    option grants.

9    76.    <u>False and Misleading November 14, 2002 Form 10-Q</u>:  On November 14, 2002, Sonic

10   filed a quarterly report on Form 10-Q with the SEC that was signed by Doris and Leighton.  The

11   Form 10-Q included Sonic's quarterly financial statements for the quarter ended September 30,

12   2002, which were materially false and misleading due to the failure to disclose the backdating of

13   stock option grants and presented in violation of GAAP due to the Company's failure to properly

14   expense stock options in accordance with APB 25.  As a result, Sonic's compensation expense was

15   understated and thus its net loss was materially understated.  The Form 10-Q also contained SOX

16   certifications signed by Doris and Leighton attesting to accuracy of Sonic's financial statements, and

17   the adequacy of Sonic's internal controls.

18   77.    <u>False and Misleading February 14, 2003 Form 10-Q</u>:  On February 14, 2003, Sonic

19   filed a quarterly report on Form 10-Q with the SEC that was signed by Doris and Leighton.  The

20   Form 10-Q included Sonic's quarterly financial statements for the quarter ended December 31, 2002,

21   which were materially false and misleading due to the failure to disclose the backdating of stock

22   option grants and presented in violation of GAAP due to the Company's failure to properly expense

23   stock options in accordance with APB 25.  As a result, Sonic's compensation expense was

24   understated and its net loss was materially understated.  The Form 10-Q also contained SOX

25   certifications signed by Doris and Leighton attesting to accuracy of Sonic's financial statements, and

26   the adequacy of Sonic's internal controls.

27

28

78.     On March 11, 2003, defendants granted Leighton an option for 200,000 shares of Sonic stock at a strike price of $3.97 per share.  That was the lowest price of the month, and the remainder of the calendar year.



**Sonic Solutions**
**February 14, 2003 to April 11, 2003**

79.     <u>False and Misleading FY03 Form 10-K</u>:  On June 26, 2003, Sonic filed its 2003 Annual Report on Form 10-K with the SEC, which was signed by Doris, Sauer, Greber, Marguglio, Langley and Leighton.  The 2003 Form 10-K repeated the false earnings results reported in Sonic's May 21, 2003 press release (Ex. 10), and included Sonic's false 2003 quarterly and year-end financial statements, which were materially false and misleading and presented in violation of GAAP due to the Company's failure to properly expense stock options in accordance with APB 25.  As a result, Sonic's reported compensation expense was materially understated and its net loss was materially understated.

80.     Additionally, the Form 10-K falsely stated that Sonic properly accounted for stock options in accordance with APB 25:

> *We follow Accounting Principles Board (APB) Opinion No. 25, "Accounting for Stock Issued to Employees."*

81.     In addition, the 2003 Form 10-K falsely stated that the Company issued stock options at an exercise price equal to the fair market value of the Company's stock on the date of the grant,

1  stating that for all of Sonic's option plans, "*all options to date have been granted as incentive stock*

2  *options" which "must be granted at fair market value at the date of grant*."

3       82.    The 2003 Form 10-K also contained SOX certifications signed by Doris and Leighton

4  attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

5       83.    <u>False and Misleading 2003 Proxy Statement</u>:  On July 29, 2003, Sonic filed its 2003

6  Proxy Statement on Form 14A with the SEC.  The 2003 Proxy Statement falsely stated that options

7  were granted at an exercise price equal to the fair market value of the Company's stock on the date

8  of the grant.

9            *The exercise price is equal to the fair market value of Sonic's common*
10           *stock on the date of grant*, as determined by reference to the closing price of Sonic's
             common stock on the Nasdaq National Market.

11       84.    <u>False and Misleading August 14, 2003 Form 10-Q</u>:  On August 14, 2003, Sonic filed

12  a quarterly report on Form 10-Q for the quarter ended June 30, 2003 with the SEC which was signed

13  by Doris and Leighton.  The Form 10-Q included Sonic's quarterly financial statements, repeating

14  false earnings results reported in its July 30, 2003 press release (Ex. 11).  The statements were

15  materially false and misleading and presented in violation of GAAP due to the Company's failure to

16  properly expense stock options in accordance with APB 25.  As a result, Sonic's compensation

17  expense was materially understated and its net earnings were materially overstated.  The Form 10-Q

18  also contained SOX certifications signed by Doris and Leighton attesting to accuracy of Sonic's

19  financial statements, and the adequacy of Sonic's internal controls.

20       85.    <u>False and Misleading November 12, 2003 Form 10-Q</u>:  On November 12, 2003, Sonic

21  filed a quarterly report on Form 10-Q for the quarter ended September 30, 2003 with the SEC which

22  was signed by Doris and Leighton.  The Form 10-Q included Sonic's quarterly financial statements,

23  repeating false earnings results reported in its October 30, 2003 press release (Ex. 12).  The

24  statements were materially false and misleading and presented in violation of GAAP due to the

25  Company's failure to properly expense stock options in accordance with APB 25.  As a result,

26  Sonic's compensation expense was materially understated and its net earnings were materially

27  overstated.  The Form 10-Q also contained SOX certifications signed by Doris and Leighton

28  attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

86.  <u>False and Misleading February 17, 2004 10-Q</u>:  On February 17, 2004, Sonic filed a quarterly report on Form 10-Q for the quarter ended December 31, 2003 with the SEC which was signed by Doris and Leighton.  The Form 10-Q included Sonic's quarterly financial statements repeating false earnings results reported in its February 4, 2004 press release (Ex. 13), which were materially false and misleading and presented in violation of GAAP due to the Company's failure to properly expense stock options in accordance with APB 25.  As a result, Sonic's compensation expense was materially understated and its net earnings were materially overstated.  The Form 10-Q also contained SOX certifications signed by Doris and Leighton attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

87.  On May 10, 2004, defendants purportedly granted Leighton an option for 100,000 shares of Sonic stock at a strike price of $17.49 per share.  ***$17.49 was the lowest price of Sonic's stock for April-June, 2004***.[7]



**Sonic Solutions**
April 12, 2004 to June 10, 2004

---

[7]     While Sonic was routinely late in filing Form 4's with the SEC relating to stock option grants, this grant to Leighton was reported on May 12, 2004.  However, by this time, Sonic stock price had risen 5.6% from $17.49 on May 10, 2004 to $18.53 on May 12, 2004 giving Leighton an instant profit of $104,000—or almost half his annual salary for the fiscal year, which was $215,000.

88.    <u>False and Misleading FY04 Form 10-K</u>:  On June 14, 2004, Sonic filed its 2004 Annual Report on Form 10-K for the fiscal year ended March 31, 2004 with the SEC, which was signed by Doris, Sauer, Greber, Marguglio, Langley and Leighton.  The 2004 Form 10-K included Sonic's 2004 quarterly and year-end financial statements, including false fourth quarter earnings results reported in the Company's May 4, 2004 press release (Ex. 24) which were materially false and misleading and presented in violation of GAAP due to the Company's failure to properly expense stock options in accordance with APB 25.  As a result, Sonic's compensation expense was materially understated and its net earnings were materially overstated.  The Form 10-K also contained SOX certifications signed by Doris and Leighton attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

89.    The 2004 Form 10-K falsely stated that the Company properly accounted for stock options in accordance with APB 25:

> **We follow Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees."**

90.    In addition, the 2004 Form 10-K falsely stated that the Company issued stock options at an exercise price equal to the fair market value of the Company's stock on the date of the grant:

**"all options to date have been granted as incentive stock options" which "must be granted at fair market value at the date of grant."**

91.    <u>False and Misleading 2004 Proxy Statement</u>:  On July 27, 2004, Sonic filed its 2004 Proxy Statement on Form 14A with the SEC.  The 2004 Proxy Statement also falsely stated that options were granted at an exercise price equal to the fair market value of the Company's stock on date of the grant.

> **The exercise price is equal to the fair market value of Sonic's common stock on the date of grant, as determined by reference to the closing price of Sonic's common stock on the Nasdaq National Market.**

92.    The 2004 Proxy Statement also discussed the Company's 2004 fiscal year, and specifically stated that Sonic had not recorded any compensation expense relating to in the money options, and further assured investors that the Company was complying with APB 25 and issuing options consistent with the Company's stock option plans.

1   During fiscal year ended March 31, 2004, the board did not have a
2   compensation committee. In March 2004, the board determined that the members of
    the audit committee (Greber, Marguglio and Langley) shall also function as members
    of the compensation committee to assist the board in determining the compensation
3   for executive officers of the Company, including the Chief Executive Officer; *to
    administer the Company's stock option plans*, subject to the authority of the
4   compensation committee to delegate the tasks associated with the administration of
    the plans; and to assist the board in other matters as appropriate. *Since the
5   compensation committee is functionally the audit committee, it does not operate
    under a separate charter but rather functions under the guidelines set forth in the
6   audit committee charter*.

7          93.    <u>False and Misleading August 4, 2004 Form 10-Q</u>: On August 6, 2004, Sonic filed a

8   quarterly report on Form 10-Q for the quarter ended June 30, 2004 with the SEC which was signed

9   by Doris and Leighton. The Form 10-Q included Sonic's false first quarter earnings results which

10  had been previously reported in the Company press release of August 2, 2004 (Ex. 14). The

11  financial statements were materially false and misleading and presented in violation of GAAP due to

12  the Company's failure to properly expense stock options in accordance with APB 25. As a result,

13  Sonic's compensation expense was materially understated and its net earnings were materially

14  overstated. The Form 10-Q also contained SOX certifications signed by Doris and Leighton

15  attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

16         94.    <u>False and Misleading November 9, 2004 Form 10-Q</u>: On November 9, 2004, Sonic

17  filed a quarterly report on Form 10-Q for the quarter ended September 30, 2004 with the SEC which

18  was signed by Doris and Leighton. The Form 10-Q included Sonic's false second quarter earnings

19  results which had been previously reported in the Company press release of November 8, 2004 (Ex.

20  15). The financial statements were materially false and misleading and presented in violation of

21  GAAP due to the Company's failure to properly expense stock options in accordance with APB 25.

22  As a result, Sonic's compensation expense was materially understated and its net earnings were

23  materially overstated. The Form 10-Q also contained SOX certifications signed by Doris and

24  Leighton attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal

25  controls.

26         95.    <u>False and Misleading February 9, 2005 Form 10-Q</u>: On February 9, 2005, Sonic filed

27  a quarterly report on Form 10-Q for the quarter ended December 31, 2004 with the SEC which was

28  signed by Doris and Leighton. The Form 10-Q included Sonic's false third quarter earnings results

which had been previously reported in the Company press release of February 8, 2005 (Ex. 16). The financial statements were materially false and misleading and presented in violation of GAAP due to the Company's failure to properly expense stock options in accordance with APB 25. As a result, Sonic's compensation expense was materially understated and its net earnings were materially overstated. The Form 10-Q also contained SOX certifications signed by Doris and Leighton attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

96.    <u>False and Misleading FY05 Form 10-K</u>:  On June 29, 2005, Sonic filed its 2005 Annual Report on Form 10-K for the fiscal year ended March 31, 2005 with the SEC, which was signed by Doris, Sauer, Greber, Marguglio, Langley and Leighton. The 2004 Form 10-K included Sonic's 2005 quarterly and year-end financial statements, including Sonic's fourth quarter and fiscal 2005 earnings which had been previously reported in the Company press release of May 16, 2005 (Ex. 17), which were materially false and misleading and presented in violation of GAAP due to the Company's failure to properly expense stock options in accordance with APB 25. As a result, Sonic's compensation expense was materially understated and its net earnings were materially overstated. The Form 10-K also contained SOX certifications signed by Doris and Leighton attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

97.    Additionally, the Company falsely stated that it properly accounted for stock options in accordance with APB 25:

>    ***We account for share-based employee compensation using the intrinsic value method in accordance with APB Opinion No. 25 . . . .***

98.    In addition, the 2005 Form 10-K falsely stated that the Company issued stock options at an exercise price equal to the fair market value of the Company's stock on the date of the grant. With respect to Sonic's 1989 and 1998 Sonic plans, Sonic stated that "***incentive stock options [] must be granted at fair market value at the date of grant***."

99.    The 2005 Form 10-K revealed that Sonic uncovered a weakness in its internal controls. Sonic did not disclose, however, the backdating of stock options, or that because of Sonic's long-lasting practice of backdating stock options, Sonic's financial statements were false and misleading.

100.    <u>False and Misleading 2005 Proxy Statement</u>:  On October 24, 2005, Sonic filed its 2005 Proxy Statement on Form 14A with the SEC.  The 2005 Proxy Statement falsely stated that options were granted at an exercise price equal to the fair market value of the Company's stock on the date of the grant:

> ***The exercise price is equal to the fair market value of Sonic's common stock on the date of grant, as determined by reference to the closing price of Sonic's common stock on the Nasdaq National Market.***

101.    The 2005 Proxy Statement stated that while Sonic's Board previously acted as a compensation committee, the Audit Committee, consisting of defendants Marguglio, Langley and Greber, took over that role in March 2005:

> During the fiscal year ended March 31, 2005, the board of directors did not have a compensation committee.  In March 2005, the board of directors determined that the audit committee shall also function as the compensation committee to assist the board in determining the compensation for executive officers of the Company, including the Chief Executive Officer; to administer the Company's stock option plans, subject to the authority of the compensation committee to delegate the tasks associated with the administration of the plans; and to assist the board of directors in other matters as appropriate.

102.    <u>False and Misleading August 15, 2005 Form 10-Q</u>: On August 15, 2005, Sonic filed a quarterly report on Form 10-Q for the quarter ended June 30, 2005 with the SEC which was signed by Habiger and Leighton.  The Form 10-Q included Sonic's false quarterly financial statements which had been previously reported in the Company press release of August 15, 2005 (Ex. 23).  The financial statements were materially false and misleading and presented in violation of GAAP due to the Company's failure to properly expense stock options in accordance with APB 25.  As a result, Sonic's compensation expense was materially understated and its net earnings were materially overstated.  The Form 10-Q also contained SOX certifications signed by Habiger and Leighton attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

103.    <u>False and Misleading November 9, 2005 Form 10-Q</u>: On November 9, 2005, Sonic filed a quarterly report on Form 10-Q for the quarter ended September 30, 2005 with the SEC which was signed by Habiger and Leighton.  The Form 10-Q included Sonic's false second quarter earnings results previously reported in the Company press release of November 8, 2005 (Ex. 18).  The financial statements were materially false and misleading and presented in violation of GAAP

1    due to the Company's failure to properly expense stock options in accordance with APB 25. As a

2    result, Sonic's compensation expense was materially understated and its net earnings were materially

3    overstated. The Form 10-Q also contained SOX certifications signed by Habiger and Leighton

4    attesting to accuracy of Sonic's financial statements, and the adequacy of Sonic's internal controls.

5         104.    False and Misleading February 9, 2006 Form 10-Q:  On February 9, 2006, Sonic filed

6    its quarterly report on Form 10-Q for the quarter ended December 31, 2006 with the SEC for its third

7    quarter FY06 which was signed by Habiger and Leighton. The Form 10-Q included Sonic's false

8    third quarter earnings results which had been previously reported in the Company's press release of

9    February 8, 2006 (Ex. 19). The statements were materially false and misleading and presented in

10   violation of GAAP due to the Company's failure to properly expense stock options in accordance

11   with APB 25. As a result, Sonic's compensation expense was materially understated and its net

12   earnings were materially overstated. The Form 10-Q also contained SOX certifications signed by

13   Habiger and Leighton attesting to accuracy of Sonic's financial statements, and the adequacy of

14   Sonic's internal controls.

15        105.    False and Misleading FY06 Form 10-K:  On June 14, 2006, Sonic filed its 2006

16   Annual Report on Form 10-K for the fiscal year ended March 31, 2006 with the SEC, which was

17   signed by Habiger, Doris, Sauer, Greber, Marguglio, Langley and Leighton. The 2006 Form 10-K

18   included Sonic's 2006 quarterly and year-end financial statements, including its false fourth quarter

19   earnings results which were previously reported in the Company's May 23, 2006 press release (Ex.

20   20). The Form 10-K was materially false and misleading and presented in violation of GAAP due to

21   the Company's failure to properly expense stock options in accordance with APB 25. As a result,

22   Sonic's compensation expense was understated and its net earnings were overstated. The Form 10-K

23   also contained SOX certifications signed by Habiger and Leighton attesting to accuracy of Sonic's

24   financial statements, and the adequacy of Sonic's internal controls.

25        106.    The 2006 Form 10-K further falsely states that the Company accounted for stock of

26   options consistent with APB 25.

27           *We account for share-based employee compensation using the intrinsic
             value method in accordance with APB No. 25, "Accounting for Stock Issued to*

28           *Employees," . . . .*

1    107.    <u>False and Misleading August 14, 2006 Form 10-Q</u>:  On August 14, 2006, Sonic filed

2    its quarterly report on Form 10-Q for the quarter ended June 30, 2006 with the SEC which was

3    signed by Habiger and Leighton.  The Form 10-Q included Sonic's quarterly financial statements,

4    repeating false earnings results which been reported in its August 8, 2006 press release (Ex. 21).

5    The statements were materially false and misleading and presented in violation of GAAP due to the

6    Company's failure to properly expense stock options in accordance with APB 25.  As a result,

7    Sonic's compensation expense was understated and its net earnings were overstated.  The Form 10-Q

8    also contained SOX certifications signed by Habiger and Leighton attesting to accuracy of Sonic's

9    financial statements, and the adequacy of Sonic's internal controls.

10    108.    <u>False and Misleading November 9, 2006 Form 10-Q</u>:  On November 9, 2006, Sonic

11    filed its quarterly report on Form 10-Q for the quarter ended September 30, 2006 with the SEC

12    which was signed by Habiger and Leighton.  The Form 10-Q included Sonic's false earnings results

13    which had been previously reported in the Company's press release of November 8, 2006 (Ex. 22).

14    The statements were materially false and misleading and presented in violation of GAAP due to the

15    Company's failure to properly expense stock options in accordance with APB 25.  As a result,

16    Sonic's compensation expense was understated and its net earnings were overstated.  The Form 10-Q

17    also contained SOX certifications signed by Habiger and Leighton attesting to accuracy of Sonic's

18    financial statements, and the adequacy of Sonic's internal controls.

19    109.    <u>Partial Disclosure and False and Misleading February 1, 2007 Press Release</u>:  On

20    February 1, 2007, the Company issued a press release entitled "Sonic Announces Voluntary Review

21    of Stock Option Accounting."  The press release explained that notwithstanding assurances that the

22    Company had issued stock option at fair market value on the date stock options were granted, and

23    that the Company properly expensed for stock options in accordance with GAAP and APB 25, that

24    the Company's annual and interim financial results could no longer be relied upon, and that the

25    Company would need to restate previously issued financial statements in order to record additional

26    compensation expenses related to stock option issuances.  Sonic carefully worded its disclosures

27    concerning its review and possible restatement, emphasizing that the results were preliminary.  In

28    addition, the Company indicated that accounting adjustments would ***not*** have any import on

1 previously reported cash and that the Company did not know which years might be affected.[8]  The

2 press release was silent regarding whether the amount of restatement was material.  The press release

3 failed to disclose material facts which were known to defendants at the time, including that the

4 restatement would be material and would require cash charges.

> *Sonic Solutions . . . announced today that it has commenced a voluntary review of its historical and current stock option grant practices and related accounting.*
>
> *Based on the review to date, the audit committee and Company management have preliminarily concluded that, under applicable accounting guidance, the Company lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants may need to be adjusted.* Based also on this review, the Company believes that its current options granting practices are generally acceptable and meet relevant standards for properly documenting grant dates.
>
> *The audit committee continues to analyze the impact of this issue, but believes it will result in significant non-cash charges.  These charges will principally affect prior fiscal years, and the Company believes that the accounting adjustments will not have any impact on previously reported cash positions or revenues.  The Company has not yet determined the amount or materiality of any such non-cash charges, any resulting cash charges associated with tax issues, or accounting or other consequences.*  Although the timeframe for completing the review is uncertain, the Company continues to be focused on completing this review in a timely manner. *Based on the preliminary conclusions of the review, the audit committee and management believe that the Company will need to restate its previously issued financial statements in order to record additional non-cash charges for stock-based compensation expense.  However, given that the audit committee review is still ongoing, the audit committee has not yet determined which years or periods will need to be restated.*
>
> *Accordingly, the audit committee, after consultation with management and the Company's board of directors, determined that the Company's annual and interim financial statements should no longer be relied upon.  Given these circumstances, the Company expects that it will not be in a position to file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2006 in a timely manner*.

21 Ex. 1.

22         110.    Securities analysts following the Company immediately reported on the Company's

23 revelations.  On February 2, 2007, D.A. Davidson issued a report titled "Option Investigation

24 Creates Near Term Cloud, Business Fundamentals Unchanged."

---

[8]      However, the Company stated that it did not have the documentation surrounding the stock option grants at issue, additional indicia of fraud.

**Option Grant Investigation Creates Near-Term Cloud, Business Fundamentals Unchanged; Maintaining $19 Target and BUY Rating**

SNIC announced yesterday that the company's audit committee had commenced a review of its historical and current stock options practices.  Preliminary results indicate that the company lacks sufficient documentation for certain historical grants and that the measurement dates associated with those grants may need to be adjusted. The company believes its current options practices are generally acceptable and meet the relevant standards for documenting option grants.

The expected impact of these findings is a significant non-cash charge, principally associated with stock compensations expenses in prior year periods. . . .

***These preliminary findings most certainly draft a near-term cloud over SNIC as the investigation could take a couple of months to complete, by our estimation. The company has notified the SEC of the investigation and, as its accounting practices are put under the microscope, there is some potential that more issues are uncovered.***

*     *     *

***We expect the stock to trade down today and it may remain weak until the option investigation reaches completion***.  SNIC will not report full financial statements until the investigation and restatements are completed.

111.    Based on the February 1, 2007 revelations, on February 2, 2007 Sonic's stock price dropped sharply from a closing price of $18.03 on February 1, 2007 to $16.68 on February 2, 2007 on over 1.1 million shares traded: over four times the volume of February 1, 2007.

112.    <u>Partial Disclosure and False and Misleading February 15, 2007 Press Release</u>:  On February 15, 2007 Sonic issued a press release announcing disappointing preliminary financial results for the quarter ended December 31, 2006 and providing select, incomplete information regarding their stock option review.  Contrary to what Sonic disclosed in its February 1, 2007 press release, Sonic for the first time revealed that it expected the amount of charges to be material.

***The Company's selected preliminary results and guidance may be adjusted as a result of possible restatement of historical results***.  As previously announced on February 1, 2007, Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting.  Based on the review, the audit committee and Sonic management have preliminarily concluded that, under applicable accounting guidance, Sonic lacks sufficient documentation for certain historical option grants and that the measurement dates associated with these option grants will need to be adjusted.  Further, as previously announced, the audit committee, after consultation with management and the Company's board of directors, has determined that the Company's annual and interim financial statements may no longer be relied upon.

***Sonic believes it will have to record additional non-cash charges for stock-based compensation expense and restate previous financial statements, and that such***

**charges will be material**.  Sonic is not yet able to determine the amount of such charges or the resulting tax and accounting impact of these actions.  Sonic intends to file its restated financial results and related periodic reports as quickly as possible.

All results and guidance reported today are presented without taking into account any adjustments to either current or previously reported results that may be required in connection with any restatement and should be considered preliminary until Sonic files its quarterly report on Form 10-Q for the third quarter ended December 31, 2006 and any required amended historical financial statements.  **Investors are cautioned that Sonic is unable to provide reconciliations to corresponding U.S. Generally Accepted Accounting Principles ("GAAP") measures for the non-GAAP information provided in this press release due to the ongoing options practice and accounting review.  The non-GAAP information includes those measures that exclude stock based compensation costs and/or other expenses that would otherwise be included in the applicable GAAP measures.**

Ex. 8.  (Second and third emphasis added in original.)

113.    On February 16, 2007, the Company held a conference call for analysts and investors. The call was hosted by defendants Leighton and Habiger.  During the call the Company declined to provide full revenue and earnings results for the quarter or a complete balance sheet.

**Dave Habiger** – Sonic Solutions – CEO

Welcome everyone, and thank you for joining us.  Today we're reporting financial results for the third fiscal quarter.  As our press release points out, because of the stock option review that we previously announced, we're reporting only selected financial results today.

\*        \*        \*

**Clay Leighton** – Sonic Solutions – CFO

Thank you, Dave.  Before I begin, I'd like to remind you that Sonic has commenced a voluntary review of its historical and current stock option grant practices and related accounting.  All results and guidance reported today are presented without taking into account any adjustments to either current or previous reported results that may be required in connection with any restatement and should be considered preliminary until Sonic files its quarterly reports on Form 10Q for the third quarter ended  December 31st,  2006  and  any  required  amended  historical  financial statements.

\*        \*        \*

During the quarter, we incurred the following operating expense.  All amounts exclude stock based compensation costs, which could be substantial.  Marketing and sales was $8.0 million; research and development, $10.9 million; general and administrative, $4.8 million; acquired in-process R&D, $3.5 million.  This acquired in-process R&D charge relates to the System OK acquisition.

\*        \*        \*

1    Now, I'd like to turn to the balance sheet.  At this point, we are not releasing a
2    complete balance sheet until we complete our stock option review.  However, we
     will provide some information related to our cash position.

3    114.    On February 16, 2007, Canaccord Adams issued a report discussing the Company's

4    February 15, 2007 conference call: "Lowering Rating from Buy to Hold on Yet Another Guide

5    Down."  The report noted the Company's failure to release its true financial condition through

6    complete financial for the quarter leaving investors to make assumptions on the Company's actual

7    results and weakening demand for its products.

8    **Lowering Rating From Buy to Hold on Yet Another Guide Down**

9    **Event**

10   Due to the voluntary stock option investigation, the company released selected
     preliminary financials for the quarter, reporting $39.1 million compared to our $40.8
11   million/$0.16 and the Street's $40.9 million/$0.16.

12                              *       *       *

13   **Details**

14   In light of the options investigation, Sonic reported preliminary financials, which did
     not include any stock-based compensation or an EPS number.  ***Nor did the company***
15   ***issue a balance sheet.***

16   115.    On February 16, 2007, in light of the Company's further revelations including the

17   materiality of its expected charges, Sonic's stock price dropped from a high of $16.20 on

18   February 15, 2007 to as low as $13.75 on February 16, 2007 on 2,080,300 volume shares traded.

19   That was compared to only 196,000 shares traded on February 15, 2007.

20   116.    During the following months, Sonic's stock price continued to decline as the

21   Company's "investigation" dragged on, and securities analysts covering the Company became

22   increasingly bearish, in part as a result of Sonic's investigation and stock option practices.

23   117.    The Class Period ends on May 17, 2007, when Sonic issued a press release containing

24   preliminary financial results and providing additional information on the Company's stock option

25   review.  The May 17, 2007 press release stated, contrary to previous press releases, that Sonic now

26   expected to "have to record ***additional cash and non-cash charges*** for stock-based compensation

27   expense and restate previous financial statements, and that such charges will be material."

28

[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAW - **C 07-05111-JSW**                                    - 42 -

1    Sonic believes it will have to record **additional cash and non-cash charges** for
     stock-based compensation expense and restate previous financial statements, and that
2    such charges will be material. Sonic is not yet able to determine the amount of such
     charges or the resulting tax and accounting impact of these actions. Sonic intends to
3    file its restated financial results and related periodic reports as quickly as possible.

4    Ex. 9.

5         118.    During Sonic's conference call that evening, Sonic's analysts questioned Leighton

6    regarding these latest disclosures:

7         **Alan Davis**
          Clay, one last question. In the wording on the stock options review, cash costs being
8         material, I wonder if there's any change there from what you've said prior, in terms
          of the potential cash costs of the options review.
9
          **Clay Leighton**
10        Well, we haven't -- are you referring to the cost of completing the review itself, or
          the eventual charges that we might have to take on our income statement related to
11        the review itself, related to --

12        **Alan Davis**
          Both combined, actually.
13
          **Clay Leighton**
14        In terms of the cost of doing the review, meaning the cost of the lawyers and the
          accountants and the like, I estimate that this quarter is likely to be a charge of $2.5
15        million or potentially more on that, in addition to the $600,000 that we recorded in
          the March quarter. In terms of the actual charges we might take, until we actually
16        complete the review, it's very hard to comment on that, except that there may be both
          cash and noncash charges associated with the conclusion of the review.
17
          **Alan Davis**
18        But that $2.5 million is cash?

19        **Clay Leighton**
          That is cash. That's the cost of hiring all the outside experts from our accountants to
20        lawyers, et cetera, who were involved in this process.

21        **Alan Davis**
          And that's all in the current quarter?
22
          **Clay Leighton**
23        That would be my estimate for the current quarter, yes.

24        119.    On May 18, 2007, Sonic's stock price dropped from a high of $13.37 on May 17,

25   2007, to a low of $12.08 on May 18, 2007 on 1,843,600 volume shares traded. That was compared

26   to only 550,500 shares traded on May 17, 2007.

27

28

1

2

**V.    DEFENDANTS KNEW OR DELIBERATELY DISREGARDED THAT THE COMPANY'S FINANCIAL STATEMENTS, PROXY STATEMENTS AND STATEMENTS REGARDING THE COMPANY'S ACCOUNTING PRACTICES WERE FALSE AND MISLEADING**

3

4        120.    Defendants' repeated statements that the Company issued stock options with an

5   exercise price equal to 100% of the stock price on the date of the grant (*E.g.*, ¶¶81, 90-91, 98, 100)

6   were materially false and misleading, and the Company and the Individual Defendants made these

7   statements knowingly, intentionally, or with deliberate recklessness disregarded that the Company

8   had, in fact, retroactively selected dates favorable to the grant recipients, representing monthly stock

9   price lows, and in some instances, representing the lowest price of a particular fiscal quarter or year.

10  Further, the retroactive selection of grant dates suspiciously and repeatedly occurred immediately

11  before sharp increases in the Company's stock price, giving the grantee an instant paper gain that

12  was not disclosed to shareholders or investors.

13        121.    Defendants' repeated statements that Sonic accounted for stock option issuance in

14  accordance with GAAP and APB 25 were also knowingly false and misleading. *E.g.*, ¶¶80, 89, 97,

15  106.  APB 25 requires that stock options be recorded as an expense on the measurement date of the

16  option grant, *i.e.*, the date of the grant.  Defendants knew or deliberately disregarded that Sonic had

17  in fact not taken the proper compensation expense during the Class Period for stock option grants

18  that were issued "in-the-money" and/or were also retroactively selected to create unearned paper

19  profits not disclosed to shareholders and investors.  In fact, because the Company has admitted that it

20  did not have the documentation evidencing the measurement dates or grant dates, it could not

21  accurately account for stock options and defendants knew or deliberately disregarded the facts at the

22  time they issued quarterly and year-end financial results, and made statements concerning manner in

23  which stock options were issued.  Indeed, the members of the Sonic Board and CEO, who were

24  specifically charged with administering the Company's stock option plans knew or should have

25  known that the statements were false and misleading.  Further, defendants Marguglio, Greber and

26  Langley were members of the Company's Audit Committee during the Class Period, and were

27

28

1   responsible for the oversight of the Company's financial statements. All defendants, at times during

2   the Relevant Period, executed false financial statements on Forms 10-K filed with the SEC.[9]

3       122.    Because defendants knew or with deliberate recklessness disregarded that the

4   Company had issued backdated stock options to defendants and Company executives and

5   employees, and failed to take the compensation expense required by GAAP and APB 25, defendants

6   also knew or with severe recklessness disregarded that Sonic's quarterly and annual earnings reports

7   and related press releases were materially false and misleading. *E.g.*, ¶¶76, 77, 79, 84-86, 88, 93-96,

8   102-05, 107, 108. Specifically, as detailed herein, Sonic overstated its net income, or understated its

9   net loss, throughout the Class Period as a result of Sonic's failure to account for in-the-money stock

10  option grants as required by APB 25. In each of those reports the Company affirmatively stated that

11  it complied with GAAP. The Company's materially false quarterly and annual earnings reports

12  caused Sonic's stock price to be artificially inflated, allowing the defendants to pocket huge insider

13  trading profits on top of exercising and selling retroactively priced stock options for millions of

14  dollars.

15      123.    Finally, the SOX certifications signed by defendants Doris, Leighton and Habiger

16  throughout the Class Period were knowingly false and misleading because they falsely attested to the

17  accuracy of Sonic's financial statements, as well as the adequacy of Sonic internal controls. *E.g.*,

18  ¶¶76, 77, 79, 82, 84-86, 88, 93-96, 102-05, 107, 108. As Sonic's restatement makes clear, the

19  Company either lacked any semblance of internal controls with respect to the granting of stock

20  options or disregarded those controls entirely. Indeed, Sonic has admitted that:

21          For a large portion of options issued by us, particularly prior to September 23,
22      2005 . . . , there is little or no contemporaneous grant-specific documentation that
        satisfies the requirements for "measurement dates" under APB No. 25 and that would
        allow us to maintain the original grant date used for accounting purposes (the
23      "Record Date"). Much of the transaction-specific documentation that was available

24  _____

25  [9]     Stock options do not grant, or backdate, themselves. As the court in *In Re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1613 (N.D. Cal. 2007):

26      If [defendants] had been so involved with granting options as plaintiff pleads, they
27      would have either known, or been deliberately reckless in not knowing, that stock
        options were not being issued at fair market value on the date of the grant.

28

in our records was unhelpful in establishing the date on which all required APB No. 25 elements were satisfied.

124.    Sonic's Board, defendants Doris, Sauer, Greber, Marguglio and Langley all knew, or were deliberately recklessness with respect to the accuracy of, their statements that stock options were issued at 100% of fair market value and that Sonic accounted for stock options in accordance with GAAP and APB 25.  Further, defendants Doris, Sauer, Greber, Marguglio and Langley all knew, or were deliberately recklessness with respect to the accuracy of Sonic's financial statements throughout the class period which admittedly understated Sonic's compensation expenses and overstated Sonic's net income and earnings per share.

125.    Specifically, Sonic stated throughout the Relevant Period that it was "the responsibility of the entire Board to . . . administer the Company's executives compensation plans." In administering Sonic's stock option plans, the Board and Doris were given the authority to: "(i) to grant Options; (ii) to determine the fair market value of the Common Stock subject to Options; (iii) to determine the exercise price of Options granted; (iv) to determine the persons to whom, and the time or times at which, Options shall be granted, and the number of shares subject to each Option . . . ." In March 2005, Sonic's Audit Committee, consisting of defendants Greber, Marguglio and Langley, assumed the duties of a Compensation Committee.

126.    As Sonic now admits in its February 26, 2008 Form 10-K, a substantial number of Sonic's stock options granted throughout the Relevant Period failed to comply with GAAP and were not correctly accounted for.  Further, there was "little or no contemporaneous grant-specific documentation that satisfies the requirements for 'measurement dates' under APB No. 25 . . . ." Ex. 6.  Thus, defendants Doris, Sauer, Greber, Marguglio and Langley, who were specifically charged with administering Sonic's stock options plans knew, or were deliberately reckless with respect to, the accuracy of Sonic's statements regarding their accounting for stock options grants, and Sonic's financial statements.

127.    Defendant Doris knew, or acted with deliberate recklessness with respect to, the accuracy of Sonic's statements that stock options were issued at 100% of fair market value and that Sonic accounted for stock options in accordance with GAAP and APB 25.  Defendant Doris also

1    knew or was deliberately recklessness with respect to the accuracy of Sonic's financial statements.

2    In addition to Doris's role as a director of Sonic, the Company's restatement reveals that, until

3    September 2005, Doris had been delegated the authority to "make grants to employees other than

4    executive officers."    At least 57% of employee grants throughout the Relevant Period were

5    backdated to correspond with periodic lows in Sonic's stock option price.

6    128.    This was accomplished by assembling and finalizing grant documentation "in

7    anticipation of quarterly SEC filings," and using as "as of" date which corresponded, more often

8    than not with a periodic low in Sonic's stock price. *See* ¶136.  Because the restatement admits that

9    Doris was responsible for granting these backdated options, there can be no question that he was at

10    least deliberately reckless with respect to the statements alleged herein to be false.  These statements,

11    including that Sonic granted options at 100% of fair market value and complied with APB 25, were

12    directly contrary to the practices employed by defendant Doris in administering Sonic's stock option

13    plans.

14    129.    Defendant Leighton knew, or acted with deliberate recklessness with respect to, the

15    accuracy of Sonic's statements that stock options were issued at 100% of fair market value and that

16    Sonic accounted for stock options in accordance with GAAP and APB 25.  Defendant Leighton also

17    knew or was deliberately reckless with respect to the accuracy of Sonic's financial statements.

18    Leighton signed off on Sonic's Forms 10-K throughout the Relevant Period.  Leighton also signed

19    SOX certifications attesting to the accuracy of Sonic's financial statements and the adequacy of

20    Sonic's internal controls.  However, at the same time as Leighton was certifying Sonic's financial

21    statements and signing Forms 10-K stating that all of Sonic's stock options were granted at 100% of

22    the fair market value, Leighton was himself receiving numerous backdated stock option grants.

23    Specifically, plaintiffs allege that Leighton received backdated options on July 16, 1996, July 22,

24    1997, November 30, 2000, July 12, 2001, March 11, 2003, and May 10, 2004.

25    130.    Leighton knew or should have known that the grants he was receiving were

26    backdated, as they all purported to fall on dates that corresponded with periodic lows in Sonic's

27    stock price.  In spite of this, Leighton signed SEC filings and SOX certifications which repeatedly

28    stated that all stock options were granted at 100% of the fair market value.  Leighton also knew or

1   was deliberately reckless in not realizing that Sonic was not expensing the grants of in-the-money as

2   required by APB 25. Mr. Leighton is a sophisticated executive who holds an MBA and has served

3   as a CFO or a Vice President of Finance for approximately 20 years. On February 25, 2008,

4   Leighton was forced to step down from the role of CFO at Sonic.

5   **VI.    POST CLASS PERIOD EVENTS AND ADMISSIONS**

6       131.    On June 8, 2007 Maxim Group initiated coverage on Sonic, giving the Company a

7   "sell" rating. One of the reasons for the sell recommendation was the ongoing options investigation:

8       **Stock Option Grant remains an overhang**

9       On February 1, 2007, the company started a voluntary review of its stock option
        grants. As a result, Sonic announced that it needed to adjust dates associated with
10      some past options grants. Furthermore, the company has effectively withdrawn some
        of its previous financial statements, likely due to the impact of options grants, stating
11      that its past financial results should no longer be relied upon. The company also
        stated that it intends to restate its past financial statements to reflect the results of the
12      stock options audit.

13      Although we do not believe that the company did anything illegal with its past
        options grants, at the very least, we recommend that investors avoid the stock until
14      the full financial impact is known.

15      132.    On August 22, 2007, D.A. Davidson & Co. issued an analyst report titled "1Q08

16  Results Out Thursday; Lowering FY08 Estimates." The report stated that "we continue to view

17  resolution of the stock options investigation as a catalyst for better performance from these shares."

18      133.    On September 25, 2007, William Blair & Company issued a report entitled "A

19  Diamond in the Digital Media Rough," which describes Sonic's options review as a negative

20  uncertainty:

21      **Options Investigation Could Create Overhang Until Resolved**

22      On February 2, 2007, Sonic's management initiated a voluntary review of its
        historical and existing stock option grant practice and related accounting. Based on
23      its review to date, Sonic lacks sufficient documentation for some historical grants
        and measurement dates, and the option grants may have to be adjusted. The likely
24      outcome of this will be restated financials with noncash charges, although the
        company does not believe prior revenues or cash balances will be affected.
25      Moreover, the company has not filed its recent 10-Q or 10-K for its March fiscal
        year-end.

26
27      134.    On December 10, 2007, Canaccord Adams issued an analyst report entitled

28  "Adjusting Estimates – Lowering March Quarter Revenue." The report expressed frustration that

1    Sonic's options review remained ongoing. "Meanwhile, the winding down of the stock options

2    review and subsequent filing of financials continues to drag on. While we had hoped the process

3    would be completed by the end of the month, we would not be surprised if that were not the case."

4        135.    On February 19, 2008, over a year after Sonic first announced the initiation of its

5    stock option investigation, the Company filed yet another Notice of Delisting, warning investors that

6    Sonic had still failed to complete its stock option review, and that it faced potential delisting as a

7    result of its inability to timely file its financial statements.

8        136.    On February 26, 2008, the Company filed its belated Form 10-K for FY07, which

9    included its restatement of financial results for the entirety of the Class Period.[10]  Ex. 6.  The

10   restatement also included a discussion of the Company's stock option review. The review, which

---

11   [10]    The initial discovery phase of this litigation should be swift and inexpensive as the Company
12   has already compiled many of the documents and e-mails that would be relevant to the alleged
     claims and possible defenses. For example, in its February 26, 2008 Form 10-K, the Company
13   revealed:

14           During the course of the review, legal counsel to the Audit Committee, with
15       the assistance of outside consultants, collected, processed and analyzed physical and
         electronic Company documents and records, including hard copy files, networked
16       electronic documents and the computer hard drives of Company personnel who were
         involved in the administration of our stock option programs. Counsel to the Audit
17       Committee was further assisted by an independent consulting firm engaged to assist
         in the collection, processing and analysis of options-related documentation. In all,
18       approximately 665,000 electronic documents were collected and processed, and
         approximately 215,000 electronic documents and 35,000 pages of paper documents
19       were reviewed. In addition, counsel conducted interviews of various Company
         personnel.

20           Supplementing the activities performed by and on behalf of the Audit
21       Committee, our management engaged in a detailed process of compiling, analyzing
         and assessing the information available to it relating to our granting of stock options
22       and administration of stock option plans during the Review Period. Information
         reviewed included, without limitation, documentation related to acquisitions and
23       other transactions completed by us, public filings (by us and by individual grant
         recipients), board minutes and written consents, spreadsheets and databases used to
24       memorialize and maintain option-related information, email communications and
         other transmittals of information to and from outside accountants, payroll
25       information, standard forms used to record decisions regarding hiring and
         termination of employees and related salary and option grant decisions known as
26       Employee Action Forms ("EAFs"), grant notices, offer letters, option statements, tax
         records, personnel files and other information.

27   Ex. 6.

28

1   was conducted by Sonic's management and Audit Committee – the very individuals responsible in

2   part for the backdating at Sonic – stated, amongst other things, that:

3       • "Based on the results of the review, we have concluded that *a substantial*
          *number of stock options granted during the Review Period were not*
4         *correctly accounted for* in accordance with accounting principles generally
          accepted in the United States applicable at the time those grants were made."
5

6       • "For a large portion of options issued by us, particularly prior to
          September 23, 2005 . . . , there is little or no contemporaneous grant-specific
7         documentation that satisfies the requirements for "measurement dates" under
          APB No. 25 and that would allow us to maintain the original grant date used
8         for accounting purposes (the "Record Date").  Much of the transaction-
          specific documentation that was available in our records was unhelpful in
9         establishing the date on which all required APB No. 25 elements were
          satisfied."
10

11      • "[O]ption grant agreements were typically dated "as of" with no separate date
          for the signature of a Company officer, and Company personnel indicated
12        that these *agreements were typically generated as part of the end-of-quarter*
          *reporting cycle, notwithstanding the Record Date appearing on the*
13        *documents themselves*.

14      • "[G]rant documentation was typically assembled and finalized in anticipation
15        of quarterly SEC filings."

16      • "[Doris], to whom authority to make grants to employees other than
          executive officers had been delegated until September 23, 2005, indicated
17        that he and others involved in the option granting process focused on the
          quarterly financial reporting cycle as the primary driver of decisions and
18        completion of associated documentation regarding the granting of options."

19      • ". . .  the Audit Committee noted instances in which personnel actively
20        discussed how to correct mistakes related to the documentation and related
          accounting treatment, and when to inform auditors of those mistakes . . ."
21

22      • "Prior to September 23, 2005, our CEO would typically make grants to our
          non-founder executive officer(s) who are considered "executive officers" for
23        purposes of Section 16 under the Exchange Act in the same manner as he
          would for non-executive employees of the Company.  Pursuant to the
24        delegation to him under our various option plans, the CEO generally did not
          have express authority to grant options to Section 16 officers, as this power
25        was reserved for the board."

26      • Under each of our various options plans, our CEO was delegated the
27        authority to make grants to employees other than executive officers.  As
          described above, except in particular circumstances . . . the Company
28        employed a quarterly-focused grant process for non-founder employees and

generally lack contemporaneous grant documentation sufficient to support the Record Dates for these option grants.

- Prior to September 23, 2005, our CEO would typically make grants to our non-founder executive officer(s) who are considered "executive officers" for purposes of Section 16 of the Exchange Act in the same manner as he would for non-executive employees of the Company.  Pursuant to the delegation to him under our various option plans, *the CEO generally did not have express authority to grant options to Section 16 officers, as this power was reserved for the board.  Nevertheless, these grants were made in a consistent fashion and it is apparent that our board was aware of these option grants and did not disapprove of them*. . . .

- We concluded that, based on the facts and circumstances, the most appropriate and reasonable approach to these grants is to apply all APB No. 25 criteria in the same manner as such criteria are being applied to grants to our non-management employees (*see* discussion *Other Employee Grants* below) that is, to recognize and acknowledge the existence of these grants, but to change measurement dates where there is insufficient information to reasonably conclude that the original Record Date satisfies the requirements of APB No. 25.

Ex. 6.

137.    The Company, in its February 26, 2008 Form 10-K, went to great lengths to obfuscate the details of the backdating at Sonic.  Nonetheless, the Form 10-K describes a pattern and practice of backdating at Sonic.  As the SEC's Chief Accountant stated in a letter regarding the various forms of options misconduct which have been seen by the SEC:

> *The existence of a pattern of past option grants with an exercise price equal to or near the lowest price of the entity's stock during the time period surrounding those grants could indicate that the terms of those grants were determined with hindsight.  Further, in some cases, the absence of documentation, in combination with other relevant factors, may provide evidence of fraudulent conduct*.

Ex. 7.

138.    Further, the February 26, 2008 Form 10-K stated that "[t]he Audit Committee did not find evidence that the officers or directors with responsibility for administration of our stock option programs had taken steps to provide themselves with options at better prices than those granted to other employees."  Ex. 6.  In other words, certain officers and directors – believed to be Doris and

1   Leighton – received backdated stock options along with Sonic's regular employees.  Such practices,

2   however, are entirely consistent with intentional backdating.[11]

3           139.    Despite the fact that Sonic's practice of backdating stock options started prior to the

4   beginning of the Class Period, Sonic has admitted that the failure to expense the granting of in-the-

5   money stock options had the most significant effect on Sonic's financial statements in FY03, FY04

6   and FY05 – in the heart of the Class Period.  As a result of Sonic's failure to properly account of

7   stock option compensation expenses, Sonic's net income and earnings per share were inflated as

8   shown in the following tables:

9
10   **Sonic Solutions**
     **Impact of Restatement on Net Income**
     **(in thousands, except error %)**

| | As reported ($) | Adjs. ($) | As Restated ($) | % Overstated |
|---|---|---|---|---|
| **FY98** | -5,876 | -60 | -5,936 | 1.02% |
| **FY99** | -1,859 | -619 | -2,478 | 33.30% |
| **FY00** | -5,694 | -1,393 | -7,087 | 24.46% |
| **FY01** | -5,855 | -1,454 | -7,309 | 24.83% |
| **FY02** | -4,182 | -3,535 | -7,717 | 84.53% |
| **FY03** | 2,537 | -4,412 | -1,875 | 173.91% |
| **FY04** | 11,084 | -9,533 | 1,551 | 86.01% |
| **FY05** | 8,542 | -5,006 | 3,536 | 58.60% |

18   **Sonic Solutions**
     **Impact of Restatement on Earnings per Share**

| | As Previously Reported | Change in Earnings per Share | Readjustment of Stock Options | % Overstated |
|---|---|---|---|---|
| **FY03** | $0.13 | -$0.24 | -$0.11 | 184.62% |
| **FY04** | $0.46 | -$0.39 | $0.07 | 84.78% |
| **FY05** | $0.32 | -$0.19 | $0.13 | 59.38% |

[11]    Another motivation for backdating options issued under broad-based plans might have been the cover it provided for executives to grant themselves  backdated options.  There is anecdotal evidence indicating that executives often were included in broad-based option grants that were backdated, but there is nothing to establish a causal connection.  *David I. Walker, Unpacking Backdating: Economic Analysis and Observations on the Stock Option Scandal*, 87 B.U.L. Rev. 561 (2007).

**VII. SONIC'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP**

140.    As a result of defendants' improper backdating of stock options, defendants caused Sonic to violate GAAP, SEC regulations and IRS rules and regulations.

141.    Sonic's financial results for 1998-2006 were included in reports filed with the SEC and in other shareholder reports.  In these reports, defendants represented that Sonic's financial results were presented in a fair manner and in accordance with GAAP.

142.    Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

143.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

144.    As alleged herein, defendants acted with scienter in that they: (a) had access to all internal data concerning the Company's stock option plans; (b) were solely responsible for establishing the terms of the option grants, including the choice of grant dates and exercise price; (c) knew or with deliberate recklessness disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false, incomplete or misleading; (d) knew or with deliberate recklessness disregarded that such statements or documents would be issued or disseminated to the investing public; and (e) knowingly or with deliberate recklessness participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

145.    Further, given the importance of stock options issued as compensation to Sonic employees, defendants were keenly aware of the negative impact on Sonic's financial condition that would result if the Company did not comply with APB 25 and was required to report compensation expenses for gains incurred in connection with misdated option grants.  Accordingly, it was of

1    enormous significance to Sonic's earnings and business model that the Company qualify for

2    favorable tax treatment under APB 25.  By disguising backdated options by manipulating their grant

3    dates, defendants were able to give significant additional immediate value to their employees'

4    options, while Sonic continued to claim favorable account treatment, under-report compensation

5    expenses, and inflate its earnings.

6    **Violations of GAAP**

7        146.    During the Class Period, defendants caused the Company to understate its

8    compensation expense by not properly accounting for its stock options under GAAP and thus

9    overstated the Company's net earnings.

10        147.    Under well-settled accounting principles in effect throughout the Class Period, Sonic

11    did not need to record an expense for options granted to employees at the then-current market price

12    ("at the money").  The Company was, however, required to record an expense in its financial

13    statements for any options granted below the then-current market price.  In order to provide Sonic's

14    executives and employees with far more lucrative "in-the-money" options, while avoiding having to

15    inform shareholders about millions of dollars incurred by the Company in compensation expenses

16    (and without paying the IRS millions of dollars in employment taxes), defendants systematically

17    falsified Company records to create the false appearance that options had been granted at the market

18    price on an earlier date.

19        148.    Throughout the Relevant Period, Sonic accounted for stock options using the intrinsic

20    method described in APB 25, "Accounting for Stock Issued to Employees."  Under APB 25,

21    employers were required to record as an expense on their financial statements the "intrinsic value" of

22    a fixed stock option on its "measurement date."  An option that is "in-the-money" on the

23    measurement date has intrinsic value, and the difference between its exercise price and the quoted

24    market price must be recorded as compensation expense to be recognized over the vesting period of

25    the option.  Options that are "at the money" or "out of the money" on the measurement date need not

26    be expensed.    Excluding non-employee directors, APB 25 required employers to record

27    compensation expenses on options granted to non-employees irrespective of whether they were "in-

28    the-money" or not on the date of grant.

**Sonic's GAAP Violations Were Material**

149.    The false and misleading statements and omissions defendants caused Sonic to make during the Class Period regarding its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, "Materiality," summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative considerations.  For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

150.    SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*        \*        \*

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\*        \*        \*

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

151.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute material fraudulent financial reporting.

**Sonic's Financial Statements Violated Fundamental Concepts of GAAP**

152.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB Opinion No. 28, ¶10);

(b)    the principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c)    the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)    the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.   To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    the principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    the principle of completeness, which means that nothing material is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

153.    Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

1    **Violations of the SEC Regulations**

2          154.    During the Relevant Period, defendants caused Sonic to violate SEC regulations by

3    failing to disclose that the Company's senior executives had been granted backdated stock options.

4          155.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

5    must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.402].    Item

6    402(b) and (c) require a company to provide both a Summary Compensation Table and an

7    Option/SAR Grants Table identifying the compensation of the named executive officers – the

8    company's CEO and its next four most highly paid executives.    Item 402 requires particularized

9    disclosures involving a company's stock option grants in the last fiscal year.    In the Summary

10   Compensation Table, the issuer must identify in a column "other annual compensation" received by

11   the named executives that is not properly categorized as salary or bonus, including any "[a]bove

12   market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to

13   the officer during the period.    Item 402(b)(2)(iii)(C)(2).    In the option grant table, the issuer must

14   identify in a column "[t]he per-share exercise or base price of the options . . . .    If such exercise or

15   base price is less than the market price of the underlying security on the date of grant, a separate,

16   adjoining column shall be added showing market price on the date of grant."    Item 402(c)(2)(vii).

17         156.    Defendants caused Sonic to violate SEC regulations by failing to disclose that the

18   Company's named executive officers had been granted options with exercise prices below the

19   market value on the date the Board approved the grant.

20   **Violations of IRS Rules and Regulations**

21         157.    During the Relevant Period, defendants further caused Sonic to violate IRS rules and

22   regulations due to its improper accounting for the backdated stock options.    As a result, the

23   Company's tax liabilities were understated exposing Sonic to potential amounts owed for back taxes,

24   penalties and interest to the IRS for improperly reporting compensation.

25         158.    Defendants caused the Company to violate IRS Code §162(m) which generally limits

26   a publicly traded company's tax deductions for compensation paid to each of its named executive

27   officers to $1 million unless the pay is determined to be "performance-based."    In order for

28   compensation to be performance-based, the Compensation Committee must have set pre-established

1    and objective performance goals.  The goals must then be approved by the shareholders.  Section

2    162(m) defines stock options as performance-based provided they are issued at an exercise price that

3    is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly

4    issued stock options do not have to be taken into account in calculating whether an executive's

5    compensation has exceeded the $1 million compensation cap.

6        159.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top

7    executives' soaring pay packages more closely to a company's performance.  This change in the tax

8    law turned compensation practices for a company's top executives away from straight salary-based

9    compensation to performance-based compensation, including stock options.  According to former

10   SEC Chairman Harvey Pitt: "What [162(m)] did was create incentives to find other forms of

11   compensation so people could get over the $1 million threshold without running afoul of the code."

12   (Alteration in original.)

13       160.    Defendants caused Sonic to violate IRS Code §162(m) by providing backdated

14   options to the Company's named executive officers which were granted with exercise prices that

15   were less than the fair market value of the stock on the date of the grant.  As a result all of the

16   income resulting from the exercise of the options must be included for purposes of calculating

17   whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

18       161.    Defendants further caused the Company to violate IRS rules and regulations in order

19   to avoid having to withhold income and FICA tax from its executives and employees upon the

20   exercise of Sonic's stock options by improperly accounting for its Non-Qualified Stock Options

21   ("NQSOs") as Incentive Stock Options ("ISOs").

22       162.    ISOs are a form of equity compensation that may be provided to a company's

23   employees.  ISOs are required to be granted at an exercise price that is no less than the fair market

24   value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not

25   subject to income tax upon exercise of the options but only upon sale of the stock (except for the

26   possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock

27   options that do not qualify as ISOs are considered to be NQSOs.  NQSOs are not entitled to

28   preferential treatment as they are subject to income tax and FICA withholding upon exercise.  As a

1  result, a company that fails to withhold income tax and/or FICA upon the exercise of NQSOs by its

2  employees would be liable for the amount of the income tax and FICA that the company failed to

3  withhold upon exercise of the options, in addition to interest and penalties.

4       163.  By improperly treating their backdated options as ISOs, defendants failed to provide

5  proper income tax and FICA withholdings upon the exercise of their options by their executives and

6  employees in violation of IRS rules and regulations.

7  **VIII.  LOSS CAUSATION**

8       164.  Lead Plaintiffs incorporate by reference and reallege each and every allegation set

9  forth above, as though fully set forth herein.

10       165.  During the Class Period, as detailed herein, defendants engaged in a scheme to

11  deceive the market and a course of conduct that artificially inflated Sonic's securities prices and

12  operated as a fraud or deceit on Class Period purchasers of Sonic's securities by misrepresenting the

13  Company's business success and future business prospects.  Defendants achieved this façade of

14  success, growth and strong future business prospects by misrepresenting the Company's financial

15  results and compensation practices.  Later, however, when defendants' prior misrepresentations and

16  fraudulent conduct began to be disclosed and became apparent to the market, Sonic's stock fell

17  precipitously as the prior artificial inflation came out of Sonic's securities prices.  As a result of their

18  purchases of Sonic securities during the Class Period, Lead Plaintiffs and other members of the class

19  suffered economic loss.

20       166.  During the Class Period, defendants presented a misleading picture of Sonic's

21  business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Sonic's

22  business was not as healthy as represented, defendants caused Sonic to misrepresent the Company's

23  earnings and compensation and tax expenses, among other important financial metrics.  During the

24  Class Period, defendants also repeatedly but falsely emphasized Sonic's compensation practices

25  aligned the interests of management with shareholders, and that Sonic's compensation and

26  accounting practices were overseen by independent, competent directors.

27       167.  These false and misleading statements concerning Sonic's financial results and

28  management compensation – plus defendants' non-disclosure of material facts concerning the

1    Company's compensation practices, which facts demonstrated defendants were not acting in the best

2    interests of shareholders but, rather, were acting dishonestly and in violation of the Company,

3    National Association of Securities Dealers Automated Quotations ("NASDAQ") and SEC policies

4    and regulations – caused and maintained the artificial inflation of Sonic's securities prices

5    throughout the Class Period and until the truth was slowly revealed to the market.

6         168.    Defendants' false and misleading statements had the intended effect and caused

7    Sonic's common stock to trade at artificially inflated levels throughout the Class Period.

8         169.    Starting in February 2007 through the end of the Class Period on May 17, 2007,

9    investors began to learn the truth upon a number of disclosures, including defendants' own

10   admissions, revealing, among other things: (i)  defendants had caused Sonic to engage in substantial

11   backdating of stock option grants issued to employees and executive officers; (ii) Sonic's published

12   financial statements during and prior to the Class Period were materially false and misleading due to

13   the failure to properly account for these stock option grants; (iii) senior management and directors

14   had not conducted themselves with integrity nor in the best interest of the Company's shareholders;

15   (iv) the Company's Board had been derelict in performing its duties; and (v) defendants sold shares

16   of Sonic based on material, non-public information.  As investors and the market became aware of

17   the true facts, the prior artificial inflation came out of Sonic's securities prices, damaging investors.

18        170.    As a direct result of these disclosures and the public revelations regarding Sonic's

19   issuance of stock options, and the falsity about Sonic's previous Class Period representations and its

20   actual business prospects going forward, Sonic's stock price dropped from a high of $18.03 on

21   February 1, 2007, to as low as $12.08 on May 18, 2007.  This drop removed some of the inflation

22   from Sonic's stock price, causing real economic loss to investors who had purchased the securities

23   during the Class Period.  In sum, as the truth about defendants' fraud and Sonic's business

24   performance was revealed on May 17, 2007, the Company's stock price dropped, the artificial

25   inflation partially came out of the stock, and Lead Plaintiffs and other members of the Class were

26   damaged.

27

28

**IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

171.    At all relevant times, the market for Sonic's securities was an efficient market for the following reasons, among others:

(a)    Sonic's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Sonic filed periodic public reports with the SEC and NASDAQ;

(c)    Sonic regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Sonic was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

172.    As a result of the foregoing, the market for Sonic's securities efficiently digested current information regarding Sonic from all publicly available sources and reflected such information in Sonic's stock price.  Under these circumstances, all purchasers of Sonic's securities during the Class Period suffered similar injury through their purchase of Sonic securities at artificially inflated prices and a presumption of reliance applies.

**X.    APPLICABILITY OF THE *AFFILIATED UTE* PRESUMPTION OF RELIANCE**

173.    Lead Plaintiffs are also entitled to the *Affiliated* presumption of reliance[12] because defendants' fraudulent scheme primarily involved a failure to disclose and/or concealment of material facts concerning defendants' backdating of options grants, which information Lead

---

[12]    A United States Supreme Court precedent relating to presumed reliance held in *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972).

1  Plaintiffs and the members of the Class would have wanted to have known and which would have

2  caused investors to not have purchased shares of Sonic at the prices they traded at during the Class

3  Period.

4  **XI.    NO SAFE HARBOR**

5      174.    The statutory safe harbor provided for forward-looking statements under certain

6  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

7  Many of the specific statements pleaded herein were not identified as "forward-looking statements"

8  when made.  To the extent there were any forward-looking statements, there were no meaningful

9  cautionary statements identifying important factors that could cause actual results to differ materially

10  from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

11  statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

12  liable for those false forward-looking statements because at the time each of those forward-looking

13  statements was made, the particular speaker knew that the particular forward-looking statement was

14  false, and/or the forward-looking statement was authorized and/or approved by an executive officer

15  of Sonic who knew that those statements were false when made.

16  **XII.    CLASS ACTION ALLEGATIONS**

17      175.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and

18  (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the publicly

19  traded securities of Sonic during the Class Period and who were damaged thereby (the "Class").

20  Excluded from the Class are defendants, the officers and directors of the Company, any employees

21  of Sonic, to the extent that they acquired Sonic securities by exercising stock options, at all relevant

22  times, members of their immediate families and their legal representatives, heirs, successors or

23  assigns and any entity in which defendants have or had a controlling interest.

24      176.    The members of the Class are so numerous that joinder of all members is

25  impracticable.  Disposition of their claims in a class action will provide substantial benefits to the

26  parties and the Court.

27      177.    Throughout the Class Period, Sonic's common stock was actively traded on the

28  NASDAQ, an active and efficient market.  While the exact number of Class members is unknown to

1   Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead

2   Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record

3   owners and other members of the Class may be identified from records maintained by Sonic or its

4   transfer agent and may be notified of the pendency of this action by mail, using the form of notice

5   similar to that customarily used in securities class actions.

6       178.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all

7   members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

8   law complained of herein.

9       179.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the

10  Class and have retained counsel competent and experienced in class and securities litigation.

11      180.    Common questions of law and fact exist as to all members of the Class and

12  predominate over any questions solely affecting individual members of the Class.  Among the

13  questions of law and fact common to the Class are:

14          (a)    whether federal securities laws were violated by defendants' acts as alleged

15  herein;

16          (b)    whether defendants acted with scienter;

17          (c)    whether the prices of Sonic common stock and other publicly traded securities

18  were artificially inflated during the Class Period;

19          (d)    whether the ownership share of public stockholders in Sonic stock was

20  improperly diluted as a result of Sonic's improper backdating of stock option grants;

21          (e)    to what extent the members of the Class have sustained economic loss and/or

22  damages and the proper measure of damages;

23          (f)    whether defendants should be required to disgorge their trading profits to

24  contemporaneous purchasers of Sonic stock; and

25          (g)    how to define contemporaneous purchasers for purposes of the Exchange Act.

26      181.    A class action is superior to all other available methods for the fair and efficient

27  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

28  damages suffered by individual Class members may be relatively small, the expense and burden of

1    individual litigation make it impossible for members of the Class to individually redress the wrongs

2    done to them.  There will be no difficulty in the management of this action as a class action.

3                                  **FIRST CLAIM FOR RELIEF**

4           **For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
                              **Against All Defendants**

5

6           182.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set

     forth above, as though fully set forth herein.

7
            183.    Defendants named herein are liable for: (i) making false statements; (ii) failing to

8    disclose adverse facts known to them about Sonic; and (iii) participating in, permitting or causing

9    contrivances and manipulative acts regarding Sonic's stock option plans and its financial statements.

10   Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of

11   Sonic's publicly traded securities, as it: (i) deceived the investing public regarding Sonic's business,

12   compensation practices and finances; (ii) artificially inflated the prices of Sonic's publicly traded

13   securities; (iii) caused Lead Plaintiffs and other members of the Class to purchase Sonic's publicly

14   traded securities at inflated prices which caused Lead Plaintiffs losses when the artificial inflation

15   was removed, and unlawfully and improperly diluted their holdings in Sonic.

16
            184.    During the Class Period, defendants disseminated or approved the false statements

17   specified above, which they knew or deliberately disregarded were misleading in that they contained

18   misrepresentations and failed to disclose material facts necessary in order to make the statements

19   made, in light of the circumstances under which they were made, not misleading.

20
            185.    During the Class Period, each of the defendants named herein occupied a position at

21   Sonic and was privy to non-public information concerning the Company.  Each of them knew or

22   recklessly disregarded the adverse facts specified herein and omitted to disclose these facts.

23   Notwithstanding their duty to refrain from selling Sonic stock while in possession of material,

24   adverse, non-public information concerning the Company, the insider selling defendants sold

25   millions of shares of Sonic stock at grossly inflated prices, improperly personally profiting and

26   benefiting from their wrongful course of conduct and false and misleading statements.

27

28

186.    While Sonic's top insiders and directors were issuing favorable, yet false and misleading statements about Sonic, defendants sold millions of shares of their Sonic stock to personally profit from the artificial inflation in Sonic's stock price.  Notwithstanding their access to material non-public information and their duty to disclose the same before acquiring or selling Sonic stock, certain of the defendants obtained option grants at artificially low prices or knew positive corporate news was coming which would boost the stock price and they also sold significant amounts of their Sonic stock at artificially inflated prices and at highly suspicious times.

187.    Public investors who purchased Sonic stock and other publicly traded securities at prices inflated by the false representations and omissions have suffered millions in damages.  Sonic and Sonic's insiders who knew the truth fared much better.

188.    At the same time that these defendants sold their shares of Sonic common stock on the open market, contemporaneous purchases were made by Lead Plaintiffs and other members of the Class.

189.    In committing the wrongful acts alleged herein, defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

190.    Defendants initiated and pursued a scheme and course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing insiders to manipulate its stock option plans and was misrepresenting its financial results; (ii) maintain defendants' executive and directorial positions at Sonic and the profits, power and prestige which defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Sonic, regarding defendants' compensation practices and Sonic's financial performance.

191.    The purpose and effect of defendants' scheme and common course of conduct was, among other things, to disguise defendants' violations of law, abuse of control, mismanagement, and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition, and to artificially inflate the price of Sonic common stock and other publicly traded securities so they could dispose of millions of dollars of their own Sonic stock, and enhance

1    their executive and directorial positions and receive the substantial compensation they obtained as a

2    result thereof.

3        192.    Defendants accomplished their common enterprise and/or common course of conduct

4    by causing the Company to purposefully and/or recklessly engage in the option backdating scheme

5    alleged herein and misrepresent Sonic's financial results.  Each of the defendants was a direct,

6    necessary and substantial participant in the common enterprise and/or common course of conduct

7    complained of herein.

8        193.    Each of the defendants herein was a direct and necessary participant in the wrongs

9    complained of herein.  In taking such actions to substantially assist the commission of the

10   wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing,

11   and was aware of his or her overall contribution to and furtherance of the wrongdoing.

12       194.    Defendants named herein acted with scienter in that they knew that the public

13   documents and statements issued or disseminated in the name of the Company were materially false

14   and misleading, knew that such statements or documents would be issued or disseminated to the

15   investing public, and knowingly and substantially participated or acquiesced in the issuance or

16   dissemination of such statements or documents as primary violations of the federal securities laws.

17   As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting

18   the true facts regarding Sonic, their control over, and/or receipt and/or modification of Sonic's

19   allegedly materially misleading statements and/or their associations with the Company which made

20   them privy to confidential proprietary information concerning Sonic and the options backdating

21   scheme, participated in the fraudulent scheme alleged herein.

22       195.    These defendants knew and/or recklessly disregarded the falsity and misleading

23   nature of the information which they caused to be disseminated to the investing public.  The ongoing

24   fraudulent scheme described in this Complaint could not have been perpetrated over the substantial

25   time period, as has occurred, without the knowledge and complicity of the insiders and personnel at

26   the highest levels of the Company, including defendants.

27       196.    Each defendant perpetuated and furthered the scheme and contrivance, failing to

28   disclose the material facts alleged herein to inflate Sonic's stock price and thus increase their own

1  profits.  Further, defendants failed to disclose material facts alleged herein so as to allow Sonic to

2  report financial results and profits which were materially inflated and in turn reap inflated bonuses

3  and other performance-related compensation, the extent of which was determined by Sonic's

4  financial results and profits.

5      197.   Defendants' affirmative actions and conduct to backdate and time their option grants,

6  as alleged herein, were based on a deliberate and concerted effort and course of conduct intended to

7  benefit and enrich themselves to the detriment of plaintiffs and the members of the Class.

8      198.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

9          (a)    employed devices, schemes and artifices to defraud;

10          (b)    made untrue statements of material facts or omitted to state material facts

11  necessary in order to make the statements made, in light of the circumstances under which they were

12  made, not misleading; or

13          (c)    engaged in acts, practices and a course of business that operated as a fraud or

14  deceit upon plaintiffs and others similarly situated in connection with their purchases of Sonic

15  common stock during the Class Period.

16      199.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the

17  integrity of the market, they paid artificially inflated prices for Sonic common stock.  Lead Plaintiffs

18  and the Class would not have purchased Sonic common stock at the prices they paid, or at all, if they

19  had been aware that the market prices had been artificially and falsely inflated by defendants'

20  misleading statements and/or failure to disclose material facts.

21      200.   During the Class Period, defendants named in this claim deceived investors and the

22  market and engaged in a course of conduct that artificially inflated Sonic's stock price and operated

23  as a fraud or deceit on Class Period purchasers of Sonic securities by falsifying the Company's

24  financial results.

25      201.   By misrepresenting the Company's financial statements, failing to inform the market

26  of the improper and manipulative options backdating scheme and the resulting impact it was having

27  on the Company's financial results and profits, and making other false statements, these defendants

28  presented a misleading picture of Sonic's business, compensation practices, financial results and

1    prospects.  This caused and maintained artificial inflation in the trading prices of Sonic's publicly

2    traded securities throughout the Class Period and until the truth came out.

3         202.    Defendants' false and misleading statements had the intended effect and caused Sonic

4    securities to trade at artificially inflated levels throughout the Class Period.

5         203.    As the truth about the extent and severity of Sonic's stock option abuses and prior

6    overstatement of income and the extent of the harm to its reputation and credibility in the market was

7    disclosed and became apparent to the market, Sonic's common stock price dropped as the prior

8    artificial inflation came out of the Company's stock price, falling from its Class Period high.  This

9    price decline occurred as the market digested the impact and meaning of defendants' "backdating"

10   scheme and its impact on Sonic.  A significant portion of the decrease in Sonic's stock price was due

11   to the disclosure, revelation and/or leakage of information inconsistent with defendants' prior

12   financial disclosures and Company releases.  This drop removed the inflation from Sonic's stock

13   price, causing real economic loss and damage to investors who had purchased the stock during the

14   Class Period.

15        204.    As a result of their purchases of Sonic stock during the Class Period, Lead Plaintiffs

16   and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities

17   laws.

18        205.    The Class Period-ending public revelations indicated that there had been prior

19   falsification of Sonic's financial results due to options backdating, accounting manipulations,

20   defendants' manipulative conduct and otherwise; and thus, the Company's prospects for business

21   success and earnings growth were severely diminished.  As investors and the market became aware

22   that Sonic's prior financial results had been falsified, and that Sonic's restatement would be material,

23   the prior artificial inflation came out of Sonic's stock price, damaging investors.

24        206.    As a direct result of defendants' admissions and the public revelations regarding the

25   truth about Sonic's improper options backdating practices, false financial results and its actual

26   earnings prospects going forward, Sonic's stock price plummeted, causing damage to Lead Plaintiffs

27   and the Class.  This decline in response to these revelations removed the inflation from the price of

28

1    Sonic's shares, causing real economic loss to investors who had purchased Sonic securities during

2    the Class Period.

3        207.    In sum, as the truth about defendants' prior misstatements and fraudulent conduct and

4    Sonic's actual financial business performance was revealed, the Company's stock price plummeted,

5    the artificial inflation came out of the stock and Lead Plaintiffs and other members of the Class were

6    damaged, suffering economic losses.

7        208.    The decline in Sonic's stock price near and at the end of the Class Period was a direct

8    result of the nature and extent of defendants' prior misstatements and fraudulent conduct finally

9    being revealed to investors and the market.  The timing and magnitude of Sonic's stock price

10   declines negate any inference that the loss suffered by Lead Plaintiffs and other Class members was

11   caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts

12   unrelated to defendants' fraudulent conduct.

13       209.    As a direct and proximate result of these defendants' wrongful conduct, Lead

14   Plaintiffs and the other members of the Class suffered damages in connection with their purchases of

15   Sonic common stock during the Class Period.

16                           **SECOND CLAIM FOR RELIEF**

17                    **For Violation of Section 14(a) of the Exchange Act**

18       210.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set

19   forth above, as though fully set forth herein.

20       211.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no

21   proxy statement shall contain "any statement which, at the time and in the light of the circumstances

22   under which it is made, is false or misleading with respect to any material fact, or which omits to

23   state any material fact necessary in order to make the statements therein not false or misleading."  17

24   C.F.R. §240.14a-9.

25       212.    Sonic's proxy statements alleged herein violated §14(a) and Rule 14a-9 because they

26   omitted material facts, including the fact that defendants were causing Sonic to engage in an option

27   backdating scheme, a fact which defendants were aware of and participated in.

28

1    213.    In the exercise of reasonable care, defendants should have known that Sonic's proxy

2    statements were materially false and misleading.

3    214.    The misrepresentations and omissions in the proxy statements were material to

4    plaintiffs and Sonic shareholders and voting on each proxy statement.  The proxy statements were an

5    essential link in the accomplishment of the continuation of defendants' unlawful stock option

6    backdating scheme, as revelations of the truth would have immediately thwarted a continuation of

7    shareholders' endorsement of the directors' positions, the executive officers' compensation and the

8    Company's compensation policies.

9    215.    As a result defendants are liable for the damages that have been sustained by Lead

10    Plaintiffs and the Class.

### THIRD CLAIM FOR RELIEF

#### For Violation of Section 20(a) of the Exchange Act
#### Against All Defendants

216.    Lead Plaintiffs incorporate by reference and reallege each and every allegation set

forth above, as though fully set forth herein.

217.    Defendants acted as controlling persons of Sonic within the meaning of §20(a) of the

Exchange Act.  By reason of their positions with the Company, and their ownership of Sonic stock,

defendants had the power and authority to cause Sonic to engage in the wrongful conduct

complained of herein.  Sonic controlled defendants and all of its employees.  By reason of such

conduct, defendants named herein are liable pursuant to §20(a) of the Exchange Act.

### FOURTH CLAIM FOR RELIEF

#### For Violation of Section 20A of the Exchange Act
#### Against Defendants Doris, Sauer, Ely, Greber, Langley, Leighton and Marguglio

218.    Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth

herein.

219.    While Sonic's securities traded at artificially inflated and distorted prices, the insider

selling defendants personally profited by selling a total of more than one million shares of Sonic

securities while in possession of adverse, material non-public information about Sonic, pocketing

over $23 million in illegal insider trading proceeds, as detailed above.

220.   By contrast, for example, plaintiffs purchased Sonic securities contemporaneously with some of the defendants as follows:

(a)   On February 19, 2004, Doris sold 104,000 shares at $21.50 for proceeds of $2,235,991. On the same date, City of Westland bought 1,900 shares of Sonic stock.

(b)   On February 19, 2004, Leighton also sold 21,000 shares at $21.50 for $559,000. On the same date, City of Westland bought 1,900 shares of Sonic stock.

(c)   On February 18, 2004, Langley sold 4,000 shares of Sonic stock at $21.15 for proceeds of $84,600. On February 13, 2004, Langley sold 4,000 shares of Sonic stock at $21.38 for proceeds of $85,348. On February 10, 2004, Langley sold 4,000 shares at $21.15 for proceeds of $84,600. City of Westland traded contemporaneously with defendant Langley by purchasing 1,900 shares of Sonic stock on February 19, 2004.

(d)   On February 10, 2004, Greber sold 10,000 shares at $21.13 for proceeds of $211,300. City of Westland traded contemporaneously with defendant Greber by purchasing 1,900 shares of Sonic stock on February 19, 2004.

221.   These plaintiffs and all the other members of the Class who purchased Sonic securities contemporaneously with the sales of Sonic securities by the Individual Defendants:

(a)   have suffered substantial damages in that they paid artificially inflated prices for Sonic securities as a result of violations of §10(b) of the Exchange Act and Rule 10b-5 herein described when the artificial inflation came out of Sonic's stock price; and

(b)   would not have purchased Sonic securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by defendants' false and misleading statements.

222.   As a result of the wrongful conduct alleged herein, these plaintiffs and other members of the Class have suffered damages.

223.   By reason of the foregoing, the defendants violated §20A of the Exchange Act and are liable to these plaintiffs and the other members of the Class for the substantial damages they suffered in connection with their purchase of Sonic securities during the Class Period.

1

**PRAYER FOR RELIEF**

2        WHEREFORE, plaintiffs pray for judgment as follows:

3        A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

4        B.     Awarding compensatory and punitive money damages against all defendants, jointly

5 and severally, for all losses and damages suffered as a result of the acts and transactions complained

6 of herein, together with pre-judgment interest, to ensure defendants do not participate therein or

7 benefit thereby;

8        C.     Awarding plaintiffs reasonable costs and attorneys' fees; and

9        D.     Awarding such other equitable, injunctive and/or other relief as the Court may deem

10 just and proper.

11

**JURY DEMAND**

12        Plaintiffs demand a trial by jury.

13 DATED:  May 27, 2008          COUGHLIN STOIA GELLER
                      RUDMAN & ROBBINS LLP

14                 SHAWN A. WILLIAMS
                 CHRISTOPHER M. WOOD

15

16

                          s/ Shawn A. Williams

17                 SHAWN A. WILLIAMS

18                 100 Pine Street, 26th Floor
                 San Francisco, CA  94111

19                 Telephone:  415/288-4545
                 415/288-4534 (fax)

20

21                 LABATON SUCHAROW LLP
                 CHRISTOPHER J. KELLER

22                 JONATHAN GARDNER
                 140 Broadway, 34th Floor

23                 New York, NY  10005
                 Telephone:  212/907-0700

24                 212/818-0477 (fax)

25                 Co-Lead Counsel for Plaintiffs

26

27

28

1

2   VANOVERBEKE MICHAUD
        & TIMMONY, P.C.
3   MICHAEL J. VANOVERBEKE
    THOMAS C. MICHAUD
    79 Alfred Street
4   Detroit, MI  48201
    Telephone:  313/578-1200
5   313/578-1201 (fax)

6   Additional Counsel for Plaintiff

7   T:\Cases$F\Sonic Solutions\CPT00051545 Corrected Consolidated.doc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on May 27, 2008, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7       I certify under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  Executed on May 27, 2008.

9

         s/ Shawn A. Williams

10       SHAWN A. WILLIAMS

11       COUGHLIN STOIA GELLER
         RUDMAN & ROBBINS LLP

12       100 Pine Street, 26th Floor

13       San Francisco, CA  94111
     Telephone:  415/288-4545

14       415/288-4534 (fax)

15       E-mail:ShawnW@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:07-cv-05111-JSW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Sara B. Brody**
  sara.brody@hellerehrman.com,terri.newman@hellerehrman.com,clay.davenport@he

- **John K. Grant**
  johnkg@csgrr.com,JDecena@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,cv

- **Monica Patel**
  monica.patel@hellerehrman.com,terri.newman@hellerehrman.com,clay.davenport@

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Shawn A. Williams**
  shawnw@csgrr.com,travisd@csgrr.com,moniquew@csgrr.com,e_file_sf@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Jonathan Gardner
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

Catherine J Kowalewski
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

David C. Walton

```
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```