1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
   CHRISTOPHER M. WOOD (254908)
3  100 Pine Street, Suite 2600
   San Francisco, CA  94111
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  shawnw@csgrr.com
   cwood@csgrr.com
6
   LABATON SUCHAROW LLP
7  CHRISTOPHER J. KELLER
   JONATHAN GARDNER
8  140 Broadway, 34th Floor
   New York, NY  10005
9  Telephone:  212/907-0700
   212/818-0477 (fax)
10 ckeller@labaton.com
   jgardner@labaton.com
11
   Co-Lead Counsel for Plaintiffs
12
   [Additional counsel appear on signature page.]
13
                  UNITED STATES DISTRICT COURT
14
                 NORTHERN DISTRICT OF CALIFORNIA
15

| | |
|---|---|
| 16  CITY OF WESTLAND POLICE AND FIRE ) | No. C 07-05111-JSW |
|     RETIREMENT SYSTEM and PLYMOUTH ) | |
|     COUNTY RETIREMENT SYSTEM, On ) | CLASS ACTION |
| 17  Behalf of Themselves and All Others Similarly ) | |
|     Situated, ) | PLAINTIFFS' OPPOSITION TO |
| 18  ) | DEFENDANTS' SUPERSEDING MOTION |
|                              Plaintiffs, ) | TO DISMISS THE [CORRECTED] |
| 19  ) | CONSOLIDATED CLASS ACTION |
|         vs. ) | COMPLAINT |
| 20  ) | |
|     SONIC SOLUTIONS, et al., ) | DATE:          September 5, 2008 |
| 21  ) | TIME:          9:00 a.m. |
|                            Defendants. ) | COURTROOM:  The Honorable |
| 22  _____ ) | Jeffrey S. White |

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2
**Page**

3   I.    INTRODUCTION ..................................................................................................1

4   II.   STATEMENT OF FACTS ....................................................................................3

5         A.   Sonic's Stock Option Plans.........................................................................3

6         B.   Sonic's Accounting for Stock Option Grants ............................................3

7         C.   Backdated Option Grants ...........................................................................4

8         D.   Backdated Stock Option Grants to the Officer Defendants ......................4

9         E.   The Audit Committee Investigation...........................................................4

10        F.   Sonic's Stock Price Plummets ...................................................................5

11        G.   Sonic's Restatement...................................................................................5

12        H.   The False and Misleading Financial Statements.......................................6

13        I.   The Individual Defendants Benefit from Stock Sales................................7

14  III.  ARGUMENT ........................................................................................................7

15        A.   Standard .....................................................................................................7

16        B.   Plaintiffs Have Adequately Alleged Defendants' Scienter Under the
               PSLRA .......................................................................................................7
17
18             1.   Backdating Is an Intentional Act.....................................................8

19             2.   The Complaint Adequately Alleges that the Individual Defendants
                    Participated in or Approved of the Backdating...........................11

20             a.   The Complaint Particularly Alleges that Doris Backdated
                    the Options .................................................................................11
21
22             b.   The Complaint Particularly Alleges that Leighton Knew
                    that the Financial Statements Were False and Misleading ...........13

23             c.   The Complaint Adequately Alleges that Sauer, Greber,
                    Langley and Marguglio Were Aware of and Tacitly
24                  Approved of the Backdated Options............................................14

25             3.   Defendants' Class Period Stock Sales Further Support the Already
                    Strong Inferences of Their Scienter .........................................15
26
27             4.   Appointing an Interested Committee to Evaluate Its Own Conduct
                    Is Akin to Appointing a Wolf to Guard the Henhouse ...............16
28

1

2                                                                                                    **Page**

3            5.    Defendants' Knowledge Is Further Supported by Their Positions of
                   Responsibility ................................................................................................18
4
             6.    Defendants' Execution of Multiple False Documents Including
5                  False Financial Statements Supports a Strong Inference of Scienter ........20

6            7.    Group Pleading ...........................................................................................22

7   IV.  THE COMPLAINT ADEQUATELY ALLEGES "CONTROL PERSON"
         LIABILITY AS TO ALL INDIVIDUAL DEFENDANTS.....................................22
8
    V.   THE COMPLAINT ADEQUATELY STATES SECTION 20A INSIDER
9        TRADING CLAIMS AGAINST DEFENDANTS DORIS, SAUER, ELY,
         GREBER, LANGLEY, LEIGHTON AND MARGUGLIO...............................25
10
    VI.  PLAINTIFFS HAVE SUFFICIENTLY PLED DEFENDANTS' PROXIES
11       CONTAINED MATERIAL MISREPRESENTATIONS AND OMISSIONS IN
         VIOLATION OF SECTION 14(a) .........................................................................27
12
         A.    There Is a Direct Link Between the Misrepresentation and/or Omission
13             and the Proposed Transaction ................................................................28

14       B.    Plaintiffs Adequately Plead that Defendants Were Negligent in
               Connection with Issuing the 2005 Proxy Statement.............................29
15
    VII. CONCLUSION.......................................................................................................30
16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Arthur Children's Trust v. Keim*,
  994 F.2d 1390 (9th Cir. 1993) .......................................................24

5

*Belova v. Sharp*,
  No. CV 07-299-MO, 2008 WL 700961
  (D. Or. Mar. 13, 2008) ...............................................27, 28, 29, 30

6

7

*Berman v. Thomson*,
  403 F. Supp. 695 (N.D. Ill. 1975) .............................................29

8

9

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...........................................8, 19, 20

10

*Buban v. O'Brien*,
  No. C 94-0331 FMS, 1994 WL 324093
  (N.D. Cal. June 22, 1994) ...........................................................26

11

12

*Commc'ns Workers of Am. Plan for Employees' Pensions &
Death Benefits v. CSK Auto Corp.*,
  525 F. Supp. 2d 1116 (D. Ariz. 2007) ........................................8

13

14

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990) ...................................................22

15

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ...........................................15, 20, 21

16

17

*In re 3COM Sec. Litig.*,
  761 F. Supp. 1411 (N.D. Cal. 1990) ..........................................22

18

*In re Am. Bus. Computers Corp. Sec. Litig.*,
  No. 913, 1994 WL 848690 (S.D.N.Y. Feb. 24, 1994) ...............26

19

20

*In re Applied Micro Circuits Corp. Sec. Litig.*,
  No. 01CV0649 KAJB, 2003 WL 25419526
  (S.D. Cal. July 15, 2003) .......................................................25, 26

21

22

*In re AST Research Sec. Litig.*,
  887 F. Supp. 231 (C.D. Cal. 1995) ............................................26

23

24

*In re CNET Networks, Inc.*,
  483 F. Supp. 2d 947 (N.D. Cal. 2007) .......................................18

25

*In re Countrywide Fin. Corp. Deriv. Litig.*,
  No. CV-07-06923-MRP (MANx), 2008 WL 2064977
  (C.D. Cal. May 14, 2008) ...........................................................25

26

27

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ...................................................14

28

1

2                                                                          **Page**

3   *In re Hansen Natural Corp. Sec. Litig.,*
           527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..........................................................................10
4
    *In re Juniper Networks Inc. Sec. Litig.,*
5          542 F. Supp. 2d 1037 (N.D. Cal. 2008) ................................................................ *passim*

6   *In re Lattice Semiconductor Corp. Sec. Litig.,*
           No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
7          (D. Or. Jan. 3, 2006) ...........................................................................................20

8   *In re McKesson HBOC, Inc. Sec. Litig.,*
           126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................14, 27, 29
9
    *In re NorthPoint Commc'ns Group, Inc., Sec. Litig.,*
10         221 F. Supp. 2d 1090 (N.D. Cal. 2002) .........................................................................19, 20

11  *In re Openwave Sys. Sec. Litig.,*
           528 F. Supp. 2d 236 (S.D.N.Y. 2007)...........................................................................25, 27
12
    *In re Read-Rite Corp. Sec. Litig.,*
13         335 F.3d 843 (9th Cir. 2003) .................................................................................13

14  *In re Silicon Graphics, Inc. Sec. Litig.,*
           183 F.3d 970 (9th Cir. 1999) ...................................................................................8
15
    *In re UnitedHealth Group PSLRA Litig.,*
16         No. 06-CV-1691 ......................................................................................................8

17  *In re Zoran Corp. Derivative Litig.,*
           511 F. Supp. 2d 986 (N.D. Cal. 2007) ................................................................ *passim*
18
    *Knollenberg v. Harmonic, Inc.,*
19         152 Fed. Appx. 674 (9th Cir. 2005).............................................................................28

20  *LDK Solar Sec. Litig.,*
           No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425
21         (N.D. Cal. May 29, 2008) .......................................................................16, 17, 19, 20

22  *Lee v. The City of Los Angeles,*
           250 F.3d 668 (9th Cir. 2001) ...................................................................................18
23
    *Manshardt v. Fed. Judicial Qualifications Comm.,*
24         408 F.3d 1154 (9th Cir. 2005) .................................................................................7

25  *Middlesex Ret. Sys. v. Quest Software, Inc.,*
           527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................................... *passim*
26

27

28

1

2                                                                                          **Page**

3  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
   *Am. West Holding Corp.,*
4       320 F.3d 920 (9th Cir. 2003) ................................................................. *passim*

5  *Paracor Fin., Inc. v. GE Capital Corp.,*
        96 F.3d 1151 (9th Cir. 1996) ........................................................................24
6
   *Ryan v. Gifford,*
7       918 A.2d 341 (Del. Ch. 2007)........................................................................10

8  *Siemers v. Wells Fargo & Co.,*
        No. C 05-04518 WHA, 2006 WL 2355411
9       (N.D. Cal. Aug. 14, 2006)...............................................................................23

10 *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
        127 S. Ct. 2499 (2007)..........................................................................*passim*
11
   *Wilson v. Great Am. Indus.,*
12      855 F.2d 987 (2d Cir. 1988)...........................................................................29

13 *Wool v. Tandem Computers, Inc.,*
        818 F.2d 1433 (9th Cir. 1987) ........................................................22, 23, 25
14

15
   **STATUTES, RULES AND REGULATIONS**
16
   15 U.S.C.
17      §78n(a) ...........................................................................................................27
        §78t-1(a)..........................................................................................................25
18
   18 U.S.C.
19      §1350................................................................................................................21

20 Federal Rules of Civil Procedure
        Rule 8...............................................................................................................23
21      Rule 9(b) .....................................................................................................8, 23
        Rule 12(b)(6)......................................................................................................7
22
   Securities and Exchange Act of 1934
23      §10(b).......................................................................................................*passim*
        §20(a).......................................................................................................*passim*
24      §20A.........................................................................................................*passim*

25

26

27

28

1

**SUMMARY OF ARGUMENT**

2      Defendants' motion to dismiss plaintiffs' §10(b) claim is essentially limited to an attack on

3 the specificity of plaintiffs' scienter allegations.[1]  However, the complaint more than adequately

4 pleads facts establishing a "cogent and compelling" inference of scienter as to each defendant under

5 *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).  Plaintiffs have shown

6 through powerful and unchallenged statistical evidence (***a 1 in 11 million chance***), together with

7 Sonic Solutions' ("Sonic" or the "Company") own admissions, that Sonic intentionally manipulated

8 the grant dates of numerous option grants (by intentionally backdating them to dates on which the

9 Company's stock was trading at historic lows) to enrich themselves.  Plaintiffs have also shown that

10 the individual defendants were responsible for both managing and approving the option granting

11 process and for review and approval of the false and misleading statements issued during the Class

12 Period.  Defendants manipulated the grant dates and then purposefully hid their failure to properly

13 account for the in-the-money backdated grants from the Company's shareholders, investors, auditors

14 and the U.S. Securities and Exchange Commission.  The options backdating scheme at Sonic was

15 prolonged and pervasive, influencing most options granted from 1996 to 2005 and resulted in the

16 Company having to issue a restatement covering the entire Class Period.

17      This predicate violation of §10(b) also results in control liability against the individual

18 defendants under §20(a) since, as senior executive officers, board members and Audit Committee

19 members, each individual defendant was personally involved in the fraudulent acts, they controlled

20 the subject matter of the fraud (the backdating) and the false statements.  *See In re Juniper Networks*

21 *Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1053 (N.D. Cal. 2008).

22      Further, the predicate §10(b) violation combined with plaintiffs' allegations that they traded

23 on the same day as two individual defendants, within one day of a third individual defendant, within

24

---

25 [1]      Defendants do not take issue with plaintiffs' allegations (i) that defendants issued materially
26 misleading statements between October 23, 2002 and May 27, 2007 (the "Class Period") (and only
several defendants – Mark Ely and the outside directors – argue that the misstatements are not
27 attributable to them), (ii) that defendants' fraud on the market establishes reliance, or (iii) loss
causation.

28

1    nine days of a fourth individual defendant and that numerous class members traded

2    contemporaneously with each insider selling defendant is sufficient to state a claim for violation of

3    §20A of the Securities Exchange Act of 1934. *See Middlesex Ret. Sys. v. Quest Software, Inc.*, 527

4    F. Supp. 2d 1164 (C.D. Cal. 2007).

5          Finally, plaintiffs adequately allege a §14(a) claim as (i) the 2005 Proxy Statement contained

6    false and misleading statements about Sonic's options practices and the Company's financials and

7    (ii) the corporate transaction voted on (the election of directors – defendants here) is directly linked

8    to the ongoing options backdating scheme at Sonic which lead to plaintiffs' damages.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      Plaintiffs City of Westland Police and Fire Retirement System and Plymouth County

2  Retirement System submit this Memorandum of Points and Authorities in opposition to the motion

3  to dismiss filed by defendants.

4                    **MEMORANDUM OF POINTS AND AUTHORITIES**

5  **I.    INTRODUCTION**

6      Falsity is not at issue.  Sonic Solutions ("Sonic" or the "Company"), through (i) its own

7  internal investigation[1] first made public in a February 1, 2007 press release and (ii) a restatement

8  announced in its FY07 Report on Form 10-K on February 26, 2008 (the "Restatement"), admits a

9  substantial number of stock options granted during the Class Period (October 23, 2002-May 27,

10  2007) were backdated and not correctly accounted for by the Company.  While defendants have

11  claimed in their motion that the Audit Committee "explicitly concluded" that no one at the Company

12  had engaged in any intentional wrongful conduct (Defs' Brf. at 1),[2] *the Audit Committee members*

13  *who reached that conclusion are defendants in this matter*.[3]  These self-exonerating conclusions

14  are neither surprising nor probative.

15      Plaintiffs' Complaint specifically details that Sonic, including certain of its former top

16  officers and the Audit Committee members, carried out a pervasive scheme that defrauded investors.

17  In general, their purpose was to (1) enrich themselves by acquiring in-the-money, backdated stock

18  options; (2)  reduce the Company's reported compensation costs by hiding the negative impact of

19  these grants (and similar backdated grants to other Sonic employees); and (3) hire and retain key

20  employees without having to pay them high cash salaries.  ¶4.

21

22

23  [1]      Sonic's internal investigation was conducted by its Management and Audit Committee, the

24  very individuals accused of backdating options at the Company.  ¶136 (All paragraph references
    ("¶") are to the [Corrected] Consolidated Class Action Complaint for Violations of the Federal

25  Securities Laws ("Complaint"), filed May 27, 2008.)

26  [2]      "Defs' Brf." refers to Defendants' Superseding Notice of Motion and Motion to Dismiss the
    [Corrected] Consolidated Class Action Complaint; Memorandum of Points and Authorities Thereof..

27  [3]      In fact, this action was commenced prior to the Audit Committee announcing its conclusions.

28

1      The Complaint details how Sonic and its officers committed fraud by, among other things:

2  (1) intentionally backdating numerous stock options in violation of the Company's publicly filed

3  plans to achieve a more favorable exercise price than that of the date the options were actually

4  granted, while representing to the market and accounting for such stock option grants as though they

5  were granted at the then current market price; (2) failing to properly account for backdated options;

6  and (3) reporting false grant dates for options whereon the price of Sonic stock was substantially

7  lower than on the date the option was actually granted.

8      The Complaint details how the scheme resulted in widespread violations of Generally

9  Accepted Accounting Principles ("GAAP") that caused every single financial statement, proxy

10  statement and earnings press release issued during the Class Period to be materially false and

11  misleading when made.[4]

12      The Complaint further establishes that Sonic's Audit Committee, comprised at all relevant

13  times of Robert M. Greber ("Greber"), Peter J. Marguglio ("Marguglio") and R. Warren Langley

14  ("Langley"), allowed this scheme to go on for years.  Each of the Stock Option Plans  provided that

15  the CEO and Board of Directors ("Board") had responsibility for issuing options.   The Audit

16  Committee was also required to review and/or sign off on every false statement issued pursuant to

17  this scheme, all of which misstated the true nature, scope and financial impact of Sonic's backdated

18  option grants and other aspects of the Company's financial health.  ¶121.

19      As revealed by the Restatement, defendants' scheme to backdate stock options lasted from

20  1996 through 2004 – an eight-year period.  ¶72.  Defendants' misconduct caused Sonic to materially

21  understate compensation expense and overstate earnings throughout the Class Period.  For example,

22  in FY03, Sonic overstated net income by $4.4 million, while reporting net income of only $2.5

23  million.  Thus, *for FY03 Sonic reported net income of $2.5 million when it should have reported a*

24  *net loss of $1.8 million* – an overstatement of 173.91%.  Similarly in FY02 and FY04, Sonic

25  overstated net income by 84.53% and 86.01%, respectively.  Sonic's reported earnings per share

---

26  [4]      Defendants do not challenge the materiality of any of the alleged false and misleading

27  statements.

28

1  ("EPS") were also grossly overstated during the Class Period.  In FY03 alone, Sonic reported EPS of

2  $0.13 when *it should have reported EPS loss of $(0.11)*.  ¶36.

3  **II.    STATEMENT OF FACTS**

4        **A.    Sonic's Stock Option Plans**

5        By 2000, Sonic had in place several Stock Option Plans  pursuant to which the Company

6  could grant stock options to its employees, officers, directors and consultants (the "Stock Option

7  Plans").[5]  *See* Exhibits 2-5.[6]  Each Stock Option Plan was administered by Sonic's Board and CEO

8  (¶¶18-21)[7] and each explicitly provided that the exercise price of incentive stock options may not be

9  less than 100% of the fair market value of the Company's common stock *on the day of the grant*.

10  ¶¶18-21.  The date of grant was defined, in turn, as the date as of which the Administrator approves

11  the grant.  ¶23.  Doris was the Company's CEO during the entire nine-year period that the Company

12  backdated options grants.

13        **B.    Sonic's Accounting for Stock Option Grants**

14        The Notes to Sonic's Consolidated Financial Statements in its Forms 10-K for FY03 through

15  FY06, clearly and falsely explain that Sonic followed Accounting Principles Board Opinion No. 25

16  ("APB 25") in accounting for stock options.  Additionally, these Notes state:

17        All options to date have been granted as incentive stock options … [which] must be
      granted at fair value at the date of the grant.

18
      ¶¶28, 81, 90, 98, 106.

19  _____

20  [5]    Sonic's Stock Option Plans consist of: (i) a stock option plan approved by Sonic's Board in
21  September 1989, which provides for the grant of stock options to employees and consultants (¶18);
(ii) a Directors Stock Option Plan approved by Sonic's Board in 1994, which provides for the grant
22  of stock options to the non-employee members of the Board (¶19); (iii) a stock option plan approved
by Sonic's Board in 1998, which provides for the grant of incentive stock options to employees
23  (¶20); and (iv) a stock option plan approved by Sonic's Board in 2000, which provides for grants of
incentive stock options to employees (¶21).

24  [6]    All "Ex. __" references are to the exhibits annexed to the Appendix to Consolidated Class
25  Action Complaint for Violations of the Federal Securities Laws, filed on March 21, 2008.

26  [7]    Indeed, Sonic stated, throughout the Class Period, that it was the responsibility of the ***entire
Board*** to administer the Company's executive compensation plans.  As Board members, Robert J.
27  Doris ("Doris"), Mary C. Sauer ("Sauer"), Greber, Marguglio and Langley had this responsibility.
¶¶124-125.

28

1  APB 25 provides that public companies that grant in-the-money options must take a com-

2  pensation expense for the difference between the fair value of the stock on the grant date and the

3  exercise price of the option.  The measurement date for determining when a grant is issued is the first

4  date that the number of options, the optionees and the exercise price are known with certainty.  ¶¶29-

5  30.  This simple policy was repeatedly violated during the Class Period, resulting in Sonic

6  understating its compensation expenses and overstating its reported net income.

7  **C.    Backdated Option Grants**

8  Between 1996 and 2004, Sonic reported 14 discretionary options grants – eight of which

9  were made on dates when Sonic's stock price was trading at its lowest price for the relevant month

10  and sometimes the lowest price for the fiscal quarter and/or fiscal year.  The odds that these grants

11  were so fortuitously timed by chance are ***approximately 1 out of 11 million***.  ¶9.

12  **D.    Backdated Stock Option Grants to the Officer Defendants**

13  Sonic's proxy statements, filed with the U.S. Securities and Exchange Commission ("SEC"),

14  demonstrate that the grant date of options to A. Clay Leighton ("Leighton"), Doris and Sauer on

15  July 12, 2001 was chosen with hindsight to ensure they were granted when Sonic's stock price was

16  at the monthly and quarterly low (and the second lowest price for the year), thereby ensuring

17  maximum personal benefits to the recipients (while violating the Company's publicly stated policy.

18  ¶14.  Leighton was also granted backdated options on five other occasions: (i) on July 16, 1996, the

19  lowest price of the quarter and second lowest price for the year (¶11), (ii) on July 22, 1997, the

20  lowest price for the quarter (¶12), (iii) on November 30, 2000, the monthly low (¶13), (iv) on March

21  11, 2003, the lowest price of the month and the remaining calendar year (¶78), and (v) on May 10,

22  2004, the lowest price for April through June 2004 (¶87).

23  **E.    The Audit Committee Investigation**

24  On or about February 1, 2007, Sonic announced an internal investigation – led by the Audit

25  Committee and Company management – into its past options practices.  ¶¶46-47 Each of the

26  individuals responsible for the internal investigation is a named defendant in this suit and was

27  responsible for Sonic's option backdating.

28

1    **F.    Sonic's Stock Price Plummets**

2    When Sonic finally shed light on the Company's true financial and operational condition, its

3    stock price plummeted.  For example, on February 1, 2007, when the Company announced it had

4    commenced a "voluntary" review of its historical stock option grant practices, that the Company

5    lacked proper documentation for historic option grants and that its past financial statements should

6    not be relied upon, Sonic's stock price fell $1.35 from $18.03 to $16.68 (¶¶46-47; Ex. 1); and on

7    February 15, 2007, when Sonic issued its press release providing select additional details of the

8    fraud, including for the first time that it expected the amount of charges to be material, the

9    Company's stock price dropped $2.45 from $16.20 to $13.75 on February 16, 2007 (¶¶48-49; Ex. 8).

10    ***These two drops alone account for a loss of market capitalization of more than $99 million***.

11    Sonic's stock price dropped another $1.29 on May 18, 2007 following revelation for the first time

12    that the Company expected to have to record ***additional cash*** and non-cash charges for stock-based

13    compensation expense as a result of the options backdating.  ¶¶50-51; Ex. 9.

14    **G.    Sonic's Restatement**

15    The Company announced a Restatement in its Form 10-K for FY07 to restate consolidated

16    financial statements for FY98-FY05.  The failure to properly expense backdated in-the-money

17    option grants had the most significant impact during FY03-FY05 – the heart of the Class Period –

18    for which Sonic wrote off all but $3.21 million of the $22.163 million previously reported as net

19    income and reduced EPS by a combined $0.82.  ¶139.

20    While the Restatement was carefully crafted to obfuscate the details of the backdating

21    scheme, the Company made a number of significant admissions, including the admission that "***a***

22    ***substantial number of stock options granted during the review period were not correctly***

23    ***accounted for***," in accordance with GAAP.[8]  The Restatement also admitted:

24    •    "[O]ption grant agreements were typically dated "as of" with no separate date for the
        signature of a Company officer, and Company personnel indicated that these
25        ***agreements were typically generated as part of the end-of-quarter reporting cycle,***
        ***notwithstanding the Record Date appearing on the documents themselves***.

26

27    [8]    Emphasis is added unless otherwise noted.

28

1

2

- "[T]he Audit Committee noted instances in which personnel actively discussed how to correct mistakes related to the documentation and related accounting treatment, and when to inform auditors of those mistakes . . . ."

3

4

5

- Under each of our various options plans, our CEO [Doris] was delegated the authority to make grants to employees other than executive officers.  As described above, except in particular circumstances . . . the Company . . . generally lack[ed] contemporaneous grant documentation sufficient to support the Record Dates for these option grants.

6

7

8

9

- Prior to September 23, 2005, our CEO [Doris] would typically make grants to our non-founder executive officer(s) who are considered "executive officers" for purposes of Section 16 of the Exchange Act in the same manner as he would for non-executive employees of the Company.  Pursuant to the delegation to him under our various option plans, *the CEO [Doris] generally did not have express authority to grant options to Section 16 officers, as this power was reserved for the board. Nevertheless, these grants were made in a consistent fashion and it is apparent that our board was aware of these option grants and did not disapprove of them*. . . .

10

Ex. 6.

11

12

### H.     The False and Misleading Financial Statements

13

The Complaint details the specific false and misleading statements contained in each of

14

Sonic's public statements, including its press releases and public filings with the SEC, during the

15

Class Period.  *See* ¶¶74-109, 112; Exs. 10-24.  Doris and Leighton signed each public filing as well

16

as Sarbanes-Oxley Act of 2002 ("SOX") certifications for each public filing from the beginning of

17

the Class Period through the filing of Sonic's Form 10-Q for the quarter ended June 30, 2005.

18

Thereafter each public filing as well as each SOX certification was signed by David C. Habiger

19

("Habiger") and Leighton.  Each Form 10-K issued during the Class Period was signed by Doris,

20

Sauer, Greber, Marguglio, Langley and Leighton.  ¶¶79, 88, 96, 105.  Habiger also signed the FY06

21

Form 10-K.  ¶105.  Defendants also filed false proxy statements during the Class Period, which

22

falsely represented that "the exercise price is equal to the fair market value of Sonic's common stock

23

on the date of grant."  ¶¶83, 91, 100.

24

25

26

27

28

As the Company's top executives, it is more than reasonable to infer that the officer defendants approved Sonic's false press releases. This is especially true for the CFO, since each press release contains financial results for the Company.[9]

## I.    The Individual Defendants Benefit from Stock Sales

During the Class Period, Doris, Sauer, Mark Ely ("Ely"), Greber, Langley, Leighton and Marguglio each handsomely benefited from sale of stock as depicted in the following chart:

| Defendants' Insider Stock Sales During the Class Period | | | |
|---|---|---|---|
| Defendant | Dates of Sales | Shares Sold | Proceeds Received |
| Doris & Sauer | 8/12/03 – 1/8/07 | 956,000 | $17,025,285 |
| Ely | 9/5/06 | 28,071 | $428,083 |
| Greber | 8/4/03 – 9/7/05 | 40,000 | $663,865 |
| Langley | 8/4/03-9/6/05 | 38,000 | $696,462 |
| Leighton | 8/12/03 – 8/25/05 | 261,000 | $4,440,900 |
| Marguglio | 8/22/03 – 8/28/03 | 20,000 | $254,630 |
| Total | | 1,343,071 | $23,509,225 |

## III.    ARGUMENT

### A.    Standard

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) only "if it appears beyond doubt that the plaintiff can prove no set of facts to support his claims." *Manshardt v. Fed. Judicial Qualifications Comm.*, 408 F.3d 1154, 1156 (9th Cir. 2005). In considering defendants' motion to dismiss, "[a]ll allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

### B.    Defendants Admit Falsity – Plaintiffs Have Adequately Alleged Defendants' Scienter Under the Private Securities Litigation Reform Act

A plaintiff may allege scienter through facts "'giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of

---

[9]    For example, Sonic issued a press release on October 23, 2002, while Leighton was CFO, in which Sonic reported its 2Q02 financial results in advance of its Form 10-Q. ¶74. The financial results reported in that press release were materially false.

1  misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)

2  (citing *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999). "In the Ninth

3  Circuit, recklessness (as a form of intentional conduct) has long sufficed to establish scienter for

4  §10(b) purposes." *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1046 (N.D. Cal.

5  2008).

6        The Supreme Court, in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007),

7  recently clarified that when evaluating a defendant's scienter, courts must consider whether an

8  inference of scienter is "cogent" and "at least as likely as" – but not more likely than – "any

9  plausible opposing inference." *Tellabs*, 127 S. Ct. at 2503, 2510 (emphasis in original). Moreover,

10  contrary to defendants' approach here, *Tellabs* clearly states that "[t]he inquiry . . . is whether all of

11  the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

12  individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in

13  original).[10] *Tellabs* also cautions "[t]he inference that the defendant acted with scienter need not be

14  irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'"

15  127 S. Ct. at 2510 (citations omitted). As discussed below, the totality of plaintiffs' allegations of

16  scienter meet, if not far exceed, the pleading requirements of Rule 9(b), the Private Securities

17  Litigation Reform Act ("PSLRA") and *Tellabs*.

18        **1.    Backdating Is an Intentional Act**

19        Backdating is an intentional act. Like betting on a horserace that has already been run, the

20  backdating assures the options granted bear the low exercise prices.[11] In this way, the backdating

21

---

22  [10]        This means that "the tie goes to the Plaintiff." *Commc'ns Workers of Am. Plan for*
23  *Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz.
    2007) (interpreting *Tellabs*). Defendants' assertion that plaintiffs' inferences must "outweigh"
24  competing inferences is thus an inaccurate statement of law. Defs' Brf. at 12.

25  [11]        *See In re UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691 (JMR/FLN), 2007 U.S. Dist.
    LEXIS 40623, at *6-*8 (D. Minn. June 4, 2007) ("[T]his case is incredibly simple. Plaintiffs claim
26  defendants were playing a game with a stacked deck. When awarded options, with deliberately
    selected grant dates which were already in the money, defendants were playing a game. . . . [T]he
27  patsy was either the hapless corporation, which in varying ways defendants controlled, or the
    corporation's shareholders, whose equity provided the game's antes and bloated pot.").

28

---

1    maximizes the value of those options to their recipient.  The backdating company avoids recording

2    compensation expenses for these backdated options because the options appear to have been granted

3    at-the-money on the purported "grant date."  The intent is to circumvent compensation expenses that

4    would otherwise be clearly required by GAAP, and to afford the optionees the greater benefit from

5    the options without any appropriate cost to the company.  Option backdating is often concealed by

6    falsifying documents, creating documents that purport to grant options "as of" a certain date, or by

7    failing to properly document the grants in the first place.  Indeed, numerous courts have found

8    statistical evidence a pattern of "granting" options on unusually fortuitous dates to be highly

9    probative of intentional backdating.

10           Here, plaintiffs have shown through powerful statistical data, together with the Company's

11   own admissions, that Sonic intentionally manipulated the grant dates of thousands of options through

12   backdating.  They have also demonstrated that those responsible for the backdating were the same

13   individuals that reviewed and approved the false and misleading statements alleged in the

14   Complaint.  The statistical improbability that a company and its executives would by chance select

15   such fortunate grant dates is powerful evidence that such grant dates were retroactively selected.

16   The more remote the odds, the stronger is the inference of intentional misconduct.

17           For instance, in *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1004 (N.D. Cal.

18   2007), 7 of the 32 grants at issue were priced on the lowest trading day of the relevant month, the

19   odds of which occurring by chance was 1 in 1,151 and 9 of 32 were made on one of the two lowest

20   trading days in a month.  On these facts, the court stated, "hitting the most favorable date seven

21   times out of 32 is a striking pattern" and "agree[d] that this pattern seems hugely suspicious."  *Id.*

22   Based on these facts, the court held "[c]oupled with the statistical pattern of favorable grant dates

23   and the fact that the grant date could be chosen at the will of the compensation committee, plaintiff

24   has plainly succeeded in pleading that these grants were backdated."  *Id.* at 1005.

25           Likewise, in *Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1181 (C.D.

26   Cal. 2007), Quest admitted that "most" of the options it granted between 1998 and 2002 were not

27   properly dated.  The court found the "extremely fortunate [grant] dates give rise to a strong inference

28   that backdating has occurred and that it was done intentionally."  *Id.* at 1182.  For additional support,

1   the court considered the graphical representation of the allegedly backdated grants and found it

2   equally remarkable.  *Id.*  The court stated:

3        The graphical representation lends substantial support to the notion that no amount of
         "highly technical" accounting treatments can obscure the obvious: that someone at
4        Quest was engaging in substantial, prolonged, and ***intentional*** backdating of stock
         options. In the parlance of the *Tellabs* holding, the Court can definitively state that
5        the inference that intentional backdating occurred at Quest is more "cogent and
         compelling" than any opposing inference offered by Defendant.  Thus, in accordance
6        with Ninth Circuit precedent, the question then becomes whether Plaintiff has
         adequately pled that Defendants either knew of the backdating, or were deliberately
7        reckless in not knowing of the backdating.

8   *Id.* (emphasis in original).

9        Plaintiffs allege here that Sonic made 14 discretionary option grants between 1996 and

10  2004.[12]  ¶9.  Of these, Sonic purportedly made eight grants on dates when its stock was trading ***at its***

11  ***lowest point in the relevant month***.[13]  *Id.*  According to the statistical analysis performed for

12  plaintiffs by Professor Eric Lie, the odds of this happening by chance are ***1 in 11 million***.  *Id.*

13  Additionally, the outrageously fortuitous grant dates occurred consistently for approximately eight

14  years between 1996 and 2004.  These extraordinary odds and the lengthy duration of the conduct

15  leave little doubt that individuals at Sonic deliberately manipulated the purported grant dates of the

16  Company's options.[14]  *See Ryan v. Gifford*, 918 A.2d 341, 355-56 (Del. Ch. 2007) (backdating of

17  stock options is intentional and egregious conduct resulting in a substantial likelihood of liability).

18  ───────────────────

19  [12]     In all, Sonic made 24 grants between 1996 and 2004, but at least ten of these grants were
20  non-discretionary grants awarded under Sonic's non-employee director plan, which grant dates could
    not be manipulated.

21  [13]     *See* ¶¶10-15, 78 and 87 for a graphical representation of Sonic's stock price on and
22  surrounding these backdated grants.

23  [14]     *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007), is not
    analogous.  There, the plaintiffs offered nothing but their own analysis comparing defendants'
24  purported option grant dates and the company's trading price ten days after the grant to conclude the
    company had backdated.  *Id.* at 1155-56.  There was no statistical analysis performed as to the
25  likelihood that such grants were chosen by chance, nor was there any description of what plaintiffs'
    analytical methods were, what those methods were based on, or whether the same methods had been
26  used by anyone else or had been peer reviewed.  Based on such "cursory allegations," the court
    declined to draw an inference that the grants at issue were backdated.  *Id.* Here, by contrast, Lead
27  Plaintiffs' expert, Eric Lie, is the leading statistician on the issue of backdating and has pioneered the
    analytical techniques for ferreting out backdating at public companies.  His work has been discussed
28  extensively since his seminal report was published in May 2005.  Professor Lie, using proven

1   Defendants claim that there is no evidence of intentional wrongdoing.  Defs' Brf. at 8.

2   Sloppy paper work and lax controls surrounding the granting of options, however, cannot explain

3   how nearly 60% of Sonic's discretionary option grants were purportedly made *on the absolute*

4   *lowest trading day in the relevant month*.[15]  Moreover, while sloppy paper work *might* (during

5   discovery) explain why the wrong grant dates were used, it *cannot* explain how the wrong grant

6   dates so consistently and overwhelmingly benefited the defendants.  Where, as here, the odds of

7   defendants selecting the purported grant dates by chance are *1 in 11 million*, the far more compelling

8   inference is that someone at Sonic intentionally backdated the grants at issue and that failing to

9   properly document such grants was necessary to facilitate the backdating and is additional indicia of

10  fraud.  *See Zoran*, 511 F. Supp. 2d 986; *Quest*, 527 F. Supp. 2d 1164.

11          **2.    The Complaint Adequately Alleges that the Individual**
            **Defendants Participated in or Approved of the Backdating**
12
13  Sonic's admissions place responsibility for backdating options at the feet of Sonic's top

    officers and directors.
14
            **a.    The Complaint Particularly Alleges that Doris**
15          **Backdated the Options**

16  According to the terms of Sonic's Stock Option Plans and representations in Sonic's annual

17  reports, Doris was responsible for administering option grants to the Company's non-§16 executive

18  officers.  As admitted in Sonic's Restatement, however, Doris consistently made option grants to

19  Sonic's §16 officers as well.  ¶53.  Each of the allegedly backdated grants was made to a §16 officer

20  of the Company.  ¶¶10-15, 78, 87.  Thus, by Sonic's own admission, Doris made each of the

21  _____

22  methods of statistical analysis of potentially backdated grants, has concluded the chance of the grant
23  dates at issue being selected at random were astronomical.  This evidence is far more compelling
    than that pleaded in *Hansen*, and is even stronger than the evidence of backdating pleaded in *Quest*
24  and *Zoran*.

25  [15]    *See also* Ex. 7 (September 19, 2006 letter from the SEC's Chief Accountant stating, "The
    existence of a pattern of past stock option grants with exercise prices equal to or near the lowest
26  price of the entity's stock during the time period surrounding those grants could indicate that the
    terms of those grants were determined with hindsight.  Further, in some cases, the absence of
27  documentation, in combination with other relevant factors, may provide evidence of fraudulent
    intent.").

28

allegedly backdated grants. As demonstrated by the statistical improbability that those grant dates were selected at random, there is at least a strong, cogent and compelling inference that Doris intentionally backdated the grants at issue. *See Zoran*, 511 F. Supp. 2d at 1005.

At the time Doris backdated these grants, he was well aware that the terms of Sonic's Stock Option Plans (plans he had adopted as a member of the Board) did not permit backdating. ¶¶17-23; Exs. 2-5. When he later signed and certified statements in the Company's annual reports affirming that all of the options issued by the Company were granted "at the fair market value of Sonic Solutions' Common Stock on the date of grant," Doris knew or was deliberately reckless in not knowing that these statements were false and misleading because he had backdated options to make them in-the-money when actually granted. ¶¶79-82, 88-90, 96-99. Those same annual reports falsely confirmed that Sonic "account[s] for share-based employee compensation using the intrinsic value method in accordance with APB No. 25," even though Doris knew the Company did not expense the options he himself had backdated. *Id.* Accordingly, Doris knew or was deliberately reckless in not knowing that the Forms 10-K and related financial statements were false and misleading.

Doris also certified each of the false financial statements at issue pursuant to SOX. ¶¶37, 76-99. In those certifications, he stated the reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements not misleading, and that the reports fairly presented in all material respects the financial condition, results of operations and cash flows of Sonic. ¶37. The Complaint alleges that he knew or was deliberately reckless in not knowing that these statements were false, because he had intentionally backdated options in violation of Sonic's Stock Option Plans, then falsely stated in the reports that all options were granted at the fair market value on the date of the grant.

The Complaint alleges that the certifications Doris signed also falsely stated that he and Leighton had designed adequate disclosure controls to ensure that all material information regarding Sonic was properly reported, that he and Leighton had tested those controls and deemed them adequate, and that all deficiencies in those controls, as well as any known frauds (whether material or not), were reported to Sonic's Audit Committee and its auditors. ¶37.

1      Moreover, Doris repeatedly and falsely stated that Sonic accounted for options in accordance

2  with APB 25, but the Restatement admitted there was "little or no contemporaneous grant-specific

3  documentation that satisfies the requirements for 'measurement dates' under APB 25." ¶32.

4  However, Sonic admits that the grants Doris backdated consistently lacked the required

5  documentation – a most rudimentary control and one that was required by the Stock Option Plans

6  themselves.   ¶136.   These admissions that suggest that defendants had a contemporaneous

7  knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent

8  with the earlier statement. *See*, *Quest*, 527 F. Supp. 2d at 1189 (citing *In re Read-Rite Corp. Sec.*

9  *Litig.*, 335 F.3d 843 (9th Cir. 2003)).  The Complaint adequately alleges that Doris knew or was

10  deliberately reckless in not knowing that the statements at issue were false and misleading when

11  issued, and thus there is a strong, cogent and compelling inference of Doris' scienter.

12                    **b.    The Complaint Particularly Alleges that Leighton Knew**
                            **that the Financial Statements Were False and**
13                          **Misleading**

14      Leighton received six of the eight allegedly backdated grants.  ¶¶11-14, 78.  Leighton was

15  also Sonic's CFO and certified false and misleading financial reports during the Class Period.  Each

16  misstated the Company's earnings and was not prepared in accordance with GAAP due to

17  defendants' failure to properly account for the backdated options under APB 25.  ¶¶75-108.  Many

18  of those reports also included statements that all options were granted at fair market value and were

19  accounted for properly under APB 25.  ¶¶80, 89-90, 97, 106.  As the recipient of numerous options

20  that were patently in-the-money when issued to him, it defies logic and common sense to suggest

21  Leighton did not know those statements were false and misleading. *See Quest*, 527 F. Supp. 2d at

22  1183-84 ("[T]he Court finds that the substantial number and value of the option grants given to

23  Defendants that consistently had measurement dates on either the lowest prices of the year or

24  immediately proceeding [sic] rapid rises in the Company's stock, combined with Defendant's key

25  positions relating to both the granting of and/or accounting for stock options gives rise to compelling

26  inference of either Defendants' actual knowledge or deliberate recklessness.").

27      Leighton's certifications also included false assurances that he and Doris had designed or

28  caused to be designed adequate internal controls such that the Company's publicly released financial

1 reports were true and accurate in all material respects. ¶¶37, 76-108, 123, 129-130. As Sonic later

2 admitted, however, those controls contained glaring material weaknesses. ¶¶109, 123, 136.

3 Moreover, despite requirements in the Stock Option Plans that each option grant required a written

4 option agreement memorializing the grant, the Restatement admitted that grants were routinely made

5 without the proper paperwork. *Id.* Accounting for options for which he lacked required paperwork

6 is at the very least deliberately reckless. Considering option grants can only be backdated by either

7 falsifying documents or by failing to create the required documents in the first place, Leighton's

8 receipt of and accounting for options that lacked the required paperwork, by itself, strongly indicates

9 his scienter. Scienter is properly alleged when the complaint alleges both false statements and the

10 defendants' close involvement in the preparation of those statements. *Zoran*, 511 F. Supp. 2d at

11 1013 (citing *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1022-24 (9th Cir. 2005)).

12      Leighton's removal as Sonic's CFO and reassignment following disclosure of defendants'

13 fraud is additional circumstantial evidence of scienter. *See In re McKesson HBOC, Inc. Sec. Litig.*,

14 126 F. Supp. 2d 1248, 1274 (N.D. Cal. 2000); *see also In re Adaptive Broadband Sec. Litig.*, No. C

15 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (inference of scienter raised because

16 "[a]s Adaptive's financial difficulties were coming to light" by a restatement and an internal

17 investigation "three of the named individual defendants either left the company or were moved to

18 new positions").

19                    c.    **The Complaint Adequately Alleges that Sauer, Greber,**
                            **Langley and Marguglio Were Aware of and Tacitly**
20                          **Approved of the Backdated Options**

21      Sauer, Greber, Langley and Marguglio were each members of Sonic's Board during the Class

22 Period. ¶¶24, 63, 65-67. As such, they were required by the Stock Option Plans to ***administer*** stock

23 option grants to Sonic's directors and §16 officers. ¶¶18-25. The annual reports each signed also

24 confirmed that such options were administered by these defendants. ¶¶22, 79, 88, 96, 105.

25      Sonic admitted that Doris had actually made the option grants to the Company's §16 officers,

26 and further admitted "***it is apparent that our board was aware of these option grants and did not***

27 ***disapprove of them***." ¶¶53, 136. Thus, according to Sonic's admission, Sauer, Greber, Langley and

28 Marguglio each knew of the misconduct. By condoning the improper usurpation of their duties,

1   these defendants demonstrate at least severe recklessness towards the propriety of Sonic's option

2   grants.

3       Moreover, as members of the Audit Committee throughout the Class Period, Greber, Langley

4   and Marguglio "reviewed and discussed the audited consolidated financial statements for the [Class

5   Period] with the Company's management and has discussed the matters required to be discussed

6   pursuant to Statement on Auditing Standards No. 61 (Communications with Audit Committees) with

7   the representatives of KPMG LLP, the independent auditors of the Company." *See*, *e.g.*, Ex. B at 7

8   to Defendants' Request for Judicial Notice.  Each signed the false financial statements indicating

9   their approval of the reports' contents.  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000).

10  Finally, Sauer co-founded Sonic with her husband Doris.  ¶63.  Considering her oversight of option

11  grants as a Board member and her receipt of backdated options, it is reasonable to infer that she

12  knew the statements alleged were false and misleading.  These facts taken together support a strong,

13  cogent and compelling inference of their scienter.  *Tellabs*, 127 S. Ct. 2499.

### 3.   Defendants' Class Period Stock Sales Further Support the Already Strong Inferences of Their Scienter

        Plaintiffs allege that defendants sold $23 million worth of Sonic stock during the Class

Period.  Defendants argue that their stock sales do not give rise to a strong inference of scienter

because plaintiffs have not alleged these sales were "unusual" or "suspicious" in number or timing,

or relative to their past trading behavior.  Defs' Brf. at 19-20.

        The percentage of shares sold is less relevant in the backdating context because the long

duration of the fraud alleviates any need to sell large numbers of shares quickly.  *Quest*, 527 F. Supp.

2d at 1185.  Where a defendant believes the fraud will continue undetected for years or decades,

there is no compulsion to sell-off shares quickly.  *Id.*  Moreover, large sales may have actually raised

suspicion, causing early detection of defendant's scheme.  *Id.*  "Thus, the requirement that

percentages be pled is only relevant when the insider is aware of the time that the inside information

will be disclosed and there will be a resulting effect on the stock price."  *Id.*

        With respect to timing, "the nature of Defendants' alleged scheme was such that there was no

preordained date on which the allegations of improper backdating would be revealed with the

1    resulting drop in stock price." *Id*.  Additionally, once backdating became public, any large stock

2    sales by the defendants would have caused a strong appearance of impropriety. *Id*. "Thus, the fact

3    that Plaintiff has not pled facts relating to the timing of Defendants' sales is of little significance and

4    this factor neither weighs for nor against a finding of suspicious stock sales." *Id*.

5         Likewise, whether defendants' sales were consistent with their prior trading history is also

6    moot because defendants are alleged to have been backdating options since Sonic went public. *Id*.

7    Thus, defendants' entire trading history has been influenced by the backdating fraud, rendering any

8    comparison to their pre-Class Period trading histories irrelevant. *Id*. at 1187.  Therefore, this factor

9    does not weigh for or against a finding of suspicious stock sales either. *Id*.  Accordingly "[g]iven

10    that the first factor, 'amount of shares sold' weighs in favor of a finding that the stock sales provided

11    a motive for Defendants' backdating, and that the second and third factors neither weigh for nor

12    against a finding of suspicious stock sales . . . the stock sales are 'suspicious,' and thus provide a

13    possible motive for Defendants' actions." *Id*.

14                    **4.    Appointing an Interested Committee to Evaluate Its Own**
                           **Conduct Is Akin to Appointing a Wolf to Guard the Henhouse**

15

16         Defendants argue that the findings of the Audit Committee exonerate them from liability for

17    the admitted fraud. Defs' Brf. at 4-5.  A special committee or audit committee, however, is not the

18    final arbiter of defendants' liability.  In fact, courts have not hesitated to find scienter was alleged

19    even where an independent committee investigating the fraud found it lacking.  In *Zoran*, the district

20    court denied the defendant's motion to dismiss the §10(b) claims of backdating against the

21    company's CEO and CFO despite the fact that its own internal investigation concluded "that there

22    was no evidence of wrongdoing by any member of the company's senior management." 511 F.

23    Supp. 2d at 997-98, 1013.  Indeed, to find that a special committee appointed by the company could

24    extinguish a plaintiff's claims would improperly usurp the role of the courts and place an

25    unwarranted degree of control in the hands of management to determine who would judge their

26    culpability. *See, e.g.*, *LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 U.S. Dist. LEXIS 42425,

27    at *31-*32 (N.D. Cal. May 29, 2008).

28

1    The inequity of such a scenario is highlighted in the instant case where Sonic's

2    "independent" investigators *were* its Audit Committee—the same defendant directors (Greber,

3    Langley and Margulgio) who are alleged to have approved of the backdating and the making of

4    numerous false and misleading statements.  This "wolf guarding the henhouse" scenario reeks of

5    self-interest and offers no shelter to defendants.  *See Quest*, 527 F. Supp. 2d at 1190; *see also LDK*,

6    2008 U.S. Dist. LEXIS 42425, at *31-*32.  For instance, in *Quest*, the defendants argued they could

7    not have intentionally violated the securities laws through backdating because each of the financial

8    statements at issue had been reviewed and approved by the company's auditors.   The court

9    disagreed, stating:

10       The fact that the financial statements were audited is insufficient to negate a finding
         of knowledge or deliberate recklessness on the part of Defendants.   Neither
11       Defendants' Motion nor Reply states who performed the audits, whether the auditors
         were members of the board, whether the auditors were recipients of option grants, or
12       whether auditing was done by an outside body hired by Quest.  ***Plaintiff, however,
         has alleged that one of the members involved in the option backdating practices***
13       ***was also a member of the Audit Committee.  To borrow from a colloquialism, this***
         ***case presents a situation where the wolves were guarding the henhouse.  Instead of***
14       ***protecting the company from reporting improper financial statements, those***
         ***responsible for supervising and auditing the financial statements were the very***
15       ***same people facilitating and benefitting from Quest's financial improprieties***.

16    *Quest*, 527 F. Supp. 2d at 1190.  Here, plaintiffs allege that defendants Greber, Langley and

17    Marguglio knew or were deliberately reckless in not knowing that Doris had usurped his

18    administrative role of granting options to Sonic's officers and had backdated many of the grants he

19    made.  ¶53.  These defendants then signed annual reports during the Class Period which included

20    false statements assuring investors that Sonic did not grant in-the-money options, as well as inflated

21    earnings resulting from the improper accounting for backdated options.  ¶¶79, 88, 96, 105.

22    Greber, Langley and Marguglio, as Sonic's Audit Committee, were responsible for ensuring

23    the Company had adequate internal controls and that its publicly released financial reports were

24    accurate.   These same defendants then exonerated their own misconduct and that of their

25    confederates, and now seek to use their own biased conclusions as a shield to plaintiffs' claims.[16]  In

26    _____

27    [16]    In their presentation of the facts, defendants state the special committee was "comprised

28    solely of independent directors."  Defs' Brf. at 4.  While these directors may have been independent

1  light of their self-interest, their "findings" are of no more value than their arguments in this brief and

2  should not be credited with the imprimatur of impartiality.[17]

3      Without acknowledging the obvious self-interest imbedded in Sonic's backdating

4  investigation, defendants rely on *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947 (N.D. Cal. 2007),

5  for the proposition that exoneration by a special committee essentially neutralizes defendants'

6  admissions of guilt.  Defs' Brf. at 14-15.  But in *CNET*, the special committee at least had the

7  outward appearance of independence.  According to CNET's annual proxy statement, the "special

8  committee" consisted of two outside board members who were not also members of CNET's

9  compensation committee (which committee was charged with oversight of the company's option

10  grants). Where the special committee investigating the fraud is indeed independent, their conclusions

11  *may* be entitled to *some* weight.  That is not the case here.

12      Here, plaintiffs have alleged direct evidence of Doris' backdating and the approval of that

13  backdating by the remaining defendants.  Therefore, considering the blatant bias inherent in the

14  Audit Committee's conclusions, and the strong direct evidence contradicting those conclusions, the

15  Audit Committee's findings are unpersuasive and they should not be afforded any weight.

16      **5.    Defendants' Knowledge Is Further Supported by Their
             Positions of Responsibility**

17

18      Defendants were the key corporate executives at Sonic and several were responsible for

19  administering the Stock Option Plans at issue.  The plans were administered by the CEO and the

20  Board.  ¶¶19-23.  These responsibilities are germane to the scienter analysis.  They demonstrate

21  defendants' control over the granting of options at Sonic.  Moreover, plaintiffs do not rely solely on

22  in the sense they were not officers or executives of Sonic, they were in no way "independent" when

23  it came to claims of option backdating, particularly where the plain language of the Stock Option

   Plans charged these "independent" directors with administration of the plans, including the

24  discretion to grant options and to determine the date and exercise prices of the options granted.  The

   characterization of these directors as "independent" is highly misleading.

25  [17]    Defendants' Request for Judicial Notice should be rejected to the extent that defendants seek

26  the introduction of the noticed materials to establish the truth of the matters asserted therein.  *Lee v.
   The City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001).  Rather, the Court can only take judicial

27  notice of the fact that the documents submitted by defendants are accurate reproductions of the
   filings they purport to be, without regard to whether the information contained those filings is true.

28

1   defendants' positions to establish their knowledge of backdating, but probe the specific terms of the

2   Stock Option Plans at issue and defendants' admissions of who was responsible for the allegedly

3   backdated option grants and which defendants were otherwise aware of them.  In other words,

4   plaintiffs have pleaded direct evidence of defendants' knowledge based on their admissions, not

5   based solely upon their positions at Sonic.[18]  Nothing more is required.  *Applied Signal*, 527 F.3d at

6   986; *see Am. West*, 320 F.3d at 943.[19]

7        Moreover, the Company's option grants were so essential to its future viability that

8   defendants' knowledge of those grants can be inferred by their positions of control and authority.

9   ¶¶3-4.  Specifically, defendants stated repeatedly in their public filings that "demand for technology

10  professionals has been very strong," that Sonic had found it "difficult" to recruit and hire qualified

11  employees, that the company was "expend[ing] considerable effort" in this regard, and that "[t]o a

12  very great degree our success in the future will depend on our ability to recruit, retain and motivate

13  engineering, technical, sales, marketing and operations professionals."  ¶4.  The stated purposes of

14  each non-director stock option plan were to: "(a) encourage employees, consultants, officers and

15  directors to improve operations and increase profits of the Company; (b) encourage employees to

16  accept or continue employment with the Company or its Affiliates; [and] (c) increase the interest of

17

18

---

19  [18]     As defendants suggest, allegations of scienter based **solely** on the defendant's position are
20  insufficient to create a strong inference of scienter.  "On the other hand, allegations that the
    defendant signed false financial documents, approved options grants, oversaw the options granting
    process, or was intimately involved in deciding when and to whom options would be granted may
21  support a strong inference of scienter."  *Juniper*, 542 F. Supp. 2d at 1047.  Moreover, the law does
    not state that allegations of a defendant's position are irrelevant to scienter, nor does it preclude a
22  finding of scienter based in part on the defendant's position.  In fact, the Ninth Circuit has
    consistently found that where the information at issue was critical to the company's core business,
23  those in positions of responsibility and authority may be presumed to have knowledge of it.  *See,
    e.g.*, *Applied Signal*, 527 F.3d at 987-88; *Am. West*, 320 F.3d 920.

24  [19]     *See also LDK*, 2008 U.S. Dist. LEXIS 42425, at *44 ("It could be reasonably and strongly
25  inferred that LDK's responsible officers were aware of major discrepancies in how much inventory
    was being reported to the public and how much was actually present."); *In re NorthPoint Commc'ns
26  Group, Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002) (finding, "upon the laying of a
    proper factual foundation that information was known within a corporation, it may be inferred that
27  facts critical to a business's core operations or an important transaction are known to a company's
    responsible officers").

28

1   employees, consultants, officers, and directors in the Company's welfare through participation in the

2   growth in value of the common stock of the Company."  *See* Exs. 2-5.

3          Considering the importance placed upon options to the future success of Sonic, and the fact

4   that the terms of the Stock Option Plans and defendants' own admissions put administration of the

5   plans and the granting of options squarely within their control, "it is absurd to suggest" these

6   defendants (especially in light of their administration of the Stock Options Plans) were not aware of

7   the backdating alleged.  *See Am. West*, 320 F.3d at 943, n. 21; *see also Applied Signal*, 527 F.3d 982;

8   *LDK*, 2008 U.S. Dist. LEXIS 42425; *NorthPoint*, 221 F. Supp. 2d 1090.

9          Indeed, like *Juniper*, the Complaint "alleges more than that [the CEO and the CFO] held high

10  executive positions.  Rather, it alleges (1) that [the CEO and the CFO] signed false financial

11  documents, (2) that they knew or were reckless in not knowing that these documents were false, and

12  (3) that they placed themselves in a position of oversight over [the Company's] options granting

13  practices such that they knew or were reckless in not knowing that options were being granted

14  inconsistent with the representations in the financial documents."  542 F. Supp. 2d at 1048.

15  Accordingly, just as in *Juniper*, defendants' motion to dismiss should be denied.

16          **6.    Defendants' Execution of Multiple False Documents Including**
                    **False Financial Statements Supports a Strong Inference of**
17                  **Scienter**

18         When "a corporate officer signs a document on behalf of the corporation, that signature will

19  be rendered meaningless unless the officer believes that the statements in the document are true."

20  *Howard*, 228 F.3d at 1061.  Thus, all defendants who signed the false SEC filings and financial

21  statements (Doris, Sauer, Habiger, Leighton, Greber, Langley and Margulio) "would have either

22  known, or been deliberately reckless in not knowing, that stock options were not being issued at fair

23  market value on the date of the grant."  *Zoran*, 511 F. Supp. 2d at 1013; *In re Lattice Semiconductor*

24  *Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *50-*51 (D. Or. Jan. 3, 2006)

25  (allegations of false SOX certifications, in combination with other allegations, are sufficient to create

26  a strong inference of actual knowledge or of deliberate recklessness).  Defendants argue that signing

27  public filings alone does not give rise to a strong inference of scienter.  Defs' Brf. at 18-19.  Once

28  again, defendants impermissibly attack a single piece of the scienter puzzle as if it stands alone.  *See*

1   *Tellabs*, 127 S. Ct. 2499.  They also denigrate the signature requirements of the SEC reporting rules

2   and SOX, and treat them as if those requirements do not impose upon the signer a duty to review and

3   approve the documents signed.  *See Howard*, 228 F.3d at 1061.  However, as explained in *Quest*,

4       For these certifications to have any substance, signatories to the certifications must
    be held accountable for the statements.  It would be wholly inappropriate to permit a

5       signatory to evade liability because he/she did not prepare the financial report, as
    Defendants argue, on the ground that the signatory was unaware of the misstatements

6       made therein.  To hold otherwise would effectively eviscerate the entire substance of
    18 U.S.C. §1350, the purpose of which is to ensure that regardless of who prepared

7       the statements, the signatories are attesting to their accuracy and reliability.
    Additionally, several Defendants also signed proxy forms and other publicly reported

8       financial disclosures.  The financial disclosures, proxy statements, and SOX
    Certifications are clearly "statements" for the purposes of establishing

9       contemporaneous knowledge.  Given that the Company is currently in the process of
    restating numerous financial reports, contemporaneous knowledge of the financial

10      reports signed by the individual defendants can be inferred.

11  527 F. Supp. 2d at 1189-90.

12      The public statements defendants Doris, Leighton, Habiger, Sauer, Greber, Langley and

13  Marguglio signed included statements they knew to be false, regardless of their participation in the

14  creation of the reports and without requiring any technical accounting expertise.  For example, the

15  annual reports each affirmed that Sonic only issued stock options with exercise prices equal to the

16  fair market value of the Company's stock on the date of the grant.  ¶¶81, 90, 98, 106.  These

17  defendants were aware that thousands of options were in-the-money on the date they were actually

18  granted.  Moreover, each of these defendants adopted the Stock Option Plans at issue, but the

19  backdated option grants clearly violated the terms of those plans.  Given this knowledge, simply

20  reading and signing Sonic's public statements knowing they contained false and misleading

21  statements alone gives rise to a strong inference of scienter.

22      Defendants argue that plaintiffs have not alleged defendants understood the accounting for

23  options or that the reports they signed included misstated earnings.  Defendants' knowledge of

24  backdating itself, however, raises a strong inference that they were aware of the proper accounting

25  treatment for options.  As discussed above, backdating is by its very nature intentional.  *Quest*, 527

26  F. Supp. 2d at 1182-83.

27      The intent is to grant greater compensation to Sonic's employees without recognizing greater

28  compensation expenses required under APB 25.  By backdating options to avoid this expense,

1    defendants have essentially admitted their understanding that APB 25 would have required an

2    expense for in-the-money options had they not been backdated, and a strong inference of scienter

3    arises.  The inference is particularly strong where defendants have also signed numerous financial

4    reports that affirmatively state the Company accounts for options in accordance with APB 25.

5                    **7.    Group Pleading**

6          Plaintiffs have not and need not resort to group pleading to adequately allege their claims.

7    Rather, plaintiffs have presented direct evidence of defendants' scienter.  Considering the statistical

8    improbability that the options at issue were misdated by chance, defendants' admission of

9    involvement in and/or knowledge of backdated options, as well as the circumstantial evidence of

10   their substantial stock sales and positions of oversight and control over stock option grants raise a

11   strong, cogent and compelling inference that defendants acted with at least deliberate recklessness.

12   The only competing inference offered by defendants—that the options were misdated because of

13   sloppy paperwork—is belied by the simple fact that the misdating so consistently benefited

14   defendants.  When taken as a whole, the inferences of defendants' scienter are far more plausible

15   than the competing inference offered by the defendants.  Accordingly, plaintiffs have adequately

16   alleged the scienter of each individual defendant, and have thus also sufficiently alleged Sonic's

17   scienter.

18   **IV.    THE COMPLAINT ADEQUATELY ALLEGES "CONTROL PERSON"
            LIABILITY AS TO ALL INDIVIDUAL DEFENDANTS**

19

20         A primary violation of §10(b) and indicia of control is all that is needed to plead a *prima*

21   *facie* case of "control person" liability under §20(a) of the Securities Exchange Act of 1934

22   ("Exchange Act").  *Am. West*, 320 F.3d at 945.[20]  Plaintiffs need only allege who is being controlled

23   and "what acts or status indicate such control."  *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433,

24   1442 (9th Cir. 1987) (superseded on other grounds); *accord In re 3COM Sec. Litig.*, 761 F. Supp.

25   1411, 1418 (N.D. Cal. 1990).  Actual exercise of control is not necessary as only an ***ability*** to control

26   [20]       The control person provision was "enacted to expand rather than to restrict the scope of
27   liability under the securities laws."  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir.
     1990) (citation omitted).

28

1   or influence a primary violator is required. *See Wool*, 818 F.2d at 1440; *see also Am. West*, 320 F.

2   3d at 945.  Further allegations of "control" need only be pled in accordance with the "notice

3   pleading" requirement of Rule 8, not the particularity requirement of Rule 9(b). *Siemers v. Wells*

4   *Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006).[21]

5   Finally, once plaintiffs allege control, the burden shifts to defendants to prove good faith – a fact

6   issue that cannot be resolved on a motion to dismiss. *See Am. West*, 320 F.3d at 945-46.

7        Defendants make two arguments: (1) no primary violation has been pled (Defs' Brf. at 32) –

8   an argument that plaintiffs dispose of – *supra*; and (2) the Complaint fails to plead with particularity

9   that they exercised the requisite control.

10        Plaintiffs allege that defendants, as top Company executive officers and directors of the

11   Company, are liable as direct participants in the backdating scheme.  ¶¶60-68.  Through their

12   positions of control and authority each of the individual defendants was not only involved in the

13   daily management and operation of the Company, but also was able to, and did, control the conduct

14   complained of herein – namely the backdating of options – and the content of the false and

15   misleading statements alleged.  ¶¶60-68, 217.

16        Specifically, Doris, Sauer, Greber, Marguglio and Langley were all members of Sonic's

17   Board.  ¶¶24, 53, 61, 63, 65-67.  In this capacity, they were directly responsible for administering

18   Sonic's Stock Option Plans which gave them the responsibility of granting options; determining the

19   fair market value of common stock subject to options; determining the exercise price of options

20   granted; and determining who received options, when they received options and how many options

21   they received.[22]  ¶25.  In addition, Sonic's Restatement admits that Doris was "responsible" for

22

23   [21]   Defendants argue that plaintiffs' §20(a) claim sounds in fraud and therefore must be pled in

24   accordance with Rule 9(b). Defs' Brf. at 25. Plaintiffs contend that the better rule holds Rule 9(b)
     inapplicable. *See Siemers*, 2006 WL 2355411, at *14 ("The control exerted by [defendant] is not a

25   circumstance that constitutes fraud. Plaintiff is only required to assert fraud with particularity as to
     the primary violations."). In any event, the particularized allegations in the Complaint would satisfy

26   Rule 9(b) if it did apply.

27   [22]   According to Sonic and as referenced in the Complaint, both the Board and the CEO were
     responsible for administering Sonic's Stock Option Plans. *See* ¶¶24, 72, 125, 136.

28

1   granting the backdated options at issue.  ¶¶128, 136.  As such, there can be no doubt that Doris,

2   along with the other Board members were responsible for administrating Sonic's Stock Option

3   Plans, had the power to cause Sonic to engage in the wrongful conduct alleged herein – and

4   therefore, are control persons under §20(a).[23]

5        Marguglio, Greber and Langley were members of Sonic's Audit Committee during the Class

6   Period and directly responsible for oversight of the Company's financial statements.  ¶121.  As of

7   March 2005, these Audit Committee members also assumed the duties of the Compensation

8   Committee, which according to Sonic's 2005 Proxy Statement included, "determining the

9   compensation for executive officers of the Company" and "administer[ing] the Company's Stock

10  Option Plans ."  ¶¶101, 125

11       Habiger, Doris, Sauer, Leighton and Ely were all key executives of Sonic during the Class

12  Period.  ¶1.  In connection with these positions, they were involved in the daily management of the

13  Company and controlled Sonic's financial statements during the Class Period.  ¶¶60-64, 68.[24]  The

14  fraud here is not limited to the issuance of the backdated options, but rather encompasses their

15  accounting treatment and descriptions of their characteristics in public filings, matters squarely

16  within these defendants' control.  During the Class Period, these defendants had direct authority with

17  respect to the signing, issuance and preparation of the false and/or misleading statements.  ¶¶60-64,

18  68, 76, 77, 79, 123.

19

20  _____

21  [23]    *See Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993) (held that
    corporation officer was a "controlling person" largely because: (1) he was a member of the
22  management committee, which made significant business decisions; (2) the committee had the
    authority to issue the securities which were at issue; and (3) the terms of the securities were
23  determined by the committee).

24  [24]    Defendants cite *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996),
    for the proposition that defendants' status as officer or director of a company alone does not create a
25  presumption of control.  *See* Defs' Brf. at 32.  Defendants' reliance on this case is misguided
    because this decision, on a motion for summary judgment, does not involve options backdating,
26  where (as here) the executives and Board member defendants are intimately involved with the
    options granting process.  The *Paracor* decision additionally holds that where, as here, a director or
27  officer is involved in business decisions regarding the securities at issue and the terms of those
    securities, control person liability exists.  *See id.* (citing *Keim*, 994 F.2d at 1390).

28

1    These allegations more than suffice to plead control. *See Juniper*, 542 F. Supp. 2d at 1053

2    (control established through defendants' positions as officers and directors since defendants were

3    able to control the content of the company's public statements and participated in the management of

4    the company); *In re Hienergy Techs., Inc. Sec. Litig.*, No SACV04-1226DOC (JTLX), 2005 WL

5    3071250, at *13 (C.D. Cal. Oct. 25, 2005) (control established for defendants who signed SEC

6    filings in their  capacities as officers and directors).[25]

7    **V.    THE COMPLAINT ADEQUATELY STATES SECTION 20A INSIDER**
     **      TRADING CLAIMS AGAINST DEFENDANTS DORIS, SAUER, ELY,**
8    **      GREBER, LANGLEY, LEIGHTON AND MARGUGLIO**

9    Section 20A of the Exchange Act imposes liability on any person who violates the Exchange

10   Act or the rules and regulations promulgated thereunder by trading securities while in possession of

11   material, non-public information.  15 U.S.C. §78t-1(a).  To satisfy §20A, a plaintiff must plead (i) a

12   predicate violation of the securities laws, and (ii) facts showing that the trading activity of plaintiffs

13   and defendants occur "contemporaneously."  *In re Countrywide Fin. Corp. Deriv. Litig.*, No. CV-07-

14   06923-MRP (MANx), 2008 WL 2064977, at *25 (C.D. Cal. May 14, 2008).

15   The "Ninth Circuit has not provided a temporal definition" of what it means to be

16   "contemporaneous." *See In re Applied Micro Circuits Corp. Sec. Litig.*, No. 01CV0649 KAJB, 2003

17   WL 25419526, at *6 (S.D. Cal. July 15, 2003) (rejecting defendants argument that trades not made

18   on the same day fail the contemporaneous requirement).   Instead, courts have interpreted

19   "contemporaneous" in various ways.  *See, e.g.*, *Countrywide*, 2008 WL 2064977, at *25; *see also In*

20   *re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255-56 (S.D.N.Y. 2007) (holding §20A claims

21   satisfied where the complaint alleged that "***members of the putative class traded*** Openwave stock

22   contemporaneously with the defendants named in the Section 20A" claim and the court found that

23   "there is no risk of a fishing expedition, as plaintiff has alleged . . . dates of defendants' trades and

24   the action is brought on behalf of a class under circumstances that make it likely that ***members of the***

25

26   [25]    *See also Wool*, 818 F.2d at 1440-42 (treating officers of a corporation as controlling persons
     where they "had direct involvement not only in the day-to-day affairs of [the company] in general
27   but also in [the company's] financial statements in particular").

28

1    *class* bought the securities sold by these defendants"); *In re Am. Bus. Computers Corp. Sec. Litig.*,

2    No. 913, 1994 WL 848690, at *4 (S.D.N.Y. Feb. 24, 1994) ("the term 'contemporaneously' may

3    embrace the entire period while relevant material non-public information remained undisclosed").

4          *Quest*, 527 F. Supp. 2d 1164, is directly on point.  In *Quest*, after determining that the term

5    "contemporaneous" was inherently "vague," the court held that plaintiff's allegations that it traded

6    "on the same day as Smith, within eight days of Garn, and within three days of Brooks" was

7    sufficient to deny defendants' motion to dismiss the §20A claims, not just as against these three

8    individual defendants, but also as to two other individual defendants.  *Id.* at 1194-96.

9          Here, plaintiffs purchased Sonic shares on the same day as Doris and Leighton sold, one day

10   after Langley sold shares, and only nine days after Greber.  ¶220.  The Complaint also alleges that

11   during the Class Period, Sauer (with Doris) sold 956,000 Sonic shares for proceeds of over $17

12   million (¶63), Ely sold over 28,000 Sonic shares for proceeds of almost half a million dollars (¶64),

13   Marguglio sold 20,000 Sonic shares for proceeds of over $250,000 (¶41), and that all the insider

14   selling defendants collectively sold more than one million Sonic shares while in possession of

15   adverse, material non-public information (¶219).  This specificity more than adequately meets

16   plaintiffs' burden of pleading a §20A claim.

17         Defendants would have the Court hold that they cannot be held liable for insider trading

18   unless the Court-appointed lead plaintiff purchased shares ***on the same day as each of the insider***

19   ***selling defendants sold***.[26]  Defs' Brf. at 34.  This holding would require a separate lead plaintiff be

20

21   ───────────────

22   [26]       Defendants argue that only same day trades are "contemporaneous."  Defs' Brf. at 34 (citing
     *Buban v. O'Brien*, No. C 94-0331 FMS, 1994 WL 324093, at *1 (N.D. Cal. June 22, 1994) and *In re*
23   *AST Research Sec. Litig.*, 887 F. Supp. 231, 233 (C.D. Cal. 1995)).   These decisions are
     inappropriate.  First, as defendants themselves recognize, the Ninth Circuit has not set a specific time
24   frame within which a trade must be made to be considered "contemporaneous."  *See Applied Micro*,
     2003 WL 25419526, at *6.   Second, the purported rationale behind these cases is that the
25   "contemporaneous" requirement serves as a proxy for the traditional requirement of contractual
     privity.  Defs' Brf. at 34.  Plaintiffs contend that the better rational for the "contemporaneous"
26   requirement was stated in *Quest:* "'the better rule with respect to standing seems to be that a class
     action may be maintained on behalf of all persons who purchased stock on an exchange during the
27   period that defendants were selling that stock on the basis of insider information.'" 527 F. Supp. 2d
     at 1196 (quoting *Am. Bus. Computers*, 1994 WL 848690, at *4).  Here, the Complaint alleges that
28   plaintiffs and members of the class have purchased Sonic shares on a national exchange during the

1   appointed for every insider sale by every defendant – a position that is directly contrary to the law

2   and the very purposes underlying the PSLRA.

3        Although plaintiffs may not have purchased on the same day as each insider selling

4   defendant sold Sonic shares, the Complaint adequately alleges that plaintiffs purchased

5   contemporaneously with multiple defendants here.  ¶¶221-223.  Moreover, as Sonic traded on a

6   national exchange there can be little doubt that members of the proposed class traded on the same

7   day as each of the insider selling defendants sold.  *See, e.g.*, *Openwave*, 528 F. Supp. 2d at 256

8   (upholding §20A claims where class members traded company stock contemporaneously with the

9   defendants named in the §20A claim).

10       Accordingly, plaintiffs have sufficiently alleged a §20A insider trading claim against Doris,

11  Sauer, Ely, Greber, Langley, Leighton and Marguglio.

12  **VI.    PLAINTIFFS HAVE SUFFICIENTLY PLED DEFENDANTS' PROXIES
         CONTAINED MATERIAL MISREPRESENTATIONS AND OMISSIONS
13       IN VIOLATION OF SECTION 14(a)**

14       Section 14(a) of the Exchange Act makes it unlawful to solicit a proxy in violation of rules

15  requiring disclosure of material facts to shareholders.  *See* 15 U.S.C. §78n(a).  To state a claim under

16  §14(a), a plaintiff must establish only that "(1) a proxy statement contained a material

17  misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy

18  solicitation, [rather than the particular defect in the solicitation materials], was an essential link in the

19  accomplishment of the transaction." *Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961, at *7

20  (D. Or. Mar. 13, 2008) (quotation marks and citation omitted).

21       Section 14(a) claims are not subject to any requirement that the plaintiff demonstrate scienter

22  – negligence is sufficient to establish liability.  *See McKesson*, 126 F. Supp. 2d at 1265-66;

23

24

25

26  _____

27  period that defendants were selling their stock on the basis of insider information, with specific
    allegations as to certain trades that occurred on the same day, the next day and within nine days.

28

1  *Knollenberg v. Harmonic, Inc.*, 152 Fed. Appx. 674, 682-83 (9th Cir. 2005) (negligence is applicable

2  standard).[27]

3      Plaintiffs have satisfied this burden as to the 2005 Proxy Statement.[28]

4  **A.    There Is a Direct Link Between the Misrepresentation and/or**
        **Omission and the Proposed Transaction**

5

6      To satisfy a §14(a) claim, plaintiffs must allege that there is a direct link between the alleged

7  omissions and misrepresentations contained in the proxy and corporate transaction voted on in the

8  proxy.  *See Belova*, 2008 WL 700961, at *7 (quoting *Zoran*, 511 F. Supp. 2d at 1016.  In *Belova*,

9  shareholders alleged that proxy statements contained misrepresentations relating to backdated stock

10 options.  *Id.*  The complaint in *Belova* alleged that, among other things, shareholders voted in

11 directors because of the allegedly false proxy statements.  The *Belova* court held that this was

12 sufficient to allege a direct link.  *Id.*  *Zoran* is also illustrative of this "essential link" being found

13 under similar facts:

14      Plaintiff essentially pleads that the directors used the proxy solicitations to
        maintain their positions on Zoran's board.  Shareholders allegedly kept voting for the
        board members in blissful ignorance of the scheme to grant insiders backdated
15      options while shortchanging the company. . . .  With each election, the board could
        continue to grant backdated stock options to itself and Zoran executives.  Zoran was
16      damaged because defendants caused it to divert company assets to recipients of
        backdated stock options. . . .  Had shareholders known that defendants had not
17      followed the dictates of the plan in the past, this likely would have changed their
        votes.

18 511 F. Supp. 2d at 1016.

19

20     Similarly, the corporate transaction voted on in Sonic's 2005 Proxy Statement was the

21 election of directors (and defendants here): Doris, Sauer, Greber, Marguglio, and Langley.  *See* Ex.

22 B to Defendants' Request for Judicial Notice.  The 2005 Proxy Statement omitted that these same

23 ───────────────

24 [27]    Some commentators have suggested that by the clear text of §14(a), "[i]t would appear that
   the liability of the corporation issuing a materially false or misleading proxy statement is virtually
25 absolute, as under §11 of the 1933 Act with respect to a registration statement."  Richard W.
   Jennings & Harold Marsh, Jr., Securities Regulation: Cases and Materials 1358 (3d ed. 1972).

26 [28]    The Complaint demonstrates that defendants made knowing actionable false and misleading
27 statements in each alleged proxy statement even if §14(a) claims earlier than the 2005 Proxy
   Statement are found to be untimely.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUPERSEDING MOTION TO DISMISS THE
[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT - C 07-05111-JSW         - 28 -

1    directors were complicit in Sonic's option backdating and that Sonic had already granted thousands

2    of in-the-money options for which it did not account properly. ¶¶100, 212.

3        These "misrepresentations and omissions" directly led to re-election of these defendants on

4    the Board and a continuation of their unlawful backdating scheme, as revelation of the truth

5    regarding these directors' participation in the backdating scheme would have significantly impaired

6    shareholders' trust in defendants, thwarting their re-election bids and halting their backdating

7    scheme. ¶214. There could not be a more direct link. *See Belova*, 2008 WL 700961, at *7; *see also*

8    *Zoran*, 511 F. Supp. 2d at 1016.

9        **B.    Plaintiffs Adequately Plead that Defendants Were Negligent in
            Connection with Issuing the 2005 Proxy Statement**

10       The culpable state of mind for §14(a) is mere negligence. Thus, plaintiffs' burden is

11   minimal: "[P]laintiffs need not demonstrate that the omissions and misrepresentations resulted from

12   knowing conduct undertaken by the director defendants with an intent to deceive. . . . Liability can

13   be imposed for negligently drafting a proxy statement." *Wilson v. Great Am. Indus.*, 855 F.2d 987,

14   995 (2d Cir. 1988); *accord*, *e.g.*, *McKesson*, 126 F. Supp. 2d at 1256; *see also Berman v. Thomson*,

15   403 F. Supp. 695, 699 (N.D. Ill. 1975) (outside director's failure to conduct independent

16   investigation is negligence as matter of law).

17       Here, as senior executives, Board members and Audit Committee members, defendants had

18   duties with respect to the administration of the Stock Option Plans, the granting of stock options, the

19   associated accounting treatment of these options and the preparation and approval of Sonic's

20   financial reports and proxy statements. *See* ¶¶24, 53, 61, 63, 65-67, 101, 121, 125, 128, 136. These

21   defendants bore ultimate responsibility for ensuring that stock options were granted at fair market

22   value on the date of the grant, as well as deciding the grant dates for the options. *Id.* They were then

23   responsible for ensuring Sonic's public statements describing and accounting for these options were

24   truthful and accurate.

25       These allegations are sufficient to lead to the inference that each defendant knew or should

26   have known that Sonic's Proxy Statements were false – this failure, at a minimum, constitutes

27   negligence. *See Zoran*, 511 F. Supp. 2d at 1016 (holding under similar facts that the allegations

28

1  "lead to the inference that the compensation committee neglected its duty and was thus negligent");

2  *see also Belova*, 2008 WL 700961, at *7 (holding that "shareholders' allegations also support an

3  inference that the defendants were negligent because they did not discover or stop the alleged

4  backdating scheme").

5  **VII.   CONCLUSION**

6  For all of the above reasons, defendants' motion to dismiss should be denied.

7  DATED:  July 18, 2008                    Respectfully submitted,

8                                           COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
9                                           SHAWN A. WILLIAMS
                                            CHRISTOPHER M. WOOD

10

11                                                      /s/
12                                           SHAWN A. WILLIAMS

13                                           100 Pine Street, 26th Floor
                                             San Francisco, CA  94111
14                                           Telephone:  415/288-4545
                                             415/288-4534 (fax)
15
                                             LABATON SUCHAROW LLP
16                                           CHRISTOPHER J. KELLER
                                             JONATHAN GARDNER
17                                           140 Broadway, 34th Floor
                                             New York, NY  10005
18                                           Telephone:  212/907-0700
                                             212/818-0477 (fax)
19
                                             Co-Lead Counsel for Plaintiffs
20
                                             VANOVERBEKE MICHAUD
21                                              & TIMMONY, P.C.
                                             MICHAEL J. VANOVERBEKE
22                                           THOMAS C. MICHAUD
                                             79 Alfred Street
23                                           Detroit, MI  48201
                                             Telephone:  313/578-1200
24                                           313/578-1201 (fax)

25                                           Additional Counsel for Plaintiff

26  T:\CasesSF\Sonic Solutions\OMD00052676.doc

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on July 18, 2008, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

     I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on July 18, 2008.

9

10

                   /s/
              SHAWN A. WILLIAMS

11

              COUGHLIN STOIA GELLER

12

                RUDMAN & ROBBINS LLP
             100 Pine Street, 26th Floor

13

             San Francisco, CA  94111
             Telephone:  415/288-4545

14

             415/288-4534 (fax)

15

             E-mail:shawnw@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:07-cv-05111-JSW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzia@csgrr.com,debh@csgrr.com

- **Sara B. Brody**
  sara.brody@hellerehrman.com,terri.newman@hellerehrman.com,matthew.thurlow@hellerehrman.com,carollynn.thompson@hellerehrman.com,clay.davenport@hellerehrman.com,Ce

- **Jonathan Gardner**
  jgardner@labaton.com

- **John K. Grant**
  johnkg@csgrr.com,JDecena@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com

- **Monica Patel**
  monica.patel@hellerehrman.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Shawn A. Williams**
  shawnw@csgrr.com,travisd@csgrr.com,e_file_sf@csgrr.com,cwood@csgrr.com,e_file_sd@csgrr.com,aelishb@csgrr.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Catherine J Kowalewski
Lerach Coughlin et al LLP
655 W Broadway #1900
San Diego, CA 92101

David C. Walton
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```