SARA B. BRODY (Bar No. 130222)
CAROL LYNN THOMPSON (Bar No. 148079)
CECILIA Y. CHAN (Bar No. 240971)
MATTHEW D. THURLOW (Bar No. 243470)
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: (415) 772-6000
Facsimile: (415) 772-6268
Sara.Brody@hellerehrman.com
CarolLynn.Thompson@hellerehrman.com
Cecilia.Chan@hellerehrman.com
Matthew.Thurlow@hellerehrman.com

Attorneys for Defendants
SONIC SOLUTIONS, DAVID C. HABIGER,
ROBERT J. DORIS, A. CLAY LEIGHTON,
MARY C. SAUER, MARK ELY, ROBERT M. GREBER,
PETER J. MARGUGLIO and R. WARREN LANGLEY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF WESTLAND POLICE AND FIRE RETIREMENT SYSTEM AND PLYMOUTH COUNTY RETIREMENT SYSTEM, On Behalf of Themselves and All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   v.<br><br>SONIC SOLUTIONS, DAVID C. HABIGER, ROBERT J. DORIS, A. CLAY LEIGHTON, MARY C. SAUER, MARK ELY, ROBERT M. GREBER, PETER J. MARGUGLIO and R. WARREN LANGLEY,<br><br>               Defendants. | Case No.: C 07 5111(JSW)<br><br>CLASS ACTION<br><br>**DEFENDANTS' SECOND REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THEIR SUPERSEDING MOTION TO DISMISS THE [CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Date:        September 5, 2008<br>Time:       9:00 a.m.<br>Crtrm:     2<br>Trial Date:  None Set<br><br>The Honorable Jeffrey S. White |

1    Pursuant to Rule 201 of the Federal Rules of Evidence and the doctrine of

2    incorporation by reference, Defendants Sonic Solutions, Inc. ("Sonic"), David C. Habiger,

3    Robert J. Doris, A. Clay Leighton, Mary C. Sauer, Mark Ely, Robert M. Greber, Peter J.

4    Marguglio and R. Warren Langley (collectively, "Defendants") request this Court take

5    judicial notice of the attached exhibits in connection with their superseding motion to

6    dismiss the [Corrected] Consolidated Class Action Complaint (the "Complaint") for

7    violations of the federal securities laws.

8    Under the incorporation by reference doctrine, a court may consider on a Rule

9    12(b)(6) motion documents "whose contents are alleged in a complaint and whose

10   authenticity no party questions, but which are not physically attached to the plaintiff's

11   pleading." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (internal

12   citation omitted); *In re Portal Software, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 20214, at

13   *12 (N.D. Cal. 2005) ("[C]ourts are specifically authorized, in connection with a motion to

14   dismiss a securities fraud complaint, to consider documents and filings described in the

15   complaint under the incorporation by reference doctrine."). Where a plaintiff fails to attach

16   to the complaint the documents upon which the complaint is premised, a defendant may

17   attach such documents in order to show that they do not support the plaintiff's claim. *In Re*

18   *Pac. Gateway Exch., Inc.*, 169 F. Supp.2d 1160, 1164 (N.D. Cal. 2001).

19   In addition, Federal Rule of Evidence 201 allows a court to take judicial notice of

20   facts that are "not subject to reasonable dispute in that [they are] either (1) generally known

21   within the territorial jurisdiction of the trial court or (2) capable of accurate and ready

22   determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.

23   R. Evid. 201(b). It is well-established in the Ninth Circuit that courts may take judicial

24   notice of documents filed with the Securities and Exchange Commission ("SEC"). *Dreiling*

25   *v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *see also In re Calpine Corp. Sec.*

26   *Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (finding that court may take judicial

27   notice of documents filed with the SEC). Likewise, it is well established that a court may

28   take judicial notice of historical stock prices. *See In re Copper Mt. Sec. Litig.*, 311 F. Supp.

1

2d 857, 864 (N.D. Cal. 2004).

This Court should take judicial notice of the following documents (filed herewith) because they are incorporated by reference into the Complaint and are judicially noticeable under Federal Rule of Evidence 201.

1. Exhibit A:    A true and correct copy of an excerpt of the Form 10-K, filed by Sonic with the SEC on February 26, 2008.

2. Exhibit B:    A true and correct copy of the Form 4, filed by Sonic with the SEC on May 12, 2004.

3. Exhibit C:    A true and correct copy of Sonic's historical stock prices available on Yahoo, for the following periods: June 22, 1997-August 22, 1997; October 30, 2000-December 31, 2000; February 11, 2003-April 11, 2003.

DATED:  August 8, 2008                    Respectfully submitted,

                                          HELLER EHRMAN LLP


                                                  /s/  Sara B. Brody
                                          _____
                                          SARA B. BRODY
                                          CAROL LYNN THOMPSON
                                          CECILIA Y. CHAN
                                          MATTHEW D. THURLOW


                                          Attorneys for Defendants
                                          SONIC SOLUTIONS, DAVID C. HABIGER,
                                          ROBERT J. DORIS, A. CLAY LEIGHTON,
                                          MARY C. SAUER, MARK ELY, ROBERT M.
                                          GREBER, PETER J. MARGUGLIO and R.
                                          WARREN LANGLEY

DEFENDANTS' SECOND REQUEST FOR JUDICIAL NOTICE
CASE NO.:  C 07 5111(JSW)

**EXHIBIT A**

10-K 1 v104179_10k.htm



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

_____

**FORM 10-K**

_____

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended March 31, 2007**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number: 72870**

_____

# SONIC SOLUTIONS

(Exact Name of Registrant as Specified in Its Charter)

| **California** | **93-0925818** |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**101 Rowland Way, Suite 110,**
**Novato, California 94945**

(Address of Principal Executive Office) (Zip Code)

**(415) 893-8000**

(Registrant's Telephone Number, Including Area Code)

_____

Securities registered pursuant to Section 12(b) of the Act:

Securities registered pursuant to Section 12(g) of the Act: None

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12(b)(2) of the Exchange Act.

Large Accelerated Filer ☐                    Accelerated Filer ☒

Non-accelerated Filer ☐                    Smaller Reporting Company ☐

(Do not check if a smaller reporting company)

Indicate by a check mark whether the registrant is a shell company (as defined in Rule 12(b)(2)). Yes ☐ No ☒

The aggregate market value of the voting stock held by non-affiliates of the registrant on September 30, 2006, based upon the closing price of the Common Stock on The Nasdaq Global Select Market for such date, was approximately $370 million.[1]

The number of outstanding shares of the registrant's Common Stock on February 25, 2008 was 26,353,277.

### DOCUMENTS INCORPORATED BY REFERENCE

None

---

(1) Excludes 1,689,987 shares held by directors, officers and ten percent or greater shareholders on September 30, 2006. Exclusion of such shares should not be construed to indicate that any such person possesses the power, direct or indirect, to direct or cause the direction of the management or policies of the registrant or that such person is controlled by or under common control with the registrant.

TABLE OF CONTENTS

### TABLE OF CONTENTS

| | Page |
|---|---|
| Additional Information | 1 |
| Forward-Looking Statements | 1 |
| Explanatory Note Regarding Restatement and Change in Accounting Policy | 2 |

### PART I

| | |
|---|---|
| Item 1. Business | 10 |



Item 1B.Unresolved Staff Comments | 42
Item 2. Properties | 42
Item 3. Legal Proceedings | 42
Item 4. Submission of Matters to a Vote of Security Holders | 42

**PART II**

Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 43
Item 6. Selected Financial Data | 45
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 46
Item 7A.Quantitative and Qualitative Disclosures About Market Risk | 78
Item 8. Financial Statements and Supplementary Data | 79
Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 135
Item 9A.Controls and Procedures | 135
Item 9B.Other Information | 137

**PART III**

Item 10.Directors, Executive Officers and Corporate Governance | 138
Item 11.Executive Compensation | 141
Item 12.Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 148
Item 13.Certain Relationships and Related Transactions, and Director Independence | 149
Item 14.Principal Accounting Fees and Services | 150

**PART IV**

Item 15.Exhibits, Financial Statement Schedules | 151
Signatures | 154

i

TABLE OF CONTENTS

**Additional Information**

References in this report to the "Company," "Sonic," "we," "our," or "us" mean Sonic Solutions together with its subsidiaries, except where the context otherwise requires.

Quantities or results referred to as "to date" or "as of this date" mean as of or to March 31, 2007, unless otherwise specifically noted. References to "FY" or "fiscal year" refer to our fiscal year ending on March 31 of the designated year. For example, "FY 2007" and "fiscal year 2007" each refer to the fiscal year ending March 31, 2007. Other references to "years" mean calendar years.

This Annual Report includes references to certain of our trademarks and registered trademarks. Products or service names of other companies mentioned in this Annual Report may be trademarks or registered trademarks of their respective owners.

**Forward-Looking Statements**



This Annual Report includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). All statements included or incorporated by reference into this Annual Report, other than statements that are purely historical in nature, are forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events. Our actual results could differ materially from those discussed in, or implied by, these forward-looking statements. Words such as "believe," "anticipate," "expect," "intend," "plan," "estimate," "project," "will," "may" and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these words. In addition, any statements that refer to expectations, projections or other characterizations of future events or circumstances are forward-looking statements. Forward-looking statements include, but are not necessarily limited to, those relating to:

- competing products that may, now or in the future, be available to consumers;

- our plans to develop and market new products or services, including next-generation high definition products;

- the demand for trends regarding and the impact on our business of next-generation high definition formats;

- the number or nature of potential licensees for our products;

- the strategic benefits of our patent program;

- the growth of our web-based retail channels and the decline of revenues from professional products and services;

- our expectations regarding trends in the personal computer ("PC") and consumer electronics ("CE") industries;

- our expectations regarding non-traditional bundling arrangements;

- our expectations regarding our Qflix$^{TM}$ and technology licensing programs;

- availability of additional financing to satisfy our working capital and other requirements;

- our ability to improve our financial performance;

- other competitive pressures;

- expenses associated with our stock option review, litigation defense and financial restatement;

- changes to improve our controls relating to the process of granting stock option and other deferred compensation awards;

- future acquisitions and other business combinations, if any, effected by us or our competitors;

- the impact of our efforts to comply with laws and regulations, including the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act");

1

TABLE OF CONTENTS

- potential remedial actions under Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"); and

- estimated tax credits available to us and tax rates applicable to us.

Factors that could cause actual results or conditions to differ from those anticipated by these and other forward-looking statements include those more fully described under the caption "Risk Factors" in Item 1A below and elsewhere in this Annual Report. Except as required by law, we do not assume any obligation to update or revise these forward-looking statements to reflect new events or circumstances. You should assume that the information appearing in this Annual Report is accurate only as of the date on the front cover of this document. Our business, financial condition, results of operations and prospects may have changed since that date.



**Explanatory Note Regarding Restatement and Change in Accounting Policy**



In this Annual Report, we are restating our consolidated balance sheet at March 31, 2006, our consolidated statements of operations for our 2005 and 2006 fiscal years, our consolidated statements of shareholders' equity for our 2005 and 2006 fiscal years, our consolidated statements of cash flows for our 2005 and 2006 fiscal years, our quarterly financial data as of and for the quarters ended in fiscal year 2006, our selected financial data as of and for our 2003, 2004, 2005 and 2006 fiscal years, and our quarterly financial data as of and for the first two quarters in our 2007 fiscal year. In addition, this Annual Report includes a "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section, which discusses our restated results for fiscal years 2005, 2006 and 2007 and supersedes any MD&A sections included in previously filed annual reports on Form 10K to the extent applicable to those periods.

Prior fiscal periods have been restated to reflect (a) additional cash and non-cash share-based compensation expense and the associated payroll tax and other expenses relating to employee stock option grants through the second quarter of fiscal year 2007, (b) adjustments to revenue and cost of revenue due to a voluntary change in revenue recognition policy, (c) other adjustments, and (d) related tax adjustments.

Effective the third quarter ended December 31, 2006, we changed our policy on how we recognize original equipment manufacturer ("OEM") royalty revenue. We applied this change in accounting policy retrospectively to fiscal year 2006 and to the quarters ended June 30, 2006 and September 30, 2006, but determined that it was not practicable to apply the change to prior periods.

In our Quarterly Report on Form 10-Q for the three and nine month periods ended December 31, 2006, we restated our condensed consolidated balance sheets as of March 31, 2006, condensed consolidated statements of operations for the three and nine month period ended December 31, 2005, condensed consolidated statement of cash flows for the nine month period ended December 31, 2005, and the related Notes to condensed consolidated financial statements.

We expect to file quarterly reports on Form 10-Q for the three months ended June 30, 2007 and the three and six months ended September 30, 2007 in the near future. These quarterly reports will contain restated financial information for the comparable periods of the prior year.



As previously disclosed in our Form 8-K accepted by the SEC on February 2, 2007, prior filed annual reports on Form 10-K and quarterly reports on Form 10-Q should no longer be relied upon.

## Stock Options Accounting

On February 1, 2007, we filed a Form 8-K and announced that we had commenced a voluntary review of our historical stock option grant practices and related accounting. The review was initiated by our management and was conducted by the audit committee (the "Audit Committee") of our board of directors, comprised solely of independent directors, with the assistance of legal counsel and outside consultants.

The Audit Committee and its advisors conducted an extensive review of our historical stock option grant practices and related accounting, including an assessment and review of our options granting policies and procedures, internal records, supporting documentation and e-mail communications, as well as interviews of Company personnel. The review focused on the period from March 3, 1998, when we engaged in a general repricing of our then-outstanding underwater options, through the present (the "Review Period").

2



TABLE OF CONTENTS

The review included all stock options granted during the Review Period, as well as certain already-outstanding options that were repriced at the commencement of the Review Period. In all, the review covered a total of approximately 2,300 stock option grants encompassing approximately 14 million shares of common stock under a total of seven stock option plans, and representing option grants to our directors, founders, officers and other employees (and including, among others, grants to newly-hired employees, individual or group performance awards, grants awarded in connection with acquisitions, and a limited number of grants to contractors).





During the course of the review, legal counsel to the Audit Committee, with the assistance of outside consultants, collected, processed and analyzed physical and electronic Company documents and records, including hard copy files, networked electronic documents and the computer hard drives of Company personnel who were involved in the administration of our stock option programs. Counsel to the Audit Committee was further assisted by an independent consulting firm engaged to assist in the collection, processing and analysis of options-related documentation. In all, approximately 665,000 electronic documents were collected and processed, and approximately 215,000 electronic documents and 35,000 pages of paper documents were reviewed. In addition, counsel conducted interviews of various Company personnel.

Supplementing the activities performed by and on behalf of the Audit Committee, our management engaged in a detailed process of compiling, analyzing and assessing the information available to it relating to our granting of stock options and administration of stock option plans during the Review Period. Information reviewed included, without limitation, documentation related to acquisitions and other transactions completed by us, public filings (by us and by individual grant recipients), board minutes and written consents, spreadsheets and databases used to memorialize and maintain option-related information, email communications and other transmittals of information to and from outside accountants, payroll information, standard forms used to record decisions regarding hiring and termination of employees and related salary and option grant decisions known as Employee Action Forms ("EAFs"), grant notices, offer letters, option statements, tax records, personnel files and other information.

With assistance from the independent consulting firm and input from the Audit Committee and its advisors, as well as based upon discussions with our independent auditors, our management created and maintained an extensive group of spreadsheets showing all options-related issuances, exercises and related data.

Based on the results of the review, we have concluded that a substantial number of stock options granted during the Review Period were not correctly accounted for in accordance with accounting principles generally accepted in the United States applicable at the time those grants were made. As a result, we are restating our historical financial statements to record adjustments for additional share-based compensation expense relating to past stock option grants in accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R (revised 2004), "Share-Based Payment," and Accounting Principles Board Opinion ("APB") No. 25, "Accounting for Stock Issued to Employees," and related payroll taxes, penalties, and other related amounts, to record additional share-based compensation expense associated with options granted to consultants and to record additional adjustments that were previously considered to be immaterial.

The review also identified less frequent errors in other categories including: grants to non-employees for which an incorrect amount of share-based compensation expense had been recognized, grants cancelled after the expiration date, and exercises occurring before vesting and after expiration. These errors were also addressed and reflected in the restatement of our historical financial statements.

### Audit Committee Conclusions

#### Lack of Contemporaneous Grant Documentation; Focus on Quarterly Financial Reporting

For a large portion of options issued by us, particularly prior to September 23, 2005 (other than with respect to certain categories of options such as founder grants, director grants, grants issued associated with acquisitions, or grants issued as part of certain programs), there is little or no contemporaneous grant-specific documentation that satisfies the requirements for "measurement dates" under APB No. 25 and that would allow us to maintain the original grant date used for accounting purposes (the "Record Date"). Much of the transaction-specific documentation that was available in our records was unhelpful in establishing the date on

3

TABLE OF CONTENTS



which all required APB No. 25 elements were satisfied. For example, option grant agreements were typically dated "as of" with no separate date for the signature of a Company officer, and Company personnel indicated that these agreements were typically generated as part of the end-of-quarter reporting cycle, notwithstanding the Record Date appearing on the documents

themselves.

Stock options were considered to be a routine part of employee compensation at the Company and, given this and the informal nature of our processes in general, it appears that insufficient attention was devoted to ensuring that grant documentation was prepared or finalized by the Record Date. Instead, while individual grants were identified and/or committed to on an ongoing basis, grant documentation was typically assembled and finalized in anticipation of quarterly SEC filings.

Our former Chief Executive Officer ("CEO"), to whom authority to make grants to employees other than executive officers had been delegated until September 23, 2005, indicated that he and others involved in the option granting process focused on the quarterly financial reporting cycle as the primary driver of decisions and completion of associated documentation regarding the granting of options. These decisions were recorded in spreadsheets which were then used to generate option tables for financial statement footnotes as well as diluted share counts for our financial statements. These spreadsheets (the "Periodic Spreadsheets"), were sent to an outside accounting firm to perform the necessary calculations as we prepared our quarterly and annual filings and remained subject to change until the point of transmittal.

In early 2005, as part of our efforts to improve internal control compliance and reporting as required by the Sarbanes-Oxley Act, we commenced a process of formalizing and improving our stock option granting and administration processes. Thereafter, at a meeting of our board of directors held on September 23, 2005, the board adopted a resolution creating an employee options subcommittee of the compensation committee comprised of our CEO and Chief Financial Officer ("CFO"). The purpose of the employee options subcommittee was to: serve as administrator for our various option plans (except for option awards to executive officers and to members of our board of directors, which awards are subject to approval by the board of directors); report to the board and to the compensation committee of the board at each regular quarterly meeting concerning grants made by the employee options subcommittee during the prior quarter; and to propose suggested changes to our various option plans as necessary and appropriate. In early 2006, we transitioned recordkeeping with respect to our employee equity awards to an external service, E*Trade. Although grants issued after September 23, 2005 did involve better contemporaneous documentation of grant decisions, the Audit Committee determined that there were still some specific grants where the documentation was incomplete for financial reporting purposes.

*No Self Dealing or Favoritism*

The Audit Committee did not find evidence that the officers or directors with responsibility for administration of our stock option programs had taken steps to provide themselves with options at better prices than those granted to other employees.

Our founders and directors typically received grants at preset times, normally at the meeting of our board of directors that immediately follows each annual shareholders meeting. Because the shareholders meetings and the board meeting immediately following the shareholders meeting were well documented, these grants were generally not determined to have Record Dates that required adjustment. In one case where full minutes were not available, certain measurement date adjustments were made based upon the supporting documentation that was available. Additionally, the Audit Committee identified two instances where written consents were used and the Company deemed the measurement date to be the date of the last signature. In both instances the change in measurement date was one day. Because the dates of the annual shareholders meetings and the board meetings scheduled to occur immediately following the annual shareholders meetings had been set well in advance (typically 60 to 90 days in advance), the Audit Committee found no evidence that knowledge of likely share price movements had been involved in selecting these dates in anticipation of the granting of options on these dates. Under this arrangement, our former CEO, who was empowered to issue grants to non-founder employees until September 23, 2005, received grants at preset times and was not in a position to benefit from the grants he made from time to time to our other employees.

4

TABLE OF CONTENTS

Additionally, our more senior employees, including those involved in the administration of our option programs, generally received grants issued by our former CEO at the same times and by the same mechanisms as our less senior employees and officers. Our Audit Committee determined that stock option grant practices during the Review Period were applied uniformly by those of our management personnel who were directly and indirectly involved in the administration of our stock option



programs, and that these processes were not used to selectively benefit any one group or individual within the Company.

*No Intent to Deceive*

After reviewing the available documentary evidence and information gathered through interviews of Company personnel, the Audit Committee concluded that the conduct of those who administered our options plans was not intentionally or knowingly wrongful. Specifically, the Audit Committee did not find any evidence that officers, employees, or directors of the Company had any knowledge that their handling of option grants violated stock option accounting rules during the Review Period. To the extent Sonic personnel authorized grants using incorrect or unreliable dates, the Audit Committee found no evidence of an intent to purposefully circumvent stock option accounting rules or to otherwise inaccurately report the financial results of the Company during the Review Period. Moreover, the Audit Committee found no indication of intent by those with responsibility for selecting grant dates to benefit personally at the expense of the Company. No Company personnel stated that they observed management back-date grants or commit other misconduct. Moreover, there were no documents indicating an intent to violate known accounting rules, or indicating any knowledge of misconduct in that regard.

The Audit Committee received full support and cooperation from our management and employees during the course of the options review.

Additionally, the Audit Committee found that our personnel did not act with an intent to mislead auditors. While the Audit Committee noted instances in which personnel actively discussed how to correct mistakes related to the documentation and related accounting treatment, and when to inform auditors of those mistakes, it determined that such personnel took no actions designed to conceal information from our auditors.

**Tax Considerations**

Based on measurement date changes resulting from our options review, certain grants of stock options made during the Review Period were priced below fair market value, rather than at fair market value. Consequently, certain grants intended to be classified as incentive stock options ("ISOs"), requiring pricing at no less than fair market value on the date of grant, should have been classified as nonqualified stock options ("NQs"). Additionally, certain options should have been treated as NQs since date of grant due to either plan limitations or ISO limitations. We did not withhold federal income taxes, state income taxes, FICA or Medicare on the options that were issued as ISOs that should have been treated as NQ stock options (due to their below-market grant pricing, plan limitations or ISO rules). We accrued payroll tax, penalty, and interest expenses related to NQ stock options originally classified as ISOs in the periods in which the underlying stock options were exercised. Then, in periods in which the liabilities were legally extinguished due to statutes of limitations, the expenses were reversed and recognized as a reduction of expense.

We informed the Internal Revenue Service ("IRS") of potential payroll tax liabilities resulting from changes in measurement dates for stock options. However, no formal settlement negotiations have taken place. On January 15, 2008, we were notified by the IRS of a payroll tax audit covering the calendar years 2004, 2005 and 2006.

We recorded deferred tax assets as a result of the share-based compensation expense recorded through the restatement based on unexercised and uncanceled nonqualified stock options at the end of each reporting period. The recognized tax benefit related to affected stock options granted to officers was limited, in certain instances, due to the potential non-deductibility of the related expenses under Section 162(m) of the Code. This IRS rule limits the amount of executive compensation that may be deducted for U.S. tax purposes under certain circumstances.

Section 409A of the Code imposes additional taxes on our employees for stock options granted with an exercise price lower than the fair market value on the date of grant for all options or portions of options that vest after December 31, 2004. As a result of the change in measurement dates described above, certain stock

5


TABLE OF CONTENTS

options granted during the Review Period were issued at prices below fair market value on the revised measurement date.



Management is considering possible ways to address the impact that Section 409A may have on our employees as a result of the exercise price of stock options being less than the fair market value of our common stock on the revised measurement dates. The IRS has issued transition rules under Section 409A that allow for a correction or cure for some of these options subject to Section 409A. We may offer non-officer employees who hold outstanding options the opportunity to cure their affected stock options. In connection with this cure, we may make future cash bonus payments to our non-officer employees in an undetermined amount. We recorded approximately $1.7 million in operating expense for estimated employee Section 409A taxes that we have elected to cover with respect to options that were exercised during the fourth quarter of fiscal year 2007.

### Stock Options Restatement

Based on the errors noted above, we have recorded adjustments to share-based compensation, including payroll taxes, Section 409A penalties and other tax expense. There was no impact on revenue or net cash provided by operating activities as a result of this additional share-based compensation and related tax expense during the restatement periods.

The following table sets forth the effect of the stock option review restatement for each of the applicable fiscal years (in thousands):

| | Stock Option Review Adjustments | | | | |
| Fiscal Year Ended | Pre-Tax Share-Based Compensation Expense Adjustments | Pre-Tax Payroll Related Tax Expense (Benefit) Adjustments | Total Pre-Tax Impact | Related Income Tax Expense (Benefit) Adjustments | Net Expense (Benefit) After-Tax Adjustments |
|---|---|---|---|---|---|
| March 31, 1998 (unaudited) | $ 60 | $ — | $ 60 | $ — | $ 60 |
| March 31, 1999 (unaudited) | 613 | 6 | 619 | — | 619 |
| March 31, 2000 (unaudited) | 1,175 | 218 | 1,393 | — | 1,393 |
| March 31, 2001 (unaudited) | 812 | 642 | 1,454 | — | 1,454 |
| March 31, 2002 (unaudited) | 3,026 | 509 | 3,535 | — | 3,535 |
| March 31, 2003 (unaudited) | 2,707 | 1,705 | 4,412 | — | 4,412 |
| March 31, 2004 (unaudited) | 8,177 | 1,356 | 9,533 | — | 9,533 |
| Cumulative effect at March 31, 2004 (unaudited) | 16,570 | 4,436 | 21,006 | — | 21,006 |
| March 31, 2005 | 4,492 | 583 | 5,075 | (69) | 5,006 |
| March 31, 2006[1] | 10,103 | 2,782 | 12,885 | (13,196) | (311) |
| Six Months Ended September 30, 2006 (unaudited) | 316 | (1,514) | (1,198) | 225 | (973) |
| Total | $ 31,481 | $ 6,287 | $ 37,768 | $ (13,040) | $ 24,728 |

---

[1] Prior to fiscal year 2006, we maintained a valuation allowance against our deferred tax assets. In fiscal year 2006, we reversed the majority of our valuation allowance against deferred tax assets due to our assessment, made at that time, that it was more likely than not the deferred tax assets would be realized. As a result of the restatement, we recorded additional deferred tax assets with respect to the periods covered by our options review. The $13.2 million income tax benefit in fiscal year 2006 relates to the release of valuation allowance against the additional deferred tax assets recorded with respect to fiscal years 2005 and prior as a result of the restatement, net of current year effect.

### Change in Accounting Policy

Effective October 1, 2006, we elected to change our method of recognizing OEM royalty revenue. Previously, we generally recognized OEM royalty revenue in the period the OEM product shipped, provided we received the OEM royalty report before the preparation of our financial statements. We now generally recognize OEM revenue in the period we receive the OEM royalty



report. We adopted the new method to improve

6

TABLE OF CONTENTS

reporting consistency across our OEM customers and reduce the length of the accounting close cycle. Comparative financial statements for fiscal year 2006 and quarterly financial information for the quarters ended June 30, 2006 and September 30, 2006 have been adjusted to apply the change in accounting policy retrospectively.

Due primarily to a change in our accounting software in fiscal 2005, retrospective application of this change in accounting policy to fiscal year 2005 and prior periods was not practicable. Therefore, we recorded the cumulative effect of the change as an adjustment to accumulated deficit at the beginning of fiscal year 2006.

The following table summarizes the effects of the retrospective application of this change in accounting policy on our consolidated statements of operations for fiscal year 2006, and for the quarters ended June 30 and September 30, 2006, and for the on-going current period charges to fiscal year 2007, as applicable (in thousands):

| | As Restated | | | |
| | | Three Months Ended | | |
| | Year Ended March 31, 2006 | June 30, 2006 | September 30, 2006 | Year Ended March 31, 2007 |
|---|---|---|---|---|
| Increase (decrease) in revenue | $ (1,068) | $ 475 | $ (609) | $ 841 |
| Decrease (increase) in costs | (14) | (207) | 62 | (237) |
| Tax benefit (expense) | 433 | (107) | 219 | (242) |
| Increase (decrease) in net income | $ (649) | $ 161 | $ (328) | $ 362 |
| Increase (decrease) in earnings per share | $ (0.02) | $ 0.01 | $ (0.01) | $ 0.01 |

The following table summarizes the effect of the retrospective application of this change in accounting policy on our consolidated balance sheets for fiscal year 2006, and for the quarters ended June 30 and September 30, 2006, and for the on-going current period charges to fiscal year 2007, as applicable (in thousands):

| | As Restated | | | |
| | March 31, 2006 | June 30, 2006 | September 30, 2006 | March 31, 2007 |
|---|---|---|---|---|
| Decrease in accounts receivable | $ (4,161) | $ (3,849) | $ (4,936) | $ (632) |
| Increase in deferred tax assets | $ 433 | $ 327 | $ 545 | $ 242 |
| Decrease in accrued expenses | $ 560 | $ 554 | $ 620 | $ 449 |
| (Increase) decrease in deferred revenue | $ (366) | $ (403) | $ 70 | $ (421) |
| Increase (decrease) in accumulated deficit[1] | $ 3,534 | $ 3,371 | $ 3,701 | $ (362) |

_____

[1] Amount includes cumulative adjustment of $2.9 million to the beginning retained earnings balance in fiscal year 2006.



### Other Adjustments

#### Revenue Adjustment

We identified that we had incorrectly recorded a sales transaction during the quarter ended June 30, 2006. This occurred from a sales agreement that we subsequently learned had additional terms that precluded us from recognizing revenue until full delivery was performed. As a result, an adjustment was made to decrease

7

TABLE OF CONTENTS

net revenues and increase deferred revenue by $0.4 million in the first quarter of fiscal year 2007. We will recognize $0.3 million of this amount as revenue during the first six months of fiscal year 2008.

#### Adjustments to Goodwill and Income Taxes Related to the Roxio CSD Acquisition

In December 2004, we acquired the assets of the Roxio Consumer Software Division ("Roxio CSD"), which included a Canadian subsidiary. During 2007, we filed income tax returns for the acquired Canadian subsidiary covering the period from April 1, 2004 to March 31, 2006. As a result of filing the Canadian income tax returns and a review of our original acquisition accounting, we made the following adjustments:

- In fiscal 2005, we decreased goodwill by approximately $2.0 million and increased deferred tax assets, net of valuation allowance, to recognize deferred tax assets in the acquired Canadian subsidiary. These deferred tax assets relate to pre-acquisition net operating losses and other temporary items.

- We recorded additional Canadian income tax expense for the fiscal years 2005 and 2006 of approximately $0.8 million and $0.3 million, respectively.

- In fiscal year 2006, we reduced goodwill by $0.4 million and increased deferred tax assets for transactional costs incurred in connection with the Roxio CSD acquisition that are deductible for tax purposes.

The adjustments did not result in any changes to cash flows in these fiscal years.

### Income Statement Impact

The income statement impact of all adjustments and restatements are as follows (in thousands):

| Fiscal Year Ended March 31, | Net Income (Loss), As Previously Reported | Restatement Adjustments, Net of Tax | | | | Net Income (Loss), As Restated |
|---|---|---|---|---|---|---|
| | | Stock Options | Change in Accounting Policy | Other | Total | |
| | | (Decrease) Increase | | | | |
| 1998 (unaudited) | $ (5,876) | $ (60) | $ — | $ — | $ (60) | $ (5,936) |
| 1999 (unaudited) | (1,859) | (619) | — | — | (619) | (2,478) |
| 2000 (unaudited) | (5,694) | (1,393) | — | — | (1,393) | (7,087) |
| 2001 (unaudited) | (5,855) | (1,454) | — | — | (1,454) | (7,309) |
| 2002 (unaudited) | (4,182) | (3,535) | — | — | (3,535) | (7,717) |
| 2003 (unaudited) | 2,537 | (4,412) | — | — | (4,412) | (1,875) |
| 2004 (unaudited) | 11,084 | (9,533) | — | — | (9,533) | 1,551 |
| Totals through March 31, 2004 (unaudited) | | (21,006) | — | — | (21,006) | |



| | | | | | | |
|---|---|---|---|---|---|---|
| 2006 | 19,927 | 311 | (649) | (255) | (593) | 19,334 |
| **Fiscal Year 2007 Quarter Ended** | | | | | | |
| June 30, 2006 (unaudited) | 4,090 | 1,007 | 161 | (257) | 911 | 5,001 |
| September 30, 2006 (unaudited) | 2,669 | (34) | (328) | — | (362) | 2,307 |
| | | $(24,728) | $ (816) | $(1,301) | $(26,845) | |

8

TABLE OF CONTENTS

The effects of these restatements on diluted earnings (loss) per share for fiscal years 2003 through 2006 and the first two quarters of fiscal year 2007 are as follows:

| Fiscal Year Ended March 31, | Diluted Earnings Per Share, As Previously Reported | Restatement Adjustments, Net of Tax | | | | Diluted Earnings (Loss) Per Share, As Restated |
|---|---|---|---|---|---|---|
| | | Stock Options | Change in Accounting Policy | Other | Total | |
| 2003 (unaudited) | $ 0.13 | $ (0.24) | $ 0.00 | $ 0.00 | $ (0.24) | $ (0.11) |
| 2004 (unaudited) | $ 0.46 | $ (0.39) | $ 0.00 | $ 0.00 | $ (0.39) | $ 0.07 |
| 2005 | $ 0.32 | $ (0.19) | $ 0.00 | $ (0.02) | $ (0.21) | $ 0.11 |
| 2006 | $ 0.73 | $ 0.03 | $ (0.01) | $ (0.01) | $ 0.01 | $ 0.74 |
| **Fiscal Year 2007 Quarter Ended** | | | | | | |
| June 30, 2006 (unaudited) | $ 0.15 | $ 0.04 | $ 0.00 | $ (0.01) | $ 0.03 | $ 0.18 |
| September 30, 2006 (unaudited) | $ 0.10 | $ 0.00 | $ (0.02) | $ 0.00 | $ (0.02) | $ 0.08 |

### *Expenses Incurred in Connection with Options Review*

We have incurred substantial expenses related to the review and analysis of the stock option grants, including approximately $6.7 million (unaudited) in costs for legal fees, external audit firm fees and external consulting fees through December 31, 2007. We expect to incur substantial additional fees in connection with stock option matters.

9

TABLE OF CONTENTS

# PART I

## Item 1. Business

### Overview

We develop and market computer software related to *digital media* — that is, data, photographs, audio, interactive features and video in digital formats. Our products create, design and deliver digital media across a wide variety of playback platforms, including broadband, broadcast, mobile and optical disc formats such as Compact Audio Disc ("CD-Audio"). Digital Video Disc ("DVD") as well as emerging formats. Our software is used to accomplish a variety of tasks, including:



- creating digital audio and video titles in the CD-Audio, DVD, Blu-ray Disc and other formats;

- recording data files on CD, DVD and Blu-ray Disc and other recordable disc formats;

- editing audio and video programs;

- playing DVD, Blu-ray Disc and other disc formats, as well as digital content from other storage media and portable devices;

- transferring digital media and data between computer and portable devices such as mobile phones, portable game players, and personal audio or video players;

- managing digital media, file systems on PCs and other CE devices;

- editing digital photographs and other images; and

- backing up the information contained on hard disks attached to PCs and CE devices.

We sell our products to both consumer and professional end users. We also license the software technology underlying our products to other companies to incorporate into products they develop. Most of the software we sell is intended for use in the Windows and Macintosh operating system environments, but some operate in Linux environments or on proprietary platforms as well.

We organize our business into two reportable operating segments: professional and consumer. These segments reflect our internal organization and the processes by which our management makes operating decisions, allocates resources and assesses performance.

### Professional

Our professional segment consists of one component, our Professional Products Group. The Professional Products Group develops, sells, and provides technical support for a range of comprehensive authoring solutions that enable commercial content owners such as major Hollywood motion picture studios to create and distribute high-end commercially released packaged media DVD-Video, Blu-ray Disc and HD DVD titles to mass consumer markets worldwide.

Intended for use by highly skilled content creation customers, high-end authoring houses, major motion picture studios and disc replicators, our professional solutions are marketed and sold under the Scenarist®, CineVision™, and DVDit® product names and Sonic® and Roxio Professional™ brands. We also sell content development technology, products and services under the InterActual® brand name, enabling professional DVD-ROM publishers to create advanced interactivity and seamless Internet connectivity for DVD-Video titles. Additionally, we license and/or bundle some of our professional authoring products to third-party companies. Our InterActual-enabled software DVD player is licensed to Hollywood studios for inclusion on motion picture packaged media releases to consumers who view DVD-Video discs on PCs. Our professional products and services are offered to our customers through a worldwide sales force augmented with a specialized dealer network. Our professional products and services accounted for approximately 6% of our net revenue for fiscal year 2007.

### Consumer

Our consumer segment consists of components that share similar technologies, products, services, production processes, customers, and distribution methods: the Roxio Division and the Advanced Technology Group.

10

TABLE OF CONTENTS



- *Roxio Division* — The Roxio Division offers a number of consumer digital media software products under the Roxio® brand name. Our applications include BackonTrack™, Backup MyPC®, CinePlayer®, Crunch™, Just!Burn™, MyDVD®, MyTV To Go™, PhotoSuite®, Popcorn™, RecordNow®, Roxio Copy & Convert™, Roxio Easy Media Creator®, Toast®, VideoWave®, WinOnCD®, and others. We sell and market these products through four primary



channels: (1) product bundling arrangements with original equipment manufacturer ("OEM") suppliers of related products, (2) volume licensing programs ("VLP") to corporate purchasers, (3) direct-to-consumer sales on our web store and (4) retail resellers (both online and "bricks and mortar" resellers). Since the Roxio CSD acquisition in December 2004, we have transitioned all of our consumer applications software products to the Roxio brand.

- *Advanced Technology Group* — The Advanced Technology Group develops software and software components that it supplies to the other two operating units and that it licenses to PC and CE application developers. We market much of this software under the Roxio, AuthorScript®, CinePlayer, and Qflix™ brand names. Customers of our Advanced Technology Group include OEM suppliers who wish to integrate our technology into products similar to the ones we distribute directly to end users through our Roxio Division. The Advanced Technology Group also collaborates with our corporate strategy group in the management of our patent program, under which we develop, acquire, license and sell patents.

We group the Roxio Division and the Advanced Technology Group into a single segment since it is difficult to draw a clear distinction between their business activities: both sell or license CD/DVD burning, CD/DVD playback and related digital media products ultimately targeted at consumers; the Advanced Technology Group develops much of the core engine technology behind both its own and Roxio products; our engineers, sales staff and other personnel transfer and/or share responsibilities between the two units in order to efficiently manage business flow and meet client needs; the two units often share budget and management responsibilities for particular initiatives; and both units engage in similar sales processes targeted at similar potential customers. For these reasons our management does not regularly review operating results broken out separately for the Roxio Division and Advanced Technology Group in deciding how to allocate resources or in assessing performance. Our consumer segment accounted for approximately 94% of our net revenue for fiscal year 2007. See Note 11 to the consolidated financial statements included in this Annual Report for a summary of our financial data by business segment.

We were incorporated in California in 1986 and completed our initial public offering in 1994. Our principal executive headquarters are located at 101 Rowland Way, Suite 110, Novato, California 94945. Our telephone number is (415) 893-8000. Our fax number is (415) 893-8008. We maintain web sites at *www.sonic.com* and *www.roxio.com*.

Our Annual Report, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, amendments to those reports, proxy statements and other reports and filings filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through our web site at *www.sonic.com* as soon as reasonably practicable after they are filed with or furnished to the Securities and Exchange Commission ("SEC").

**DVD-Video and Related Optical Formats**

Many of our products involve the creation or playback of DVD discs and related formats.

The DVD-Video optical disc format, introduced in 1996, offers high quality video, surround audio and extensive interactivity on a CD-sized disc. DVD-Video is built upon the DVD-ROM standard, which specifies a disc capable of storing a significantly greater amount of digital information than the earlier CD format. A single-layer, single-sided DVD-ROM disc holds 4.7 gigabytes of data, which equals more than 7 times the 650 megabyte capacity of a CD-ROM. A double-layer, double-sided DVD can hold up to 17 gigabytes of information, which equals more than 26 times that stored on a CD-ROM. The DVD-Video format utilizes this large capacity to offer content publishers and video consumers a compelling set of features and options, including:

11

TABLE OF CONTENTS



- *High Quality Video* — Video can be presented in the Moving Pictures Expert Group-2 ("MPEG-2") compressed digital video format, and in multiple streams. DVD-Video's perceived video quality significantly surpasses VHS cassette or broadcast television.

- *Theater Quality Audio* — Audio for DVD-Video can be presented in compressed digital stereo and "surround" formats (in up to 8 user-selectable audio streams to support different language dialog tracks, or to allow stereo and surround



the beginning balance of retained earnings. We are currently in the process of evaluating the effect of FIN 48 on our financial position and results of operations.

In September 2006, the FASB issued SFAS No. 157, "Fair Value Measures," which defines fair value, establishes a framework for measuring fair value in accordance with GAAP, expands disclosures about fair value measurements, and applies under other accounting pronouncements that require or permit fair value measurements. SFAS No. 157 does not require any new fair value measurements, but may change current practice for some entities. SFAS No. 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, with early adoption permitted. We will adopt SFAS No. 157 in fiscal year 2008 and are currently evaluating what impact, if any, SFAS No. 157 will have on our financial position or results of operations.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities – Including an Amendment of FASB Statement No. 115." SFAS No. 159 permits an entity to choose to measure many financial instruments and certain other items at fair value. Most of the provisions in SFAS No. 159 are elective; however, the amendment to FASB Statement No. 115, "Accounting for Certain Investments in Debt and Equity Securities," applies to all entities with available-for-sale and trading securities. The fair value option established by SFAS No. 159 permits all entities to choose to measure eligible items at fair value at specified election dates. A business entity will report unrealized gains and losses on items for which the fair value option has been elected in earnings at each subsequent reporting date. The fair value option (a) may be applied instrument by instrument, with a few exceptions, such as investments otherwise accounted for by the equity method, (b) is irrevocable (unless a new election date occurs), and (c) is applied only to entire arrangements and not to portions of instruments. SFAS No. 159 is effective as of the beginning of an entity's first fiscal year that begins after November 15, 2007. We will adopt SFAS No. 159 in fiscal year 2008 and are currently evaluating what impact, if any, SFAS No. 159 will have on our financial position or results of operations.

In December 2007, the FASB issued SFAS No. 141 (revised), *Business Combinations*. The standard changes the accounting for business combinations including the measurement of acquirer shares issued in consideration for a business combination, the recognition of contingent consideration, the accounting for pre-acquisition gain and loss contingencies, the recognition of capitalized in-process research and development, the accounting for acquisition-related restructuring cost accruals, the treatment of acquisition related transaction costs and the recognition of changes in the acquirer's income tax valuation allowance. Statement 141(R) is effective for fiscal years beginning after December 15, 2008, with early adoption prohibited. We will evaluate the impact the provisions of SFAS No. 141(R) and will adopt this standard on April 1, 2009.

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy**

We are restating our consolidated balance sheet as of March 31, 2006, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the fiscal years ended March 31, 2005 and March 31, 2006.

93

TABLE OF CONTENTS

**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**March 31, 2005, 2006 and 2007**

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)**

We are also restating the unaudited quarterly financial information and condensed financial statements for interim periods of fiscal year 2006, and the unaudited condensed consolidated financial statements for the quarters ended June 30, 2006 and September 30, 2006.

These restatements reflect (a) additional cash and non-cash share-based compensation expense and the associated payroll tax and other expenses relating to employee stock option grants through the second quarter of fiscal year 2007, (b) adjustments to



revenue and cost of revenue due to a voluntary change in revenue recognition policy, (c) other adjustments, and (d) related tax adjustments.

Effective October 1, 2006, we changed our policy for recognizing original equipment manufacturer ("OEM") royalty revenue. We applied this change in accounting policy retrospectively to the fiscal year ended March 31, 2006 and the quarters ended June 30, 2006 and September 30, 2006, but determined that it was not practicable to apply the change to prior periods.

### Stock Options Accounting

On February 1, 2007, we announced that we had commenced a voluntary review of our historical stock option grant practices and related accounting. The review was initiated by our management and was conducted by the audit committee (the "Audit Committee") of our board of directors, comprised solely of independent directors, with the assistance of legal counsel and outside consultants.

The Audit Committee and its advisors conducted an extensive review of our historical stock option grant practices and related accounting, including an assessment and review of our options granting policies and procedures, internal records, supporting documentation and e-mail communications, as well as interviews of Company personnel. The review focused on the period from March 3, 1998, when we engaged in a general repricing of our then-outstanding underwater options, through the present (the "Review Period").

The review included all stock options granted during the Review Period, as well as certain already-outstanding options that were repriced at the commencement of the Review Period. The review covered stock option grants under a total of seven stock option plans, and representing option grants to our directors, founders, officers and other employees (and including, among others, grants to newly-hired employees, individual or group performance awards, grants awarded in connection with acquisitions, and a limited number of grants to contractors).

During the course of the review, legal counsel to the Audit Committee, with the assistance of outside consultants, collected, processed and analyzed physical and electronic Company documents and records, including hard copy files, networked electronic documents and the computer hard drives of Company personnel who were involved in the administration of our stock option programs. Counsel to the Audit Committee was further assisted by an independent consulting firm engaged to assist in the collection, processing and analysis of options-related documentation.

Supplementing the activities performed by and on behalf of the Audit Committee, our management engaged in a detailed process of compiling, analyzing and assessing the information available to it relating to our granting of stock options and administration of stock option plans during the Review Period. Information reviewed included, without limitation, documentation related to acquisitions and other transactions completed by us, public filings (by us and by individual grant recipients), board minutes and written consents, spreadsheets and databases used to memorialize and maintain option-related information, email communications and other transmittals of information to and from outside accountants, payroll information, standard forms used to record decisions regarding hiring and termination of employees and related salary and option grant decisions known as Employee Action Forms ("EAFs"), grant notices, offer letters, option statements, tax records, personnel files and other information.

94

TABLE OF CONTENTS

**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**March 31, 2005, 2006 and 2007**

### Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)

With assistance from the independent consulting firm and input from the Audit Committee and its advisors, as well as based upon discussions with our independent auditors, our management created and maintained an extensive group of spreadsheets



showing all options-related issuances, exercises and related data.

Based on the results of the review, we have concluded that a substantial number of stock options granted during the Review Period were not correctly accounted for in accordance with accounting principles generally accepted in the United States applicable at the time those grants were made. As a result, we are restating our historical financial statements to record adjustments for additional share-based compensation expense relating to past stock option grants in accordance with SFAS No. 123R and APB No. 25, and related payroll taxes, penalties, and other related amounts, to record additional share-based compensation expense associated with options granted to consultants and to record additional adjustments that were previously considered to be immaterial.

The review also identified less frequent errors in other categories including: grants to non-employees for which an incorrect amount of share-based compensation expense had been recognized, grants cancelled after the expiration date, and exercises occurring before vesting and after expiration. These errors were also addressed and reflected in the restatement of our historical financial statements.

### Restatement Methodologies

In light of the review and in accordance with APB No. 25, other applicable literature (including, for the period commencing on April 1, 2006, SFAS No. 123R), and the guidance published by Conrad Hewitt, Chief Accountant, SEC, in a September 19, 2006 letter (the "SEC Letter"), we considered and applied the methodologies described below to determine the appropriate measurement dates for our historical stock option grants.

### Applicable Standards

In determining corrected measurement dates for our historical option grants, we followed the requirements of APB No. 25, which deems the measurement date for an option grant to be the first date on which all of the following are known: (a) the identity of the individual employee who is entitled to receive the option grant; (b) the number of options that the individual employee is entitled to receive; and (c) the option's exercise price. Under APB No. 25, the measurement date cannot be earlier than the date on which the grant is approved. In each instance where we determined that we cannot rely on the Record Date previously associated with an option, we considered alternate measurement dates based on our ability to establish or confirm, in our reasonable judgment, whether through other documentation or credible circumstantial information, when each of the elements associated with the determination of a measurement date for the option grant had been satisfied under applicable accounting principles. In making such determinations, we considered, among other things, the guidance in the SEC Letter, which provides that, where a company lacks definitive and complete documentation, it "must use all available relevant information" to form a reasonable conclusion with respect to, among other things, the appropriate dating for the option grant.

### Information Types Considered

We analyzed all available information for each option grant. In considering this information relating to each option grant, we reached the following general conclusions:

- *Board Minutes.* For certain grants (primarily grants to board members and founders), board minutes (typically from board meetings held immediately after annual shareholder meetings) were considered to be definitive, reasonable and appropriate evidence of the best measurement dates for the grants in question.

95

TABLE OF CONTENTS

**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**March 31, 2005, 2006 and 2007**

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)**



- *Board Consents.* Although not widely used, unanimous written consents of the board were similarly considered to be definitive, reasonable and appropriate evidence of the best measurement dates for grants described in such consents, subject to analysis of the date on which all board members had signed the consent.

- *Acquisition Dates.* We evaluated the extrinsic information associated with certain company acquisitions and, except as described in *Acquisition-Related Grants* below, generally were able to conclude that the original Record Dates were reasonably supportable as the appropriate measurement dates for the options granted in connection with such transactions.

- *Individual Public Filings.* Forms 3, 4 and/or 5 filed by grant recipients were considered to represent reasonable evidence of the existence of the underlying grants and to be a basis for establishing appropriate measurement dates. To the extent that the applicable Form was filed within two days of the Record Date described in the Form, we concluded that it is reasonable to consider this Record Date to be the appropriate measurement date. If, on the other hand, the Form was filed more than two days after the specified Record Date, we concluded that the filing date is an appropriate measurement date (absent information supporting an earlier date), but that the Record Date referenced in the Form is not, without additional reliable support, usable as the measurement date.

- *Employee Offer Letters.* Based upon the specific facts and circumstances described in *Hiring Grants* below, we determined that certain of our offer letters triggered variable accounting treatment for a substantial portion of options issued to new employees during the Review Period.

- *Date of Hire.* The hiring date (first day of work) was not, in itself, considered to be a valid measurement date, as there is no indication that our closing stock price on such dates was considered or memorialized in any way for stock grant purposes. However, as noted above with respect to employee offer letters, we determined that the date of hire may constitute the appropriate date for commencing variable accounting treatment for new hire grants, as described in more detail in *Hiring Grants* below.

- *Employee Action Forms.* Our EAFs do not provide sufficient evidence to establish appropriate measurement dates. While EAFs sometimes refer to a number of shares to be granted, they typically do not contain exercise price information, and they contemplate that future actions will be necessary to finalize the granting process. Further, although in some instances our former CEO (who had full authority to grant options to non-executive officer employees prior to September 23, 2005) signed EAFs, he did not typically date his signature and EAFs, in contrast to offer letters, were not usually provided to, or countersigned by, grant recipients. In addition, it appears that we did not follow a consistent policy, practice or pattern with regard to our use and execution of EAFs in connection with the option granting process. Accordingly, even though in some instances it is possible to reasonably conclude that an EAF was approved or otherwise recognized by a particular date — for example, sometimes EAFs were date-stamped when submitted to our payroll department or to our external payroll service, Automatic Data Processing, Inc., for processing — it does not necessarily follow that this approval constituted the final act in granting underlying stock options. Based on the totality of the facts and circumstances, we concluded that, in the absence of additional extrinsic information, EAFs do not constitute a reasonable basis for establishing measurement dates.

- *Vesting Base Dates.* Stock options that were granted would be assigned a "base date" which would be used to calculate time options were held for purposes of calculating vesting. Stock option vesting base dates did not generally coincide with grant dates (vesting often would be designated to commence prior to the option grant reflected in our records, and would often correspond with other

96

TABLE OF CONTENTS

**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**



**March 31, 2005, 2006 and 2007**

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)**

events or milestones such as the date of a performance review or the first date of employment at Sonic), and based on all available information, we concluded that vesting base dates should not be considered to establish appropriate measurement dates for APB No. 25 purposes.

- *Signed Grant Notices.*  A signed and dated grant notice (which would contain the date of grant, number of shares, recipient identity and exercise price) would, absent contrary information, be considered to represent definitive evidence of a measurement date for the applicable grant. To the extent any such grant notices were available, they were, absent evidence to the contrary, used in determining the proper measurement dates for the grants in question. As a general matter, though, until we changed our processes in September 23, 2005, we did not issue or retain signed/dated grant notices.

- *Periodic Spreadsheets.*  We concluded that option grant measurement dates can often reasonably be established by the dates on which extrinsic evidence demonstrates the existence of a Periodic Spreadsheet in final form. For example, in each applicable period through September 23, 2005, our practice was to send final Periodic Spreadsheets to an outside accounting firm used by us to assist in the calculation of compensation expense, diluted outstanding shares, and other matters relating to our SEC filings. In some cases, we were able to find evidence of the dates on which we sent final Periodic Spreadsheets to the outside accounting firm; in other cases, we located evidence showing the dates on which final Periodic Spreadsheets were sent back to us by the outside accounting firm. Absent additional evidence suggesting a different measurement date should be used, we used the date of transmission of these spreadsheets to or from our outside auditors as evidence of a measurement date.

- *Company Public Filings.*  In instances where no earlier reliable information exists, we concluded that the required granting actions would have occurred with finality no later than the dates on which we filed our quarterly and annual reports. By this time, the Periodic Spreadsheet would need to have been finalized and provided to (and received back from) the outside accounting firm, so that applicable share-based compensation and earnings per diluted share disclosures, including options granted during the period in question, could be calculated and included in our filings. Accordingly, in the absence of other reliable information, we considered these dates, in some instances, to be the earliest dates that would qualify as measurement dates for purposes of APB No. 25.

*Methodology by Grant and Grant Category*

The following analysis sets forth the methodologies applied to certain grants and grant categories. In addition to these general methodological approaches, where we had specific information regarding particular grants, we communicated with our independent auditors and our advisers, and reached consensus on the appropriate approach to accounting for such grants, consistent with the criteria of APB No. 25, related accounting literature, and the guidance of the SEC Letter.

*Founder and Director Grants*

The vast majority of grants to founders and directors were issued to coincide with our annual shareholder meeting. Grants of this type were typically authorized at our board meetings held immediately after our annual shareholder meetings, reflected in board minutes, and issued on the same date. We concluded that we have sufficient contemporaneous, extrinsic and reliable information to support and substantiate most of our founder and director Record Dates as appropriate measurement dates for purposes of APB No. 25 and other applicable literature. One exception to this general conclusion is that, in the single instance where we implemented the founders and directors grants agreed-upon at a board meeting by means of a subsequently- executed unanimous written consent, we concluded that the appropriate measurement date is the date of the final signature on the consent, rather than the original Record Date (which was the date of the meeting). In

97





TABLE OF CONTENTS



# SONIC SOLUTIONS

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### March 31, 2005, 2006 and 2007

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)**

addition, a unanimous written consent was used to grant initial options to one of our directors when he was first elected to the board, and we concluded that the appropriate measurement date for that grant is the date that the final signature was added to the consent. Further, in one case where full minutes were not available, certain measurement date adjustments were made based upon the supporting documentation that was available. Finally, our conclusions regarding certain salary reduction grants are described in *Salary Reduction Grants* below.

### *Non-Founder Section 16 Officer Grants*

Prior to September 23, 2005, our CEO would typically make grants to our non-founder executive officer(s) who are considered "executive officers" for purposes of Section 16 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in the same manner as he would for non-executive employees of the Company. Pursuant to the delegation to him under our various option plans, the CEO generally did not have express authority to grant options to Section 16 officers, as this power was reserved for the board. Nevertheless, these grants were made in a consistent fashion and it is apparent that our board was aware of these option grants and did not disapprove of them. Furthermore, we have disclosed these grants in filed proxy statements, periodic reports and other public documents, and the parties to these grants (both the Company and the Section 16 officer recipient) have consistently honored the terms of the grants over a large number of years.

We concluded that, based on the facts and circumstances, the most appropriate and reasonable approach to these grants is to apply all APB No. 25 criteria in the same manner as such criteria are being applied to grants to our non-management employees (see discussion *Other Employee Grants* below) — that is, to recognize and acknowledge the existence of these grants, but to change measurement dates where there is insufficient information to reasonably conclude that the original Record Date satisfies the requirements of APB No. 25.

Since September 23, 2005, it has been our policy that all grants to our non-founder executive officers be made by the board, and be memorialized by contemporaneous documentation. As a practical matter, no such grants were issued after September 23, 2005.

### *Other Employee Grants*



Under each of our various option plans, our CEO was delegated the authority to make grants to employees other than executive officers. As described above, except in particular circumstances (for example, grants made in the context of acquisitions and certain grants made after September 23, 2005), the Company employed a quarterly-focused grant process for non-founder employees and generally lack contemporaneous grant documentation sufficient to support the Record Dates for these option grants. Accordingly, we analyzed all available relevant information for each stock option grant in an attempt to determine the earliest point in time at which the evidence reasonably shows that all requisites for the establishment of a measurement date under APB No. 25 were satisfied. Except in specific circumstances (see *Hiring Grants, Salary Reduction Grants, Acquisition-Related Grants* and *Other*, below), or where we were able to locate contemporaneous grant documentation, this approach generally has resulted in our determining that the most appropriate measurement dates occur some time after the original Record Date in our records, often the date on which final Periodic Spreadsheets were sent to or received from the outside accounting firm we used for financial statement calculations, or the date on which we filed our quarterly or annual reports with respect to the grant(s) in question. Given the generally upward trend of our stock price during a substantial portion of the Review Period, moving to these "end of quarter" measurement dates generally results in a larger compensation charge and restatement amount.

98



TABLE OF CONTENTS



**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**March 31, 2005, 2006 and 2007**

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)**

On September 23, 2005, our board created an employee options subcommittee to make grants under our option plans to recipients other than executive officers and to board members. This subcommittee reported on its activities to the board and compensation committee at each regularly-scheduled board meeting.

*Hiring Grants*

We concluded that variable accounting is the most appropriate restatement methodology for initial grants to newly-hired employees made after December 15, 1998 and prior to the adoption of new procedures in September 23, 2005, other than in connection with acquisitions. This conclusion is based upon Financial Accounting Standards Board ("FASB") Interpretation No. ("FIN") 44 (March 2000), "Accounting for Certain Transactions Involving Stock Compensation — An Interpretation of APB Opinion No. 25," which provides that "if the exercise price of a fixed stock option award is reduced, the award shall be accounted for as variable from the date of the modification to the date the award is exercised, is forfeited, or expires unexercised."

In reaching this conclusion, we considered the following facts and circumstances: (a) offer letters sent to new employees during this period were signed by our CEO, the same person who had full authority to make grants to such employees, (b) while the offer letters inform the new employees that an option grant will be made "shortly after" the commencement of employment, our actual practice — as reflected in our own grant records and documentation — was to make these initial grants over a significant period of time, up to several months after the start of employment, and (c) the offer letters, once signed by the employee, arguably constitute a legally binding commitment by us to issue option shares in the stated amount, as the grant obligation is not subject to any contingencies such as board approval. Under these facts and circumstances, we concluded that the most appropriate approach under APB No. 25 and FIN 44 is to treat the offer letters as constituting a grant at the initial hire date, with a subsequent repricing on a later date (whether the Record Date or an alternate measurement date determined as a result of the review).

Even though in a number of instances our share price at the subsequent measurement date was higher than the price on the initial hire date, due to the fact that the price declined in other instances we concluded that it is appropriate to apply variable accounting to this entire category of hiring grants, with the initial option grant date and vesting base date being deemed to have occurred on the hire date in all cases. Further, although we were not been able to locate signed copies of all offer letters associated with initial hire grants, because our practice was to utilize substantially similar letters signed by the former CEO for all new hires, we concluded that it is appropriate to apply variable accounting to these grants as well, based on the analysis described above.

*Salary Reduction Grants*

In March of 1998 and July of 2001, we offered salary reduction programs to certain of our senior employees. The programs allowed these employees to reduce their compensation and, for each dollar of reduced pay, the employee was entitled to an option to purchase one share of our common stock. For example, if an employee reduced his or her pay by $25,000, the employee was entitled to options to purchase 25,000 shares of our common stock. We never created any formal plans to document these programs, and formal board approval was not obtained, although a notation describing the 1998 salary reduction program was included in supporting materials provided to directors at the board meeting immediately prior to the reduction.

The 2001 salary reduction program was for one year, beginning July 1, 2001 and ending June 30, 2002. Payroll was paid semi-monthly, five days after the end of the payment period (that is, for mid-month payrolls, payment would be on the 20th; for month-end payrolls, payment would be on the 5th of the following month). The options under this program were issued and dated July 12, 2001, which was the payroll processing date for the semi-monthly pay period beginning on July 1, 2001. We concluded that this date is the appropriate measurement date.



TABLE OF CONTENTS

SONIC SOLUTIONS

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
March 31, 2005, 2006 and 2007

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)**

The 1998 salary reduction program was also for one year, beginning May 1, 1998 and ending April 30, 1999. The options under this program were dated and issued March 3, 1998. As noted above, this salary reduction program was discussed at the March 3, 1998 board meeting, based on a package of supporting materials attached to the March 3, 1998 board minutes. Consistent with our approach to the 2001 salary reduction program, however, we concluded that the appropriate measurement date for these options should be May 12, 1998, the payroll processing date for the first payment period during the program period, since in theory a potential participant may have decided in the interim not to take part.

*Acquisition-Related Grants*

During the Review Period, we completed certain corporate acquisitions and, in connection with these transactions, issued certain option grants. Generally, these grants were described in offer letters signed by our then-CEO in which acquired employees were informed that they would receive the options at the time of closing of the relevant acquisition. These transactions include:

- *Daikin*. At a January 24, 2001 meeting, our board unanimously resolved to enter into an asset purchase agreement with and to acquire the assets of Daikin Industries, Ltd. The transaction closed on February 27, 2001 and was announced on February 28, 2001. As part of the acquisition, key members of Daikin joined the Company and were issued options dated February 27, 2001, the date of acquisition, at the closing price of our stock on that date.

- *Veritas*. At a November 1, 2002 meeting, our board unanimously resolved to enter into an asset purchase agreement with and to acquire the assets of the Desktop and Mobile Division of VERITAS Software Corporation. On November 13, 2002, we entered into the asset purchase agreement, and the transaction closed and was announced on December 18, 2002. At the time of the acquisition, we issued options to employees who joined the Company through this acquisition. These options were issued on December 18, 2002 and the exercise price was the closing price on that date.

- *InterActual*. At a December 2, 2003 meeting, our board unanimously resolved to acquire InterActual Technologies, Inc., by way of merger. We entered into the definitive agreement on January 31, 2004, the transaction closed on February 13, 2004, and was announced on February 19, 2004. At the time of the acquisition, we issued inducement grants to employees who joined the Company as a result of this transaction. These options were dated February 13, 2004 and the exercise price was the closing price on that date.

- *Ravisent*. On May 29, 2002, we announced that we had entered into an agreement under which Axeda exclusively licensed its Ravisent software to us under terms that were essentially equivalent to ownership and, in connection with this transaction, we hired a number of Ravisent (Axeda) employees. Board minutes were not available but board materials dated May 28, 2002 indicate that the transaction closed Friday, May 24, 2002. Grants were issued on two different dates. One group of grants to 10 individuals was issued on May 28, 2002, with an exercise price equal to the closing stock price on that date. The other group of grants to 11 individuals was dated January 2, 2003, with an exercise price equal to our closing price on that date. For contractual reasons, Ravisent (Axeda) employees from the Pennsylvania office could not receive shares until January 2, 2003, their date of hire by us — accordingly, their options were issued on January 2, 2003, with the exercise price equal to our closing price on that date. Based on the contractual terms, the hiring dates of these Pennsylvania employees, and the language in their offer letters, we concluded that we had reasonable evidence to support the Record Date of January 2, 2003 as the measurement date for accounting purposes.

100

TABLE OF CONTENTS



**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**March 31, 2005, 2006 and 2007**

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)**

- *Roxio (U.S. Grants).* On December 17, 2004, we entered into an amended and restated asset purchase agreement and acquired Roxio's consumer software division. We announced this acquisition on December 20, 2004 and filed a Form 8-K on December 23, 2004. At the time of the acquisition, we issued inducement grants to employees who joined the Company through this acquisition. In particular, we issued options to Roxio employees located in the United States on December 17, 2004, the closing date, and the exercise price was the closing price on that date.

- *Roxio (Foreign Grants).* Because no appropriate foreign option plan was in place at the time that the Roxio transaction closed, we were unable to issue options to Roxio employees located outside of the United States at the time of closing of the transaction. Thereafter, at a meeting on March 15, 2005, our board adopted the 2005 Stock Incentive Plan (Non-U.S. Employees) and, according to our stock options records, options were issued to the non-U.S. Roxio employees on April 6, 2005, with the exercise price equal to the closing price on that date. Because the offer letters for these employees stated that the grants would be made at the time the acquisition closed, we concluded that variable accounting is the most appropriate restatement methodology for these options.

With the exception of the Roxio foreign grants, which are described above, we determined that we have sufficient reliable evidence to reasonably support and maintain the original Record Dates as the appropriate measurement dates for purposes of APB No. 25 for our acquisition-related grants.

*Other*



In a number of isolated cases, we identified accounting errors that we corrected in accordance with APB No. 25 and other applicable accounting literature, including miscellaneous situations involving acceleration of vesting, extensions of exercise periods for vested options, grants to consultants that were erroneously accounted for as if they had been made to employees, repricing previously issued grants, missed grants, and other "one-off" situations.

**Tax Considerations**

Based on measurement date changes resulting from our options review, certain grants of stock options made during the Review Period were priced below fair market value, rather than at fair market value. Consequently, certain grants intended to be classified as incentive stock options ("ISOs"), requiring pricing at no less than fair market value on the date of grant, should have been classified as nonqualified stock options ("NQs"). Additionally, certain options should have been treated as NQs since date of grant due to either plan limitations or ISO limitations. We did not withhold federal income taxes, state income taxes, FICA or Medicare on the options that were issued as ISOs that should have been treated as NQ stock options (due to their below-market grant pricing, plan limitations or ISO rules). We accrued payroll tax, penalty, and interest expenses related to NQ stock options originally classified as ISOs in the periods in which the underlying stock options were exercised. Then, in periods in which the liabilities were legally extinguished due to statutes of limitations, the expenses were reversed and recognized as a reduction of expense.

We informed the Internal Revenue Service ("IRS") of potential payroll tax liabilities resulting from changes in measurement dates for stock options. However, no formal settlement negotiations have taken place. On January 15, 2008, we were notified by the IRS of a payroll tax audit covering the calendar years 2004, 2005 and 2006.

We recorded deferred tax assets as a result of the share-based compensation expense recorded through the restatement based on unexercised and uncanceled nonqualified stock options at the end of each reporting period. The recognized tax benefit related to affected stock options granted to officers was limited, in certain instances, due to the potential non-deductibility of the related expenses under Section 162(m) of the Internal





TABLE OF CONTENTS

## SONIC SOLUTIONS

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### March 31, 2005, 2006 and 2007

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)**

Revenue Code of 1986, as amended (the "Code"). This IRS rule limits the amount of executive compensation that may be deducted for U.S. tax purposes under certain circumstances.

Section 409A of the Code imposes additional taxes on our employees for stock options granted with an exercise price lower than the fair market value on the date of grant for all options or portions of options that vest after December 31, 2004. As a result of the change in measurement dates described above, certain stock options granted during the Review Period were issued at prices below fair market value on the revised measurement date. Management is considering possible ways to address the impact that Section 409A may have on our employees as a result of the exercise price of stock options being less than the fair market value of our common stock on the revised measurement dates. The IRS has issued transition rules under Section 409A that allow for a correction or cure for some of these options subject to Section 409A. We may offer non-officer employees who hold outstanding options the opportunity to cure their affected stock options. In connection with this cure, we may make future cash bonus payments to our non-officer employees in an undetermined amount. We recorded approximately $1.7 million in operating expense for estimated employee Section 409A taxes that we have elected to cover with respect to options that were exercised during the fourth quarter of fiscal year 2007.

### *Stock Options Restatement*

Based on the errors noted above, we have recorded adjustments to share-based compensation, including payroll taxes, Section 409A penalties and other tax expense. There was no impact on revenue or net cash provided by operating activities as a result of this additional share-based compensation and related tax expense during the restatement periods.

The following table sets forth the effect of the stock option review restatement for each of the applicable fiscal years (in thousands):

| | Stock Option Review Adjustments | | | | |
| Fiscal Year Ended | Pre-Tax Share-Based Compensation Expense Adjustments | Pre-Tax Payroll Related Tax Expense (Benefit) Adjustments | Total Pre-Tax Impact | Related Income Tax Expense (Benefit) Adjustments | Net Expense (Benefit) After-Tax Adjustments |
|---|---|---|---|---|---|
| March 31, 1998 (unaudited) | $       60 | $       — | $       60 | $       — | $       60 |
| March 31, 1999 (unaudited) | 613 | 6 | 619 | — | 619 |
| March 31, 2000 (unaudited) | 1,175 | 218 | 1,393 | — | 1,393 |
| March 31, 2001 (unaudited) | 812 | 642 | 1,454 | — | 1,454 |
| March 31, 2002 (unaudited) | 3,026 | 509 | 3,535 | — | 3,535 |
| March 31, 2003 (unaudited) | 2,707 | 1,705 | 4,412 | — | 4,412 |
| March 31, 2004 (unaudited) | 8,177 | 1,356 | 9,533 | — | 9,533 |
| Cumulative effect at March 31, 2004 (unaudited) | 16,570 | 4,436 | 21,006 | — | 21,006 |
| March 31, 2005 | 4,492 | 583 | 5,075 | (69) | 5.006 |
| March 31, 2006[1] | 10,103 | 2,782 | 12,885 | (13,196) | (311) |
| Six Months Ended September 30, 2006 (unaudited) | 316 | (1,514) | (1,198) | 225 | (973) |





(1) Prior to fiscal year 2006, we maintained a valuation allowance against our deferred tax assets. In fiscal year 2006, we reversed the majority of our valuation allowance against deferred tax assets due to our assessment, made at that time, that it was more likely than not that deferred tax assets would be realized. As a result of the restatement, we recorded additional deferred tax assets with respect to the periods

102

TABLE OF CONTENTS

### SONIC SOLUTIONS

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### March 31, 2005, 2006 and 2007

#### Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)

covered by our options review. The $13.2 million income tax benefit in fiscal year 2006 relates to the release of valuation allowance against the additional deferred tax assets recorded with respect to fiscal years 2005 and prior as a result of the restatement, net of the current year effect.

*Change in Accounting Policy*

Effective October 1, 2006, we elected to change our method of recognizing OEM royalty revenue. Previously, we generally recognized OEM royalty revenue in the period the OEM product shipped, provided we received the OEM royalty report before the preparation of our financial statements. We now generally recognize OEM revenue in the period we receive the OEM royalty report. We adopted the new method to improve reporting consistency across our OEM customers and reduce the length of the accounting close cycle. Comparative financial statements for fiscal year 2006 and quarterly financial information for the quarters ended June 30, 2006 and September 30, 2006 have been adjusted to apply the change in accounting policy retrospectively.

Due primarily to a change in our accounting software in fiscal year 2005, retrospective application of this change in accounting policy to fiscal year 2005 and prior periods was not practicable. Therefore, we recorded the cumulative effect of the change as an adjustment to accumulated deficit at the beginning of fiscal year 2006.

The following table summarizes the effects of the retrospective application of this change in accounting policy on our consolidated financial statements for fiscal year 2006, and for the quarters ended June 30 and September 30, 2006, and for the on-going current period charges to fiscal year 2007, applicable (in thousands):

| | As Restated | | | |
| | | Three Months Ended | | |
| | Year Ended March 31, 2006 | June 30, 2006 | September 30, 2006 | Year Ended March 31, 2007 |
|---|---|---|---|---|
| Increase (decrease) in revenue | $ (1,068) | $ 475 | $ (609) | $ 841 |
| Decrease (increase) in costs | (14) | (207) | 62 | (237) |
| Tax benefit (expense) | 433 | (107) | 219 | (242) |
| Increase (decrease) in net income | $ (649) | $ 161 | $ (328) | $ 362 |
| Increase (decrease) in earnings per share | $ (0.02) | $ 0.01 | $ (0.01) | $ 0.01 |



The following table summarizes the effect of the retrospective application of this change in accounting policy on our consolidated balance sheets for fiscal year 2006, and for the quarters ended June 30 and September 30, 2006, and for the on-going current period charges to fiscal year 2007, as applicable (in thousands):

| | As Restated | | | |
| | March 31, 2006 | June 30, 2006 | September 30, 2006 | March 31, 2007 |
|---|---|---|---|---|
| Decrease in accounts receivable | $ (4,161) | $ (3,849) | $ (4,936) | $ (632) |
| Increase in deferred tax assets | $ 433 | $ 327 | $ 545 | $ 242 |
| Decrease in accrued expenses | $ 560 | $ 554 | $ 620 | $ 449 |

103

TABLE OF CONTENTS

## SONIC SOLUTIONS

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### March 31, 2005, 2006 and 2007

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)**

| | As Restated | | | |
| | March 31, 2006 | June 30, 2006 | September 30, 2006 | March 31, 2007 |
|---|---|---|---|---|
| (Increase) decrease in deferred revenue | $ (366) | $ (403) | $ 70 | $ (421) |
| Increase (decrease) in accumulated deficit[1] | $ 3,534 | $ 3,371 | $ 3,701 | $ (362) |

---

[1] Amount includes cumulative adjustment of $2.9 million to the beginning retained earnings balance in fiscal year 2006.

**Other Adjustments**

*Revenue Adjustment*

We identified that we had incorrectly recorded a sales transaction during the first quarter of 2007. This occurred from a sales agreement that we subsequently learned had additional terms that precluded us from recognizing revenue until full delivery was performed. As a result, an adjustment was made to decrease net revenues and increase deferred revenue by $0.4 million in the first quarter of fiscal year 2007. We will recognize $0.3 million of this amount as revenue during the first six months of fiscal year 2008.

*Adjustments to Goodwill and Income Taxes Related to the Roxio CSD Acquisition*

In December 2004, we acquired the assets of the Roxio Consumer Software Division ("Roxio CSD"), which included a Canadian subsidiary. During 2007, we filed income tax returns for the acquired Canadian subsidiary covering the period from April 1, 2004 to March 31, 2006. As a result of filing the Canadian income tax returns and a review of our original acquisition accounting, we made the following adjustments:

- In fiscal 2005, we decreased goodwill by approximately $2.0 million and increased deferred tax assets, net of valuation allowance, to recognize deferred tax assets in the acquired Canadian subsidiary. These deferred tax assets relate to pre-




acquisition net operating losses and other temporary items.

- We recorded additional Canadian income tax expense for the fiscal years 2005 and 2006 of approximately $0.8 million and $0.3 million, respectively.

- In fiscal year 2006, we reduced goodwill by $0.4 million and increased deferred tax assets for transactional costs incurred in connection with the Roxio CSD acquisition that are deductible for tax purposes.

The adjustments did not result in any changes to cash flows in these fiscal years.

104

TABLE OF CONTENTS

**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**March 31, 2005, 2006 and 2007**

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)**

**Income Statement Impact**

The income statement impact of all adjustments and restatements are as follows (in thousands):

| Fiscal Year Ended March 31, | Net Income (Loss), As Previously Reported | Restatement Adjustments, Net of Tax | | | | Net Income (Loss), As Restated |
|---|---|---|---|---|---|---|
| | | Stock Options | Change in Accounting Policy | Other | Total | |
| | | (Decrease) Increase | | | | |
| 1998 (unaudited) | $ (5,876) | $ (60) | $ — | $ — | $ (60) | $ (5,936) |
| 1999 (unaudited) | (1,859) | (619) | — | — | (619) | (2,478) |
| 2000 (unaudited) | (5,694) | (1,393) | — | — | (1,393) | (7,087) |
| 2001 (unaudited) | (5,855) | (1,454) | — | — | (1,454) | (7,309) |
| 2002 (unaudited) | (4,182) | (3,535) | — | — | (3,535) | (7,717) |
| 2003 (unaudited) | 2,537 | (4,412) | — | — | (4,412) | (1,875) |
| 2004 (unaudited) | 11,084 | (9,533) | — | — | (9,533) | 1,551 |
| Totals through March 31, 2004 (unaudited) | | (21,006) | — | — | (21,006) | |
| 2005 | 8,542 | (5,006) | — | (789) | (5,795) | 2,747 |
| **Fiscal year 2006 quarter ended** | | | | | | |
| June 30, 2005 (unaudited) | 5,904 | 7,125 | 329 | — | 7,454 | 13,358 |
| September 30, 2005 (unaudited) | 3,102 | (3,775) | (197) | — | (3,972) | (870) |
| December 31, 2005 (unaudited) | 8,201 | 3,993 | (1,499) | — | 2,494 | 10,695 |
| March 31, 2006 (unaudited) | 2,720 | (7,032) | 718 | (255) | (6,569) | (3,849) |

Fiscal year 2007 quarter ended

| | | | | | | |
|---|---|---|---|---|---|---|
| June 30, 2006 (unaudited) | $ 4,090 | 1,007 | 161 | (257) | 911 | $ 5,001 |
| September 30, 2006 (unaudited) | 2,669 | (34) | (328) | — | (362) | 2,307 |
| | | $ (24,728) | $ (816) | $ (1,301) | $ (26,845) | |

The effects of these restatements on diluted earnings (loss) per share for fiscal years 2003 through 2006 and the first two quarters of fiscal year 2007 are as follows (in thousands):

| | | Restatement Adjustments, Net of Tax | | | | | |
|---|---|---|---|---|---|---|---|
| Fiscal Year Ended March 31, | Diluted Earnings Per Share, As Previously Reported | Stock Options | Change in Accounting Policy | Other | Total | | Diluted Earnings (Loss) Per Share, As Restated |
| 2003 (unaudited) | $ 0.13 | $ (0.24) | $ 0.00 | $ 0.00 | $ (0.24) | $ (0.11) | |
| 2004 (unaudited) | $ 0.46 | $ (0.39) | $ 0.00 | $ 0.00 | $ (0.39) | $ 0.07 | |
| 2005 | $ 0.32 | $ (0.19) | $ 0.00 | $ (0.02) | $ (0.21) | $ 0.11 | |
| Fiscal year 2006 quarter ended | | | | | | | |
| June 30, 2005 (unaudited) | $ 0.22 | $ 0.28 | $ 0.02 | $ 0.00 | $ 0.30 | $ 0.52 | |
| September 30, 2005 (unaudited) | $ 0.11 | $ (0.15) | $ 0.00 | $ 0.00 | $ (0.15) | $ (0.04) | |
| December 31, 2005 (unaudited) | $ 0.30 | $ 0.16 | $ (0.05) | $ 0.00 | $ 0.11 | $ 0.41 | |
| March 31, 2006 (unaudited) | $ 0.10 | $ (0.26) | $ 0.02 | $ (0.01) | $ (0.25) | $ (0.15) | |
| **Fiscal year 2006** | $ 0.73 | $ 0.03 | $ (0.01) | $ (0.01) | $ 0.01 | $ 0.74 | |
| Fiscal year 2007 quarter ended | | | | | | | |
| June 30, 2006 (unaudited) | $ 0.15 | $ 0.04 | $ (0.00) | $ (0.01) | $ 0.03 | $ 0.18 | |
| September 30, 2006 (unaudited) | $ 0.10 | $ (0.00) | $ (0.02) | $ 0.00 | $ (0.02) | $ 0.08 | |

105

TABLE OF CONTENTS

## SONIC SOLUTIONS

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### March 31, 2005, 2006 and 2007

#### Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)

#### Expenses Incurred in Connection with Options Review

We have incurred substantial expenses related to the review and analysis of the stock option grants, including approximately $6.7 million (unaudited) in costs for legal fees, external audit firm fees and external consulting fees through December 31, 2007. We expect to incur substantial additional fees in connection with stock option matters.

#### Restatement Impact on the Consolidated Financial Statements

The following presents the effect of the restatement adjustments by financial statement line item for the consolidated balance



sheet as of March 31, 2006, statements of operations for the years ended March 31, 2005 and 2006, the statements of cash flows for the years ended March 31, 2005 and 2006.

106

TABLE OF CONTENTS

## SONIC SOLUTIONS

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### March 31, 2005, 2006 and 2007

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)**

### CONSOLIDATED BALANCE SHEET
(in thousands, except share amounts)

| | March 31, 2006 | | |
|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 18,731 | $ — | $ 18,731 |
| Short-term investments | 42,350 | — | 42,350 |
| Accounts receivable, net of allowance of $5,235 | 23,141 | (4,161) | 18,980 |
| Inventory | 689 | — | 689 |
| Deferred tax benefits | 3,879 | — | 3,879 |
| Prepaid expenses and other current assets | 3,771 | — | 3,771 |
| Total current assets | 92,561 | (4,161) | 88,400 |
| Fixed assets, net | 4,833 | — | 4,833 |
| Purchased and internally developed software costs, net | 1,266 | — | 1,266 |
| Goodwill | 54,151 | (2,478) | 51,673 |
| Acquired intangibles, net | 43,914 | — | 43,914 |
| Deferred tax benefit, net | 11,391 | 11,504 | 22,895 |
| Other assets | 1,355 | — | 1,355 |
| Total assets | $ 209,471 | $ 4,865 | $ 214,336 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| Current Liabilities: | | | |
| Accounts payable | $ 7,833 | $ — | $ 7,833 |
| Accrued expenses and other current liabilities | 24,309 | 6,174 | 30,483 |
| Deferred revenue | 7,795 | 366 | 8,161 |

| | | | |
|---|---|---|---|
| Bank note payable | 30,000 | — | 30,000 |
| Other long term liabilities, net of current portion | 375 | — | 375 |
| Deferred revenue, net of current portion | 2 | — | 2 |
| Total liabilities | 70,314 | 6,540 | 76,854 |
| Shareholders' equity: | | | |
| Convertible preferred stock, no par value, 10,000,000 shares authorized; 0 shares issued and outstanding at March 31, 2006 | — | — | — |
| Common stock, no par value, 100,000,000 shares authorized; 25,685,953 shares issued and outstanding at March 31, 2006 | 126,880 | 28,604 | 155,484 |
| Accumulated other comprehensive income (loss) | (937) | — | (937) |
| Accumulated earnings (deficit) | 13,214 | (30,279) | (17,065) |
| Total shareholders' equity | 139,157 | (1,675) | 137,482 |
| Total liabilities and shareholders' equity | $ 209,471 | $ 4,865 | $ 214,336 |

107

TABLE OF CONTENTS

**SONIC SOLUTIONS**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
March 31, 2005, 2006 and 2007

**Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy – (continued)**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except share and per share amounts)

| | Year Ended March 31, 2005 | | | Year Ended March 31, 2006 | | |
|---|---|---|---|---|---|---|
| Consolidated Statements of Operations Data: | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| Net revenue | $ 90,627 | $ — | $ 90,627 | $ 148,676 | $ (1,068) | $ 147,608 |
| Cost of revenue | 13,373 | — | 13,373 | 34,118 | 14 | 34,132 |
| Gross profit | 77,254 | — | 77,254 | 114,558 | (1,082) | 113,476 |
| Operating expenses: | | | | | | |
| Marketing and sales[1] | 21,117 | 1,430 | 22,547 | 31,605 | 4,001 | 35,606 |
| Research and development[1] | 31,618 | 1,681 | 33,299 | 40,560 | 3,597 | 44,157 |
| General and administrative[1] | 9,845 | 1,932 | 11,777 | 17,019 | 5,195 | 22,214 |

| | | | | | |
|---|---|---|---|---|---|
| Business integration | 2,190 | — | 2,190 | 336 | — | 336 |
| Total operating expenses | 67,870 | 5,043 | 72,913 | 89,520 | 12,793 | 102,313 |
| Operating income | 9,384 | (5,043) | 4,341 | 25,038 | (13,875) | 11,163 |
| Interest income | 998 | — | 998 | 1,271 | — | 1,271 |
| Interest expense | (182) | (32) | (214) | (1,754) | (92) | (1,846) |
| Other expense | (607) | — | (607) | (431) | — | (431) |
| Income before income taxes | 9,593 | (5,075) | 4,518 | 24,124 | (13,967) | 10,157 |
| Provision for income taxes | 1,051 | 720 | 1,771 | 4,197 | (13,374) | (9,177) |
| Net income | $ 8,542 | $ (5,795) | $ 2,747 | $ 19,927 | $ (593) | $ 19,334 |
| Net income per share: | | | | | | |
| Basic | $ 0.37 | $ (0.25) | $ 0.12 | $ 0.81 | $ (0.03) | $ 0.78 |
| Diluted | $ 0.32 | $ (0.21) | $ 0.11 | $ 0.73 | $ 0.01 | $ 0.74 |
| Shares used in per share calculation: | | | | | | |
| Basic | 23,347 | — | 23,347 | 24,750 | — | 24,750 |
| Diluted | 26,529 | (1,577) | 24,952 | 27,421 | (1,187) | 26,234 |
| [1] Includes share-based compensation expense as follows: | | | | | | |
| Marketing and sales | $ — | $ 1,345 | $ 1,345 | $ — | $ 3,846 | $ 3,846 |
| Research and development | — | 1,527 | 1,527 | — | 3,460 | 3,460 |
| General and administrative | — | 1,620 | 1,620 | 131 | 2,797 | 2,928 |
| Total share-based compensation expense | $ — | $ 4,492 | $ 4,492 | $ 131 | $ 10,103 | $ 10,234 |

108

TABLE OF CONTENTS

## SONIC SOLUTIONS

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### March 31, 2005, 2006 and 2007

#### Note 2 — Restatement of Consolidated Financial Statements and Change in Accounting Policy  – (continued)

### CONSOLIDATED STATEMENTS OF CASH FLOWS
### (in thousands)

| | Years Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | | | 2006 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |

 **Cash flows from operating activities:**



Adjustments to reconcile net income to net cash provided by operating activities:

| | | | | | |
|---|---|---|---|---|---|
| Depreciation and amortization | 4,393 | | 4,393 | 9,607 | | 9,607 |
| Deferred income taxes | (640) | | (640) | (14,297) | (10,033) | (24,330) |
| Provision for returns and doubtful accounts, net of write-offs | (108) | | (108) | (3,572) | — | (3,572) |
| Share-based compensation | | 4,492 | 4,492 | 131 | 10,103 | 10,234 |
| Tax benefit from employee stock option plans | 784 | (431) | 353 | 14,474 | (2,129) | 12,345 |
| Acquired in-process technology | 3,100 | | 3,100 | | | |
| Release of acquisition reserve | | | | (1,261) | | (1,261) |
| Loss on disposal of assets | | | — | 23 | — | 23 |
| Cumulative effect of accounting change in revenue recognition | | | — | — | (2,885) | (2,885) |
| Changes in operating assets and liabilities, net | | | | | | |
| Accounts receivable | 319 | | 319 | (5,391) | 4,161 | (1,230) |
| Inventory | 401 | | 401 | 66 | | 66 |
| Prepaid expenses and other assets | 781 | | 781 | (2,257) | (483) | (2,740) |
| Other assets | (987) | | (987) | 1,228 | — | 1,228 |
| Acquired intangibles sold as part of operations | | | | 1,169 | | 1,169 |
| Accounts payable | 4,477 | | 4,477 | (1,961) | — | (1,961) |
| Accrued liabilities | 160 | 1,734 | 1,894 | 3,416 | 1,493 | 4,909 |
| Deferred revenue | 967 | | 967 | 1,865 | 366 | 2,231 |
| Net cash provided by operating activities | 22,189 | | 22,189 | 23,167 | | 23,167 |
| **Cash flows from investing activities:** | | | | | | |
| Purchase of fixed assets | (3,035) | | (3,035) | (1,761) | | (1,761) |
| Additions to purchased and internally developed software | (635) | | (635) | (776) | | (776) |
| InterActual goodwill adjustment | 245 | | 245 | | | |
| Acquisition of Roxio CSD | (75,163) | | (75,163) | | | |
| Purchase of short term investment instruments | — | | — | (42,350) | | (42,350) |
| Net cash used in investing activities | (78,588) | | (78,588) | (44,887) | | (44,887) |
| **Cash flows from financing activities:** | | | | | | |
| Proceeds from issuance of common stock | 23,901 | | 23,901 | | | |
| Proceeds from exercise of common stock options | 2,101 | | 2,101 | 5,865 | | 5,865 |
| Borrowings on bank credit facility | 30,000 | | 30,000 | | | |
| Principal payments on capital leases | (91) | | (91) | (89) | | (89) |
| Net cash provided by financing activities | 55,911 | | 55,911 | 5,776 | | 5,776 |
| Effect on exchange rate changes on cash and cash equivalents | (258) | | (258) | (761) | | (761) |
| Net decrease in cash and cash equivalents | (746) | | (746) | (16,705) | | (16,705) |
| **Cash and cash equivalents at beginning of year** | 36,182 | | 36,182 | 35,436 | | 35,436 |
| **Cash and cash equivalents at end of year** | $ 35,436 | $ | $ 35,436 | $ 18,731 | $ | $ 18,731 |

109



**EXHIBIT B**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1 (b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* <br> LEIGHTON A CLAY <br><br> (Last)　(First)　(Middle) <br> C/O SONIC SOLUTIONS <br> 101 ROWLAND WAY, SUITE 110 <br><br> (Street) <br> NOVATO　CA　94945 <br> (City)　(State)　(Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br> SONIC SOLUTIONS/CA/ <br> [ SNIC ] <br><br> 3. Date of Earliest Transaction (Month/Day/Year) <br> 05/10/2004 <br><br> 4. If Amendment, Date of Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer <br> (Check all applicable) <br> ___ Director  ___ 10% Owner <br> X Officer (give title below)  ___ Other (specify below) <br> Sr. VP and CFO <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | |
| Employee Stock Option (right to buy) | $17.49 | 05/10/2004 | | A | | 100,000 | | (1) | 05/10/2014 | Common Stock | 100,000 | $0 |

**Explanation of Responses:**

1 The option vests with respect to 1/36th per month beginning on 5/10/04.

/s/ Julie Murray, attorney-in-fact for A. Clay Leighton　　05/12/2004

** Signature of Reporting Person　　Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

**EXHIBIT C**

SNIC: Historical Prices for SONIC SOLUTIONS - Yahoo! Finance    Filed 08/08/2008    Page 39 of 47    Page 1 of 3

Case 4:07-cv-05111-CW    Document 52-2



Yahoo!    My Yahoo!    Mail    More          Make Y! My Home Page          Hi, fiendofkinks    Sign Out    Help

## YAHOO! FINANCE          Search          WEB SEARCH

Dow ⬆ 2.77%  Nasdaq ⬆ 2.39%                    Fri, Aug 8, 2008, 2:31PM ET - **U.S. Markets close in 1hr 29mins.**

GET QUOTES    Finance Search

## Sonic Solutions (SNIC)          At 2:15PM ET: **5.45** ⬆ 0.31 (6.03%)

    E*TRADE        AMERITRADE $9.99 trades. No surprises.

## Historical Prices          Get **Historical Prices** for:    GO

### SET DATE RANGE

Start Date: Jun  22  1997    Eg. Jan 1, 2003    ⦿ Daily
                                                ○ Weekly
End Date: Aug  22  1997                          ○ Monthly
                                                ○ Dividends Only

Get Prices

First | Prev | Next | Last

**PRICES**

| Date | Open | High | Low | Close | Volume | Adj Close* |
|------|------|------|-----|-------|--------|-----------|
| 22-Aug-97 | 7.12 | 7.88 | 7.12 | 7.50 | 8,800 | 7.50 |
| 21-Aug-97 | 7.00 | 8.25 | 7.00 | 7.50 | 93,100 | 7.50 |
| 20-Aug-97 | 7.00 | 7.37 | 7.00 | 7.00 | 28,800 | 7.00 |
| 19-Aug-97 | 6.62 | 7.00 | 6.62 | 7.00 | 4,000 | 7.00 |
| 18-Aug-97 | 6.38 | 7.00 | 6.38 | 7.00 | 15,600 | 7.00 |
| 15-Aug-97 | 7.00 | 7.00 | 6.75 | 6.75 | 1,000 | 6.75 |
| 14-Aug-97 | 6.75 | 6.88 | 6.50 | 6.62 | 18,600 | 6.62 |
| 13-Aug-97 | 7.12 | 7.75 | 7.00 | 7.37 | 24,000 | 7.37 |
| 12-Aug-97 | 6.50 | 7.50 | 6.50 | 7.25 | 27,700 | 7.25 |
| 11-Aug-97 | 6.06 | 6.88 | 6.00 | 6.50 | 81,600 | 6.50 |
| 8-Aug-97 | 7.37 | 7.88 | 7.25 | 7.50 | 11,900 | 7.50 |
| 7-Aug-97 | 7.88 | 8.25 | 7.37 | 7.75 | 17,100 | 7.75 |
| 6-Aug-97 | 5.75 | 7.75 | 5.75 | 7.75 | 62,400 | 7.75 |
| 5-Aug-97 | 5.75 | 6.13 | 5.62 | 6.13 | 26,400 | 6.13 |
| 4-Aug-97 | 5.75 | 6.00 | 5.75 | 6.00 | 4,800 | 6.00 |

ADVERTISEMENT

SNIC: Historical Prices for SNIC SOLUTIONS INC at Yahoo! Finance

Case 4:07-cv-05111-CW Document 52-2    Filed 08/08/2008    Page 40 of 47    Page 2 of 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 1-Aug-97 | 5.75 | 5.81 | 5.75 | 5.75 | 3,600 | 5.75 |
| 31-Jul-97 | 5.81 | 5.87 | 5.50 | 5.87 | 16,600 | 5.87 |
| 30-Jul-97 | 5.87 | 5.87 | 5.38 | 5.87 | 39,200 | 5.87 |
| 29-Jul-97 | 5.87 | 5.87 | 5.38 | 5.44 | 7,800 | 5.44 |
| 28-Jul-97 | 5.50 | 5.87 | 5.38 | 5.50 | 5,900 | 5.50 |
| 25-Jul-97 | 5.87 | 5.87 | 5.50 | 5.50 | 7,400 | 5.50 |
| 24-Jul-97 | 5.38 | 5.75 | 5.00 | 5.50 | 41,900 | 5.50 |
| 23-Jul-97 | 5.25 | 5.25 | 5.25 | 5.25 | 7,400 | 5.25 |
| 22-Jul-97 | 5.12 | 5.25 | 5.12 | 5.12 | 1,400 | 5.12 |
| 21-Jul-97 | 5.50 | 5.50 | 5.00 | 5.38 | 10,800 | 5.38 |
| 18-Jul-97 | 5.12 | 5.25 | 5.12 | 5.25 | 4,600 | 5.25 |
| 17-Jul-97 | 5.12 | 5.50 | 5.12 | 5.12 | 14,100 | 5.12 |
| 16-Jul-97 | 5.12 | 5.25 | 5.12 | 5.12 | 15,300 | 5.12 |
| 15-Jul-97 | 5.12 | 5.12 | 5.12 | 5.12 | 2,100 | 5.12 |
| 14-Jul-97 | 5.12 | 5.12 | 5.12 | 5.12 | 2,800 | 5.12 |
| 11-Jul-97 | 5.50 | 5.50 | 5.12 | 5.12 | 2,100 | 5.12 |
| 10-Jul-97 | 5.12 | 5.50 | 5.12 | 5.25 | 9,100 | 5.25 |
| 9-Jul-97 | 5.12 | 5.12 | 5.12 | 5.12 | 100 | 5.12 |
| 8-Jul-97 | 5.12 | 5.50 | 5.12 | 5.12 | 6,900 | 5.12 |
| 7-Jul-97 | 5.38 | 5.38 | 5.12 | 5.25 | 3,500 | 5.25 |
| 3-Jul-97 | 5.12 | 5.12 | 5.12 | 5.12 | 6,100 | 5.12 |
| 2-Jul-97 | 5.12 | 5.38 | 5.12 | 5.25 | 18,900 | 5.25 |
| 1-Jul-97 | 5.31 | 5.38 | 5.12 | 5.25 | 5,500 | 5.25 |
| 30-Jun-97 | 5.12 | 5.38 | 5.12 | 5.12 | 11,900 | 5.12 |
| 27-Jun-97 | 5.12 | 5.25 | 5.12 | 5.25 | 1,900 | 5.25 |
| 26-Jun-97 | 5.25 | 5.25 | 5.25 | 5.25 | 24,100 | 5.25 |
| 25-Jun-97 | 5.12 | 5.50 | 5.12 | 5.25 | 18,100 | 5.25 |
| 24-Jun-97 | 5.25 | 5.62 | 5.12 | 5.62 | 5,900 | 5.62 |
| 23-Jun-97 | 5.62 | 5.62 | 5.00 | 5.50 | 9,300 | 5.50 |
| 20-Jun-97 | 5.62 | 5.62 | 5.00 | 5.00 | 36,100 | 5.00 |



Now through
September 2nd
you can take advantage
of this special offer.

For More Information,
Visit bayareabmw.com

Certified
Pre-Owned
by BMW

* Close price adjusted for dividends and splits.

First | Prev | Next | Last

Download To Spreadsheet

Add to Portfolio    Set Alert    Email to a Friend

Get **Historical Prices** for Another Symbol:    GO  Symbol Lookup

- Stock Screener
- Mergers & Acquisitions
- Splits

Copyright © 2008 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy - Send Feedback

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

SNIC: Historical Prices for SONIC SOLUTIONS - Yahoo! Finance

Case 4:07-cv-05111-CW    Document 52-2    Filed 08/08/2008    Page 42 of 47    Page 1 of 3

Yahoo!    My Yahoo!    Mail    More                Make Y! My Home Page          Hi, fiendofkinks    Sign Out    Help

 **FINANCE**                 Search                          **WEB SEARCH**

Dow ⬆ 2.73%  Nasdaq ⬆ 2.38%                    Fri, Aug 8, 2008, 2:34PM ET - **U.S. Markets close in 1hr 26mins.**

GET QUOTES    Finance Search

## Sonic Solutions (SNIC)

At 2:19PM ET: **5.46** ⬆ 0.32 (6.23%)

        

## Historical Prices

Get **Historical Prices** for:    GO

### SET DATE RANGE

| | | | | |
|---|---|---|---|---|
| **Start Date:** | Oct | 30 | 2000 | Eg. Jan 1, 2003 |
| **End Date:** | Dec | 31 | 2000 | |

⦿ Daily
◯ Weekly
◯ Monthly
◯ Dividends Only

Get Prices

First | Prev | Next | Last

### PRICES

| Date | Open | High | Low | Close | Volume | Adj Close* |
|---|---|---|---|---|---|---|
| 29-Dec-00 | 1.38 | 1.94 | 1.31 | 1.50 | 220,500 | 1.50 |
| 28-Dec-00 | 1.16 | 1.62 | 1.03 | 1.38 | 414,900 | 1.38 |
| 27-Dec-00 | 1.00 | 1.25 | 1.00 | 1.16 | 267,300 | 1.16 |
| 26-Dec-00 | 1.62 | 1.72 | 1.25 | 1.25 | 71,800 | 1.25 |
| 22-Dec-00 | 1.38 | 1.50 | 1.25 | 1.38 | 128,900 | 1.38 |
| 21-Dec-00 | 1.81 | 1.94 | 1.25 | 1.31 | 107,200 | 1.31 |
| 20-Dec-00 | 1.75 | 1.81 | 1.62 | 1.62 | 79,500 | 1.62 |
| 19-Dec-00 | 1.97 | 2.00 | 1.69 | 1.75 | 81,300 | 1.75 |
| 18-Dec-00 | 2.09 | 2.09 | 1.88 | 2.00 | 42,500 | 2.00 |
| 15-Dec-00 | 1.78 | 2.09 | 1.62 | 2.06 | 72,700 | 2.06 |
| 14-Dec-00 | 2.12 | 2.12 | 1.88 | 1.94 | 65,200 | 1.94 |
| 13-Dec-00 | 1.94 | 2.12 | 1.94 | 2.12 | 21,400 | 2.12 |
| 12-Dec-00 | 2.12 | 2.22 | 1.94 | 2.12 | 37,300 | 2.12 |
| 11-Dec-00 | 2.00 | 2.19 | 1.88 | 2.12 | 66,100 | 2.12 |
| 8-Dec-00 | 2.06 | 2.19 | 1.88 | 2.00 | 27,400 | 2.00 |

ADVERTISEMENT

| 7-Dec-00 | 1.88 | 2.25 | 1.84 | 2.16 | 47,200 | 2.16 |
|---|---|---|---|---|---|---|
| 6-Dec-00 | 1.89 | 2.06 | 1.88 | 2.00 | 40,100 | 2.00 |
| 5-Dec-00 | 1.84 | 2.22 | 1.56 | 1.88 | 129,300 | 1.88 |
| 4-Dec-00 | 2.00 | 2.25 | 1.72 | 1.88 | 49,300 | 1.88 |
| 1-Dec-00 | 1.73 | 2.38 | 1.62 | 1.94 | 65,900 | 1.94 |
| 30-Nov-00 | 1.69 | 2.00 | 1.56 | 1.56 | 80,100 | 1.56 |
| 29-Nov-00 | 1.97 | 2.05 | 1.88 | 1.88 | 60,600 | 1.88 |
| 28-Nov-00 | 1.89 | 2.09 | 1.89 | 2.06 | 61,100 | 2.06 |
| 27-Nov-00 | 2.09 | 2.09 | 1.94 | 2.06 | 46,500 | 2.06 |
| 24-Nov-00 | 2.06 | 2.12 | 2.00 | 2.09 | 13,200 | 2.09 |
| 22-Nov-00 | 2.14 | 2.22 | 2.00 | 2.00 | 60,900 | 2.00 |
| 21-Nov-00 | 2.25 | 2.25 | 2.06 | 2.06 | 24,200 | 2.06 |
| 20-Nov-00 | 2.12 | 2.38 | 2.06 | 2.12 | 39,600 | 2.12 |
| 17-Nov-00 | 2.20 | 2.38 | 2.06 | 2.38 | 36,300 | 2.38 |
| 16-Nov-00 | 2.44 | 2.50 | 2.06 | 2.31 | 38,300 | 2.31 |
| 15-Nov-00 | 2.31 | 2.50 | 2.15 | 2.38 | 29,200 | 2.38 |
| 14-Nov-00 | 2.31 | 2.94 | 2.12 | 2.28 | 54,200 | 2.28 |
| 13-Nov-00 | 2.06 | 2.38 | 2.00 | 2.25 | 32,200 | 2.25 |
| 10-Nov-00 | 2.23 | 2.62 | 2.12 | 2.16 | 24,300 | 2.16 |
| 9-Nov-00 | 2.42 | 2.44 | 2.12 | 2.25 | 23,200 | 2.25 |
| 8-Nov-00 | 2.67 | 2.69 | 2.25 | 2.38 | 55,800 | 2.38 |
| 7-Nov-00 | 2.86 | 2.88 | 2.62 | 2.62 | 27,700 | 2.62 |
| 6-Nov-00 | 3.00 | 3.06 | 2.62 | 2.88 | 68,600 | 2.88 |
| 3-Nov-00 | 2.17 | 3.06 | 2.06 | 2.94 | 207,300 | 2.94 |
| 2-Nov-00 | 2.12 | 2.19 | 1.94 | 2.06 | 226,300 | 2.06 |
| 1-Nov-00 | 2.25 | 2.31 | 2.12 | 2.25 | 62,500 | 2.25 |
| 31-Oct-00 | 2.09 | 2.25 | 2.00 | 2.22 | 11,400 | 2.22 |
| 30-Oct-00 | 2.11 | 2.12 | 2.03 | 2.06 | 22,600 | 2.06 |

* Close price adjusted for dividends and splits.



**MANAGING RISK USING OPTIONS:**
Part I: Covered Calls and Covered Puts

by **Randy Frederick**
Schwab's Director of Derivatives

❝ ...the traders who thrive are not those who pick the most winners, but those who lose the least on their unsuccessful days. ❞

READ THE FULL ARTICLE ▸



TALK TO CHUCK

*charles* SCHWAB

First | Prev | Next | Last

⚒ Download To Spreadsheet

✉ Add to Portfolio    ☜ Set Alert    ✉ Email to a Friend

Get **Historical Prices** for Another Symbol:    GO Symbol Lookup

- Stock Screener
- Mergers & Acquisitions
- Splits

Copyright © 2008 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy - Send Feedback

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

SNIC: Historical Prices for Sonic Solutions — Yahoo! Finance   Page 45 of 47   Page 1 of 3

Case 4:07-cv-05161-CW   Document 52-2   Filed 08/08/2008

Yahoo!    My Yahoo!    Mail    More          Make Y! My Home Page          Hi, fiendofkinks        Sign Out    Help

# YAHOO! FINANCE

Search                    **WEB SEARCH**

Dow ⬆ 2.73%  Nasdaq ⬆ 2.41%        Friday, August 8, 2008, 2:35PM ET - U.S. Markets close in 1 hour and 25 minutes.

GET QUOTES    Finance Search

## Sonic Solutions (SNIC)

At 2:20PM ET: **5.46** ⬆ 0.32 (6.23%)

  E✱TRADE 

## Historical Prices

Get **Historical Prices** for:          GO

### SET DATE RANGE

Start Date: Feb  11  2003    Eg. Jan 1, 2003

End Date:  Apr  11  2003

◉ Daily
○ Weekly
○ Monthly
○ Dividends Only

Get Prices

First | Prev | Next | Last

### PRICES

| Date | Open | High | Low | Close | Volume | Adj Close* |
|---|---|---|---|---|---|---|
| 11-Apr-03 | 7.05 | 7.20 | 6.97 | 7.01 | 299,000 | 7.01 |
| 10-Apr-03 | 7.25 | 7.34 | 6.76 | 7.02 | 612,400 | 7.02 |
| 9-Apr-03 | 7.45 | 7.55 | 7.17 | 7.25 | 333,000 | 7.25 |
| 8-Apr-03 | 7.66 | 7.66 | 7.25 | 7.44 | 518,000 | 7.44 |
| 7-Apr-03 | 7.19 | 7.59 | 6.97 | 7.25 | 1,469,000 | 7.25 |
| 4-Apr-03 | 6.04 | 7.00 | 6.00 | 6.79 | 1,610,500 | 6.79 |
| 3-Apr-03 | 5.63 | 6.04 | 5.55 | 5.97 | 391,300 | 5.97 |
| 2-Apr-03 | 5.63 | 5.72 | 5.48 | 5.60 | 217,100 | 5.60 |
| 1-Apr-03 | 5.68 | 5.74 | 5.45 | 5.55 | 117,800 | 5.55 |
| 31-Mar-03 | 5.58 | 5.74 | 5.13 | 5.70 | 328,400 | 5.70 |
| 28-Mar-03 | 5.56 | 5.65 | 5.45 | 5.65 | 157,400 | 5.65 |
| 27-Mar-03 | 5.57 | 5.74 | 5.44 | 5.60 | 203,800 | 5.60 |
| 26-Mar-03 | 5.65 | 5.68 | 5.49 | 5.65 | 326,800 | 5.65 |
| 25-Mar-03 | 4.96 | 5.50 | 4.95 | 5.40 | 369,300 | 5.40 |
| 24-Mar-03 | 5.00 | 5.00 | 4.78 | 4.93 | 188,300 | 4.93 |

ADVERTISEMENT

SNIC: Historical Prices for SECURITIES INVESTMENT Yahoo! Finance   Page 46 of 47   Page 2 of 3

Case 4:07-cv-05111-CW   Document 52-2   Filed 08/08/2008

| | | | | | |
|---|---|---|---|---|---|
| 21-Mar-03 | 4.85 | 5.12 | 4.73 | 5.11 | 361,100 | 5.11 |
| 20-Mar-03 | 4.74 | 4.90 | 4.63 | 4.90 | 223,200 | 4.90 |
| 19-Mar-03 | 4.70 | 4.80 | 4.55 | 4.66 | 290,300 | 4.66 |
| 18-Mar-03 | 4.35 | 4.70 | 4.31 | 4.62 | 321,700 | 4.62 |
| 17-Mar-03 | 4.33 | 4.46 | 4.18 | 4.36 | 355,700 | 4.36 |
| 14-Mar-03 | 4.33 | 4.44 | 4.15 | 4.37 | 273,100 | 4.37 |
| 13-Mar-03 | 4.02 | 4.43 | 4.01 | 4.33 | 376,200 | 4.33 |
| 12-Mar-03 | 3.97 | 4.04 | 3.96 | 4.02 | 203,100 | 4.02 |
| 11-Mar-03 | 3.99 | 4.03 | 3.89 | 3.97 | 189,600 | 3.97 |
| 10-Mar-03 | 4.00 | 4.03 | 3.85 | 3.99 | 166,600 | 3.99 |
| 7-Mar-03 | 4.06 | 4.07 | 3.95 | 4.03 | 201,700 | 4.03 |
| 6-Mar-03 | 4.25 | 4.25 | 4.02 | 4.05 | 181,700 | 4.05 |
| 5-Mar-03 | 4.15 | 4.24 | 4.15 | 4.20 | 159,600 | 4.20 |
| 4-Mar-03 | 4.19 | 4.19 | 4.06 | 4.11 | 233,000 | 4.11 |
| 3-Mar-03 | 4.29 | 4.29 | 4.12 | 4.20 | 887,700 | 4.20 |
| 28-Feb-03 | 4.30 | 4.40 | 4.21 | 4.25 | 198,500 | 4.25 |
| 27-Feb-03 | 4.69 | 4.74 | 4.35 | 4.40 | 514,000 | 4.40 |
| 26-Feb-03 | 4.66 | 5.09 | 4.51 | 4.63 | 1,588,300 | 4.63 |
| 25-Feb-03 | 4.30 | 4.31 | 4.02 | 4.10 | 230,100 | 4.10 |
| 24-Feb-03 | 4.66 | 4.67 | 4.20 | 4.36 | 213,200 | 4.36 |
| 21-Feb-03 | 4.32 | 4.75 | 4.32 | 4.66 | 247,700 | 4.66 |
| 20-Feb-03 | 4.37 | 4.38 | 4.23 | 4.33 | 98,200 | 4.33 |
| 19-Feb-03 | 4.50 | 4.55 | 4.28 | 4.29 | 210,600 | 4.29 |
| 18-Feb-03 | 4.07 | 4.50 | 4.07 | 4.20 | 280,500 | 4.20 |
| 14-Feb-03 | 3.86 | 4.12 | 3.76 | 4.08 | 231,000 | 4.08 |
| 13-Feb-03 | 3.85 | 3.97 | 3.78 | 3.83 | 151,100 | 3.83 |
| 12-Feb-03 | 3.96 | 3.97 | 3.66 | 3.75 | 736,500 | 3.75 |
| 11-Feb-03 | 4.02 | 4.06 | 3.93 | 3.96 | 178,100 | 3.96 |

* Close price adjusted for dividends and splits.

First | Prev | Next | Last

⚝ Download To Spreadsheet

⚏ Add to Portfolio    ⚑ Set Alert    ✉ Email to a Friend

Get **Historical Prices** for Another Symbol:    [GO] Symbol Lookup

• Stock Screener                                        • Splits

• Mergers & Acquisitions

Copyright © 2008 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy - Send Feedback

SNIC: Historical Prices for SOLUTIONS 1960 Inc. - Yahoo! Finance    Page 3 of 3

Case 4:07-cv-05111-CW   Document 52-2    Filed 08/08/2008    Page 47 of 47

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.