1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7                                          No. C 07-05111 CW

CITY OF WESTLAND POLICE AND FIRE
8  RETIREMENT SYSTEM and PLYMOUTH COUNTY      ORDER GRANTING IN
   RETIREMENT SYSTEM, On Behalf of            PART AND DENYING IN
9  Themselves and All Others Similarly        PART DEFENDANTS'
   Situated,                                  MOTION TO DISMISS
10
              Plaintiffs,
11
        v.
12
   SONIC SOLUTIONS et al.,
13
              Defendants.
14  _____/

15

16       Defendants Sonic Solutions, David C. Habiger, Robert J. Doris,

17  A. Clay Leighton, Mary C. Sauer, Mark Ely, Robert M. Greber, Peter

18  J. Marguglio and R. Warren Langley move to dismiss the Consolidated

    Class Action Complaint (CAC).  Lead Plaintiffs City of Westland
19
    Police and Fire Retirement System (Westland) and Plymouth County
20
    Retirement System (Plymouth) oppose the motion.  The motion was
21
    heard on February 26, 2009.  Having considered all of the parties'
22
    papers and oral argument on the motion, the Court grants
23
    Defendants' motion in part and denies it in part.
24
                             BACKGROUND[1]
25
         Defendant Sonic is a California corporation that develops and
26

27  _____

28       [1]All facts are taken from Lead Plaintiffs' CAC and are assumed
    to be true for purposes of this motion.

markets computer software related to digital media, such as data, photographs, audio and video in digital formats. Sonic has been a publicly traded company since February, 1994, and is traded on the Nasdaq Global Select Market. Defendants Robert J. Doris and Mary C. Sauer co-founded Sonic in 1986. Doris has been the Chairman of the Board of Directors since the inception of Sonic and he served as the CEO of Sonic from 1986 until he resigned from the position in September, 2005. Sauer has been a Director and Sonic's Secretary since its founding. She also served as the Senior Vice President of Marketing and Sales from February, 1993 to September, 2005.

Defendants David C. Habiger, A. Clay Leighton, and Mark Ely are executive officers of Sonic. Habiger has worked for Sonic since 1993. In April, 2005, Habiger became President and Chief Operating Officer and, in September, 2005, he succeeded Doris as the CEO. Leighton joined Sonic in 1992 and served as Sonic's Chief Financial Officer from January, 1999 to February, 2008. Ely joined Sonic in 1992 and became an Executive Vice President in September, 2006.

Defendants Robert M. Greber, R. Warren Langley and Peter Marguglio are outside directors and members of various Board Committees. They joined Sonic's Board in August, 1993, August, 1996 and June, 2001, respectively.

Lead Plaintiffs Westland and Plymouth purchased Sonic's publicly traded securities between October 23, 2002 and May 17, 2007 (Class Period).

This case arises out of Defendants' alleged false statements about Sonic's earnings and their concealment of backdated stock

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

option grants.   A stock option granted to an employee of a corporation allows the employee to purchase company stock at a specified price (exercise price), typically the fair market value of the stock on the date the option was granted.   When the employee exercises an option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised.   Backdating occurs when a stock option is reported as having been granted on a certain date, but is actually granted days or months later and is backdated to a date when the company's stock was trading at a lower price.   Backdating allows option grantees to realize immediate unearned and undisclosed financial gains.   Lead Plaintiffs allege that Defendants altered stock option grants to the Company's officers, directors and employees in order to provide the recipients with a more profitable exercise price.   Defendants' statements of Sonic's earnings and expenses were allegedly false because they failed to disclose the backdating of options.

On February 1, 2007, Defendants announced an internal investigation into Sonic's past options practices.   At the conclusion of the investigation, on February 26, 2008, Defendants announced a $29 million restatement of Sonic's consolidated financial statements for the fiscal years (FY) from 1998 to 2005 to account for stock option grants which were granted but never documented properly.

In the restatement, Sonic stated that "a substantial number of stock options granted during the review period were not correctly accounted for."   The company explained that "option grant agreements were typically dated 'as of' with no separate date for

the signature of a Company officer, and Company personnel indicated that these agreements were typically generated as part of the end-of-quarter reporting cycle notwithstanding the Record Date appearing on the documents themselves."  The restatement also noted,

> Under each of our various options plans, our CEO was delegated the authority to make grants to employees other than executive officers.  As described above, except in particular circumstances . . . the Company employed a quarterly-focused grant process for non-founder employees and generally lack[ed] contemporaneous grant documents sufficient to support the Record Dates for these option grants.
>
> . . .
>
> The Audit Committee noted instances in which personnel actively discussed how to correct mistakes related to the documentation and related accounting treatment, and when to inform auditors of those mistakes.
>
> . . .
>
> Prior to September 23, 2005, our CEO [Doris] would typically make grants to our non-founder executive officer(s) who are considered "executive officers" for purposes of Section 16 of the Exchange Act in the same manner as he would for non-executive employees of the Company.  Pursuant to the delegation to him under our various option plans, the CEO [Doris] generally did not have express authority to grant options to Section 16 officers, as this power was reserved for the board.  Nevertheless, these grants were made in a consistent fashion and it is apparent that our board was aware of these option grants and did not disapprove of them. . .

The restatement also concluded, "After reviewing the available documentary evidence and information gathered through interviews of Company personnel, the Audit Committee concluded that the conduct of those who administered our options plans was not intentionally or knowingly wrongful."  The restatement reported that the Audit Committee also "found no indication of intent to purposefully circumvent stock option accounting rules or to otherwise

4

inaccurately report the financial results of the Company during the Review Period."

Westland filed the initial complaint in this case on October 4, 2007, eight months after Defendants announced their internal investigation.  Following Defendants' restatement in February, 2008, Westland, joined by Plymouth, filed a Consolidated Class Action Complaint.  Lead Plaintiffs allege that Defendants violated Sections 10(b), 14(a), 20(a) and 20A of the Exchange Act and Rule 10b-5.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  See Bell Atl. Corp. v. Twombly, 550 U.S. 554, 127 S. Ct. 1955, 1964 (2007).

In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).

When granting a motion to dismiss, the court is generally

United States District Court
For the Northern District of California

required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

REQUESTS FOR JUDICIAL NOTICE

Defendants seek judicial notice of Exhibits A, B and 1-3 to their request.  Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994).

Having reviewed the exhibits, the Court denies Defendants' request as to Exhibits A, B, 1 and 2 because the information contained in these SEC filings is disputed by Lead Plaintiffs. Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001) (holding that a court may not take judicial notice of "disputed facts in public records."). The Court will not accept as true the matters asserted in those documents.  The Court grants Defendants' request as to Exhibit 3 because historic stock prices are subject to accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned.

DISCUSSION

I.    Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) reliance, (3) scienter, and (4) resulting damages."  Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1157 (9th Cir. 1996); see also McCormick v. Fund Am. Cos., 26 F.3d 869, 875 (9th Cir. 1994).

Some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action.  See Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Ninth Circuit in In re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970 (9th Cir. 1999), recklessness, as defined by Hollinger, is a form of intentional conduct, not merely an extreme form of

United States District Court
For the Northern District of California

negligence.  <u>See</u> <u>Silicon Graphics</u>, 183 F.3d at 976-77.  Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[] some degree of intentional or conscious misconduct."  <u>See</u> <u>id.</u> at 977.  The <u>Silicon Graphics</u> court refers to this subspecies of recklessness as "deliberate recklessness."  <u>See</u> <u>id.</u> at 977.

Lead Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.  <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc).  Pursuant to the requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Further, pursuant to the requirements of the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness.  <u>See</u> 15 U.S.C. § 78u-4(b)(2); <u>Silicon Graphics</u>, 183 F.3d at 977.  Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. <u>See</u> <u>Silicon Graphics</u>, 183 F.3d at 979.  In order to satisfy the

United States District Court
For the Northern District of California

8

heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  Id.

A.   Requisite Mental State

Thus, to state a claim pursuant to § 10(b) of the Exchange Act, Lead Plaintiffs must "plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  Zucco Partners v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) quoting Silicon Graphics, 183 F.3d at 976. If no individual allegations are sufficient, then the Court will "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference" of scienter.  Id.

Defendants argue that Lead Plaintiffs' allegations, when examined alone or considered holistically, are insufficient to give rise to a strong inference of scienter.  Lead Plaintiffs counter that nine different sources of evidence support such an inference: (1) Defendants' admissions, (2) the magnitude of the accounting violations, (3) Defendants' receipt of backdated options, (4) the timing of the backdated options, (5) Defendants' filing of false documents with the SEC, (6) the Board of Directors' actions, (7) the importance of the stock options program, (8) Defendants' insider trading and (9) the timing of Defendant Leighton's termination as CFO.  The Court addresses these contentions in turn.

1          1.   Defendants' Admissions

2       Lead Plaintiffs argue that, in the restatement, Defendants

3  admitted to conduct that supports a strong inference of scienter.

4  Specifically, the restatement notes that "option grants were

5  typically dated 'as of' with no separate date for the signature of

6  a Company officer, and Company personnel indicated that these

7  agreements were typically generated as part of the end-of-quarter

8  reporting cycle, notwithstanding the Record Date appearing on the

9  document themselves."  Lead Plaintiffs argue that this means that

10  the option was not "granted" on the date that it was approved by

11  the Board or CEO, but instead dated to reflect an effective date

12  "as of" a date that had already passed.  Defendants counter that

13  because the Audit Committee concluded that no intentional

14  misconduct occurred, any evidence of backdating should be seen as

15  the result of "innocent but sloppy accounting practices," and that

16  "not each and every single instance where a company has chosen the

17  wrong measurement date is necessarily a case of backdating."  In re

18  Zoran Corp. Deriv. Litig. 511 F. Supp. 2d 986, 1003-04 (N.D. Cal.

19  2007).  However, here, Lead Plaintiffs do not assert merely one or

20  two stock options that contain an incorrect measurement date.  In

21  other filings submitted to the SEC, Defendants noted that "for a

22  large portion of options issued . . . there is little to no

23  contemporaneous grant-specific documentation that satisfies the

24  requirements for 'measurement dates' under APB No. 25."[2]  CAC

25

26       [2]APB No. 25 is the acronym for Accounting Principles Board
Opinion No. 25.  Issued in 1972, APB No. 25 provides guidelines for
27  the expensing of options granted by a company to its employees.  In
1973, APB became the Financial Accounting Standards Board, which is
28                                                    (continued...)

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

¶ 123.  Further, Defendants cannot fairly rely on the Audit Committee's statement that no intentional misconduct occurred because the members of the Audit Committee are the same people responsible for overseeing the option backdating process.  ¶ 136. In sum, Defendants' statements about their stock options practice provide some insight into their state of mind, but do not give rise to a strong inference of scienter.

> 2.  The Magnitude of Defendants' Accounting Violations

Lead Plaintiffs argue that Defendants' $29 million restatement, which proved that Defendants' earlier SEC filings were inaccurate and in violation of Generally Accepted Accounting Principles (GAAP), supports an inference of scienter.  See In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1016 (9th Cir. 2005) ("Violations of GAAP standards can also provide evidence of scienter."); In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) (In re McKesson) ("when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter.  After all, books do not cook themselves.").  Defendants do not dispute that throughout the Class Period they failed to comply with APB No. 25 when they backdated stock options.  However, Defendants argue that they did so unknowingly.  They argue that, until recent years, few companies understood the relevance of or how to apply APB No. 25.  Defendants state that it is "an unsubstantiated stretch of the imagination to argue that executives recognized [APB No. 25's]

---

[2](...continued)
a leading organization in the private sector for establishing standards of financial accounting and reporting in the United States.

importance in the late 1990s and early 2000s."

In a September, 2006 letter issued by the SEC which describes how APB No. 25 should be applied, the SEC stated:

> The existence of a pattern of past option grants with an exercise price equal to or near the lowest price of the entity's stock during the time period surrounding those grants could indicate that the terms of those grants were determined with hindsight.  Further, in some cases, the absence of documentation, in combination with other relevant factors, may provide evidence of fraudulent conduct.

CAC ¶ 44.

Yet, courts have concluded that APB No. 25 is a complex rule, and that a misapplication of APB No. 25 "cannot be construed as a glaring example of scienter because the measurement date criteria embodied in APB No. 25 are far from obvious."  Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938, 949 (D. Ariz. 2007); see In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1168-69 (S.D. Fla. 2004) ("interpretations of the measurement date criteria embodied in APB No. 25 are far from obvious").  Also, the $29 million amount in the restatement is not glaringly high given that it applies to a ten-year period.  Courts have concluded that restatements of amounts far greater than $29 million do not establish scienter.  See In re Marvell Tech. Group Ltd. Sec. Litig., 2008 WL 4544439, at *6 (N.D. Cal. Sept. 29) ("plaintiffs cannot show scienter solely by pointing to the fact that Marvell restated its financial statements [by $327.4 million in stock-based compensation expenses]"); Weiss, 527 F. Supp. 2d at 942 (dismissing a stock option backdating case where the restatement was $106 million).  Though the magnitude of Defendants' accounting violation alone does not demonstrate scienter, together with other

12

1  allegations, it could amount to the requisite mental state.

2          3.   Defendants' Receipt of Backdated Options

3       Lead Plaintiffs argue that the receipt of backdated options by

4  Defendants Doris, Sauer and Leighton supports a strong inference of

5  scienter on their part.  For instance, Lead Plaintiffs allege that

6  Defendant Leighton received at least 440,000 backdated options from

7  which he immediately realized earnings when the options were filed.

8  See Middlesex Ret. Sys. v. Quest Software, Inc., 527 F. Supp. 2d

9  1164, 1183 (C.D. Cal. 2007) ("it is simply incomprehensible that

10  for such large option grants Defendants would not have been keenly

11  aware of the option measurement date and the resulting value of the

12  option grants"); In re Affymetrix Deriv. Litiq., 2008 U.S. Dist.

13  LEXIS 97245, at *21 (N.D. Cal. Oct. 24) (concluding that

14  allegations that defendants received backdated options "support an

15  inference that [those defendants] had knowledge of and participated

16  in the backdating of the options because they had a significant

17  financial interest in doing so").  However, Defendants counter that

18  these option grants were only a small subset of the grants that

19  Leighton received while he worked at Sonic and, therefore, do not

20  support any inference of scienter.  Further, Defendants argue that

21  if the backdating had been done intentionally, they would have

22  picked even more advantageous dates, dates on which the stock was

23  trading even lower than on the ones recorded.  Defendants also

24  argue that the grants to Doris and Sauer are irrelevant because

25  they occurred outside of the class period.  This last argument is

26  not well-taken because the class period is defined by the dates of

27  Defendants' alleged false statements, not the option grant dates.

28  In re Openwave Sys. Sec. Litiq., 528 F. Supp. 2d 236, 250 (S.D.N.Y.

United States District Court
For the Northern District of California

2007) ("it is irrelevant that the options were received before the class period.  The accounting for the backdated options affected every financial statement until those options vested.").  While standing alone, the receipt of backdated options by individual Defendants does not necessarily support a strong inference of those Defendants' scienter, it does provide some support for that conclusion.

> 4.    Timing of the Backdated Options

Lead Plaintiffs argue that the timing of the backdating was "so fortuitous that intentional retroactive selection of such grants is the only reasonable inference that can be drawn." Opposition at 17.  Lead Plaintiffs claim that, based on all publicly available documents regarding Sonic's option grants, the Company made fourteen discretionary grants between 1996 and 2004.[3] Eight grants were purportedly made on dates when its stock was trading at its lowest point in the relevant month.  Lead Plaintiffs assert that, "according to a statistical analysis performed by Professor Eric Lie, the odds of this happening by chance are <u>1 in 11 million</u>."  Opposition at 17 (emphasis in original); <u>see also</u> CAC ¶ 9.  Defendants counter that this statistical claim is spurious because nothing in the complaint describes how the calculation was made nor how Lead Plaintiffs determined which "grants among the thousands made by Sonic during the class period were 'discretionary'."  Reply at 7.  In the absence of further

_____

[3]Lead Plaintiffs note that, in total, "Sonic made 24 grants between 1996 and 2004, but at least ten of those grants were non-discretionary grants awarded under Sonic's non-employee director plan, under which grant dates could not be manipulated." Opposition at 17 n.10.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

information as to why these fourteen grants are distinguishable from thousands of other grants made by Sonic, these fourteen grants must be viewed as a small unrepresentative sample of all stock option grants. Further, the claim that many of these grants were made at the lowest point of the month may be misleading because, in some instances, the stock traded at the same price or lower several times in a month. If Defendants were actively selecting grant dates with the intent to maximize their earnings, they would have selected more favorable dates. Absent a clearer showing, the grant dates themselves provide little evidence from which to make an inference scienter.

    5.   Filing of False Documents with the SEC

Lead Plaintiffs argue that each time Defendants signed false SEC filings, Sarbanes-Oxley (SOX) certificates and financial statements they knew or at least were "deliberately reckless in not knowing that stock options were not being issued at fair market value on the date of the grant." See Zoran, 511 F. Supp. 2d at 1013. However, standing alone, these filings do not give rise to a strong inference of scienter. Zucco Patners LLC v. Digimarc Corp., 2009 WL 311070, at *18 ("Sarbanes-Oxley certifications are not enough to create a strong inference of scienter and do not make [plaintiff's] otherwise insufficient allegations more compelling by their presence in the same complaint."); Brodsky v. Yahoo! Inc., 2008 WL 4531815, at *10 (N.D. Cal. Oct. 7) ("Without any supporting allegations that Defendants made false accounting entries or inflated revenues, Defendants' signatures on the SEC certificates do not create a strong inference of scienter."). However, in conjunction with the fact that many Defendants personally received

15

backdated stock options, their signed false SEC and SOX documents provide some evidence of scienter.

### 6.    Board of Directors' Actions

With respect to stock option grants to Sonic's non-founding executive officers, the restatement noted that "the CEO generally did not have express authority to grant options to [them], as this power was reserved for the board.  Nevertheless, these grants were made in a consistent fashion and it is apparent that our board was aware of these option grants and did not disapprove of them."  CAC ¶ 53.  Lead Plaintiffs point to this section of the restatement as evidence that the entire Board of Directors participated in a scheme to backdate stock options.  However, the restatement refers to actions the CEO took with respect to granting stock options to non-founding executive officers, without first getting the approval of the Board.  The restatement does not acknowledge that the Board knowingly participated in illegally backdating stock options.

### 7.    The Importance of the Stock Options Program

Lead Plaintiffs contend that, because the stock options program was "of fundamental importance to the Company's success," there is a strong inference that Defendants knew or were deliberately reckless in not knowing that they acted illegally by not correctly disclosing backdated options to the SEC.  In essence, Lead Plaintiffs argue that stock options were critical to Sonic's "core operations."  South Ferry LP v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008) ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the

United States District Court
For the Northern District of California

PSLRA standard. . . However, in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA"). Here, the stock options program was not part of Sonic's core operation, which was the business of manufacturing and selling digital media products. While Defendants no doubt knew that they granted stock options as part of Sonic's benefits packages, not enough facts have been alleged to support a strong inference that, simply because of the importance of the stock option plans and Defendants' position in the company, they knew accounting policies were being violated.

8. Defendants' Insider Trading

Lead Plaintiffs argue that Defendants' sales of $23 million worth of Sonic stock during the Class Period contribute to a strong inference of scienter. However, Lead Plaintiffs have not plead specific facts to show that these sales were unusual or suspicious, including: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." Zucco, 2009 WL 311070, at *19. Lead Plaintiffs claim that these three factors are not relevant in the backdating context because of the long duration of the fraud. Quest, 527 F. Supp. 2d at 1185. Even if these factors are not relevant, Lead Plaintiffs have not plead with particularity any other facts that would show how Defendants' insider trading supports a strong inference of scienter.

9. The Timing of Defendant Leighton's Termination as CFO

On February 25, 2008, shortly after Sonic completed its internal investigation, Defendant Leighton changed positions from CFO to COO. Lead Plaintiffs argue that this move supports a strong

17

United States District Court
For the Northern District of California

inference of scienter because Defendant Leighton was partly responsible for and a direct recipient of backdated stock options. However, Lead Plaintiffs do not plead any facts to show that the Board moved Defendant Leighton from one top management position to another top management position because he engaged in fraud.  See In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("after a restatement of earnings and a subsequent loan default, it is unremarkable that the Company would seek to change its management team"); Zucco, 2009 WL 311070, at *16 ("Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself.").

In sum, Lead Plaintiffs' allegations do not create a strong inference that Defendants acted with scienter.  Several factors do lend support for the requisite mental state, such as Defendants' admissions, the magnitude of Defendants' accounting violations, Defendants' receipt of backdated options and Defendants' filing of false documents with the SEC.  However, even when viewed cumulatively, these factors do not establish a strong inference that Defendants acted with deliberate recklessness.  Therefore, Lead Plaintiffs have not adequately alleged that Defendants violated § 10(b) of the Exchange Act and Rule 10b-5.

II.  Section 14(a) of the Exchange Act

Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

18

United States District Court
For the Northern District of California

material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

The statute of limitations for claims under § 14(a) is the earlier of one year after the discovery of the violation, or three years after the alleged violation. See In re Asyst Tech, Inc. Deriv. Litig., 2008 WL 2169021, at *5 (N.D. Cal.); Rudolph v. UTStarcom, 2008 WL 1734763 (N.D. Cal.). Plaintiff Westland filed this complaint on October 4, 2007, making its § 14(a) claim time-barred as to proxy statements issued on July 29, 2003 and July 27, 2004. However, the claim based on Defendants' proxy statement filed on October 24, 2005 is not time-barred.

To plead a § 14(a) violation, a plaintiff must allege that (1) a proxy statement contained a material misrepresentation or omission, (2) the misstatement or omission was made with the requisite level of culpability and (3) the misstatement or omission was an essential link in the accomplishment of the proposed transaction. Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000). The requisite level of culpability is negligence. In re McKesson, 126 F. Supp. 2d at 1265-66.

Here, Lead Plaintiffs have adequately alleged that the 2005 proxy statement omitted the material facts that Defendants had failed properly to account for backdated options. Although Lead Plaintiffs' allegations do not support a strong inference of deliberate recklessness, they do support a strong inference that Defendants were negligent in failing to discover, stop or disclose the alleged backdating scheme. Defendants, as senior executives, Board members and Audit Committee members, had duties associated

**United States District Court**
For the Northern District of California

with administering and accounting the stock option plans, granting the stock options and approving Sonic's financial reports and proxy statements.  <u>See</u> ¶¶ 24, 53, 61, 63, 65-67, 101, 121, 125, 128, 136. Defendants were also responsible for ensuring that Sonic's public statements describing and accounting for these options were truthful and accurate.  Therefore, Lead Plaintiffs' allegations are sufficient to raise an inference that Defendants knew or should have known that Sonic's proxy statement was false.

Lead Plaintiffs have also adequately alleged that the omission in the proxy statement was an essential link in the accomplishment of the proposed transaction.  Lead Plaintiffs' complaint alleges that "revelations of the truth [of backdated stock options] would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies."  CAC ¶ 214. <u>See also</u>, <u>Belova v. Sharp</u>, 2008 WL 700961 (D. Or. March 13); <u>Zoran</u>, 511 F. Supp. 2d at 1016; <u>In re Maxim Integrated Prods., Inc. Derivative Litig.</u>, 574 F. Supp. 2d 1046, 1066-67 (N.D. Cal. 2008). Standing for election as directors based on these proxy statements constitutes a proposed transaction.

III. Section 20(a) of the Exchange Act

Lead Plaintiffs allege control person liability against Defendants based on § 20(a) of the Exchange Act, which states, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling

United States District Court
For the Northern District of California

person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To prove a prima facie case under § 20(a), a plaintiff must prove: 1) "a primary violation of federal securities law"; and 2) "that the defendant exercised actual power or control over the primary violator." Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000). "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." Id. "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." Id.

The complaint does not allege any specific facts supporting a conclusion that Defendants are controlling persons of Sonic. The entirety of the relevant allegations is contained in the following paragraphs:

> Defendants acted as controlling persons of Sonic within the meaning of § 20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Sonic stock, defendants had the power and authority to cause Sonic to engage in the wrongful conduct complained of herein. Sonic controlled defendants and all of its employees. By reason of such conduct, defendants named herein are liable pursuant to § 20(a) of the Exchange Act.

CAC ¶¶ 217. These paragraphs consist of bare legal conclusions and are devoid of any factual underpinnings. Accordingly, the complaint does not state a claim against Defendants.

IV.   Section 20A of the Exchange Act

    Lead Plaintiffs also allege that Defendants Doris, Sauer, Ely, Greber, Langley, Leighton and Marguglio violated § 20A of the Exchange Act, which states, "Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."  15 U.S.C. § 78t-1.

    Defendants argue that Lead Plaintiffs did not trade "contemporaneously" with Defendants.  The term "contemporaneous" is inherently vague.  Moreover, Congress did not intend precisely to define "'contemporaneous as used in § 20A', but instead apparently intended to adopt the definition 'which has developed through the case law.'"  Neubronner v. Milken, 6 F.3d 666, 669 n.5 (9th Cir. 1993) (citing H.R. Rep. No. 910, 100 Cong., 2d Sess. 27 (1988)).  The Ninth Circuit has not provided clear guidance on this issue.  In Neubronner, the Ninth Circuit specifically refrained from determining the "exact contours of 'contemporaneous trading'. . ."  Neubronner, 6 F.3d at 670.  The court did, however, explain that "the contemporaneous trading rule ensures that only private parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims."  Id.

    Defendants assert that, to be contemporaneous, Lead Plaintiffs' trading must have occurred on the same day as Defendants'.  See, e.g., Buban v. O'Brien, 1994 WL 324093, at *2

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(N.D. Cal. June 22); In re AST Research Sec. Litig., 887 F. Supp. 231, 233 (C.D. Cal. 1995).  Interpreting "contemporaneous" so strictly increases the likelihood that a plaintiff purchased the actual shares sold by the insider.  As the time between the insider's sale and the plaintiff's purchase increases, the likelihood that the shares purchased by the plaintiff are the same shares the insider sold decreases substantially.

Here, Lead Plaintiffs have alleged that they purchased Sonic shares on the same day that Defendants Doris and Leighton sold shares, one day after Defendant Langley sold shares, and nine days after Defendant Greber sold shares.  Although the purchase of stock nine days after a sale pushes the contours of contemporaneousness, the Court concludes that all of these purchases are contemporaneous with the sales.  See Middlesex, 527 F. Supp. 2d at 1194-96 (holding that the plaintiff's allegation that it traded "on the same day as Smith, within eight days of Garn, and within three days of Brooks" was sufficient to deny the defendants' motion to dismiss the § 20A claims.).  The Court notes that Lead Plaintiffs failed to allege that Defendants Sauer, Ely and Marguglio sold stock contemporaneously with Lead Plaintiffs' purchases.  Therefore, the § 20A claims against those Defendants are dismissed.

CONCLUSION

For the foregoing reasons, the Court GRANTS in part Defendants' motion to dismiss Lead Plaintiffs' CAC (Docket No. 67). The Court grants Lead Plaintiffs leave to amend their CAC in accordance with this order.  Lead Plaintiffs shall serve and file their second consolidated amended complaint by May 8, 2009. Defendants shall respond by June 18, 2009.  Any motion to dismiss

shall be noticed for August 20, 2009 at 2 p.m.   The opposition to

Defendants' motion to dismiss shall be filed on July 16, 2009, and

any reply brief is due July 30, 2009.   A further case management

conference will be held on August 20, 2009 at 2 p.m., even if no

motion to dismiss is filed.

        IT IS SO ORDERED.

Dated: 4/6/09

_____
CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California

24